UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

MICROSOFT CORPORATION,          )
                                )
                Plaintiff,      )  C10-01823-JLR
                                )
v.                              )  September 3, 2013
                                )
MOTOROLA, INC., et al,          )
                                )
                Defendant.      )
                                )

_____

**BEFORE THE HONORABLE JAMES L. ROBART**
**UNITED STATES DISTRICT JUDGE**

_____

APPEARANCES:


 For the Plaintiff:      Arthur Harrigan, Christopher
                         Wion, David Pritikin, Richard
                         Cederoth, Andy Culbert, Nathaniel
                         Love and Ellen Robbins



 For the Defendants:     Ralph Palumbo, William Price,
                         Brian Cannon, Kathleen Sullivan
                         and Andrea Roberts



EXAMINATION INDEX

EXAMINATION OF                                                    PAGE
 DAVID KILLOUGH          DIRECT EXAMINATION (Cont.)          10
                         BY MS. ROBBINS:
                         CROSS EXAMINATION                   37
                         BY MS. ROBBINS:
                         REDIRECT EXAMINATION                45
                         BY MS. ROBBINS:
 SHELLEY McKINLEY
                         EXAMINATION                         46
                         BY MR. PRICE:
 TERESA DALY
                         EXAMINATION                         52
                         BY MR. PRICE:
                         EXAMINATION                         60
                         BY MS. KELLY
                         EXAMINATION                         61
                         BY MR. PRICE
 DAVID OWEN ROBERTS
                         EXAMINATION                         63
                                                            63
 LEO TAYLOR
                         EXAMINATION                         74
 RICHARD HOLLEMAN
                         DIRECT EXAMINATION                  82
                         By Ms. Sullivan:
                         CROSS-EXAMINATION                   94
                         By Mr. Cederoth:
 GREGORY LEONARD
                         DIRECT EXAMINATION                  99
                         By Mr. Cannon:
                         CROSS EXAMINATION                  140
                         BY MR. PRITIKIN:




                         EXHIBIT INDEX
EXHIBITS ADMITTED                                            PAGE
  6552- 6556, 6558 - 6589, 6339 - 6359,                      24
  6187 - 6196, 6179, 6180, 6182, 6186, 6202, 6210,
  and 6212
  6609                                                       28
  6608                                                       29
  6608-A, B, C & D                                           32
  PDX23                                                      34
  PDX24                                                      35
  7135, 6033, 7146, 7150 and 6022                            73

| 7020-5 | 85 |
| 217 | 88 |
| 2838 | 89 |
| 1130 | 97 |
| 7069-A | 102 |

                    September 3, 2013

1

2          THE COURT:  Mr. Cannon, I understand you wish to

3   address the court.

4          MR. CANNON:  Yes.  Thank you, Your Honor.  With

5   respect to the witness that's on the stand right now,

6   Mr. Killough, Microsoft's in-house counsel, we have a couple

7   of evidentiary disputes in terms of exhibits that he might

8   use, that I thought I would request if he we could hear ahead

9   of time.

10         THE COURT:  All right.

11         MR. CANNON:  If I could approach.

12         THE COURT:  Are they your exhibits?  Because I have

13  two notebooks of exhibits up here.

14         MR. CANNON:  These are loose exhibits.  I don't

15  believe they're in the notebooks.  They are one of the FTC

16  documents that Your Honor has excluded, Exhibit 6009; one of

17  Microsoft's pleadings on summary judgment, Exhibit 6087.

18         THE COURT:  All right.

19         MR. CANNON:  Your Honor, we understand Microsoft is

20  going to use Exhibit 6009 in some fashion with the witness

21  this morning.  This is a January 3rd, 2013 statement of the

22  Federal Trade Commission that Your Honor explicitly excluded

23  as an exhibit, in the oral order that you gave on the FTC

24  issue.  So we think as a preliminary matter this exhibit is

25  out of the case.  Discussing it is prejudicial.  And it's

1  also cumulative, because Microsoft had its witness on the

2  FTC, Mr. Heiner, testify last week.  So we don't think

3  Mr. Killough should get into any FTC matters.  In fact, he

4  was not disclosed at all in the pretrial order as a witness

5  with knowledge on that particular topic.

6          THE COURT:  Well, let's take these one at a time.

7  Who's handling this witness?  What are you going to use 6009

8  for?

9          MS. ROBBINS:  Your Honor, the only reason we want to

10  use 6009 -- as we advised Motorola -- is just the date of

11  when the FTC announced the consent decree, just the date.  We

12  will not be reading from the document.  In fact, we advised

13  Motorola we are not seeking admission of this exhibit.

14          THE COURT:  Mr. Cannon, is that true?

15          MR. CANNON:  The consent decree was July of 2013,

16  last month.  6009 is the January 3rd statement of the FTC in

17  which the FTC --

18          THE COURT:  I understand what it is.  So, counsel,

19  how are you going to use the January document to prove

20  something that happened in July?

21          MS. ROBBINS:  We're not.  We're using it for the date

22  that they announced that this was happening and to get the

23  date in the record.  We think it's relevant to the sequence

24  of events.  We are going to use it to refresh Mr. Killough's

25  recollection of the date.

1          THE COURT:  All right.  Well, I will allow it to be

2     used for refreshing a date.  I don't think the underlying

3     question is going to make it, but we'll take that up when the

4     time comes.

5          MR. CANNON:  Thank you, Your Honor.  Because, if this

6     witness does start to discuss the FTC investigation we would

7     have an objection to that, depending on the question.

8        The second document is Microsoft's reply brief in support

9     of summary judgment, September 30, 2011.  And as a threshold

10     matter we would certainly object to this entire brief coming

11     in as an exhibit.  We understand Microsoft may ask the

12     witness to read from a portion of this document.  And

13     depending upon the very specific portion that is read, that

14     might be acceptable to us.  But we certainly want the

15     remainder of the document, and the caption, redacted.  And

16     we've not gotten a commitment from Microsoft yet on that

17     point.

18          MS. ROBBINS:  Again, Your Honor, this was addressed

19     last night.  Mr. Cannon was not on the call.  We do not

20     intend to seek admission of this exhibit.  This is an exhibit

21     discussing when Microsoft made a representation to the court

22     that it was ready, willing, and able to accept a RAND

23     license.  That was the subject matter that Mr. Price explored

24     with Mr. Gutierrez using a court's order from May 2012.  We

25     are not seeking admission of the document, just to use the

1   date that this representation was made to the court.

2           THE COURT:  All right.

3           MR. CANNON:  We'd just like to know the exact words

4   the witness is going to use.  But if that representation is

5   correct, then we will accept it's just the date and the

6   statement.

7           THE COURT:  Counsel, you've all been here for, what,

8   six days now?  Does the concept occur to you to try talking

9   to each other?  You just burn up your trial time when you

10  stand up and say:  They're going to do something nefarious.

11  And the other side says:  We're going to read the line that

12  Mr. Price read, "Microsoft is seeking and remains ready and

13  willing to take a license to these patents."  It's just not

14  good use of your time.  But we'll take it up when the time

15  comes.  Anything else, Mr. Cannon?

16          MR. CANNON:  That's it, Your Honor.

17          THE COURT:  All right.

18          MR. PRICE:  I just have a question of timing.  If

19  Mr. Killough is their last witness, then we need to make the

20  appropriate motions for the record.  So we just want to know

21  how the court wants to handle that.  Do you want to excuse

22  the jury or do it a side bar?

23          THE COURT:  I think I covered this with Ms. Kennedy

24  on Friday -- Ms. Kennedy -- Sullivan.  I have a very close

25  friend whose name is Kathleen Kennedy, and I'm having

1    terrible trouble.  What I said was I will note that it's time

2    for you to make that motion, that you made it for purposes of

3    the record, and we'll hear your oral description when the

4    jury is not present.

5              MS. SULLIVAN:  Thank you, Your Honor.

6              THE COURT:  I thought I clarified that already,

7    counsel.  Some confusion?

8              MS. SULLIVAN:  Not at all, Your Honor.  We just

9    wanted to make sure that we didn't try to raise it when you

10   hadn't already excused the jury.

11             THE COURT:  All you need to say is:  Your Honor, we

12   have motions to make.  And I'll note on the record that you

13   will be making them but for my request they be postponed.

14   All right.  Anything further?

15        Let the court make one announcement, then.  We finished

16   our revisions to the jury instructions.  We've provided you

17   with copies.  Ms. Sullivan either has moved down closer to

18   the court or is trying to find more room.  We'll take

19   exceptions to them at 4:30 today.  So be ready at that time.

20   Please remember these are your formal exceptions.  This is

21   not another opportunity to explore your most recent ideas on

22   what the instructions ought to be.

23        With that, any other matters before we bring the jury in?

24             MR. HARRIGAN:  No, Your Honor.

25             THE COURT:  All right.  Counsel, there's an

1  interesting question on who the parties are for the

2  injunction request in Germany.  Motorola has submitted

3  language identifying the two parties, which is Motorola

4  Mobility and General Instruments.

5         MS. SULLIVAN:  That's correct.

6         THE COURT:  There has never been any proof at trial

7  as to who that is.  So I've struggled through that question

8  and have resolved it in the manner it's resolved in the jury

9  instructions.  So you need to be mindful of how we dealt with

10 that.  We basically adopted Motorola's language.

11    (The following occurred in the presence of the jury.)

12        THE COURT:  Mr. Killough, you're on the stand.

13                    DAVID KILLOUGH

14  Previously being sworn, resumed and testified as follows:

15                DIRECT EXAMINATION (Cont.)

16 BY MS. ROBBINS:

17 Q  Mr. Killough, when we left off I had asked you to please

18 turn in your black binder to Exhibit 6087.

19 A  I have it.

20 Q  Do you recognize that document?

21 A  Yes.  This is a --

22        THE COURT:  I'm sorry.  The question was, do you

23 recognize it.

24 A  Yes, I do.

25 Q  And what is it?

1    A    It's a brief that Microsoft Corporation filed in this

2    lawsuit on September 30, 2011.

3    Q    Mr. Killough, did Microsoft tell the court anything in

4    this pleading regarding a RAND license?

5              MS. ROBERTS:  Objection, leading.

6              THE COURT:  I'll permit the question.

7    A    Yes, it did.

8    Q    What did it tell the court?

9    A    A RAND license was among the subject matters in this

10   particular brief.  And I think very relevant to the

11   proceedings here, at the top of page nine of the brief, it

12   states, and I quote, "Microsoft is seeking and remains ready

13   and willing to take a license to Motorola's H.264 and 802.11

14   declared essential patents on RAND terms."

15   Q    If we could please put up the timeline, again, PDX2.

16              Mr. Killough, did Motorola continue to pursue its

17   injunction actions after that statement was made in September

18   of 2011?

19   A    By September 2011 there were three parallel litigation

20   tracks, we can see on the timeline, where Motorola was

21   pursuing injunctions on standards-essential patents.  The

22   first track was a district court track, it started in

23   November 2010.  The second track was the International Trade

24   Commission track that Motorola started also in November 2010.

25   Then the third parallel track was in Germany, which was

1    started in September of 2011.

2           THE COURT:  Ladies and gentlemen, remember this is a

3    demonstrative exhibit.  I don't believe it's been admitted.

4    A    And all of those were still being pursued by Motorola at

5    the time that Microsoft made this statement in the brief in

6    September 2011.  And all three of those tracks by Motorola,

7    to an injunction on standards-essential patents, continued

8    well after September 2011.

9    Q    For clarification, what was the date of the German

10   lawsuits?

11   A    The German lawsuits actually started -- there were four of

12   them on two patents against a variety of Microsoft entities.

13   And those were started on July 6th and 7th of 2011 in

14   Mannheim, Germany.

15   Q    Who were the parties to the German litigation?

16   A    The parties in the German litigations were General

17   Instrument, which is a wholly-owned Motorola Mobility

18   subsidiary, and it sued Microsoft Corporation, the U.S.

19   corporation, Microsoft's German subsidiary, and Microsoft's

20   Irish subsidiary.  And there were two patents, H.264 patents

21   at issue.

22   Q    Mr. Killough, are you familiar with the proceedings in

23   Germany?

24   A    Yes.  As part of my job supervising all these litigations,

25   I kept careful track of what was going on in the litigations,

1   attended a number of the hearings, and managed it on a

2   day-to-day basis for Microsoft.

3   Q   When did you expect that an injunction would be issued in

4   Germany?

5   A   There was a first hearing held by the court in Germany, in

6   Mannheim, in February of 2011.  And the court set an

7   April 17, 2011 date for its decision date, which is the

8   procedure I understand in Germany, they have a hearing and

9   sometimes they have additional hearings.  But eventually they

10  will set a date for decision.

11       So this April 17, 2011 decision -- excuse me, yes,

12  April '11 -- actually 2012 -- decision date was set by the

13  court and that's when it would decide whether or not

14  Microsoft was infringing and whether or not the court would

15  issue an injunction.

16  Q   Now, looking at the timeline there's an entry just before

17  that April 17, 2012 date for and April 12, 2012 temporary

18  restraining order.  Do you see that entry?

19  A   Yes, I do.

20  Q   Can you explain what that refers to?

21  A   Well, following the February 2012 hearing in Germany,

22  Microsoft came to this court and asked this court to issue a

23  temporary retraining order which would prohibit Motorola from

24  enforcing an injunction in Germany, should the court in

25  Germany issue an injunction.  And as indicated on the

1    timeline, this court entered that temporary restraining order

2    on April 12th of 2012.

3    Q    And just to be clear, for the record, the February 7th

4    date that you referenced and the April 17th date that you

5    referenced, what years were those?

6    A    Those were both 2012.

7    Q    What was the outcome of that motion that you just

8    referenced?

9    A    Well, the court actually granted the motion.  And that's

10   what we see on the timeline, "Temporary restraining order

11   barring enforcement of German injunction April 12, 2012."

12   Q    Now, after April 12, 2012, did Motorola continue to pursue

13   injunctions on its standards-essential patents in the United

14   States?

15   A    Yes, it did.

16   Q    Mr. Killough, do you recall Mr. Heiner's testimony

17   regarding the FTC's June 6, 2012 public-interest statement

18   that was filed with the International Trade Commission?

19   A    I certainly recall the event and that he testified about

20   it.  I don't know that I recall everything Mr. Heiner said.

21   Q    Did Motorola continue to seek an exclusion order on its

22   H.264 and 802.11 standards-essential patents in the ITC after

23   June 6, 2012?

24   A    Yes, it did.

25   Q    Did Motorola appeal this court's April 12th order

1   prohibiting Motorola from enforcing any German injunction?

2   A   Yes, they did.  As you can see on the timeline, after the

3   court here issued the temporary restraining order against a

4   German injunction being enforced, Motorola appealed to the

5   Ninth Circuit.  And so there was still uncertainty about

6   whether or not that injunction might actually go into effect

7   in Germany.  And we opposed -- Microsoft opposed that relief

8   on the appeal.  And eventually the Ninth Circuit, in

9   September of 2012, affirmed the restraining order put in

10  place by this court.

11  Q   Now, did Motorola continue to seek injunctions in the

12  United States after the Ninth Circuit affirmed this court's

13  order in September 2012?

14  A   Yes, it did.  There were now two of the three parallel

15  tracks remaining.  There was still the district court track

16  that had started in Wisconsin; and Motorola was still on that

17  track to an injunction.  Then there was the ITC track back in

18  Washington D.C.; and Motorola was still pursuing that track.

19  Q   Mr. Killough, moving further down the timeline there's an

20  entry for November 30, 2012.  Are you familiar with that

21  date?

22  A   Yes.  I am familiar with what occurred then.

23  Q   What happened on November 30th?

24  A   On November 30th the district court here cut off the

25  district court track from Wisconsin.  The court here issued a

1    summary judgment order saying that Motorola would not be able

2    to obtain an injunction by pursuing the Wisconsin District

3    Court track.  So that was the stop of that path to an

4    injunction.

5    Q    So after that order on November 30, 2012, did Motorola

6    stop pursuing its attempts to obtain injunctive relief on its

7    standards-essential patents?

8    A    No, there was still one track remaining.  The Wisconsin

9    District Court track had ended, the German track had been

10   ended by court order -- in fact, both by court order -- but

11   the third track, the ITC track in Washington D.C. was still

12   ongoing, until Motorola dropped its claims -- withdrew the

13   claims without stating a reason later after that time.

14   Q    Now, Mr. Killough, you've heard some testimony regarding

15   the FTC's investigation of Motorola?

16   A    Yes.

17   Q    That investigation resolved with a consent decree?

18   A    Yes.

19   Q    Based on your responsibilities for the litigation between

20   Motorola and Microsoft, are you familiar with those events?

21   A    I've read the consent decree several times and am familiar

22   with the general train of events, yes.

23   Q    Do you recall when the FTC announced its settlement with

24   Motorola, and its new parent, Google?

25   A    I believe that was toward the end of 2012, there were --

1    that is when the fact that they had reached a settlement

2    became apparent, and press reports, and such, I think.

3           MS. ROBBINS:  Your Honor, may I approach?

4           THE COURT:  For what reason?

5           MS. ROBBINS:  To hand him an exhibit to refresh his

6    recollection of the specific date.

7           THE COURT:  All right.  Yes.  It seems to me he's

8    identified the date, counsel.  You want him to be more

9    specific?

10          MS. ROBBINS:  That's fine.

11   Q   Can you be any more specific with respect to the date of

12   that?

13   A   Well, I think it's -- again, toward the end of 2012.  You

14   know, as you can see on the timeline, Motorola dropped its

15   802.11 claims October 24, 2012.  And, again, it did that in a

16   filing to the International Trade Commission just saying:

17   We're withdrawing the patents.  It didn't really say why it

18   was withdrawing the claims.

19          And then on January 8th of 2013 Motorola dropped the H.264

20   claims in the ITC.  And, again, the paper they put into the

21   ITC just said:  We're withdrawing the claims.  It didn't say

22   why.  Both of those dates are coincident with the ITC

23   investigation.  And shortly after the January date is when

24   the --

25          MS. ROBERTS:  Objection.

1          THE COURT:  Stop.  I'm going to sustain the

2    objection.  At this point we're beyond the question.

3    Q    How do the dates for Motorola dropping its claims in the

4    ITC coincide with the FTC announcement?

5          MS. ROBERTS:  Objection, leading.

6          THE COURT:  Overruled.

7    A    My recollection is that the consent -- the actual consent

8    decree was shortly after the January 8, 2013 date.  I believe

9    it was still in January that the consent order with the FTC

10   was publicly announced.

11   Q    Now, Mr. Killough, we've heard testimony that in this case

12   Microsoft is seeking not only a determination by the court of

13   RAND royalties, which the court has already done, but also is

14   seeking money damages from Motorola.  What money damages is

15   Microsoft seeking?

16   A    Well, one element of the damages has already been talked

17   about in court, the cost of relocating Microsoft's German

18   facility to the Netherlands.

19        The other element of damages that Microsoft seeks is the

20   attorneys' fees and litigation expenses that Microsoft has

21   laid out to defend against Motorola's claims seeking an

22   injunction on its standards-essential patents.

23   Q    And for which lawsuits on the timeline is Microsoft

24   seeking attorneys' fees and costs as damages?

25   A    That essentially goes back to the three litigation tracks.

1    Microsoft is seeking to recover its fees and expenses in

2    defending against the Wisconsin track on standards-essential

3    patents, the German track, and the ITC track.  Part of the

4    expenses related to the German track are the expenses that

5    Microsoft paid in this case to obtain the temporary

6    restraining order and to defend that temporary restraining

7    order against the German injunction on appeal to the Ninth

8    Circuit.

9    Q    Are you familiar with the work done by Microsoft's outside

10   counsel in those cases?

11   A    Yes.  Again, I supervise the cases day-to-day.  I work

12   day-to-day with the lawyers working on those cases.  And I'm

13   the person at Microsoft who receives the billing invoices

14   from the law firms.  And I review them, and I approve the

15   invoices for payment.

16   Q    Can you identify those outside counsel?

17   A    Yes.  Your law firm, Sidley and Austin; Mr. Harrigan's

18   firm.  And then three firms helped me with the German

19   litigation, a German litigation firm Freshfields; a German

20   patent specialist field, Boehmert; and then the Klarquist

21   firm in Portland, Oregon.  And one attorney there, in

22   particular, assisted me with the German litigations.  He's

23   very proficient in H.264.  And I appreciated the extra help.

24   Q    Now, were you involved in selecting the various outside

25   counsel to represent Microsoft in these cases?

1    A    Yes, I was.

2    Q    Since Microsoft is based in Redmond, why didn't it retain

3    only Seattle counsel?

4    A    Well, we did retain Mr. Harrigan's firm.  And

5    Mr. Harrigan's firm has a very fine reputation, knows Seattle

6    well, but it's a small firm, it doesn't really have the

7    number of attorneys to cover this national litigation in D.C.

8    and Wisconsin.  Mr. Harrigan's firm doesn't specialize in

9    patent cases, doesn't specialize in ITC cases in particular.

10   So we paired Mr. Harrigan up with the Sidley Austin firm, who

11   does have an office in Washington D.C., does work frequently

12   at the ITC, does a lot of patent litigation for Microsoft and

13   other clients.  And Sidley Austin also has attorneys who are

14   electrical engineers, and software engineers, and that is

15   very, very helpful in patent cases like this.  And, of

16   course, Seattle counsel wouldn't be helpful at all -- excuse

17   me -- but not that much for German litigation.

18   Q    Now, based on your involvement in these cases,

19   Mr. Killough, do you know what law firms Motorola hired to

20   represent it in these cases?

21   A    Primarily --

22         MS. ROBERTS:  Objection, relevance.

23         THE COURT:  Overruled.

24   A    Similar to Microsoft, Motorola hired primarily, to my

25   observation, the Summit Law Group, which like Mr. Harrigan's

1    firm is a somewhat smaller firm based here in Seattle; and

2    then pairing Summit up with two national law firms, Ropes and

3    Gray, and then Quinn Emanuel, to handle the Wisconsin cases,

4    the ITC cases, and this case as well.

5    Q    Are you familiar with the attorneys' fees and costs

6    charged to Microsoft by its outside counsel in these cases?

7    A    Yes, I am.  From the billing invoices and reviewing the

8    billing invoices for the purpose of ascertaining what

9    Microsoft's damages claim could be.

10   Q    How much in total were the attorneys' fees and costs

11   relating to Motorola's attempts to get injunctions on its

12   standards-essential patents?

13   A    The actual number, I believe firmly is more, but the

14   amount Microsoft is seeking to recover in attorneys' fees and

15   expenses is something just under $6 million.

16   Q    What have you done to identify the attorneys' fees and

17   costs that Microsoft is seeking to recover as damages from

18   Motorola?

19   A    Well, I went through the billing invoices.  And the way

20   they're set up is each attorney, if he's doing a particular

21   activity on a day, will write down what he's doing, or she is

22   doing, say how much time it takes, then that translates into

23   dollars, because they all bill by the hour.

24        So I had -- in the invoices I could go through and look at

25   each of the entries and identify whether or not I believed

1  that was work done in defending against Motorola's

2  standards-essential patent injunction claims, or something

3  else.  If it was something else, then I redacted it from the

4  bill and it didn't count toward the attorneys' fees claim.

5  Q    Now, Mr. Killough, to save some time, before you took the

6  stand did you have an opportunity to review, in your binders,

7  some of the law firm invoices?

8  A    Yes, I did.

9  Q    If I could ask you to look at binder No. 2.

10  A    Okay.

11  Q    Take a look at Exhibits 6552 through 6556 and 6558 through

12  6589, and identify what those documents are.

13  A    Right.  As you mentioned I did look through these in

14  advance, these exhibits, to save time.  And those exhibit

15  numbers correspond to a set of invoices from your firm, the

16  Sidley Austin firm.  These are hardcopy printouts.  The

17  information contained in these invoices I review in

18  electronic form; it gets transmitted electronically to

19  Microsoft.  But these are hardcopy printouts.  And as I

20  mentioned, these copies of these invoices have been redacted

21  to remove time entries that relate to activities Microsoft is

22  not seeking to recover as damages.

23  Q    If I could ask you to turn back to the black binder,

24  binder No. 1.

25  A    Okay.

1  Q   And can you identify for us Exhibits 6339 through 6359.

2  A   6339 was the first one?

3  Q   Correct, yes.

4  A   Again, I've looked at this set of exhibits in advance to

5  save everyone time, and similar to the previous set of

6  exhibits, the ones you just read off, relate to or are

7  invoices from Mr. Harrigan's law firm.  And they also have

8  been redacted to remove billing entries that Microsoft is not

9  seeking to recover for.

10  Q   Again, in that same binder please look at Exhibits 6187

11  through 6196.  Can you identify those documents?

12  A   Right.  Again, I've looked through this set.  And these

13  are hardcopy printouts of the Freshfields firm, which is a

14  litigation firm in Germany.  And, again, these have been

15  redacted -- I think the principal purpose of redaction here

16  was to remove reference to privileged information in such a

17  way that it didn't get in my way of determining whether or

18  not it was appropriately part of the damages claim.

19  Q   Please look at Exhibits 6179, 6180, 6182 and 6186, and

20  identify those, please.

21  A   Right.  I've looked at this set in advance as well.  And

22  these are redacted versions of the Boehmert firm invoices,

23  B-O-E-H-M-E-R-T.  And that's the German patent firm I

24  mentioned.  And, again, these have these redactions for the

25  same reasons as the others.

1   Q   Last thing, Mr. Killough, if you could please turn to

2   Exhibit 6301 through 6310 and 6312, and identify those for

3   us.

4   A   This is another set I've looked at in advance.   And this

5   set reflects the Klarquist billings for the German

6   H.264 cases.   And for the most part it just reflects Kyle

7   Rinehart's billings.   Although there were a few others who

8   spent some time on the case.

9   Q   In connection with your role of supervising Microsoft's

10   outside counsel, do you know whether these invoices were

11   paid?

12   A   If an invoice is delayed in payment I hear about it pretty

13   quickly.   But for these particular ones, I went through my

14   records and I can pull up spreadsheets that indicate status

15   of payment.   And I checked all the invoice numbers against my

16   records.   And all of them were indicated as having been paid.

17         MS. ROBBINS:   Your Honor, Microsoft moves admittance

18   of the law firm invoices, Exhibits 6552 through 6556.   6558

19   through 6589, 6339 through 6359, Exhibits 6187 through 6196,

20   6179, 6180, 6182, 6186, 6202 through 6210, and 6212.

21         THE COURT:   Any objection?

22         MS. ROBERTS:   No objection.

23         THE COURT:   Then they're admitted and may be

24   published.

25         (Exhibit Nos. 6552- 6556, 6558 - 6589, 6339 - 6359,

```
 1      6187 - 6196, 6179, 6180, 6182, 6186, 6202, 6210, and 6212
 2                  were admitted into evidence.)
 3   Q   Now, Mr. Killough in reviewing the invoices from the law
 4   firms that you just identified, how did you go about
 5   determining whether particular time entries related to
 6   Microsoft's defense of the injunction actions on Motorola's
 7   standards-essential patents?
 8   A   Well, again, I went through the invoices one-by-one.  I
 9   went through each of the time entries one-by-one.  And the
10   time entries indicate the day the work is done, they describe
11   in a narrative the work being performed, and they indicate
12   how much time the work took.  And that translates into a
13   dollar billing for that particular entry.
14        And so I was able to read the activity and determine
15   whether or not it related to defense against the
16   standards-essential patent claims for an injunction by
17   Motorola or not.  And if I wasn't sure that it related to
18   defense against the standards-essential patent claims, then I
19   would have it redacted, so it would not appear on the invoice
20   anymore and we would not ask for recovery of that entry.
21   Q   Now, did you do anything with respect to the Sidley firm
22   invoices to distinguish between the work done with respect to
23   the 802.11 patents and the work done with respect to the
24   H.264 patents?
25   A   Yes, I did.
```

1      MS. ROBERTS:  Objection.

2      THE COURT:  I'm sorry?

3      MS. ROBERTS:  Leading.

4      THE COURT:  Overruled.

5  A   Yes, I did.

6  Q   What did you do?

7  A   For the Sidley invoices, Sidley being the only firm that

8  had substantial billings related to the 802.11 patents,

9  because those were being principally fought out on the ITC

10 track, I wanted to distinguish between the work done for

11 H.264 and the work done for 802.11 as to the Sidley bills.

12     And then there was also a third category of the Sidley

13 bills where they were simply working on RAND issues.  And

14 those were essentially billings that related to both H.264

15 and 802.11.  So, for the Sidley bills I wanted to place the

16 entries into one of three categories, if it was in the

17 running at all.  If it was not in the running it was thrown

18 out.  Then after that I would divide it into 802.11 or to

19 H.264 or both.

20 Q   And mechanically how did you memorialize those divisions?

21 A   Well, I took the physical printouts of the Sidley invoices

22 and went through and directed that a symbol be placed next to

23 each one.  And I used a triangle to indicate H.264, a circle

24 to indicate 802.11, and a square to indicate both.  And those

25 designations would be placed next to the time entries.

1    Q    Now, did you rely on anything to help make these

2    categorizations if the actual time entry didn't expressly

3    reference H.264 or 802.11?

4    A    I did.  I went from my memory about the cases, about what

5    was going on at particular times and what particular attorney

6    was working on a particular issue, or an expert's name, or a

7    patent number.  But I didn't want to just rely on my memory

8    of those things.  And most of the things were easy to look

9    up, because I could look at a brief, or a complaint, and I

10   would know exactly what the patent number was for an H.264

11   patent.  And so if I encountered a patent number in a billing

12   entry, then I would essentially have my cheat sheet that I

13   could look at that had patent numbers and vendor names,

14   expert names.  It included a timeline of events, and things

15   such as that, that would help me be sure that an entry should

16   be included.  Or if I couldn't be sure, then I would exclude

17   it.

18   Q    Mr. Killough, if you could look in your white binder,

19   please, and turn to Exhibit 6609.  Can you identify this

20   exhibit?

21   A    Yes.  6609 is a document I prepared when getting ready for

22   one of my depositions in this case, to reflect the

23   information that I was looking up and using to help me

24   categorize the entries on the Sidley invoices.

25        MS. ROBBINS:  Your Honor, we move for admission of

1  Exhibit 6609.

2         MS. ROBERTS:  No objection.

3         THE COURT:  It is admitted and may be published.

4         (Exhibit No. 6609 was admitted into evidence.)

5  Q   Now, Mr. Killough, in making these categorization what did

6  you do if the time entry related only partially to one of

7  those categories that Microsoft is including in its damages?

8  For example, if an entry described work done in connection

9  with an 802.11 patent, but also work done in connection with

10 a non-standards-essential patent?

11 A   Well, there were certainly a number of entries like that.

12 For example, in the ITC there was a trial that lasted two

13 weeks and there were five patents at issue in the ITC, two

14 802.11, two H.264, and then one of them was not a

15 standards-essential patent.  And so I would encounter entries

16 like:  I'm attorney so and so.  I attended the ITC trial this

17 day.  And that's all it would say.  And since -- even though

18 four out of five patents being talked about at that trial

19 were standards essential, out of an abundance of caution I

20 just deleted it entirely and I didn't charge four-fifths of

21 the time, I just deleted it entirely.

22 Q   Now, did you add up the actual dollar amounts that

23 correspond to each of the categories 802.11, H.264, or both?

24 A   Yes, I did.

25 Q   And how did you do that?

1  A   What I did with that is I started with Mr. Menenberg's

2  spreadsheet for the Sidley Austin invoices that he testified

3  about.  He created an Excel spreadsheet that listed all of

4  the time entries, the dates, the amounts, and he used that so

5  he could have a tool to easily calculate the totals.

6      So I started with his spreadsheet and then I added my

7  triangle, circle, square categories to that, so that I could

8  sort, with my Excel spreadsheet, and determine the amount of

9  money that fell into each category.

10 Q   If you could please turn, again, in binder No. 2, the

11 white binder, to Exhibit 6605.  Can you identify that

12 document for us?

13 A   This is a hardcopy printout of the Menenberg Excel file

14 for the Sidley Austin invoices.  And I also had it in

15 electronic form.

16 Q   And if I could ask you to please turn to Exhibit 6608 in

17 that same binder, and identify that.

18 A   Okay.  This is a printout of my Excel spreadsheet, which

19 is exactly like Mr. Menenberg's, but with the addition of my

20 "shape" categories.

21       MS. ROBBINS:  We move for admission of Exhibit 6608.

22       MS. ROBERTS:  No objection.

23       THE COURT:  It is admitted and may be published.

24       (Exhibit No. 6608 was admitted into evidence.)

25 Q   Now, Mr. Killough, can you explain the changes that you

1   made to Mr. Menenberg's spreadsheet that are now reflected

2   here on Exhibit 6608?

3   A   Yes, I can.   Shall I go ahead?

4   Q   Yes.

5   A   In 6608 I simply took the electronic version of

6   Mr. Menenberg's spreadsheet and I added the first column that

7   you see on this exhibit, and I called it "shape."   Then for

8   each of these entries, which correspond to entries on the

9   Sidley invoices, I would put a "T" for triangle, H.264; or a

10  "C" for circle, 802.11; or an "S" for square, which is both.

11  And there actually remained, on Mr. Menenberg's invoices,

12  some entries that I wanted to remove.   So I would put an "X"

13  next to anything I decided I wanted to remove from

14  Mr. Menenberg's invoice.

15  Q   Why did you decide to remove certain entries from

16  Mr. Menenberg's spreadsheet?

17  A   Well, principally the court had made some rulings about

18  what could be recovered.   And it went back to the three

19  litigation tracks.   And Microsoft would only be recovering

20  fees for what was essentially a bracket in time, from when

21  one of those tracks started until it got cut off by a court

22  order, or Motorola's withdrawal of the claim.   And so I

23  wanted to go back in and make sure that those date cutoffs

24  were imposed on the time entries.   And the spreadsheets were

25  an easy tool to accomplish that.

1    Q    Now, can you figure out, from the Excel spreadsheet that

2    you prepared, the total dollar sums for each of the three

3    shape designations?

4    A    Yes, you can, when you have the electronic file, because

5    you can choose to sort on any one or more of the shapes.  And

6    so what I did was if I wanted to know the triangle total, the

7    H.264 total, I would simply tell the Excel program:  Sort on

8    the triangle.  And then it would give me the sum of the

9    triangle dollar entries.

10   Q    Did you prepare anything which would show your work with

11   respect to the spreadsheet to calculate the various

12   categories of attorneys' fees that corresponded with each of

13   those three shapes?

14   A    Yes, I did.  As I had the Excel program run each of the

15   sorts that I wanted to run, when it finished sorting I would

16   take a screenshot of what was shown on my computer screen,

17   and that would give me the evidence of what the actual total

18   was.  And so I captured each of my sorts on a screenshot.

19   Q    If you could please look in your binder to Exhibit 6608-A,

20   B, C and D, and identify what those documents are.

21   A    Yes.  These are four screenshots that I took when I ran

22   the sorts.  And I ran a triangle, a circle, and a square sort

23   separately for H.264, 802.11, and then both.  And then I ran

24   a sort that was all of those put together, which gave me the

25   total for the three categories.

1    MS. ROBBINS:  Your Honor, we would move the admission

2  of Exhibit 6608 A, B, C and D.

3    MS. ROBERTS:  No objection.

4    THE COURT:  They are admitted and may be published.

5  (Exhibit Nos. 6608-A, B, C & D were admitted into evidence.)

6  Q   Let's first put up Exhibit 6608-A.  Mr. Killough, can you

7  explain what this exhibit shows?

8  A   Yes.  This is an exhibit showing the sort I did for the

9  triangle shape.  It looks like the screen is a little pushed

10  over, but you can see -- if you see the hardcopy of the

11  exhibit it does indicate the "T" for triangle down the

12  left-hand side.  And what Excel shows you when you run a sort

13  is the sum.  And when we look over at the dollars column you

14  indicate -- it indicates a sum.  And that's the

15  $2,087,093.79.

16  Q   Let's take a look at Exhibit 6608-B.  What does this

17  exhibit show?

18  A   That's the 802.11 sort.  And, again, it shows the sum, in

19  this case it's $1,309,337.62.

20  Q   Let's take a look at Exhibit 6608-C.  What does this

21  exhibit show?

22  A   That one is the square, that's the "both"

23  category $259,038.79.

24  Q   And, finally, let's take a look at Exhibit 6608-D.  Can

25  you explain what this exhibit shows?

1  A    Yes.  This one is the screenshot for all three of the

2  shape categories put together.  And the total is

3  $3,655,470.20.

4  Q    And, again, this relates to the Sidley invoices?

5  A    This is just the Sidley invoices for these screenshots.

6  Q    Now, last week Mr. Menenberg provided some testimony

7  regarding the amounts of fees and expenses relating to the

8  Harrigan firm and the three firms utilized in the German

9  litigation.  Did you do anything with respect to his

10  calculations for those law firms fees and expenses?

11  A    Yes, I did.  But I went about it a little bit differently.

12  Q    What did you do for those?

13  A    For those I, again, started with Mr. Menenberg's

14  spreadsheets.  He had done similar spreadsheets as he did for

15  Sidley.  And he did that for each of the law firms.  But

16  since I wasn't categorizing for the other law firms into

17  categories like H.264, 802.11, and both, what I did was I

18  worked with the hardcopy invoices from the firms.  And if

19  there was anything I wanted to eliminate principally, again,

20  to get within the date cutoffs, I pulled out my Windows phone

21  calculator and added up the amount that I wanted to deduct.

22  Then I could simply deduct that amount from the totals on

23  Mr. Menenberg's spreadsheet, to come to the amount of

24  Microsoft's attorneys fee damages claim for that particular

25  law firm.

1  Q    Can we put up PDX23?

2        Mr. Killough, what does this show?

3  A    Well, this shows the results of the work that I did to

4  determine the amount of Microsoft's damages claim for

5  attorneys' fees for each of the law firms.

6  Q    What is the total for Microsoft's legal-cost damages?

7  A    That's the number that approaches $6 million I mentioned

8  before.  $5,971,530.  And that's rounded off with no cents.

9        MS. ROBBINS:  We'd move for admission of PDX23 as a

10  summary exhibit.

11        MS. ROBERTS:  No objection.

12        THE COURT:  It may be admitted and may be published.

13        (Exhibit No. PDX23 was admitted into evidence.)

14  Q    Now if we could put up PDX 24.

15        Have you broken down damages separately into those that

16  relate solely to H.264 and those that relate solely to

17  802.11?

18  A    Yes, I have.

19  Q    Are those totals represented on this exhibit?

20  A    Yes, that's right.

21  Q    Now, if the jury finds only that Motorola breached its

22  contract with the ITU relating to its H.264

23  standards-essential patents, what damages is Microsoft

24  seeking?

25  A    Well, that would be the first line.  Microsoft in the case

1    of just a breach of the H.264 contract is seeking, for

2    attorneys' fees, $2,051,783.

3    Q   Now, if the jury finds only that Motorola breached its

4    contract with the IEEE relating to the 802.11

5    standards-essential patents, what damages is Microsoft

6    seeking?

7    A   $1,309,337.

8    Q   If the jury finds that Motorola breached its contracts

9    relating to both H.264 and 802.11, what are the damages that

10   Microsoft is seeking?

11   A   Well, in that sense, then, you really add all three

12   numbers together for all the law firms, H.264, 802.11, and

13   the billings that went to both.  And when you add all three

14   of those together it's the $5,971,530.

15        MS. ROBBINS:  Your Honor, we move for admission of

16   PDX24 as a summary exhibit.

17        MS. ROBERTS:  No objection.

18        THE COURT:  It is admitted and may be published.

19        (Exhibit No. PDX24 was admitted into evidence.)

20   Q   Mr. Killough, had Motorola provided a license to its H.264

21   and 802.11 patents to Microsoft on RAND terms, would

22   Microsoft have incurred the legal fees and costs that it now

23   seeks to recover from Motorola as damages?

24   A   None of the litigation would have happened, so there

25   wouldn't be any of these attorneys' fees or expenses as

1    damages.

2    Q    Now, had Motorola sued only for damages and not

3    injunctions, wouldn't Microsoft have had to incur certain

4    legal fees and costs in any event?

5    A    Well, there's -- there's kind of a non sequitur in the

6    question.  One of the tracks that Motorola pursued was the

7    International Trade Commission.  The International Trade

8    Commission doesn't issue damages, it only issues exclusion

9    orders.  And so if Motorola was only interested in damages it

10   wouldn't be in the ITC.

11       And most of the fees that Microsoft is seeking to recover

12   relate to the International Trade Commission path that

13   Motorola was pursuing to an injunction.

14       Similarly, the monies that Microsoft spent in this case to

15   obtain a temporary restraining order against the German

16   injunction were specifically directed to the injunction.  And

17   those wouldn't be related to any damages claim.

18       And if Motorola was only looking for RAND -- a RAND

19   royalty, that all could have been done in this case and there

20   wouldn't be any need for the satellite cases even for damages

21   purposes.

22           MS. ROBBINS:  Thank you, Mr. Killough.  I have no

23   further questions at this time.

24           THE COURT:  Ms. Roberts.

25

```
 1                        CROSS EXAMINATION
 2   BY MS. ROBBINS:
 3   Q    Good morning, Mr. Killough.
 4   A    Good morning.
 5   Q    First of all, you're assistant general counsel at
 6   Microsoft; is that correct?
 7   A    One of a number of folks with that title, yes.
 8   Q    In that role your duties are to supervise the conduct of
 9   patent litigations?
10   A    Yes, that's right.
11   Q    That includes the present litigation, correct?
12   A    That's right.
13   Q    And you're, indeed, the Microsoft in-house attorney that's
14   responsible for the day-to-day management of all of the
15   litigation between Microsoft and Motorola; is that right?
16   A    Yes.
17   Q    And in that role you provide legal advice to your client
18   Microsoft; is that true?
19   A    I do, yes.
20   Q    And you sometimes have a need to advocate for your client,
21   Microsoft, correct?
22   A    Yes, I do.
23   Q    In fact, you have a duty to conscientiously and ardently
24   assert your client's interests, correct?
25   A    Yes.
```

1    Q    Now, let's talk about the attorneys' fees that Microsoft

2    is seeking to recover in this case.  So let's just walk

3    through these cases quickly.  First of all we have, the case

4    is filed in Wisconsin on November 10, 2010; is that correct?

5    A    Yes, ma'am.

6    Q    Microsoft is seeking to recover attorneys' fees and costs

7    incurred in litigating that action?

8    A    Those that relate to the standards-essential patents in

9    the two actions filed in Wisconsin.

10    Q    Okay.  And you agree that that action was not filed until

11    after Microsoft filed its October 1st and November 9th

12    lawsuits against Motorola, correct?

13    A    Yes.

14    Q    And in the Wisconsin action, the 699 action, Microsoft

15    filed an answer to that complaint on January 25, 2011; is

16    that right?

17    A    I don't remember the date, but certainly Microsoft filed

18    an answer.

19    Q    Okay.  If you could turn to Exhibit 7173 in your binder.

20    A    I have that.

21    Q    And is this document Microsoft's answer and counterclaims

22    to the first amended complaint in the Wisconsin action?

23    A    Yes.  In the first filed Wisconsin action, which I usually

24    go by the number 699.

25    Q    Right.  And does this document refresh your recollection

1  that it was filed on January 25, 2011?

2  A   Yes, that's what it looks like.  I accept that.  It

3  doesn't really refresh my recollection, but I see that's

4  true.

5          MS. ROBERTS:  Your Honor, we move to admit

6  Exhibit 7173.

7          MS. ROBBINS:  Objection to the admission of a

8  pleading.

9          THE COURT:  You need this only for what purpose,

10  counsel, to establish the date?

11          MS. ROBERTS:  Yes, that's fine.  We can just go ahead

12  and ask questions about the document.

13          THE COURT:  Yes.

14  Q   Okay.  Mr. Killough, in the answer it's correct that

15  Microsoft denied that it infringed Motorola's patents; is

16  that correct?  And I'll direct your attention to the

17  paragraph beginning at paragraph 11 on page 11.

18  A   Oh, I'm sorry, what was the page number again?

19  Q   I apologize.  Sorry.  I was looking at the counterclaims.

20  Beginning at paragraph 14 on page 4.  And the question was:

21  It's true that Microsoft denied that it infringed Motorola's

22  patents asserted in the 699 action?

23  A   Let's see, page 4 paragraph 14?

24  Q   Yes.  Beginning at paragraph 4.  Claim 1, Claim 2, Claim

25  3, Microsoft's responses.

40

1  A   I don't know that I'm looking at the same thing.  I would

2  be surprised if Microsoft did not contest infringement of the

3  patents asserted.  I was just trying to find it to make

4  doubly sure.  But I would be surprised if we didn't assert

5  that the patents asserted against Microsoft were not

6  infringed and also invalid.

7  Q   Okay.  Thank you.

8       Now, the next case that Microsoft is seeking to recover

9  attorneys' fees for is the second case filed on November 10,

10 2010, right?

11 A   Yes.

12 Q   And that was another case filed in the Western District of

13 Wisconsin?

14 A   Yes.

15 Q   And, again, that case was not filed until after Microsoft

16 filed its own litigations, correct?

17 A   Correct.

18 Q   Isn't it correct this case can be called the 700 action?

19 A   That's what I would call it, yes.

20 Q   That action was stayed by stipulation of the parties,

21 correct?

22 A   Shortly after it started it was stayed by stipulation of

23 the parties, as is a typical thing that happens when there's

24 a parallel ITC case going on with the same patents, then the

25 district court gets stayed and the ITC continues on.

1  Q    Okay.  And in neither the 699 or the 700 action did

2  Motorola actually file a motion for an injunction with the

3  court; is that right?

4  A    It asked for an injunction in the pleadings, but I don't

5  believe they actually filed a motion for preliminary

6  injunction, for example, or something like that.

7  Q    So the answer is, no, Motorola did not file a motion?

8  A    Did not file a motion.  Asked for it in its pleadings.

9  Q    Moving along to both the ITC action filed on November 22,

10 2010, that too was filed after Microsoft filed its own

11 lawsuits, correct?

12 A    Chronologically, it certainly did.

13 Q    The same is true of the German action filed in July of

14 2011?

15 A    Yes.

16 Q    Now, in addition to the lawsuits filed by Motorola in

17 Germany, Microsoft filed actions against Motorola seeking to

18 invalidate the patents asserted, correct?

19 A    That's the procedure in Germany.  Instead of putting

20 invalidity in as a defense in the case, you have to go off to

21 a separate and slower German court to have validity

22 determined.

23 Q    Microsoft is seeking to recover those attorneys' fees and

24 costs as well, correct?

25 A    Yes, to the extent those are reflected in the German

1  invoices.  Because proving a patent invalid is a path to cut

2  off the potential for an injunction on the patent.

3  Q   But you haven't segregated those in your calculations of

4  the attorneys' fees that Microsoft is seeking to recover,

5  correct?

6  A   I have not tried to eliminate those.

7  Q   Now, it's true that at the time that Microsoft filed this

8  case, Microsoft had not incurred any of the attorneys' fees

9  or litigation costs that it is seeking to recover, correct?

10  A   Since Motorola only sued the day after Microsoft filed

11  this case, on the day Microsoft filed this case it had not

12  incurred fees and expenses to defend against the cases not

13  yet filed; that's correct.

14  Q   In Germany, in addition to seeking to nullify the patents,

15  Microsoft put in evidence and asked the court to conclude

16  that Microsoft had not infringed the patents asserted by

17  Motorola, correct?

18  A   Right.

19  Q   And the German court actually did find infringement by

20  Microsoft, correct?

21  A   Right.

22  Q   Now, I'd like to turn your attention to one of the

23  exhibits that I believe is in your notebook -- probably in

24  both of your notebooks.  But if you could turn your attention

25  to Exhibit No. 6577.

1    A    Let's see, that's a Sidley invoice?

2    Q    It is.  It's certainly in the notebook that we gave you.

3    A    Okay.  Do you think it's in your binder as well?

4    Q    It is.

5    A    6577?

6    Q    Yes.

7    A    I have it.

8    Q    Okay.  And is this an invoice from Sidley Austin to

9    Microsoft dated September 20, 2011?

10   A    It is.

11   Q    If I could turn your attention to the page ending in 2318.

12   A    I have that page.

13   Q    And is it correct on the bottom of this page there are

14   time entries for work relating to work on a preliminary

15   injunction motion?

16   A    There was work into researching that issue, yes.

17   Q    And it's correct that this is the injunction motion that

18   Microsoft ultimately filed in which it asked this court to

19   preclude Motorola from enforcing an injunction in Germany in

20   August of 2011?

21   A    I wouldn't say there's a direct connection.  As soon as

22   the German cases were filed, Microsoft looked at the

23   possibility of asking this court to do something about that,

24   and so looked into the possibility of seeking an injunction

25   against enforcement of a German injunction.  But I wouldn't

1    say that this was the beginning of drafts of motions that

2    were filed much later.  I think this is the beginning of

3    looking at the issue.

4    Q    Right.  The subject matter is the same, correct?

5    A    It's the same subject matter.

6    Q    Right.  And Microsoft ultimately filed that motion but not

7    until March 28, 2012?

8    A    That's right, not until after the court had denied, in

9    part, a summary judgment motion that would have given us the

10   same relief.

11   Q    To get a clear question and answer, Microsoft did not file

12   that motion until March 28, 2012, correct?

13   A    The TRO motion?

14   Q    Yes.

15   A    I think that's right.  If you're right about the date,

16   that sounds right.

17            MS. ROBERTS:  To the extent it was not already

18   admitted we move to admit Exhibit 6577.

19            MS. ROBBINS:  No objection.  I think it was already

20   admitted.

21            MS. ROBERTS:  No further questions.

22            THE COURT:  Thank you, counsel.  Redirect?

23            MS. ROBBINS:  Yes, Your Honor.

24

25

1              REDIRECT EXAMINATION

2   BY MS. ROBBINS:

3   Q   Mr. Killough, what happens in a patent case if you don't

4   contest infringement or validity?

5              MS. ROBERTS:  Objection.  Foundation.

6              THE COURT:  Overruled.

7   A   Infringement and invalidity are known as affirmative

8   defenses.  And if you're sued for patent infringement and you

9   want to make a defense of non-infringement or invalidity, you

10  have to assert that or you've lost it.  And those are the

11  principal defenses to a patent case, that the patent is not

12  infringed or the patent is invalid.  And if you don't say

13  that right off the bat, your case is, most of the time, just

14  over.  You lose.

15  Q   Did Microsoft's assertion of validity and non-infringement

16  defenses mean that it was not willing to take a RAND license

17  to Motorola's standards-essential patents?

18  A   No.  In the complaint in this case -- and if I'm

19  remembering right -- in paragraphs 7 and 8 of the complaint,

20  Microsoft said that despite its questions about the validity

21  and essentiality of the Motorola patents, it nonetheless,

22  wanted to receive that RAND offer that it had not yet

23  received from Motorola.

24             MS. ROBBINS:  Thank you.  I have no further

25  questions.

 1          MS. ROBERTS:  No questions, Your Honor.

 2          THE COURT:  All right.  You may step down.  Thank

 3    you, Mr. Killough.

 4       Does Microsoft wish to call further witnesses at this

 5    time?

 6          MR. HARRIGAN:  Microsoft rests, Your Honor.

 7          THE COURT:  Counsel, I will note for the record that

 8    Motorola has indicated a desire to file motions, and I'll

 9    hear argument on those at the break outside the presence of

10    the jury.

11          MS. SULLIVAN:  Thank you, Your Honor.

12          THE COURT:  Motorola will call its first witness,

13    please.

14          MR. PRICE:  Motorola calls Shelley McKinley by

15    deposition.

16          THE COURT:  Ladies and gentlemen, it's been awhile

17    since you've seen a deposition.  But you'll recall this is

18    the equivalent of trial testimony, only it's admitted with

19    the witness not being present.

20                         SHELLEY McKINLEY

21          Testified by video deposition as follows:

22                            EXAMINATION

23    BY MR. PRICE:

24    Q   So, first let me ask you what's your position at

25    Microsoft?

1    A    Today I am the head of legal and government affairs for

2    the German, Austrian, and Swiss subsidiaries.

3    Q    So let's go back to the 2011/2012 timeframe.  What was

4    your position then?

5    A    I was the assistant general counsel for the Xbox hardware

6    manufacturing and supply chain business, and the logistics

7    for all physically-distributed products.

8    Q    Now, when you became aware of -- finally became aware of

9    the lawsuits -- lawsuit that was filed, was it your

10   understanding that an injunction couldn't issue from the

11   German court unless there was some finding by the court that

12   there was infringement?

13   A    On the -- in the -- in the German cases, my understanding

14   was injunctions are issued relatively routinely when you

15   lose.

16   Q    So when you say injunctions are issued routinely "When you

17   lose?"

18   A    Um-hum.

19   Q    What do you mean by injunctions are issued routinely,

20   "When you lose?"

21   A    When you -- when you lose the case, the initial instance

22   of the case.

23   Q    So when there's a finding by a court that you are

24   infringing the patent?

25   A    That's -- that's right.  There's an -- my understanding is

1   there's an infringement proceeding, and if you lose that, an

2   injunction is issued relatively quickly.

3   Q    Now, you told me that -- that -- earlier on, that in

4   Germany, the injunctions -- it was not unusual for

5   injunctions to be issued in patent infringement cases.  Do

6   you recall that?

7   A    That's -- I recall -- I recall that's what I understood,

8   yes.

9   Q    And that would be in connection with any patent

10  infringement case; that's not unusual for injunctions to

11  issue in Germany, correct?

12  A    That's what I understand.

13  Q    Now, in -- in connection with giving legal advice,

14  guidance to the business folks, did you tell them that?  Did

15  you tell them that, in general, in patent infringement cases

16  filed in Germany, that it's not unusual that injunctions

17  issue?

18  A    I would have told them that it's not unusual, yes.

19  Q    And that would be whether it was this case or any other

20  case that was filed against Microsoft in Germany, correct?

21  A    I would have told them that it's, it's generally,

22  generally if you, if you lose, is I think what I said,

23  there's an injunction that issues.  Not specifically this

24  case.

25  Q    In advising the client, were you -- was it also your

1    responsibility to advise them as to the effect this move

2    would have on the distribution center, you know, in terms of

3    the future business, in terms of future activity?

4    A    So, we knew that injunction are -- are frequent in

5    Germany.  And we -- I would have advised the business on

6    that.

7    Q    Okay.  And why would that have had any application to

8    future business?

9    A    Having -- having your global logistics tied up in Germany

10   is -- foreseeably puts you in a situation in other cases.

11   Q    Why would having your global logistics tied up in Germany

12   -- in Germany, put you at risk or have an effect on future

13   cases?

14   A    I think I've answered that.  That's -- again, I -- my

15   understanding is, Germans are -- injunctions are frequent in

16   patent-infringement cases in Germany.

17   Q    Do you recall a response that anyone in the business arena

18   gave to you, Mr. Roberts, or -- or anyone else, when you

19   talked about the potential effect on future cases of having

20   your global logistics distribution center centered in

21   Germany, or -- in Germany?  Do you recall any response they

22   had to that advice?

23   A    The response they had to moving the distribution center

24   was certainly one of hesitance.  It's not easy to move a

25   distribution center.  We looked at other options, and things

1  such as a bonded warehouse is what the -- the business looked

2  into.

3  Q   Okay.  So -- so let me ask you this one:  When the

4  restraining order came out prohibiting Motorola from

5  enforcing an injunction, did you give any advice to the

6  business folks as to the effect of that order?

7  A   I would have told them about the order.

8  Q   What would you have told them?

9  A   That we were granted a temporary restraining order that

10  prohibited Motorola from enforcing the injunction, and that

11  that was temporary and was going to be heard later.

12  Q   Now, when you advised the business folks of that, was the

13  response you got back that, well, that's great, but it's too

14  late, we're past the point of no return?

15  A   I recall, at that time, that we were just past the point

16  of no return.

17  Q   Was that based upon your analysis or the business --

18  A   I recall being told that.

19  Q   Okay.  So who told you that, if you remember?

20  A   Oh, it -- well, it would have been Owen, Jeff, or someone

21  who worked for them.

22  Q   Let me -- let me ask you, when you -- when you gave them

23  advice on the risks, the pros and cons of various options,

24  did you tell them that under -- one alternative under the

25  Orange-Book procedure, that Microsoft could avoid an

 1   injunction by putting into escrow an amount that -- that --

 2   that Motorola would demand as a royalty, and that later it

 3   would be determined whether or not that was an appropriate

 4   amount?

 5   A   I did not advise them that there was a -- an Orange-Book

 6   procedure that would allow them to eliminate risk related to

 7   the lawsuit.

 8   Q   And did you have any -- do you have any recollection as to

 9   why the Orange-Book procedure would not have resolved the

10   issue as to whether or not an injunction would be issued?

11   A   I recall that the Orange-Book procedure was very -- it --

12   it wasn't necessarily a very clear procedure for an American

13   to understand.

14   Q   But that -- that's why you had German counsel.  Right?

15   A   That is why we had German counsel to deal with the

16   Orange-Book offer.  But there wasn't a -- for me, there

17   wasn't a clear, obvious way to resolve the problem with an

18   Orange Book.

19           (The video deposition testimony concluded.)

20           MR. PRICE:  Your Honor.  We next call Teresa Daly by

21   deposition.

22           THE COURT:  Thank you.

23                        TERESA DALY

24        Testified by video deposition as follows:

25

```
 1              EXAMINATION

 2  BY MR. PRICE:

 3  Q   Can you tell us your name?

 4  A   Yes, Teresa Daly.

 5  Q   Mrs. Daly, where do you work?

 6  A   I work with Microsoft, Dublin.

 7  Q   So prior to 12 months ago -- I'm kind of going backwards

 8  instead of starting with your first job -- so prior to

 9  12 months ago, before you became the manager, what were you

10  doing?

11  A   I was responsible for channel operations.

12  Q   During what years were you responsible for channel

13  operations?

14  A   From -- six years at Microsoft -- so channel operations,

15  for just under five years.

16  Q   Could you tell us what channel operations is?

17  A   So channel operations, again, it is responsible for the

18  order-to-cash cycle.  So order management, right through to

19  fulfillment of the product, to the invoicing of the product.

20  What we call the ordered-cash cycle.

21  Q   During that time were you, as manager of channel

22  operations, concerned with the performance of that

23  distribution center in Germany?

24  A   Of Arvato?  No.  We had actually a really good performance

25  delivered by the distribution center in Germany, Arvato.
```

1   Q   Were you involved indirectly in any reviews of Arvato's

2   performance?

3   A   Indirectly?  No.  I mean, we had a really good performance

4   level at the time.  So there was no major issues to be

5   discussed.

6   Q   So let me ask you whether you have shared any thoughts.

7   Did you ever share your thoughts with anyone in Microsoft as

8   to what would be the best location for the EMEA distribution

9   center?

10  A   Now you are talking about specifically Duren?

11  Q   Yes, for the Duren?

12  A   For the Duren one, no.  It was a really good location for

13  us, so there was no particular discussions with respect to

14  Duren.  There were clearly discussions with respect to other

15  parts of the EMEA.

16  Q   So what you're telling us is at the time your view was

17  that this would be an opportunity to update processes, to

18  align globally?

19  A   At the time it was Paul's view that this would be an

20  opportunity.

21  Q   Did you disagree with him?

22  A   I mean, he sent the e-mail out.  He didn't consult me

23  prior to sending the e-mail out.

24  Q   Mr. Longstaff reported to you?

25  A   He reported to me, yes.

1    Q    So did you disagree with him as to whether or not this

2    transition was an opportunity to update the processes?

3    A    I wasn't as optimistic that we would have -- that within

4    the timelines, that we would have the opportunity.

5    Q    What was your view of the timing?

6    A    My view of the timing was this was hitting our year-end.

7    And year-end for our sales organization is absolutely

8    critical in terms of meeting their budget targets.  And I

9    knew this was going to cause concern for my sales colleagues.

10   Q    What did Mr. Davidson say about that when you said your

11   concern was about the timing?

12   A    He said he didn't really have a choice in the timing, that

13   this was mitigating a risk, and this was the plan they were

14   going ahead with.

15   Q    Did he say why they didn't have a choice, what was going

16   on in the litigation, or --

17   A    He didn't go through the details.  He just said we were

18   mitigating a potential risk to our business.

19   Q    Now, I'd like you to look at what we are going to mark as

20   Daly Exhibit 5.  Ms. Daly, you have a Daly Exhibit 5 in front

21   of you, correct?

22   A    Yes.

23   Q    This is an e-mail you sent around June 1, 2012, correct?

24   A    Yes.

25   Q    And at the time you were general manager of MCIS?

1    A    Yes.

2    Q    So we're talking about overall this was sent to over 100

3    people?

4    A    Yes, it's a pretty big group, yes.

5    Q    Why such a big group?

6    A    Because the primary focus of this was to inform and update

7    the sales and marketing organization as to what was

8    happening; and then on the copy-line, that's basically so

9    that the internal teams are aware of the communication that

10   has gone out to the sales team.

11   Q    Did anyone request that you send this e-mail?

12   A    Yes.

13   Q    Who requested that you send it?

14   A    Owen Roberts.

15   Q    Did Mr. Roberts review the e-mail before you sent it?

16   A    Yes.

17   Q    When Mr. Roberts reviewed the e-mail and before you sent

18   it did he have any comments or edits to the e-mail?

19   A    Owen Roberts reviewed it and Jeff Davidson both reviewed

20   it.

21   Q    Okay.   Thank you.

22   A    Jeff Davidson supplied the facts and figures and the

23   photographs.

24   Q    I'm sorry?

25   A    Jeff Davidson supplied the fact and figures and the

1    photographs that are attached.

2    Q    So if we look at this e-mail, the facts and figures, you

3    are referring to what's in the boxed part at the end of the

4    first page?

5    A    Yes.

6    Q    Did you have any view that Mr. Davidson, in providing you

7    with these facts and figures, and the photographs, that are

8    also in the e-mail, that he was in any way trying to mislead

9    the people who were receiving the e-mail?

10   A    Absolutely not.

11   Q    Was it your understanding that Mr. Davidson was providing

12   accurate information?

13   A    I believe the information is accurate.

14   Q    And if you look at the e-mail itself, in the first

15   paragraph after you say, "Hi, everyone," in the second

16   sentence it says, "Per my previous note, we will transition

17   our main European distribution center from Germany to the

18   Netherlands."  So that was basically the topic of the e-mail,

19   this transition, right?

20   A    Yes.

21   Q    Then if we look at the second paragraph it says, "The

22   decision to move our main distribution center in Europe was

23   made with a vision for the future."  Do you see that?

24   A    Yes.

25   Q    Now, who came up with that language that the decision to

1    move was made with a vision to the future?

2    A    It was a collaboration between Owen and myself.

3    Q    Then the next sentence, "To support the growth in our

4    business over the years ahead, we need to significantly scale

5    our distribution footprint and capabilities in EMEA."  Do you

6    see that?

7    A    Yes.

8    Q    And EMEA refers to Europe, Middle East, and Africa?

9    A    Absolutely right.

10   Q    And when you say you need to significantly upscale the

11   distribution footprint and capabilities, what was that

12   referring to?

13   A    That was referring to future growth, to future devices and

14   product categories that we knew were going to come in the

15   future.  And it was clear that we needed to scale our

16   distribution footprint.  And it was also clear that we needed

17   to build new capabilities.

18   Q    What was -- when you say scale distribution footprint,

19   what does that specifically entail?

20   A    It means that we were going to have more volume

21   through-put over the next three years.  We also -- it was

22   also clear that we were going to go both direct to consumer

23   and direct to retail.  So that was going to require a

24   different footprint.  It was going to require us providing

25   different services.

1   Q   And who came up with that idea that all the people who

2   were being sent this e-mail would be shown these figures to

3   show how the transition from Germany to the Netherlands was

4   going to position Microsoft for future success?

5   A   Okay.  It's not the transition that was positioning us for

6   future success.  Arvato could have done this as well.

7   Q   Pardon?

8   A   Arvato, we could have easily scaled with Arvato.  We could

9   have scaled with whatever company.  So it's not the

10   transition itself that was scaling us.  It was the fact that

11   we were in a bigger facility.

12   Q   So, you are saying if Arvato had been managing the new

13   facility it would have applied to Arvato as well?

14   A   It could have applied -- we could have also scaled it in

15   Germany, in the existing facility, because we were in a

16   shared facility.  So that could have also been an option.

17   Q   Stepping back, though, you believe that someone who would

18   read this e-mail would think that the topic of the e-mail

19   was, as you put it in the first paragraph -- second

20   paragraph, "The decision to move our main distribution center

21   in Europe was made with provision for the future."  Correct?

22   A   Yes.  That was the message, yes.

23   Q   When did Mr. Roberts and Mr. Davidson tell you that it was

24   a possibility to expand the German facility?

25   A   We always knew that.  We were in the facility for a number

1    of years, and we expanded our cubic meters of the shared

2    facility in accordance with our volume growth every year.

3    And as we came into a season in the months of October and

4    November, we had overflow capacity, with Arvato in the

5    facility.

6    Q    And all of this was to show that this move was going to

7    position Microsoft for future success?

8    A    The objective was to give the sales organization

9    confidence and to try and control any sense of concern they

10   had in meeting their year-end numbers.  They were very

11   frustrated, very concerned.  They found it difficult to

12   understand why we could do a transition at this time of year.

13   So there was a general concern within the sales organization.

14   And clearly as a leader of a subsidiary, I mean, you are

15   going to say:  Okay, so they're changing the distribution

16   center.  They were clearly going to be concerned about our

17   ability to hit the service levels that we were to deliver.

18   Q    We're looking at the e-mail that you sent out to 100 other

19   people which you say was motivated by the sales organization

20   and the concerns about your current year goals.  And, in

21   fact, in this e-mail there is nothing that talks about the

22   current sales goals or the ability to meet those goals; is

23   that correct?

24   A    That's correct.

25   Q    And what this e-mail talks about is how the decision to

1  move the distribution center was made with a vision for the

2  future, right?

3  A    Yes.

4  Q    And that the business was going to grow, it was going to

5  move, and to do that you needed to change the distribution

6  footprint and capabilities in EMEA; correct?

7  A    Correct.

8  Q    And in sending this e-mail out to over 100 folks, you did

9  not have the intention of misleading them in any way,

10 correct?

11 A    Correct.

12                          EXAMINATION

13 BY MS. KELLY:

14 Q    I just have really one question for you.  If you could

15 turn to Exhibit 5.

16 A    Yes.

17 Q    This is the e-mail that you circulated on June 1st, 2012;

18 is that correct?

19 A    That's correct.

20 Q    You testified that the information contained within the

21 chart in this e-mail, as well as the photographs, were

22 circulated to you by Mr. Davidson; is that correct?

23 A    Yes.  Jeff and his team.

24 Q    That is my question.  Do you know whether it was Jeff

25 personally who forwarded the information, or whether it was

1    someone on his team who forwarded the information?

2    A   I can't remember.

3    Q   You can't remember either way?  It might have been someone

4    on Jeff's team, or --

5    A   I can't remember exactly who the person was that sent the

6    photographs.

7    Q   And the information contained in the chart?

8    A   And the information on the chart.

9                           EXAMINATION

10   BY MR. PRICE:

11   Q   Ms. Daly, did Mr. Davidson see the draft of your e-mail

12   before it was sent?

13   A   Yes, I am pretty sure he did.

14   Q   And at any time did he tell you that anything in your

15   e-mail or the facts and figures or the photographs was

16   inaccurate?

17   A   No.  No, he didn't.

18          (The video deposition testimony concluded.)

19          THE COURT:  Ladies and gentlemen, we're now going to

20   take our morning break.  I will wait until lunch to read you

21   your usual admonitions since you really can't get into any

22   mischief back there, other than talking among yourselves,

23   which you know not to do.

24     (The following occurred outside the presence of the jury.)

25          THE COURT:  Ms. Sullivan, I'll give you your choice

 1   here.  If you want, I'll let you take your motions at 10:45

 2   and it will run against your time.  Or we'll do it at noon,

 3   and we'll run against my time.  Which would you prefer?

 4          MS. SULLIVAN:  Your Honor, if we're perfectly

 5   preserved that we're doing this at the close of Microsoft's

 6   case in chief, I would be very grateful to do it at noon on

 7   your time.

 8          THE COURT:  All right.  We'll do it at noon.  We'll

 9   be in recess until 10:45.

10                (The proceedings recessed.)

11          THE COURT:  I don't believe it is a full moon, but

12   nonetheless, lots of interesting things happening.  Juror

13   Number 8 has informed the clerk that 40 years ago apparently

14   one of her parents died.  There was a trust.  It was

15   administered by the Sidley & Austin firm.  It was handled by

16   her brother.  And it was 40 years ago.  Does anyone wish me

17   to bring the juror out to be questioned in regards to this?

18          MR. HARRIGAN:  No, your Honor.

19          MR. PRICE:  No, your Honor.

20          THE COURT:  Must have been that big stack of

21   billings.  Please bring the jury in.

22   (At this time the jury entered the courtroom.)

23          THE COURT:  Motorola call its next witness.

24          MR. PRICE:  We call by deposition Owen Roberts.

25          THE COURT:  Thank you.

DAVID OWEN ROBERTS

Testified by video deposition as follows:

EXAMINATION

1  Q   Will you please state your full name for the record?

2  A   Yeah.  My full legal name is David Owen Roberts.  I use

3  Owen as my given name.

4  Q   And what was your position prior to that?

5  A   My position before that was general manager of Microsoft's

6  supply chain -- global supply chain, based in Redmond,

7  Washington.

8  Q   And what does that mean?

9  A   I was responsible for all of the logistics, distribution,

10  and channel operations globally for the Microsoft streams of

11  business that operate through retail.

12  Q   Okay.  So in the period between July of 2011 and July

13  of 2012 that's the position that you held?

14  A   Yeah.  Just one correction to that.  November 2011 I was

15  appointed the global owner of the supply chain.  Beforehand I

16  just had the Americas operation centers.

17  Q   Okay.  And I understand there was previously a

18  distribution center located in Duren, Germany; is that right?

19  A   That is correct.

20  Q   And that distribution center, did that fall within your

21  umbrella of duties?

22  A   After November the 11th, 2011, yes, it did.

1    Q    And did you have people who reported directly to you?

2    A    Yes, I did.

3    Q    And who were those people?

4    A    There were 250 people.

5    Q    Okay.  Was there 250 that directly reported to you or --

6    A    No.

7    Q    -- was there a smaller number that directly reported to

8    you?

9    A    Yes, there were.  I had a head of distribution and

10   logistics, Jeff Davidson.  I had a head of channel strategy,

11   Theresa Daly.  I had a head of Singapore operations, David

12   Engine.  I had a head of reverse logistics Edwin Heslinga.

13   And I had a head of software manufacturing, a gentleman

14   called Noel Moore.

15   Q    Okay.  And so were you and Mr. Tobey informed that

16   Motorola -- or sorry, that Microsoft would need to relocate

17   its facilities out of Germany, or that Microsoft should

18   consider whether it should relocate out of Germany?

19   A    My recollection is that we were told that based on the

20   pending litigation there was a high degree of risk that we

21   would not be able to do business out of our German facility,

22   which -- which moves product all over Europe.

23   Q    Now, you mentioned that both Arvato and CEVA had

24   identified the Netherlands as the most logical location.  Why

25   is that?

1   A   For the reasons I just stated, that it's known as a very

2   good logistics and distribution hub.

3   Q   And do you know why it is known as a very good logistics

4   and distribution center?

5   A   Proximity to ports.

6   Q   Rotterdam?  And why is the proximity to ports important?

7   A   Because the majority of our product is imported from the

8   far east via ship.

9   Q   Okay.  And were those all things that Microsoft considered

10  in deciding whether to relocate the German distribution

11  facility?

12  A   We weren't considering moving the German facility.  That

13  was never in our plans, to move the German facility.  We were

14  being forced to move the German facility, and therefore --

15  As part -- you were asking me what are the three -- what are

16  the criteria for selecting a new site, and I talked about

17  ingress and egress and proximity to port.  But there are

18  other multiple factors like what is the security environment

19  like, et cetera, et cetera.

20  Q   The speed in which Microsoft relocated the facility, did

21  that add to the costs?

22  A   Yes.

23  Q   Had the decision to relocate been made earlier, do you

24  think that that would have made the move less costly?

25  A   It depends how much earlier.  Most, I will -- I will --

1    We evaluate distribution centers on sort of my Americas

2    experience on an annual to semi -- on a two yearly basis, but

3    these decisions are long decisions and are made years in

4    advance of moving things, so, therefore, you can be planned

5    for and cost effective in moving facilities or transferring

6    facilities.  We actually don't -- we don't actually move

7    facilities very often, we change management of facilities.

8    Q    Can you explain to me what the difference is?

9    A    Yeah.  To move a facility is an extraordinarily expensive

10   undertaking, and most facilities are set up -- like the Duren

11   facility being set up back in 1998, it had established its

12   local, our customers knew where that local was, both from an

13   in-and-out perspective; our logistics providers knew where

14   that local was from an in-and-out perspective, and there is a

15   lot ancillary services that are tied to that local over a

16   period of time.

17   Q    Is it your understanding that the termination letter in

18   Davidson Exhibit 4 terminated services prior to the time when

19   they would otherwise be up under the contract term?

20   A    Yes.

21   Q    And were there penalties associated with that?

22   A    Yes, there were.

23   Q    Okay.  Turning your attention back to Davidson Exhibit 4.

24   The second sentence says that, "Microsoft is making this

25   change to avoid any potential disruption to our business in

1   the event we experience an adverse outcome in current

2   litigation between Microsoft and Motorola Mobility in

3   Germany."  Do you see that?

4   A   I do see that sentence.

5   Q   And is it -- is this the first case in which Microsoft was

6   threatened with an injunction?

7   A   I have no other knowledge of any other threats.  This is

8   the one and only that I know of.

9   Q   I am going to hand you what was previously marked as

10  Davidson Exhibit 9.  I will give you a --  If I could turn

11  your attention to the e-mail that is second from the bottom.

12  It is from --

13  A   Which page, ma'am?

14  Q   It is on the second to the last page.  So it is from you

15  to Mary Ellen Smith?

16  A   Yep.

17  Q   Dated March 9th, 2012?

18  A   Um-hum.

19  Q   Do you recognize this e-mail?

20  A   I do.

21  Q   Okay.  This is an e-mail that you sent to Ms. Smith?

22  A   Yes, it is.

23  Q   In this e-mail speaking of Arvato you state that, "They

24  were demanding a significant increase in their current

25  pricing.  This, coupled with the scale, they cannot match in

1    Europe as it relates to distribution and logistics compared

2    to CEVA, ultimately meant that we move the business."

3         Focusing first on the significant increase in their

4    current pricing that Arvato was demanding, is that in

5    reference to the bid that they submitted for the new

6    facility, or were they demanding an increase in their pricing

7    at the Duren facility prior to the move?

8    A   No, ma'am.  This is all to do with the new facility.

9    Q   And then what does it mean when you reference "scale that

10   they," Arvato, "cannot match in Europe"?

11   A   This was a reference to help --  This was an informed

12   e-mail, so to Mary Ellen Smith, to help her understand that

13   -- She probably didn't know of CEVA Logistics.  And I was

14   trying to position the fact that CEVA Logistics were a big

15   player, and in fact were a significantly bigger player in the

16   logistics field than Arvato was, just to give her some

17   comfort that we weren't selecting some small supplier were no

18   background.

19   Q   And so in this e-mail you are reassuring her that CEVA is

20   actually a bigger player than Arvato in this area?

21   A   A known player and has scale, yes.

22   Q   Did they have -- did CEVA have a bigger scale than Arvato?

23   A   Worldwide, yes.

24   Q   What about in Europe?

25   A   Yes, in Europe as well.

1   Q   I will hand you what we will mark as Roberts Exhibit 10,

2   which has the Bates number MS-Moto_1823_0004082140.  Do you

3   recognize this document?

4   A   I do indeed.

5   Q   Okay.  And focusing on the bottom e-mail on the page from

6   you, dated March 8th, 2012.  Do you --

7   A   Yes, I see where you are.  Yeah.

8   Q   Is this your e-mail to CEVA announcing that CEVA had won

9   the bid on the EMEA distribution facility?

10  A   Yes, it is.

11  Q   And is it correct that on or about March 8th the decision

12  that was made was the decision between Arvato and CEVA, not

13  the decision to move in the first place, correct?

14  A   Absolutely.

15  Q   Okay.  I was going to hand you what we will mark as

16  Roberts Exhibit 14, which has Bates number

17  MS-Moto_1823_00004083147.

18       Have you seen this document before?

19  A   Yes, I have.

20  Q   Can you tell me what this document is?

21  A   Yes.  This was a document that we asked our GM of

22  operations in Dublin, who owns the channel relationship, the

23  sales relationship.  We asked her to send out a document to

24  the team letting them know that we had made a change, and

25  giving them some basic statistics around the change, to help

1   put their minds at ease around the transition.

2   Q   Do you know if you or anyone else on your team reviewed

3   her e-mail before she sent it?

4   A   I am sure that the facts and figures were given to her by

5   Jeff and his team, and she would have made up the -- she knew

6   the dates obviously, so this is just her writing.

7   Q   Do you have any reason to believe that the facts and

8   figures reflected in this document are not correct?

9   A   No, I don't have any reason to believe that.

10   Q   Okay.  In the second paragraph of Ms. Daly's June 1st,

11   2012 e-mail she states, "The decision to move our main

12   distribution center in Europe was made with a vision for the

13   future."  Do you know what she is referring to there?

14   A   No, I don't.

15   Q   Do you agree with that statement?

16   A   I believe this document is designed for sales folk to

17   digest.  So its written in the hyperbole.

18   Q   To your knowledge, does the Netherlands facility have more

19   space, lines, and doors than Microsoft needed?

20   A   The facility that we were able to get was bigger than the

21   Duren facility, and was, at that time, potentially bigger

22   than we absolutely needed, but that was all that was

23   available.

24   Q   Okay.  And I know you stated earlier you had the

25   discussion with Shelley McKinley in which you learned of the

1    potential for an injunction --

2    A    Yeah.

3    Q    -- in January before 2012?

4    A    Correct.

5    Q    Prior to January of 2012, did you have any information

6    regarding the potential for an injunction?

7    A    No, ma'am.

8    Q    Okay.  And were you aware of the litigation in Germany at

9    all?

10   A    No, ma'am.

11   Q    And do you know why Shelley or anyone in the legal

12   department did not advise you of that prior to January

13   of 2012?

14   A    No.

15   Q    In terms of when Microsoft started the process for

16   relocating the distribution facility, from your point of view

17   what date would that be?  Would that be January of 2012 or

18   early March when the decision was made to go to CEVA?

19   A    Can you clarify the question?  I thought I had already

20   testified that the first I heard about this was in mid to

21   late January.

22   Q    Right.  I'm trying to get an idea from your perspective.

23   When you are thinking about when the move process started, do

24   you go back to the January date or once you selected a vendor

25   and were, you know, moving forward with that vendor?

1  A   No.  As far as my recollection is concerned, we had not

2  made a decision to move the facility in that January date.

3  We had the potential risk of a move and that's why we were

4  being prudent and starting the work of due diligence.  And it

5  was at some later stage -- some stage between that date and

6  March date when we finally awarded the business that we had

7  decided that we were going that way.  And I think that was

8  closer to the March timeframe than the January timeframe.

9  Q   And it's correct that Arvato's bid was higher than CEVA's

10 bid, correct?

11 A   Yes, that is correct.

12 Q   If Microsoft had chosen to go with Arvato to run the

13 Netherlands facility, would that have reduced costs because

14 Arvato already had institutional knowledge?

15 A   No.  Their bid was higher than CEVA's bid.

16 Q   I understand that Microsoft shared the Duren facility with

17 other tenants, correct?

18 A   That is correct.

19 Q   It does not do so at the Venray facility, correct?

20 A   That is correct.

21 Q   If the Venray facility was larger than Microsoft needed,

22 I'm wondering if Microsoft considered using just a portion of

23 that facility to keep costs down?

24 A   Yeah, we --  The facility was selected on the basis of it

25 was the appropriate square footage for our business.

1    Q    Okay.  So it fit the needs for Microsoft?

2    A    It fit the needs for Microsoft.

3    Q    Do you know whether Microsoft is storing more products in

4    the Venray facility than it was storing in the Duren

5    facility?

6    A    At any one point in time I can't answer that question.

7    Historically in the Duren facility during peak periods we

8    would have to go and source alternative warehousing space to

9    cover those peak periods at a very high cost because Duren

10   didn't have the space for us.

11   Q    And so you don't need to do that in Venray?

12   A    I don't know for now whether we do or not.  Our business

13   continues to grow on a fairly exponential basis.

14   Q    Are you aware of Microsoft having to find alternative

15   space in peak periods since the move to Venray?

16   A    Not for the first holiday season.

17         MR. PRICE:  Your Honor, with respect to the

18   depositions you just heard, we move into evidence

19   Exhibit 7135, Ms. Daly; and for Mr. Roberts, Exhibit 6033,

20   7146, 7150 and 6022.

21         THE COURT:  Any objection?

22         MS. ROBBINS:  No objection, your Honor.

23         THE COURT:  The exhibits are admitted.

24         (7135, 6033, 7146, 7150 and 6022 admitted.)

25         MR. PRICE:  The next witness by deposition is Leo

1   Taylor.

2                          LEO TAYLOR

3         Having been sworn under oath, testified as follows:

4                          EXAMINATION

5   Q   Would you state your name for the record, sir?

6   A   K. McNeill Taylor, Jr.

7   Q   Where do you work?

8   A   I work in Libertyville, Illinois and San Diego,

9   California.

10  Q   Who is your employer?

11  A   Motorola Mobility, Inc.

12  Q   What is your current title?

13  A   I am corporate vice-president and chief IP counsel.

14  Q   What are your duties and responsibilities in that

15  position?

16  A   I'm responsible for all intellectual property matters,

17  other than trademarks, and all litigation matters.

18  Q   I'm going to hand you what's been marked as Exhibit 1 for

19  identification.  Why don't you take a minute to review that?

20  Then I'm going to have a few questions for you.

21  A   Okay.

22  Q   Have you seen this letter before today?

23  A   Yes.

24  Q   Can you identify it for us, please?

25  A   It is a letter that Motorola sent to Microsoft offering a

1   license on RAND terms under Motorola's patents essential to

2   the 802.11 standard.

3   Q   When did you see this letter for the first time?

4   A   When I participated in drafting it.

5   Q   Can you recall who the other participants were?

6   A   I'm not sure.  I know we had --  Kirk obviously was

7   involved, as he ended up signing it.  I believe Tim Kowalski

8   was involved, and we had outside counsel review and advise as

9   well.

10  Q   When did Microsoft request that Motorola identify its

11  patent value?

12  A   Sometime after the surprise attack on, when was it,

13  October 1st or 4th.  There was --  At that point there were

14  calls from Microsoft reaching out, trying to explain what

15  they were doing to a number of executives.  And there was a

16  subsequent meeting.  I think it was a meeting that had been

17  scheduled before the surprise attack for licensing

18  discussions.  And in that meeting, my understanding was, Brad

19  Smith and Horacio Gutierrez communicated they were trying to

20  start a licensing program, and they had an existing agreement

21  with HTC, and due to sort of a high-level most-favored

22  nations concern on their part we really needed to establish

23  our patent value to be able to have some sort of balanced

24  deal.  I don't think Microsoft had any -- initially I don't

25  think they had any thought that Motorola would ever pay $5

1    per phone and $10 per tablet, which they claim was their

2    program.

3        We'd been coexisting for years without exchanging money,

4    knowing that each side was getting value from the other

5    side's patented technology.  Microsoft decided to change that

6    picture, so they tried to explain that.

7        We were, you know, obviously taken aback that we were

8    attacked without warning, and we were responding to their --

9    And they followed up later and confirmed that's what they

10   wanted us to do.  I think they actually used the term "you

11   need to sue us" to show the value that have you in your

12   portfolio.

13   Q    Before the Exhibit 1 letter was sent, can you recall

14   anyone evaluating the 2.25 royalty rate to see if it involved

15   an offer of fair and commercially reasonable terms?

16   A    Do you mean specifically in connection with the letter?

17   Q    Yes.

18   A    The answer is yes.

19   Q    Do you recall who did that evaluation?

20   A    Yes.

21   Q    Who?

22   A    It was myself and outside counsel, and I think a broader

23   discussion among the group.

24   Q    And the group encompassed who, other than you and outside

25   counsel?

1   A   Kirk Dailey and Tim Kowalski.  It wasn't a specific

2   discussion of, oh, is this FRAND?  It was, what rate?  What

3   do we put in the letter?  And, let's make sure the letter is

4   consistent with our FRAND obligation.

5       We didn't really have any focus on the 2.25.  I think that

6   was the basis of your question.

7   Q   Yes, sir.

8   A   Because that was already so well established.

9   Q   So, if I understand your testimony, what you're saying is

10  that the 2.25 royalty rate that was proposed in Exhibit 1 was

11  not evaluated in connection with the sending of the Exhibit 1

12  letter because you had used that rate in the past in the

13  other license agreements that we've talked about?

14  A   No.  That's not what I said.

15  Q   How did I get what you said wrong?

16  A   I said we did look at all the provisions in the letter,

17  because we wanted to make sure that we were following our

18  FRAND obligation.  We didn't have to focus much on the

19  specific rate.  At this point we didn't know a lot about the

20  product areas of Microsoft, and we expected to get that

21  information in good faith negotiations.  We didn't expect

22  litigation tactics.  My expectation was good faith

23  negotiation.

24  Q   Why did you think when the Exhibit 1 letter was sent that

25  2.25 was a reasonable rate as distinct, for example, from a

1  tenth of one percent?

2  A   A tenth of one percent would never have entered my mind.

3  That would be a ludicrous rate.  It wouldn't justify the

4  transaction cost and licensing, much less provide any

5  compensation for our R&D investment.  I never considered a

6  rate like that in my years at Motorola.

7       2.25 percent --  We've done 50 agreements.  I've been

8  involved in over half of those.  And its always been in the

9  range of -- trying to get something in the range of 2.25

10  value.  It's what I believe is standard in telecommunications

11  and equipment manufacturers.

12  Q   I take it no one went back to see what consideration

13  others at Motorola had given in the past to appropriate

14  royalty rates for Motorola's 802.11 standards when licensed

15  to makers of video games, laptops, PCs and that sort of

16  equipment?

17            MR. PEPE:  Objection.  Form.

18            THE WITNESS:  Well, the people who were working on

19  the letter were the people who had been involved in it.  I

20  personally had been involved in all sorts of licensing.  And,

21  definitely, in sending out the letter and approving the form,

22  I thought about what we had done in the past.

23  Q   Now, in thinking about the offer that was made to

24  Microsoft in Exhibit 1, was it your view that Motorola had a

25  contractual obligation to Microsoft to offer fair and

1    commercially reasonable terms for the Motorola patents that

2    were the subject of the letter?

3    A    No.

4    Q    Before the Exhibit 1 letter was sent, did anyone else that

5    was involved in putting that letter together, so far as you

6    know, investigate how many other patent owners besides

7    Motorola had provided letters of assurance in connection with

8    the 802.11 standard?

9    A    I am sure that we were aware as a company of the other

10   declarants or other submitters of letters of assurance.

11   Q    Sure.  In formulating the 2.25 royalty rate in Exhibit 1,

12   did Motorola consider the fact other patent owners besides

13   Motorola also claimed to have 802.11 standards-essential

14   patents?

15   A    The people who were involved in sending out the letter,

16   drafting and sending it out were knowledgeable in this area.

17   I think we all understood there were a lot of 802.11 patents

18   out there.

19   Q    If were you demanding a grant-back of Microsoft's standard

20   essential 802.11 patents, wouldn't it have been important in

21   judging whether the 2.25 percent net of that grant-back was

22   reasonable, to look at the volume of their sales versus your

23   sales, and to look at the value of their 802.11

24   standards-essential patents?

25   A    We certainly expected to do that in the good faith

1   negotiations.

2   Q   Why didn't you do it before you put a number on the table?

3   A   Because we didn't have any time.  We'd been sued and

4   Microsoft asked us to put our patents on the table.  And

5   that's what we did.  And typically we never had to do that.

6   We might look at backlash as a general concept before

7   launching a licensing negotiation.  But in this case we

8   didn't have to look at backlash, because we knew we were

9   under attack.  So, here, it was to get the discussion

10   started.  It was to lay out our standard rate and to make

11   sure that it was understood there would be a grant-back.

12   This is a very high level one=page three-paragraph letter

13   intended to get discussions started.  That was my

14   expectation.

15   Q   I am going to hand you what has been marked as Exhibit 2.

16   Can you identify it for the record?

17   A   This was a letter that Kirk Dailey signed that was sent to

18   Microsoft on October 29th related to H.264

19   standards-essential patents.

20   Q   When did you see this letter for the first time?

21   A   I participated in drafting it, you know, about that time.

22   Q   Now, if Microsoft had accepted the 802.11 license offer in

23   Exhibit 1, would Motorola have licensed the H.264 patents

24   addressed in Exhibit 2 at no additional charge?

25   A   That's our standard practice.

1  Q   Now, that fact is not laid out in the Exhibit 2 letter.

2  Was that just an oversight?

3  A   It wasn't an oversight.  Our expectation was there was

4  going to be good faith negotiation.  We were, you know --  I

5  was really surprised when instead of negotiating, you know,

6  Microsoft came up with this idea about how to short circuit

7  that and focus more on litigation.  It is not something I

8  ever contemplated.

9      My concern was, you know, let's get it out there.  Let's

10  start the discussion.  And I expect discussion.  So I don't

11  expect the standards essential to be something that we'll be

12  actively litigating in the short term.  We were certainly

13  getting ready for it.  It was easier to get ready from a

14  litigation standpoint because we had the claim charts done.

15      On the nonessential side they would get 24,000 patents.  I

16  think we spent a million dollars that October trying to firm

17  up our case on the nonessential side.  We didn't spend nearly

18  anything on the essentials side because we already had the

19  work done through the claim charts.

20  Q   How do you decide what a reasonable royalty is in that

21  situation if you have a commitment to a standards body to

22  charge a reasonable royalty?

23  A   Just the way we've come up with a royalty rate, we have

24  developed over time a lengthy -- I don't know, 25-page

25  document that sets forth what we believe are our FRAND terms.

1    2.25 has typically been the rate in those terms on the

2    end-user product price.  We present that to the other side.

3    And then typically what happens is they either have some

4    patents or they try to construct some other arguments to

5    negotiate, or they make some other offer, like, I'll commit

6    to pay a certain amount, I will give you this lump sum

7    amount, something that balances the risk.

8        But then there are cases where they just say, yeah, I

9    don't have anything, I guess that's it.  We spend a lot of

10   time going through the terms and conditions.  I don't think

11   anybody just signs the document we send over.  Then they will

12   have more concern about one area or not.  We either get an

13   agreement done or we don't.

14       Then at that point you have to decide what to do next.

15   Typically we've been very successful in reaching agreements

16   using that process.

17           MS. SULLIVAN:  Your Honor, Motorola calls Mr. Richard

18   Holleman.

19                       RICHARD HOLLEMAN

20       Having been sworn under oath, testified as follows:

21           THE CLERK:  Will you state your full name for the

22   record, please?

23           THE WITNESS:  Richard Joseph Holleman.

24                       DIRECT EXAMINATION

25   By Ms. Sullivan:

1    Q    Good morning, Mr. Holleman.

2    A    Good morning.

3    Q    Could you please describe your educational background to

4    the jury?

5    A    I am a graduate of the U.S. Military Academy at West

6    Point.  I have a bachelor's of science degree.

7    Q    After West Point did you serve in the Army?

8    A    Yes, I did.  I was commissioned as an officer in the Corps

9    of Engineers.  I served in the Airborne Combat Engineer

10   Battalion of the 101st Airborne Division.  And I was Ranger

11   qualified.

12   Q    Please describe your professional background after the

13   Army?

14   A    In 1963 I exchanged an Army green uniform for an IBM blue

15   suit.  I worked for IBM for 37 years.  I retired in July

16   of 2000.  During that time I held and managed a number of

17   standards positions, including being the corporate director

18   of standards in intellectual property and licensing.

19   Q    Did your standards work at IBM give you occasion to work

20   with the standards bodies in this case, ITU and IEEE?

21   A    Yes, it did.  I was IBM's representative to those

22   organizations and other standards organizations, both

23   nationally and internationally, and took positions, presented

24   material and information, particularly in the area of

25   patent-related standards, to IEEE, the ITU and others.

1  Q   Did you have specific responsibility for patent policies

2  with either of those organizations?

3  A   Yes.  In the case of the ITU, for about 15 years I was

4  IBM's representative to the U.S. State Department Advisory

5  Committee.  In that role I represented not only IBM but U.S.

6  interests internationally in developing positions.  I was the

7  person in a number of leadership roles.  I drafted the first

8  guidelines to the ITU patent policy, and also chaired the

9  committee that actually developed and published the patent

10  licensing statement for the ITU.

11  Q   And with the IEEE?

12  A   With the IEEE, again, both of these were for about 15

13  years.  I was in a leadership position.  I had a number of

14  positions in the IEEE, chairman of the standards board.  Most

15  significantly, I was named the first chairman of the

16  standards board patent committee.  And I held that position

17  from 1994 to 1997.

18  Q   So all told, Mr. Holleman, how many years have you been

19  involved with standard policies?

20  A   Well, I have been involved in standards policies now for

21  more than 30 years.

22  Q   Are you an expert on the patent policies and practices of

23  standard-setting organizations?

24  A   Yes, that's the area of my expertise.

25  Q   Now, Mr. Holleman, I would ask you to look in your binder,

1   please, at the exhibit that has been marked 7020-A.

2   A    Yes.

3   Q    Can you identify that document?

4   A    Yes.   That's my CV, my resume, of my background.

5          MS. SULLIVAN:  Your Honor, Motorola moves into

6   evidence the exhibit marked 7020-5.

7          MR. CEDEROTH:  No objection.

8          THE COURT:  It is admitted and may be published.

9          (7020-5 admitted.)

10  By Ms. Sullivan:

11  Q    Mr. Holleman, how did you come to be involved in this

12  lawsuit?

13  A    I was asked by Motorola to give my opinions on the SSO

14  policies and procedures relating to standards and patented

15  materials.

16  Q    Are you being paid for that work?

17  A    Yes, I am.   I am being paid at my normal rate of $600 an

18  hour.

19  Q    Does your payment depend in any way on the outcome of the

20  case?

21  A    No it does not.   It is independent of the outcome.

22  Q    So, Mr. Holleman, I would like to turn your focus now to

23  the reasons why we have standard-setting organizations.   Can

24  you describe why we have standard-setting organizations?

25  A    Well, standard-setting organizations, their primary

1   purpose is to develop and be able to publish standards that

2   will promote interoperability, interconnectivity,

3   compatibility of products and services, and doing so using

4   the best technology that is available.  Often, particularly

5   in high tech fields like telecommunications and information

6   technology, there are patents associated -- patented material

7   associated with those specifications.

8   Q    How do SSOs achieve those goals?

9   A    The goals and their objectives is to balance the rights of

10  the patentholder for fair compensation for their contribution

11  with the needs of the implementers to be able to have patents

12  that they can use in the promulgation of the standard and

13  implementation of the standards and their products.  This is

14  the balance that is very important to the SSOs.

15  Q    How is that balance achieved?

16  A    It is achieved through the form of what we are calling the

17  letters of assurance.  So the LOAs are the requests to the

18  patentholders to inform the SSO if they have patents that

19  they feel may be essential to the implementation of the

20  standard.

21  Q    What commitment do they make in the LOAs?

22  A    The LOAs, one of the options is to indicate that you are

23  willing to provide the licensing -- make licenses available

24  under reasonable non-discriminatory terms and conditions.

25  You have heard a lot of that here, commonly known as RAND.

1   It was just referred to as FRAND, which is the European

2   version.

3   Q    Are patentholders required to provide letters of

4   assurances?

5   A    No, they are not.  It is voluntary on the part of the

6   patentholder to decide if they wish to, or if they do not

7   want to.

8   Q    Now, I would like to turn to some of these specific

9   policies you have been describing.  And I would like to start

10  by asking to you turn to Exhibit 217 in your binder.  For the

11  jury's convenience we will show that on the screen.

12              THE COURT:  It is not admitted.

13              MS. SULLIVAN:  Excuse me, your Honor.

14  By Ms. Sullivan:

15  Q    Can you turn to Exhibit 217, Mr. Holleman?

16  A    Yes, I have it here.

17  Q    Can you identify that document?

18  A    Yes.  It is the common patent policy for the ITU.

19  Q    Is that one of the policies you were involved in drafting?

20  A    Yes.  This would be included in the guidelines.  It is

21  policy through my work and the ITU for the U.S.  I was

22  involved in reviewing, and in some cases modifying it,

23  through the years.

24              MS. SULLIVAN:  Motorola moves into evidence the

25  exhibit marked 217.

```
 1          MR. CEDEROTH:  No objection.

 2          THE COURT:  217 is admitted and may be published.

 3          (217 admitted.)

 4   By Ms. Sullivan:

 5   Q   Let's show a demonstrative to make it easy for the jury to

 6   read.  Mr. Holleman, what if anything does the ITU common

 7   patent policy say about RAND licenses?

 8   A   In this document, if we look at the third paragraph, there

 9   is a sentence at the end that says, "the detailed

10   arrangements arising from patents, licensing royalties,

11   et cetera, are left to the parties concerned, as these

12   arrangements might differ from case to case."

13   Q   Now, could you please look in your binder at the exhibit

14   that has been marked 2838?

15   A   Yes, 2838.

16   Q   Can you identify that document?

17   A   This is the patent statement form for the ITU.

18   Q   And can you identify in particular --

19          MS. SULLIVAN:  Motorola moves into evidence

20   Exhibit 2838, your Honor.

21          MR. CEDEROTH:  I'm not sure the testimony corresponds

22   to the exhibit at this point.

23          MS. SULLIVAN:  May I do a follow-up question?

24          THE COURT:  Yes.

25   By Ms. Sullivan:
```

1   Q    Mr. Holleman, can you identify which letter of assurance

2   this is, this Exhibit 2838?

3   A    2838 is the ITU's patent statement licensing declaration

4   form.  It is their version of an LOA.

5   Q    And is there any company listed on that form?

6   A    Yes.  Motorola is listed as the patentholder on these

7   forms.

8   Q    So is it fair to say that these were the letters of

9   assurance filed by Motorola under the ITU common patent --

10  A    Yes, it is.

11          MR. CEDEROTH:  Leading.

12          MS. SULLIVAN:  I am just trying to help with your

13  question, Mr. Cederoth.

14          THE COURT:  I will overrule the objection.

15          MS. SULLIVAN:  Motorola moves into evidence 2838.

16          MR. CEDEROTH:  No objection.

17          THE COURT:  2838 is admitted.

18          (2838 admitted.)

19          THE COURT:  Counsel, you might want to comment on

20  Page 39, also, two or three in.

21          MS. SULLIVAN:  Your Honor, I was going to get to that

22  next.  If I may just finish on 2838?

23          THE COURT:  That is part of 2838.  Your witness has

24  testified this is Motorola, and this also includes General

25  Instruments, at least in my copy of the exhibit.

1      MS. SULLIVAN:  Your Honor, on 2839 --

2      THE COURT:  I am on 2838, counsel, which is a

3  multipage document.

4  By Ms. Sullivan:

5  Q   2838 is a multipage document.  Does it also include a

6  commitment made by General Instruments Corporation?

7  A   The first few pages is Motorola's declaration.  That is

8  followed by a declaration by General Instruments, and then

9  another one by Motorola.

10  Q   Focusing on Page 2 of the document, can you tell us

11  whether there is a particular option that Motorola chose on

12  that form?

13  A   Well, as you can see from the form on the screen, there

14  are three options, one, two and three.  Motorola in this case

15  has checked or Xed out the second option, which is the RAND

16  option on the form.

17  Q   And what does that option say?

18  A   It says they are willing to grant a license, unrestricted

19  number of applicants, worldwide, non-discriminatory basis on

20  reasonable terms and conditions.

21  Q   Does it say anything about RAND licenses?

22  A   Yes.  Just below that there is a sentence that reads,

23  "Negotiations are left to the parties concerned and are

24  performed outside of the ITU."

25  Q   Do you see italicized text below that?

1    A    Yes, I do.

2    Q    What does that say?

3    A    There is a sentence here in italics that reads, "Also mark

4    here with an X, which Motorola did.  If the patentholder's

5    willingness to license is conditioned on reciprocity for the

6    above documents," meaning the above standard.

7    Q    What does "reciprocity" mean?

8    A    Well, reciprocity is actually described even in the bottom

9    of this document.  But simply it refers to the fact that if

10   the licensee has --

11         MR. CEDEROTH:  Your Honor, I believe this is beyond

12   the scope of the expert report and the allowed testimony.

13         THE COURT:  Counsel, I will see you at sidebar.  And

14   someone needs to bring the report.

15   (Sidebar out of the presence of the jury.)

16         MR. CEDEROTH:  As for the objection, I didn't want to

17   say out loud, it transcends the court's Daubert order.  He is

18   not allowed to give testimony on the meaning of terms.  He is

19   allowed to say what is in and what is not.  He is not allowed

20   to give --

21         THE COURT:  Let's start with --  What's in the

22   report?

23         MS. SULLIVAN:  Your Honor, I will withdraw the

24   question.

25         THE COURT:  All right.  That was easy.

1   (End of sidebar.)

2           THE COURT:  Ms. Sullivan, you are going to ask a

3   fresh question?

4           MS. SULLIVAN:  Yes.

5   By Ms. Sullivan:

6   Q   What in the SSO policies --  What do the SSOs, based on

7   your experience of the SSOs, say about specific RAND terms,

8   if anything?

9   A   In this case neither the ITU nor the IEEE policies -- in

10  fact most SSOs policies are silent on specific RAND terms.

11  That's considered outside the scope of the policy, outside

12  the practices and procedures of the SSOs.

13  Q   Mr. Holleman, can you turn in your binder to the document

14  marked 2839?

15  A   Yes.

16  Q   Do you recognize the document?

17  A   Yes, I do.

18  Q   What is it?

19  A   This is the IEEE's letter of assurance form.  And this one

20  has been completed by Motorola.

21          MS. SULLIVAN:  Motorola moves 2839 into evidence.

22          MR. CEDEROTH:  No objection.

23          THE COURT:  2839 is admitted.

24  By Ms. Sullivan:

25  Q   Now, on this form, what option, if any, did Motorola

1    choose in returning that form?

2    A    Well, on this form there are four options that are shown.

3    The second one is checked, and that's the RAND option.

4    Q    Can you read that?

5    A    "Patentholder is prepared to grant a license to an

6    unrestricted number of applicants on a worldwide

7    non-discriminatory basis and on reasonable terms and

8    conditions to comply with the IEEE standard."

9    Q    Does it say anything else on that page about RAND

10   licenses?

11   A    Yes.  I think, importantly, up at the top there is an

12   italics statement at the very top of the form.  It says, "No

13   license is implied by submission of this letter of

14   assurance."

15   Q    Now, Mr. Holleman, just one last question.  In your

16   experience with standard-setting bodies, why is it in your

17   experience that those bodies have a policy of leaving

18   negotiations to the parties?

19   A    Well, negotiations are left to the parties because the

20   SSOs are concerned about not wanting to be accused of any

21   anticompetitive behavior.  These are competitors that join

22   together in the standards committee to decide on technical

23   aspects.  So they are very specifically precluded from

24   discussing licensing terms, doing negotiations, royalty rates

25   and so forth.  So all of that is left outside of the SSO's

1   policies and practices.  As far as the SSOs are concerned,

2   and based on my background and experience, when there is a

3   RAND undertaking there is no limit from an SSO point of view

4   on the patentholder's right to assert its legal rights to

5   enforce its standards, and including the right to seek

6   injunctions, as far as the SSO policies --

7           MR. CEDEROTH:  I will object.

8           THE COURT:  I will sustain the objection.  The jury

9   will regard that last testimony, which was nonresponsive, and

10  involves a legal conclusion that this witness is not

11  qualified to give.  We will leave it at that.

12          MS. SULLIVAN:  Thank you, your Honor.

13  By Ms. Sullivan:

14  Q   Just confining yourselves to the SSO policy, sir, where do

15  the policies leave the manner of specific RAND terms?

16  A   The specific terms, as I said, are left completely to the

17  parties involved, and the expectation is that there will be

18  negotiations between the parties.

19          MS. SULLIVAN:  Thank you very much, Mr. Holleman.

20  Thank you, your Honor.  No further questions.

21                          CROSS-EXAMINATION

22  By Mr. Cederoth:

23  Q   Mr. Holleman, you are not offering any opinions on

24  economics, are you?

25  A   No, I'm not.

1    Q   And in preparation of your opinions for this case, you

2    have not spoken with anyone at the ITU or IEEE, have you?

3    A   No, I have not.

4    Q   Now, on your direct testimony you said that submitting

5    letters of assurance is a voluntary activity.  But it is

6    binding on the party that submits the letter of assurance

7    once they do submit it, correct?

8    A   It is expected they will be willing to offer licenses on

9    RAND terms, yes.

10   Q   In terms of your own personal experience, you have never

11   participated in a negotiation of a patent license on RAND

12   terms, correct?

13   A   That's correct.

14   Q   You have never been directly involved in negotiating any

15   type of license?

16   A   This is correct, yes.

17   Q   And you have no personal experience in evaluating what

18   would be a reasonable royalty rate, correct?

19   A   No, I do not.  That is outside the scope of my testimony

20   and my expertise with SSOs.

21   Q   And you are not qualified to offer testimony on whether

22   someone has offered a RAND royalty?

23   A   No, I'm not, again, outside of SSO's activities and my

24   expertise.

25   Q   Now, with respect to the SSO policy that you mentioned,

1  the policies of the IEEE and the ITU do not address the

2  situation where the implementer of a standard, like

3  Microsoft, believes that it is not getting a RAND offer and

4  has to go to court, correct?

5  A   Correct, the policies do not address such a situation.

6  Q   Now, you testified today that the SSOs do not specify RAND

7  royalty, correct?

8  A   They do not specify a specific actual RAND royalty, is

9  that what you're asking?

10 Q   Yes.  That was your testimony?

11 A   That's true.  It doesn't specify a specific royalty rate.

12 Q   In your binder, the black binder that was handed up, would

13 you turn to the document that has been marked as

14 Exhibit 1130?

15 A   Yes.

16 Q   Can you identify that document?

17 A   This is a copy of the IEEE standards 1994 operations

18 manual.

19 Q   Now, that is a document you are familiar with and that you

20 reviewed in forming your opinions here, correct?

21 A   Yes, it is.

22        MR. CEDEROTH:  Your Honor, Microsoft moves 1130.

23        MS. SULLIVAN:  No objection.

24        THE COURT:  Exhibit 1130 is admitted and may be

25 published.

1        (Exhibit No. 1130 was admitted into evidence.)

2    By Mr. Cederoth:

3    Q    Now, at the time that Motorola and Symbol --  Are you

4    familiar with Symbol?

5    A    Symbol Technologies, I know the name, yes.

6    Q    At the time that Motorola first submitted its letter of

7    assurances to the IEEE, beginning in 1994, there was a

8    requirement that pursuant to the operations manual that the

9    license be provided at nominal competitive costs, wasn't

10   there?

11   A    There is a statement to that effect in this document, and

12   also a statement on a basis of reasonable costs.  Both of

13   them are in this document.

14   Q    And at Page 19, at the bottom, Section 6.3.2 submittal, in

15   fact it requires that the license be provided on nominal

16   competitive costs?  That's the RAND license that is provided

17   pursuant to the letter of assurance, correct?

18   A    It says, "Will be made available at nominal competitive

19   cost," correct.

20   Q    Now, the ITU and the IEEE RAND policies say nothing about

21   making sure that patentholders receive any royalty

22   compensation, do they?

23   A    Well, it does say that they will -- their RAND letter of

24   assurance is for reasonable terms and conditions.  And, as I

25   said, there is a balance there that applies to the licensee

1    and to the licensor.  I think there is an intent and an

2    expectation that this is a two-way street.

3    Q   Would you turn in your binder to your 2013 deposition?  I

4    will call your attention to Page 195, Lines 11 to 15.

5    A   I'm sorry.  What page was that?

6    Q   It is Page 195, which is the second to the last page in

7    that tab.

8              THE COURT:  The ITC deposition?

9              MR. CEDEROTH:  It is the 2013 deposition, second tab

10   in the black binder, in the upper right-hand corner of that

11   page.

12             THE WITNESS:  The page again, please?

13   By Mr. Cederoth:

14   Q   The page of the deposition is 195, looking at Lines 11 to

15   15.

16   A   Yes.

17             MR. CEDEROTH:  Have you found that, your Honor?

18             THE COURT:  Yes.

19             MS. SULLIVAN:  Your Honor, objection.  The testimony

20   in the deposition is not inconsistent with the testimony.

21             THE COURT:  I will permit the question.

22   By Mr. Cederoth:

23   Q   Sir, in your deposition you were asked the question:

24   "Okay.  And the ITU and the IEEE IPR policies are simply

25   silent as to the extent of any compensation for the

1  patentholders?"  Answer:  "In terms of a royalty, yes, they

2  are silent."  Were you asked that question and did you give

3  that answer?

4  A   Yes, I did.

5         MR. CEDEROTH:  No further questions, your Honor.

6         THE COURT:  Ms. Sullivan.

7         MS. SULLIVAN:  No further questions, your Honor.

8         THE COURT:  You may step down.

9         MR. CANNON:  May I call the next witness.

10        THE COURT:  Yes.

11        MR. CANNON:  Motorola calls Gregory Leonard.

12                       GREGORY LEONARD

13     Having been sworn under oath, testified as follows:

14        THE CLERK:  Will you state your name for the record,

15  please?

16        THE WITNESS:  Gregory Keith Leonard.

17                     DIRECT EXAMINATION

18  By Mr. Cannon:

19  Q   Dr. Leonard, where are you employed?

20  A   I am an economist and partner at an economics consulting

21  firm called Edgeworth Economics.

22  Q   Would you describe your educational background for the

23  jury, please?

24  A   Yes.  I received a bachelor of science degree in applied

25  math and economics from Brown University in 1985, and then a

1  Ph.D. in economics from the Massachusetts Institute of

2  Technology, or MIT, in 1989.

3  Q   Would you describe your professional background, please?

4  A   Yes.  I started off after getting my Ph.D. as an assistant

5  professor at Columbia University, and then I went into

6  economic consulting, and I have been doing that for about 20

7  years.

8  Q   Do you have any particular specialties in economics?

9  A   Yes.  My areas of specialty are, first, what is called

10  applied microeconomics, which is the study of how consumers

11  behave and how firms behave; and also econometrics, which is

12  the application of statistical methods to data and economics.

13  Q   Can you tell us briefly about any publications you might

14  have had?

15  A   Yes.  I have had over 50 publications and journals of one

16  sort or another.  And a number of those have addressed issues

17  on intellectual property, such as I had one publication in

18  the Journal of Econometrics.  It looked at econometric

19  methods for values in patents.

20  Q   Have you been involved in the publication of any books?

21  A   Yes, I edited a book on the economics of intellectual

22  property, and co-authored several of the chapters.

23  Q   Could you describe any other experiences you have with the

24  economics of intellectual property?

25  A   Yes.  I have been consulted on two occasions by federal

1  government agencies to get my views on issues related to

2  intellectual property policy.

3  Q    Have you been cited in any case law decisions?

4  A    I have.  The appeals court for patent cases cited one of

5  my works on patent damages in what is called the Unilock

6  case.

7  Q    Do you have any experience with intellectual property

8  licensing negotiations?

9  A    I do.  I have been involved in several actual licensing

10  negotiations, advising a party on how much it should pay.  It

11  was a complicated cross-license in one case.  So I have done

12  that.

13      And then also in the course of being involved in

14  litigation like this, you have the opportunity to see not

15  only executed license agreements where the parties have

16  negotiated some sort of agreement, but also a lot of times

17  the actual negotiations that went into documents related to

18  that, and people's description of what happened.  So I have a

19  fair amount of experience with actual licensing negotiations.

20  Q    Have you served as an expert witness in patent cases

21  before?

22  A    Yes, I have.

23  Q    Approximately how many cases?

24  A    Probably about 45 cases overall that involve patents in

25  one way or another.

1   Q   Did any of those cases involve requests for patent
2   damages?
3   A   Yeah.  I think about 30 of the cases or so involved patent
4   damages.
5   Q   And did any of those cases involve requests for
6   injunctions?
7   A   I didn't go back and count exactly, but I would say most
8   of them involved at one point or another a request for an
9   injunction.
10  Q   In your binder is Exhibit 7069-A.  If you could take a
11  look at that, please?
12  A   Yes.
13  Q   Can you identify this document?
14  A   Yes.  It is my curriculum vitae.
15          MR. CANNON:  Motorola offers 7069-A in evidence.
16          MR. CEDEROTH:  No objection, your Honor.
17          THE COURT:  7069-A is admitted.
18      (Exhibit No. 7069-A was admitted into evidence.)
19  By Mr. Cannon:
20  Q   You have been engaged by Motorola to testify in this case?
21  A   Yes, I have.
22  Q   Are you being paid for the work you have done?
23  A   I am.
24  Q   And what are you being paid?
25  A   My hourly rate is $700 per hour.

1    Q    Does your payment depend in any way on the outcome of this

2    case?

3    A    No, it does not.

4    Q    What were you asked to do in this case?

5    A    I was asked as an economist to take a look at some of the

6    actions of Motorola and Microsoft, and do some analysis, and

7    also to consider and respond to the arguments that were put

8    forward by Microsoft's expert, Dr. Murphy.

9    Q    Have you been attending the trial?

10   A    I have.

11   Q    And what is the basis of your opinions that you are going

12   to tell us today?

13   A    Well, I reviewed a bunch of documents -- business

14   documents that were produced in the case, and deposition

15   transcripts of people that had given testimony in the

16   deposition setting, and of course I have attended the trial

17   here.  And, also, of course, I am going to apply my economics

18   background and experience in licensing and intellectual

19   property.

20   Q    Would you put the timeline up, please?  Dr. Leonard, you

21   understand that Microsoft's accusations in this case start

22   with the letters that Motorola sent in October 2010.  Do you

23   have that understanding?

24   A    Yes, I do.

25   Q    And what is your understanding logistically about the

1    timing of when the letters were sent?

2    A    On October 1st, 2010, is when Microsoft, as we have heard

3    many times before, has brought the two lawsuits.  And then

4    shortly after that there was some discussion between most and

5    Motorola employees.  As I understand it, Microsoft employees

6    asked Motorola to put your patents on the table.  And then

7    with meetings upcoming, and in the course of this kind of

8    litigation, you want to get going.  So Motorola put together

9    the offer letters in the course of about two to three weeks,

10   and then sent them to Microsoft.

11   Q    And you understand that one of the letters had to do with

12   a standard called H.264, correct?

13   A    Yes.

14   Q    You were here during the testimony of Microsoft's expert,

15   Dr. Murphy?

16   A    Yes, I was.

17   Q    And do you recall when he was asked about the October 29th

18   letter, he said, "Such a large demand could only be explained

19   by somebody trying to extract the value of the standard, and

20   that such a big demand would have to be reflective of

21   hold-up."  Do you remember him talking about that?

22   A    I do.

23   Q    Can you tell the jury what your reaction is to that

24   testimony?

25   A    Well, it is a pretty strong statement to say that the only

1   explanation could be a hold-up strategy.  And when I looked

2   at it, I just disagreed with that.

3   Q    And why did you disagree with that?

4   A    Well, if Motorola really was interested in getting a

5   royalty that included hold-up value, it is not really a

6   rational way to go about it, to send an offer letter like the

7   one that Microsoft is claiming was sent.

8   Q    What has to happen for a company actually to receive

9   hold-up value?

10  A    Well, there actually has to be a royalty paid.  If you

11  don't ever get paid a royalty there can't be any hold-up

12  value in the royalty if it hasn't been paid.

13  Q    Are you aware of Microsoft ever paying Motorola for

14  infringing the patents?

15  A    No, I have not.  I don't think they have paid anything to

16  date.

17  Q    Can you describe as a matter of economics your opinion

18  about why the letters are not a rational way to receive

19  hold-up value?

20  A    Sure.  Basically you think, okay, do sending those letters

21  somehow give Motorola an advantage?  So think about it, does

22  it give them an advantage in the negotiation?  No.  Does it

23  give them an advantage in things that end up in court?  No.

24  So it really didn't give them any advantage, just the letter

25  itself.

1  Q    In your opinion, if you end up in litigation is the

2  company actually going to achieve hold-up value?

3  A    No.  Because presumably what is going to happen is the

4  court is going to determine the RAND royalty rate.  That RAND

5  royalty rate doesn't include hold-up.  So the letter is going

6  to be irrelevant once you get to litigation.

7  Q    From an economic perspective, what other explanations

8  could there be for sending the letters in October of 2010?

9  A    Well, the other explanation is that you are under a lot of

10 time pressure and you are trying to get a negotiation going

11 to try to settle this whole thing.  I think, as Mr. Taylor

12 testified via deposition, that's what Motorola was doing.

13 And that's a sound explanation for sending a letter.

14 Q    Do you recall Dr. Murphy talked about the leverage that

15 Motorola had over Microsoft?

16 A    I do.

17 Q    And with respect to the letters that were sent in October

18 of 2010, what is your reaction to testimony that the letters

19 might have provided leverage?

20 A    Again, the letter by itself is just a piece of paper.  It

21 can't provide any leverage.  The only way -- and Motorola

22 can't just say, Microsoft, you have to pay us, and then

23 Microsoft has to do it.  What would have to happen is

24 Motorola would ultimately have to go to court, or, of course,

25 they would have to reach an agreement.

1   Q   Do you recall when Dr. Murphy gave the example -- I am

2   going to use a bit of casual language, he gave the example of

3   five guys, each with a patent on a standard.  Do you remember

4   how he described that?  He said, maybe my patent is only

5   worth one penny, but the value of the system to him is $10.

6   Well, I can hold him up for that $10, because if he doesn't

7   get my license he loses out; not just on my penny's worth of

8   value, he loses out on the whole $10.  Do you remember that

9   testimony?

10   A   Yes, I do.

11   Q   What is your reaction to that?

12   A   It leaves out a really important part of the whole

13   process, which is crucial, which is that Motorola, for

14   instance, or a patent owner in general cannot simply say to a

15   potential licensee, you know, you can't use the standard.

16   You actually have to go to court and go through that process.

17   You have to win.  You have to get -- win on the infringement

18   validity issues.  And then ultimately you would have to

19   convince a court that they should actually give an

20   injunction.  It just leaves out what is really the crucial

21   part of the process, from my point of view as an economist.

22          THE COURT:  Counsel, we will take our break now.

23   Ladies and gentlemen, it has been a while, so let me remind

24   you.  Until the trial is over, do not discuss this case with

25   anyone, including your fellow jurors, members of your family,

 1   people involved in the trial, nor anyone else, and do not

 2   allow others to discuss the case with you.  This includes

 3   discussing the case in chat rooms or through blogs, bulletin

 4   boards, e-mails or text messaging.  If anyone tries to

 5   communicate with you about the case, please let me know about

 6   it immediately.  Do not read, watch or listen to any news

 7   reports or other accounts of the trial or anyone associated

 8   with it.  Don't do any research, such as consulting

 9   dictionaries, searching the internet or making an

10   investigation on your own.  Finally, until all of the

11   evidence has been presented and you have heard the closing

12   instructions and the views of your fellow jurors, keep an

13   open mind.  If anyone needs to speak with me about anything,

14   simply give a signed note to the clerk who will give it to

15   me.

16       Tomorrow, for your lunch, you will be the guest of the

17   court.  The clerk will be giving you a menu at some point,

18   probably early in the morning, and a lunch will come in.  I

19   think as I may have mentioned once before, that sounds good

20   the first time.  You see the same menu over and over.  Think

21   about what kind of sandwiches you like.

22       Ladies and gentlemen, please rise for the jury.

23   (At this time the jury left the courtroom.)

24           THE COURT:  Please be seated.  Ms. Sullivan, the

25   court is really not used to having its in limine orders

1    violated, and there was an in limine order on witnesses that

2    I think Mr. Holleman was specifically covered by it, that he

3    could not state legal conclusions.  You seem to be working

4    off a script, so I assume that was volunteered and not

5    anticipated response.

6         MS. SULLIVAN:  Yes, your Honor.  The Daubert motion

7    was specifically discussed and instructed, and my questioning

8    was directed solely at knowledge of SSO policy, and that was

9    not a scripted question.  Thank you, your Honor, for allowing

10   me to explain that.

11        THE COURT:  All right.  Counsel, in regards to an

12   exhibit that you previously used, which is 2970, the famed

13   June 14 letter from Microsoft to the Federal Trade

14   Commission, I have highlighted in yellow the portions that

15   have been used during the course of the trial.  And that's

16   what I told you that we would send back to the jury, as

17   opposed to the entire exhibit.  So someone should take a look

18   at this from each side and make sure I have gotten all of the

19   highlighting -- the portions of the document that have

20   actually been used.  I will give that to the clerk at this

21   time.

22      Ms. Sullivan, you were going to make motions.

23        MS. SULLIVAN:  Thank you, your Honor.  Motorola would

24   like to move as of the time of the close of Microsoft's

25   case-in-chief this morning, per your Honor's permission --

 1          THE COURT:  Yes, that's when the clock stopped for

 2    purposes of their case.

 3          MS. SULLIVAN:  Thank you, your Honor.  Motorola would

 4    like to move under Federal Rule of Civil Procedure 50(a)(1)

 5    for a judgment as a matter of law in favor of defendants on

 6    the breach of contract claims brought by Microsoft.

 7          What I would like to do, your Honor, is summarize our

 8    arguments very briefly on the record to preserve your Honor's

 9    time for the lunch break and to include, as implicated in our

10    argument, all of the arguments that would be made in a

11    written submission later today at the earliest convenience,

12    as soon we can look t the transcript of the rest of the

13    case-in-chief.  Is that acceptable to your Honor?

14          THE COURT:  That's fine.

15          MS. SULLIVAN:  I would like begin with a preliminary

16    point, your Honor.  At the time of the close of Microsoft's

17    case-in-chief there were no contracts in evidence.  And a

18    breach of contract case turns centrally on the contracts at

19    issue, and Microsoft did not introduce the contracts at issue

20    in the case.  So we point that out, that as of the time of

21    the close of its case-in-chief it was crucial, and we would

22    regard it as essential, evidence in the case that had been

23    introduced --

24          THE COURT:  I don't think you want to use the word

25    essential.

1          MS. SULLIVAN:   Correct, your Honor.   Necessary

2    evidence in the case should have been the text of the

3    contracts concerned, which was not introduced at that time.

4          In the event that your Honor thinks that omission is

5    curable, let me turn just to three brief points about why the

6    evidence failed to show in Microsoft's case-in-chief for the

7    satisfaction of a reasonable jury that Motorola had breached

8    any of its obligations of good faith to the ITU or the IEEE.

9          Let me begin with the offer letters, your Honor, and just

10   summarize the argument briefly.   With respect to the opening

11   offer letters sent by Motorola to Microsoft in October 2010,

12   it is clear from the law of this case, and all applicable

13   law, that an opening offer need not itself be on RAND terms.

14   That an opening offer is an invitation to a dialogue that

15   need not itself satisfy RAND.   And it is, second, clear as a

16   matter of law, your Honor, that no case has ever held that an

17   opening offer, by virtue of the disparity and terms alone

18   between that offer and some other view of what an appropriate

19   ultimate resolution would be, is a breach of the duty of good

20   faith.   Disparity in a price term with actual value

21   determined separately has never been found the basis for a

22   breach of the duty of good faith under Washington law.

23         So we would turn against that background to what evidence

24   Microsoft educed about Motorola's supposed breach of its

25   duty.   I would like to divide this for convenience, your

 1    Honor, into the subjective component and the objective

 2    components.  Your Honor has listed a number of aspects of the

 3    objective component.

 4        But to begin with the subjective component, we believe the

 5    undisputed evidence shows that Motorola sent the letters and

 6    intended the letters to be sent as opening offers to invite

 7    and elicit negotiations in response by Microsoft, in that it

 8    never did receive the responses it expected.  Yet, the

 9    undisputed evidence is that Motorola subjectively expected

10    Microsoft to respond to those letters based on its knowledge

11    of prior licensing proceedings and its knowledge of custom

12    and practice in the industry.  So the first point about

13    subjective good faith, these were opening offers and they

14    were intended to elicit responsive -- a response and then

15    negotiations in light of the response, but there was none.

16        The second key point on subjective good faith, the

17    amount -- the rate included in the opening letter of

18    2.25 percent, it is undisputed, was Motorola's standard rate

19    for RAND licenses based on its prior practice.  So that the

20    reliance, the resort to a default of a prior rate was

21    subjectively intended to follow past Motorola practice.

22            THE COURT:  Let me interrupt, because I have followed

23    this argument with some interest.  The testimony, and your

24    witness recently gave it again, I think Mr. McNeill, it was

25    for telecommunications and equipment suppliers.  What

1    evidence have I heard in regards to taking a rate from a

2    foreign field, applying it to a new field, and saying so that

3    makes everything okay?

4         MS. SULLIVAN:  Your Honor, we are focusing now on the

5    subjective intent.  The key fact I wanted to add to that was

6    the time pressure that was created by the October 1st

7    lawsuits.  And I don't want to confuse Mr. Taylor's testimony

8    yet, because, your Honor, we are reserving the right to file

9    an additional and separate 50(a) at the close of all

10   evidence.  At that time we will analyze the case, including

11   the testimony --

12        THE COURT:  I mention him only because he is

13   consistent with everyone else's testimony.

14        MS. SULLIVAN:  Yes, your Honor.  On that, your Honor,

15   we think that no reasonable jury could find that Motorola

16   intended that 2.25 percent rate to be offered as an opening

17   offer based on the telecommunications past practice.  No

18   reasonable jury could find that there was an intention to fix

19   that rate as the right rate for the new context.  The point

20   was, let's send our standard rate out, according to the

21   undisputed testimony, and see what Microsoft says back about

22   the differences in this context, not being a

23   telecommunication provider.  So on subjective good faith,

24   your Honor, there is simply no evidence in Microsoft's

25   case-in-chief that Motorola intended to apply a

1  telecommunication's rate from past practice to a new context

2  without discussion.  So the key point is there was an

3  expectation that Microsoft would come back and say, hey, the

4  Xbox is our product but all of these other things that we

5  sell go into PCs that are not our products.  And without that

6  response from Microsoft, we think there is no evidence in the

7  case-in-chief that there was a subjective intent to offer

8  2.25 as the proper rate in the new context, as opposed to an

9  opening to dialogue.

10      Does that answer your Honor's question.

11          THE COURT:  Yes.

12          MS. SULLIVAN:  And the last key point, your Honor, is

13  the evidence is undisputed that the origin of the

14  October 2010 letters was the Microsoft filing of the suits on

15  October 1st, the time pressure that was created by that

16  filing, the invitation, which is undisputed from Microsoft's

17  own witnesses, your Honor, to Motorola to, quote, put their

18  patents on the table.  I don't want to confuse it with our

19  responsive case, your Honor, but even in the case-in-chief

20  there was no evidence that Motorola subjectively had adequate

21  time to do the kind of analysis that obviously your Honor had

22  time to do in the course of the RAND rate trial.  It was

23  under extreme time pressure to come up with some kind of

24  opening salvo in the negotiations, and therefore the absence

25  of a further analysis prior to sending of the letter does not

1    indicate subjective bad faith.  So those are the key factors,

2    your Honor.  Subjectively these are initials offers.

3    Motorola expected Microsoft to respond.  It quoted its

4    default rate under extreme time pressure without any

5    expectation being set forth in the letters that that would be

6    the final rate.  The expectation was that it was the

7    beginning of a tennis match, the ball had to go back and

8    forth, so to speak.  So it was subjectively sent in good

9    faith.  That's what we think the evidence shows to a rational

10   jury as a matter of law.

11       Sticking with the opening offer letters, your Honor, and

12   turning now to the objective factors.  With your permission

13   for brevity, your Honor, I will just lump the multiple

14   objective factors that you have described in your

15   instructions into the heading of objective good faith.  The

16   evidence is undisputed that Microsoft and Motorola have

17   peacefully coexisted prior to the October 1st filing of

18   lawsuits by Microsoft.  They acted as business partners with

19   reciprocal licensing arrangements.

20       After a period of renegotiation of the ActiveSync license,

21   Microsoft sued Motorola without warning on October 1st, and

22   Microsoft told Motorola that it was interested in resolving

23   the dispute and entering into a global resolution, and it

24   told Motorola to put its patents on the table.

25       Now, I cite all that, your Honor, which is subjective

1    evidence, because it informs the objective analysis.  The

2    objective analysis starts crucially with the undisputed

3    evidence that the industry custom and practice on

4    standards-essential patents is that the parties negotiate.

5    They negotiate through a multitude of different arrangements.

6    There is no one size fits all.  But the undisputed evidence,

7    including evidence from Microsoft's lead negotiator,

8    Mr. Gutierrez, was that 99 percent of the time he rejects the

9    opening offer.  And we would impute that statement to the

10   industry custom and practice more generally, which we think

11   the undisputed evidence allows us to do.  Parties negotiate

12   about disputes over standards-essential patents.  And the

13   undisputed evidence is also that they do so by placing the

14   standards-essential patents into a broader context of

15   negotiation over essentials and nonessentials, often together

16   in the same resolution.

17       So the industry custom and practice made it objectively

18   reasonable for Motorola to think that putting its

19   standards-essential patents on the table in response to

20   Microsoft's expressed invitation that they do so was a good

21   faith opening effort to resolve the dispute between the

22   companies in a global fashion, including but not limited to

23   whatever value or rate would apply to the standards-essential

24   patents.  And the undisputed evidence is that Motorola did

25   not receive a response from Microsoft; Microsoft did not

1    respond, except to sue Motorola in this lawsuit, and that

2    Motorola was in good faith in seeking to open those

3    negotiations as a matter of objective good faith under the

4    factors your Honor has enumerated.

5           THE COURT:  All right.

6           MS. SULLIVAN:  Turning then --  Again, your Honor, we

7    reserve the right to elaborate these in our written

8    submissions.

9           THE COURT:  I understand.

10          MS. SULLIVAN:  Thank you.  Your Honor, turning now to

11   the issue of seeking injunctions.  Microsoft's second theory

12   of breach of the contracts with the IEEE and ITU is that

13   Motorola breached its contracts by breaching the implied duty

14   of good faith, by seeking injunctions in the actions begun in

15   the district courts on November 9th -- the district court and

16   the ITC in November 2010, and subsequently in July 2011 in

17   Germany.

18      Your Honor, respectfully, we would again submit that this

19   seeking of injunctions - and I want to focus here on the

20   timeframe when the injunctions was sought, October 2010 and

21   then July 2011 - seeking of injunctions -- no rational jury

22   could find, we submit, that the seeking of the injunctions in

23   those timeframes violated the duty of good faith implied in

24   the RAND letters of assurance.

25      Now, to begin, your Honor, as is clear from the law of

 1    this case, and the law of every other relevant decision,

 2    there is no decision categorically barring

 3    standards-essential patentholders from seeking injunctions in

 4    all circumstances.  So the question is, was it appropriate --

 5    was it within the duty of good faith in these circumstances

 6    to file for injunctions?

 7         And, again, to divide it into the subjective good faith

 8    and objective good faith components, your Honor, subjectively

 9    we believe that no rational jury could believe that Motorola

10    filed the injunction actions in order to, quote, hold-up

11    Microsoft for the value of its standards-essential patents

12    exceeding the value of its own contribution to the standard.

13    For the reason that, your Honor, the undisputed evidence is

14    that, subjectively, Motorola filed those injunction actions

15    in response not to its own letters but in response to

16    Microsoft's filing of the October 1st affirmative

17    patent-infringement lawsuits against Motorola.  In other

18    words, Motorola put its patents on the table hard, to quote

19    Mr. Gutierrez, by filing injunction actions against Microsoft

20    that showed the value of its standards-essential patents

21    as --

22              THE COURT:  Did you mean to say Microsoft?

23              MS. SULLIVAN:  If I misspoke, your Honor, what I

24    meant to say is that the subjective evidence is that Motorola

25    acted in good faith when it filed its injunction lawsuits,

1  because those were responsive to Microsoft's earlier --

2       THE COURT:  I think you had it --

3       MS. SULLIVAN:  It is quite possible.  The M words can

4  get mixed up.  I apologize if I misspoke.

5     Now, on subjective good faith, just a more things that are

6  important to note, your Honor.  We think the undisputed

7  evidence shows that at the time Motorola filed its request

8  for injunctive relief on its standard essentials, Microsoft

9  had not then indicated that it was a willing licensee.  It

10 had not sought from this court an order that it enter into a

11 RAND license.

12    As your Honor yourself found in the course of pretrial

13 motions in this case, the complaint contained no offer on

14 Motorola's -- I'm sorry, on Microsoft's part, no indication

15 on Microsoft's part, that it was seeking a RAND license; to

16 the contrary, it was seeking a declaration of rights, but it

17 wasn't seeking a RAND license.

18    As your Honor noted, it was not until a later time, at the

19 earliest September 30th, 2011 --  Microsoft put Mr. Killough

20 on today to testify to a statement and a pleading on

21 September 30th, 2011, saying it was willing to enter into a

22 RAND license.

23    And so we would submit, your Honor, Motorola can't be in

24 subjective breach of its duty of good faith if it sues an

25 unwilling licensee for an injunction, and at the time it

1    filed, October/November of 2010 or July of 2011, Microsoft

2    had not yet indicated that it would take a license on RAND

3    terms.  The undisputed evidence at the close of Microsoft's

4    case-in-chief was that Microsoft was fighting validity, it

5    was fighting essentiality, and it was fighting infringement;

6    and it wasn't until a later change of litigation strategy

7    noted by your Honor that Microsoft offered to enter a license

8    on RAND terms, if it did indeed do so.

9         So, your Honor, the undisputed evidence is that Motorola

10   did not file its injunction actions in the absence of

11   subjective good faith.  It believed itself entitled by the

12   fact that Microsoft had sued it to file a responsive lawsuit

13   that would put its patents on the table as Microsoft had

14   requested that it do in the wake of the October 1st lawsuits.

15   And the suing of Motorola first was the cause of Motorola's

16   filing those suits.  In other words, Motorola filed the suits

17   for injunctive relief, not as part of a strategy connected to

18   its October letters, but rather as part of the overall

19   dispute that Microsoft had initiated on October 1st.  And

20   that's why those lawsuits can't be said to have been filed by

21   Motorola in bad faith in seeking injunctive relief.

22        Your Honor, turning to objective good faith, Microsoft, we

23   would submit again, failed in its case-in-chief to elicit

24   evidence sufficient to satisfy a rational jury that Motorola

25   had acted in objective bad faith, because the undisputed

1    evidence, including from Microsoft's own expert witness, is

2    that seeking an injunction by itself can't consummate a

3    hold-up strategy.  An injunction has to be issued by a judge,

4    who will decide whether a RAND commitment shows that monetary

5    compensation is adequate, for example, and all of the other

6    factors that go into a judicial determination in a patent

7    infringement action, about whether an injunction can possibly

8    be warranted on the standards-essential patents.  So seeking

9    an injunction, which is what Microsoft claims is the breach

10   of the duty of good faith, almost by definition cannot be

11   objective bad faith, because seeking an injunction is subject

12   to judicial discretion over whether that injunction will

13   issue.

14       Second, your Honor, remember, this is custom and duty --

15   custom and practice of the industry is something that your

16   Honor correctly says is important to determining whether

17   there is objective good faith.  And the custom and practice

18   of the industry was in dispute.

19       To engage in negotiations.  There were no negotiations

20   here.  Microsoft responded to the letters with silence until

21   it filed this lawsuit for breach of contract.  And in that

22   circumstance there were no negotiations that could have

23   broken down.  So as to even --  Even if we entertain the

24   hypothesis that seeking an injunction might be a breach of

25   good faith duties in a case where negotiations had broken

1  down, this was a case in which the negotiations never began,

2  and so they couldn't have broken down, and therefore there

3  was no breach of the objective component of the duty of good

4  faith.

5       Now, your Honor, I think that Microsoft actually

6  recognizes this deficiency in the evidence as to the duty of

7  good faith with respect to seeking injunctions.  Because they

8  have tried in the case to introduce a new theory, which is

9  not in the pleadings, not in the complaint, not in the

10  amended complaint, wasn't in the rog responses -- the

11  interrogatory responses, wasn't a part of the theory that is

12  encapsulated in the pretrial order.

13       The new theory seems to be, oh, well, never mind about

14  November 2010 and July 2011, what about the fact that

15  Microsoft -- what about the fact, Microsoft says, that

16  Motorola later failed to withdraw the injunctions until your

17  Honor's anti-suit injunction with respect to Germany, with

18  your Honor's determination on injunctions in the district

19  court patent infringement cases brought by Motorola, and the

20  matters that transpired in Washington in the course of the

21  2012 and 2013.

22       But, your Honor, with respect, we don't think you can

23  allow them to amend the suit on a kind of ongoing basis to

24  include the course of conduct after the order, the failing to

25  withdraw injunction requests, for obvious reasons.  When you

1   are in litigation the failure to withdraw a request has many

2   possible explanations, other than your breach of good faith

3   or your attention to your duties.  It has become something

4   that is subject to many considerations, implications for

5   other cases, and implications for admissions in the case.

6        With respect, your Honor, we would urge you at all points

7   to try to keep the case confined to the pleadings, and to see

8   the injunctive relief good faith claim as about

9   October/November 2010 and July 2011.  And I believe your

10  Honor has ruled that subsequent events can inform our

11  understanding of those events, but they should not create a

12  new theory that somehow there was an ongoing breach every day

13  unless and until Motorola withdrew those requests.  We think

14  that theory -- that new theory is not in the case, and,

15  therefore, even if proven, shouldn't be a basis for a finding

16  of good faith breach.

17       Third, your Honor, and, again, we will put it all in

18  writing, so I don't want to belabor --  If your Honor has no

19  questions on injunctions --

20            THE COURT:  I don't.  Go ahead.

21            MS. SULLIVAN:  Turning to the third theory that

22  Microsoft offered, that Motorola's response to Marvell was a

23  breach of Motorola's duty of good faith under its RAND

24  commitments to Microsoft.  We would simply renew our legal

25  argument, your Honor, that Microsoft is not entitled as a

1   matter of standing to use Motorola's conduct toward Marvell

2   as evidence of Motorola's good faith toward Microsoft.  But

3   even assuming that you find it relevant -- that evidence

4   relevant or probative, we think the evidence -- the

5   undisputed evidence fails to convince a rational jury as a

6   matter of law that anything Motorola did breached its duty of

7   good faith with respect to Marvell.

8       Just to highlight two key points, it was undisputed that

9   defensive suspension clauses, that is the refusal to do a

10  pass-through license to a counter-party that has sued the

11  licensor, are common in the industry; and, second, it is

12  undisputed that Motorola did not single Microsoft out for

13  special treatment, but contained in the defensive suspension

14  clause that it -- in the negotiations with Marvell other

15  companies that had also sued Motorola.  So there was no

16  attempt to breach duties of good faith, there was simply a

17  defensive suspension clause, a refusal to use Marvell as a

18  tool for a Microsoft license that was common in the industry

19  and similar to how Motorola treated other parties.

20      The last point about Marvell, your Honor, is we think that

21  the Marvell evidence, if anything, bolster's the case for

22  rejecting the good faith claims on both offer letters and the

23  injunctions because it shows, as I have argued to your Honor,

24  that it is undisputed in the case that normal industry custom

25  and practice is to negotiate, that to fail to respond in any

1   way, shape or form to an offer concerning a RAND license to a

2   standards-essential patent is anomalous.  Microsoft's conduct

3   here was anomalous.  And Marvell's own conduct, based on the

4   undisputed evidence, shows how anomalous it was, because

5   Marvell did respond to Motorola's opening offer, and did

6   engage in a back and forth negotiation.  So the Marvell

7   evidence is it probative of the lack of Microsoft's making

8   its case on injunctions and opening offer letters.

9       Your Honor, for the reasons that none of the individual

10  theories is legally sufficient to convince a rational jury

11  that Motorola breached its duty of good faith on offer

12  letters, injunctions, or Marvell, for the same reason you

13  can't find a combination of those theories to have created

14  any breach to the duty of good faith.

15      Turning to damages, your Honor, even if there were

16  sufficient evidence as a matter of law to find that Motorola

17  breached its duty of good faith, we submit that no reasonable

18  juror could find that Microsoft met its burden to prove that

19  Motorola caused it, the damages it asserted in this case.

20      To begin with, attorney fees, your Honor, we regard the --

21  we just reiterate our objection and disagreement respectfully

22  with your Honor's view that the attorneys fees here can be

23  allowed under Washington law as a kind of damages because of

24  the violation of the American rule.

25      We respectfully disagree with the notion that a RAND

 1    commitment is a covenant not to sue.  It is not an implied

 2    license.  We just reiterate our legal disagreement with your

 3    Honor.  Even assuming your Honor's framework, that attorneys

 4    fees here are permissible legally as a kind of damages in

 5    this case, we respectfully submit that Microsoft has failed

 6    to prove to a reasonable jury that Motorola's letters were

 7    the cause of its incurring legal costs, because the

 8    undisputed evidence is that the war began with Microsoft's

 9    suit on October 1st, and the war was perpetuated by

10    Microsoft's anomalous, less than one percent, failure to

11    respond to the October letters from Motorola.  So causation

12    here was not proved to be Motorola's cause --  There was a

13    prior cause, which was Microsoft filing the October 1st

14    lawsuits.  And there was an intervening cause, which was

15    Microsoft's anomalous failure to respond at any time between

16    the October 21st and 29th Motorola letters and the filing of

17    this lawsuit on November 10th.  So failures of causation,

18    that applies, of course, to the entire damages case,

19    attorneys fees, as well as relocation of the German facility.

20        Turning just to damages on the German facility, your

21    Honor, we respectfully submit that in addition to the fact

22    that Microsoft, not Motorola, was the cause of its own

23    expenses, Microsoft failed to prove that Motorola's filing

24    the injunction actions in Germany was the cause of its

25    relocation from Germany to the Netherlands for its

 1   distribution center.  It was undisputed that Microsoft's own

 2   executives in charge of the move had other asserted reasons,

 3   including ultimate business objectives going to scale and

 4   convenience for making the move.  And it is undisputed, based

 5   on Microsoft's case-in-chief, that those other reasons were

 6   in the decision-making process with respect to the move from

 7   Germany.  So we don't think they have proved causation as to

 8   attorneys fees or relocation costs as a matter of law based

 9   on the case-in-chief.

10       Finally, your Honor, we just respectfully request that

11   your Honor, at a minimum, grant judgment as a matter of law

12   on the German move damages as to Motorola Solutions, because

13   Motorola Solutions doesn't hold any patents that are relevant

14   to the German action under the relevant standard.  With

15   respect to damages, we can simply carve Motorola Solutions

16   out of the other defendants for purposes of the damages on

17   the German move.

18       If there are no questions, your Honor, we will elaborate

19   in our written submission.  That is the summary of our Rule

20   50(a)(1) motion based on the close of Microsoft's

21   case-in-chief.

22            THE COURT:  When are you going to be able to get into

23   your written submission?

24            MS. SULLIVAN:  Your Honor, we will aim to do it early

25   this afternoon.  We just had to put in the Killough testimony

1  from this morning, because that was the end of the

2  case-in-chief.  Would 3:00 p.m. be sufficient for your Honor?

3          THE COURT:  I was going to say 9:00 a.m. tomorrow.

4          MS. SULLIVAN:  9:00 a.m. tomorrow is sufficient.

5  Your Honor, just as a preview, we will again present a

6  similar summary of our 50(a)(1) arguments at the close of all

7  evidence with your Honor's permission.

8          THE COURT:  I was going to say, since evidence closes

9  today, when do you think you can have that in?

10          MS. SULLIVAN:  We will aim to have both submissions

11  in by 9:00 a.m. tomorrow.

12          THE COURT:  I will give you until noon.

13          MS. SULLIVAN:  We'll do 9:00 a.m. for the first one,

14  noon for the second one.  Thank you.

15          THE COURT:  And then I expect a response from

16  Microsoft.  You can respond to both, but I would like to keep

17  your arguments separate.  So it is one pleading but a

18  response to two motions, because I need to deal with them as

19  two separate motions.  And noon Friday.  That will give you

20  two days.

21      I intend to take these under advisement.  If the jury

22  comes back before then, they are still under advisement, and

23  gives me the last word here.

24          MS. SULLIVAN:  Thank you, your Honor.

25          THE COURT:  That's how the court is going to do this.

```
 1            MR. PRITIKIN:  We will also have a JMOL motion.  When
 2   would you like us to put a very briefly statement of that on
 3   the record, again, subject to a further briefing?
 4            THE COURT:  Probably tomorrow after the case goes to
 5   the jury.
 6       Counsel, subject to my going and getting my adding
 7   machine, I think at this point, as of noon, Microsoft had one
 8   hour and 29 minutes left, and Motorola has one hour and 60
 9   minutes.  Anything further, counsel?
10            MR. HARRIGAN:  No, your Honor.
11            THE COURT:  The absence of my clerk suggests that
12   they have found typos in the jury instructions.  I will see
13   if I can't get you a red-line version between what we gave
14   you this morning and the correction in the typos, so you will
15   know if we made any changes.  We will be in recess.
16                 (The proceedings recessed.)
17                      AFTERNOON SESSION
18            THE COURT:  Counsel, I want to highlight for you
19   something that we ran into in the course of the jury
20   instructions.  Our chambers' policy is that we have someone
21   read them for typos as the last and third step.  And what
22   came back was they couldn't tell who Motorola was.  And as a
23   result, although it is listed in Stipulation of Fact 10,
24   you've stipulated to the facts, some of them you've never
25   seen before, which namely is saying who Motorola is, and then
```

1   who Motorola Solutions is, who Motorola Mobility is, who

2   General Instrument is.  And then saying, we're going to call

3   you Motorola unless we specifically call you out to the

4   contrary.  So know that that change is in there and you

5   should be mindful of it.  It impacts a whole number of

6   instructions where we use the word Motorola.  So you need to

7   make sure you, indeed, were referring to that collective

8   entity as opposed to an individual.  But I wanted to

9   highlight that for you so you know that that was a change

10  that we made.

11       Are we ready to bring the jury in?

12          MR. HARRIGAN:  Yes, Your Honor.

13          MR. PRICE:  Yes, Your Honor.

14          THE COURT:  All right.  Let's bring the jury in.

15       (The following occurred in the presence of the jury.)

16          THE COURT:  Mr. Cannon.

17          MR. CANNON:  May I begin?

18          THE COURT:  Yes.

19  Q   Good afternoon, Dr. Leonard.

20  A   Good afternoon.

21  Q   Before the break you had been discussing leverage, and you

22  had gone through issues with respect to the letters sent in

23  October 2010.  Now I'd like to turn to the issue of

24  injunctions.

25  A   Okay.

1    Q    Do you remember Microsoft's expert, Dr. Murphy, testified

2    about injunctions.  Do you remember that?

3    A    Yes.

4    Q    And do you remember when he said, here in court, that if

5    you get an injunction on somebody's product, you say you

6    cannot import the Xbox into the country or you can't sell

7    Windows, you're not just enjoining use of your patent, you're

8    enjoining them from using this entire standard.  Do you

9    recall that?

10   A    I do.

11   Q    And at a high level, what is your reaction to that

12   opinion?

13   A    I think the key word there is the very first one, "if."

14   If you get an injunction.  But there's a whole legal process

15   before you can get an injunction.  Motorola can't just get

16   one by virtue of asking.

17   Q    What's the economic leverage inherent to filing a

18   complaint and asking for an injunction?

19   A    Well, again, if for instance you file for it but you have

20   no chance of getting one, or very small chance of getting

21   one, then your leverage is necessarily very small, if any.

22   Q    And you've testified in a number of patent cases, correct?

23   A    I have.

24   Q    As a matter of economic impact, when, over the course of a

25   patent case, does an injunction come to be?

1   A   Well, I think at the very beginning, as I understand --

2   I'm just an economist, but I have been involved in some of

3   these cases -- so I think in your opening complaint, or

4   something, you have to ask for an injunction, just to

5   preserve your right to ask for it later on.  But it actually

6   isn't granted by the court until the very end of the process

7   after there's been a trial on the merits and the patents have

8   been found to be valid and infringed.  So it's really at the

9   very end that that process happens.

10  Q   So in your experience about how long is a typical patent

11  case?

12  A   A patent case can take a different amount of time.  But,

13  you know, two years or something like that is certainly

14  typical to go from beginning to end.

15  Q   In 2010 how common was it for parties to include a request

16  for injunction when they filed their initial complaint?

17  A   It was, in my experience, again, very common.  Because,

18  again, you want to just preserve your rights.  You may end up

19  not asking for it.  You may end up not getting it.  But you

20  want to at least ask for it in the beginning so if you want

21  it later you can ask for it.

22  Q   What sort of factors does a court consider in deciding

23  whether or not to issue an injunction?

24          THE COURT:  Counsel, is this witness qualified?  Is

25  he a lawyer?

1        MR. CANNON:  He's not a lawyer.

2        THE COURT:  Then I'm going to exclude that question,

3   because you're asking him to give legal testimony.  He can

4   testify to his understanding, but he can't tell you the

5   criteria.

6        MR. PRITIKIN:  Your Honor, the other problem is it's

7   not in the expert report.

8        THE COURT:  All right.  I'll see counsel at side bar.

9   Someone bring the report.

10       (Court and counsel met at side bar as follows:)

11       MR. PRITIKIN:  Which paragraph?

12       MR. CANNON:  Paragraph 12 of the rebuttal report, so

13   that's the second report.  It's in the white binder.

14       THE COURT:  I didn't bring mine down, so may I read

15   over your shoulder?

16       MR. CANNON:  Yes.

17       THE COURT:  That's not going to get you there,

18   counsel.

19       MR. CANNON:  Okay.  I can ask, though, about the

20   guarantee aspect, asking for -- seeking an injunction, does

21   it guarantee --

22       THE COURT:  Absolutely, that's fine.

23               (The side bar concluded.)

24   Q   Dr. Leonard, you're not a lawyer; is that right?

25   A   I'm not, no.

1    Q    You're an economist?

2    A    That's right, I'm an economist.

3    Q    In your experience participating in these cases as an

4    economist, when a party seeks an injunction, does that

5    guarantee that one will, in fact, issue?

6    A    Not in my experience.  I've been asked to, for instance,

7    testify on economic issues that, as I understood it, relate

8    to whether an injunction should be granted.  So that

9    certainly indicated to me that the process was far from one

10   in which it's automatic to get an injunction.  In fact, I

11   think it's -- can be difficult in certain circumstances.

12   Q    In your experience, as an economist, are there any

13   economic factors that might be considered when a court

14   evaluates whether an injunction is appropriate?

15   A    Yes.

16   Q    And can you describe those economic factors, please?

17   A    Yes.  One of the factors I would look at is, you know, if

18   there's no injunction, so there might be a question of some

19   injury to the patent owner, is that, can it be compensated

20   through money?  And that, to an economist, usually the answer

21   is yes, we can figure out an amount of money.  But in a case

22   where it's a standards-essential patent and the patent owner

23   has agreed that they're willing to exchange use of their

24   patent rights for money, then certainly money would seem to

25   be a very appropriate way to compensate the patent owner for

1    any injury that occurred without an injunction.

2        So from an economic point of view, you don't really need

3    an injunction, you just award a money amount of damages.

4    There are other issues, too, again, I've been asked to opine

5    on from an economic point of view with regards to the public

6    interest.  If an injunction would do harm to the public

7    interest, that is consumers or third parties, that would be

8    something else that, as I understand it, the court might look

9    at.  I can give some economic views about what the effects on

10   the public interests would be.  And, again, that's something

11   that could come up that would be an argument against giving

12   an injunction in a given case.

13   Q   Do you recall Dr. Murphy discussing in his testimony

14   incentives and the purpose of RAND commitments?

15   A   I do.

16   Q   And one of the issues he raised, I believe, was the idea

17   of making sure the standard is widely adopted.  Do you recall

18   that testimony?

19   A   Yes, I do.  And I agree with it, too.

20   Q   Are there any other economic incentives important in this

21   context with respect to the intellectual property laws?

22   A   Yes, because a standard -- there's really two things about

23   it you'd like to have.  You'd like for it not to be super

24   expensive, so that people are willing to be able to adopt it

25   and implement it.  But, of course, you also want it to have

1   good technology in it.  How does that happen?  Well, it

2   happens because people who have technology and have patent

3   rights in that technology are willing to contribute it to the

4   standard.

5       So it is important that the owner of some intellectual

6   property has an incentive to contribute their technology to

7   the standard and make the standard better.  So there is this

8   question of balance that, from at least an economic point of

9   view, is important to consider.

10  Q   What happens, from an economic point of view, if patent

11  holders contribute technology to the standards don't get

12  paid?

13  A   Well, if they don't get paid then that reduces the

14  incentives that they have to contribute the technology.  And

15  the end result of that is we could have standards that

16  weren't as good, you know, in terms of WiFi.  Maybe it

17  doesn't work as fast, you couldn't watch videos on it, or

18  something like that.  You could also have a situation where

19  patent owners decide to try to go their own way.  Instead of

20  joining the standard they try to create their own proprietary

21  standard.  So you get a lot of fragmentation.  So, I mean,

22  those are dangers if you don't sufficiently compensate patent

23  owners.  But, again, I agree it's a balance.  You want to be

24  worried about people getting too much, too.  But it's also

25  important to realize they've got to get enough in order to

1   contribute their technology.

2   Q   With respect to the incentives that might arise on

3   intellectual property laws.  Are there any analogies that you

4   might describe to the jury that could illustrate this point?

5   A   Sure.  It really has to do -- the incentive and incentive

6   problem is that innovation takes spending money on R&D.  And

7   a project might work or might not work.  But at the end of

8   that you have to be able to somehow protect your investment,

9   get a return on the R&D.  And then that pays off the

10  investments that you then were willing to do it in the first

11  place.

12      So a good analogy might be in the copyright area.  It's

13  another form of intellectual property.  And, for instance, if

14  you think about a Hollywood producer.  You know, if they make

15  a blockbuster movie, they've got to pay millions of dollars

16  to get the thing made, say $100 million.  And then they go

17  out to distribute it, and copyright allows them to protect

18  and control the distribution of the product.  So they control

19  the distribution of the product.  So people go see the movie

20  and the producer of the movie gets paid, he makes back his

21  $100 million, and perhaps more if he's lucky.

22      Without copyright laws, what would happen?  Well, people

23  would copy the movie, then everyone would start seeing it for

24  free, and the producer would never get his money back.  So

25  the purpose of copyright, the purpose of patents is really

1    the same.  And that's to really give away for patent owners

2    -- or, sorry -- developers, either in one case arts and in

3    another case technology, to get a return on their

4    investments.

5    Q    And can you tell us, again, how this relates to standards

6    setting?

7    A    Well, again, if you, for instance, said:  Okay, if you

8    want to contribute your technology to the standard you're

9    going to be forced to take no royalties at all, you know,

10   royalty-free is the only option.  Then that would just reduce

11   people's incentives to contribute the technology.  So that's

12   a pretty extreme case, but if you -- the point is simply if

13   you don't give the right level of return, then you're not

14   going to get the right level of contribution.  So, again, it

15   is a balance here.

16   Q    Dr. Leonard, you understand that this court set a RAND

17   rate and range for the two standards at issue?

18   A    Yes.

19   Q    Do you know how the court did that?

20   A    Yeah, I do.  I reviewed the court's decision and a lot of

21   the material that went into it.

22   Q    And are you aware that a trial was held with witnesses?

23   A    Yeah.  And that was even after a very long process where

24   there's all the discovery you've heard about, and deposition

25   testimony, and there were expert witnesses on the technical

1    issues to say, okay, what do the technologies do?  There were

2    expert economists, I think, who opined on the value of the

3    technologies.  And it was quite a process and took quite

4    awhile.  And that all went into the court's opinion.

5    Q    Do you know when the court issued this opinion?

6    A    I think it was in April of 2013.

7    Q    And back in 2010 did the economic actors that we've been

8    discussing in this trial, in 2010, have the benefit of the

9    court's decision?

10   A    Well, certainly not.  They really didn't even have the

11   benefit of the information, a lot of the information that

12   went into it.  Because that's exactly what came out during

13   the two-plus year process that occurred.

14   Q    All right.  In conclusion, what leverage, as a matter of

15   economics, did Motorola have when it sent the letters in

16   October 2010?

17   A    I think the letters provided virtually no leverage at all.

18   Q    Do you remember that Dr. Murphy testified that Motorola's

19   conduct, taken as a whole, was far more consistent with

20   Motorola looking to engage in hold-up than it was with

21   Motorola attempting to negotiate a license on RAND terms.  Do

22   you remember that?

23   A    I do.

24   Q    And do you agree with that opinion?

25   A    No, I really don't.  For all the reasons that I've said, I

```
 1   don't think the offers by themselves were going to have any

 2   effect.  And Motorola's ability to get an injunction was far

 3   from automatic.  And, in fact, given that it was a

 4   standards-essential patent, at least the economic arguments

 5   against getting an injunction were pretty strong.  So

 6   Motorola, even though they asked for it, had a very tough

 7   uphill battle, from my point of view as an economist.

 8           MR. CANNON:  No more questions.  Thank you.

 9           MR. PRITIKIN:  Your Honor, may we approach with a

10   copy of a binder?

11           THE COURT:  Yes.

12                       CROSS EXAMINATION

13   BY MR. PRITIKIN:

14   Q   Good afternoon, Dr. Leonard.

15   A   Good afternoon.

16   Q   Now, have you been in the courtroom here through the

17   entire trial?

18   A   All of it except Friday afternoon when I had to get home

19   and take care of my son.  But otherwise, yes.

20   Q   So you have heard a number of references to the fact that

21   Microsoft had filed a lawsuit on October 1st of 2010 against

22   Motorola, accusing it of infringing patents?

23   A   Yes.

24   Q   Now, Microsoft's October 1st lawsuit did not excuse or

25   release Motorola from its H.264 and its 802.11 RAND
```

1  commitments, did it?

2  A   I suppose it's probably a legal issue, but I guess if you

3  want my economist-view, I would say probably not.

4  Q   Now you're also aware, of course, that Microsoft filed

5  this lawsuit asking for a judicial accounting on November 9th

6  of 2010?

7  A   Yes.

8  Q   And you're not suggesting that Microsoft did anything

9  improper in seeking relief from this court, are you?

10  A   No.

11  Q   And you're aware that at least by September 30th of 2011,

12  Microsoft had said explicitly that it was ready, willing and

13  able to take a license on RAND terms, determined by this

14  court?

15  A   I heard the testimony earlier to that effect.

16  Q   And you'd agree that Microsoft had the ability to pay for

17  the RAND license?

18  A   I would imagine so, but I haven't studied their financial

19  situation.

20  Q   Now, the truth of the matter is that Motorola tried to do

21  an end-run around this court, didn't it, by filing its ITC

22  action after that and by filing its case in Germany?

23  A   I don't believe so.  I think the suit in Germany was filed

24  before, for instance, before Microsoft said that it was

25  willing to pay the RAND rate.

1    Q    It was filed after this lawsuit was filed, correct?

2    A    It was filed after this lawsuit, yes.

3    Q    Now you'd agree if you're not going to abide by your RAND

4    commitment, an injunction or the threat of an injunction

5    makes it easier to extract hold-up value, right?

6    A    Well, again, it really comes down to what's your

7    probability of getting it.  And if you've got -- if you made

8    a RAND commitment, that in itself is going to be a powerful

9    argument that -- in this case Microsoft -- would have had to

10   say an injunction shouldn't be granted.  So it really comes

11   down to what happens in that legal proceeding.  It's by no

12   means automatic.

13   Q    There's a copy of your deposition in the binder.  Could

14   you find that, Dr. Leonard?

15   A    Sure.

16              THE COURT:  Are you talking about the black binder?

17              MR. PRITIKIN:  Yes, sir.

18   Q    And could you turn, please, to page 144 of the deposition?

19   A    Okay.  I'm there.

20   Q    And I'd direct your attention to lines 14 through 23.

21   A    I'm sorry, could you say that again?

22   Q    Sure.  Lines 14 through 23.

23   A    Okay.  All right.  Yeah, I've read it.

24              MR. CANNON:  No objection.

25              THE COURT:  I'm sorry, what was that?

1    Q   "Question --

2         MR. CANNON:  I said no objection to counsel reading

3    it.

4    Q   "Question:  The injunction makes it easier to extract more

5    than hold-up value, doesn't it, if you don't want to abide by

6    your RAND commitment?

7         "Answer:  If you don't want to abide by your RAND

8    commitment then of course there is, you know, even before you

9    get to an injunction there is a threat of injunction, so you

10   know that that exists in advance.  So if you're not, you

11   know, going to abide by your RAND commitment, then an

12   injunction may add to that to some incremental degree."

13        Were you asked that question, sir, and did you give

14   that answer?

15   A   I did.  And, of course, "incremental" can be very, very

16   small, which is what I just said.

17   Q   Now, you testified about some of the economic factors that

18   may be considered in whether an injunction is granted.  And

19   your experience has been in cases here in the United States?

20   A   It has, yes.

21   Q   You weren't offering an opinion as to what economic

22   factors are considered by a German court, were you?

23   A   That's correct.

24   Q   And you've made statements about how injunctions aren't

25   automatic.  Again, you don't have any experience or knowledge

1   about German courts or German law, do you?

2   A   I've heard some things in this case.  But, no, I'm not an

3   expert on German law.

4   Q   Now, you are aware, of course, that Motorola continued to

5   pursue its requests for injunctions in the ITC and in Germany

6   even after Microsoft had said that it was ready, willing, and

7   able to take a license on RAND terms in this court, correct?

8   A   Well, I mean, I thought the cases had been brought before

9   and injunctions had been sought when the cases were brought.

10  So I don't know what you mean by "pursue," exactly.

11  Q   Well, they didn't give up their attempts to get an

12  injunction, did they, when Microsoft said it was ready,

13  willing, and able to take a RAND license?

14  A   You know, at that point, I mean, obviously there's a lot

15  of considerations that go into these legal things and

16  probably a lot of legal strategy.  So, you know, what went

17  into all of that I'm not exactly sure myself.

18  Q   Simple question.  They didn't give up trying to get the

19  injunctions after Microsoft said it was ready, willing, and

20  able to take a license on RAND terms, did they?

21  A   They might have at some point, but certainly not within a

22  month afterwards, or something like that.

23  Q   Well, Microsoft had made the statement -- we just talked a

24  few minutes -- at least by September of 2011, right?

25  A   Right.

1   Q   And they continued to pursue the injunction in Germany

2   until a temporary restraining order was granted by this court

3   in April of 2012; isn't that right?

4   A   Again, I'm not sure of all the things that went into that.

5   It was -- I know there was an Orange-Book procedure going on,

6   too.  So I don't know whether they had an injunction at that

7   point to give up.

8   Q   And they continued to pursue their ITC claims until

9   January of 2013 on the H.264 patents, didn't they?

10  A   Well, again, I don't think they dropped their request for

11  an injunction.

12  Q   Now, in preparing your expert report in this case you had

13  a conversation about the case with Kirk Dailey, didn't you?

14  A   I did.

15  Q   In fact, Dailey was the only Motorola employee you

16  actually talked to about this case?

17  A   I think that's correct, yes.

18  Q   And that conversation with Mr. Dailey was on May 29th of

19  2013?

20  A   That sounds about right.

21  Q   And that was the same day that you dated and signed your

22  expert report in this case, right?

23  A   Yes.

24  Q   Now, the conversation with Mr. Dailey was important enough

25  that you cited it a number of times in your expert report as

1  the basis for some of the opinions you were expressing,

2  correct?

3  A   Certainly some of the opinions in my report, yes.

4  Q   One of the things -- now, if you wanted to know why it was

5  that Motorola didn't stop pursuing the injunctions, despite

6  this case, you could have asked Mr. Dailey that question

7  since he was the head of IP at Motorola, couldn't you?

8  A   I don't think --

9       MR. CANNON:  Your Honor, objection.  Beyond the scope

10  of the direct.

11       THE COURT:  Overruled.

12  A   If I heard him right when he testified here, I think he

13  said he wasn't in charge of the litigation.

14  Q   He was the head of IP, right?

15  A   I think IP licensing.  So that would be in the

16  negotiations about licensing, not litigation.

17  Q   So he may have known or may not have known why it was that

18  Motorola was continuing to pursue the injunctions; fair to

19  say?

20  A   I think, though, that when he testified here he, at least

21  from my hearing, made it clear that he wasn't really privy,

22  necessarily, to litigation-type strategy decisions.

23  Q   In any event, it's correct, is it not, that you did not

24  ask Mr. Dailey why, after he knew that this court was going

25  to determine a RAND royalty and was going to hold the parties

1    to it, why Motorola continued to seek injunctions in places

2    like the ITC and Germany.  You didn't ask him that question,

3    did you?

4    A   I didn't ask him that question.  But, again, I'm not

5    really sure you could get an injunction.  At that point,

6    again, there's probably some legal issues involved.  But once

7    a court here has ruled, maybe that you can't get an

8    injunction, and then there's not really -- it doesn't really

9    matter whether you're theoretically still in your complaint

10   or not.

11   Q   Now, I think you told us earlier your training is as an

12   economist?

13   A   Yes.

14   Q   And you taught for one year as an assistant professor

15   after you got your Ph.D., some 24 years ago.  But since that

16   time you've worked for economic consulting firms helping out

17   on litigation and other projects?

18   A   Yeah.  Litigation is certainly a part of the work we do.

19   But there are other things as well.

20   Q   In the last five years you've spent between 50 and

21   75 percent of your time on litigation-related work?

22   A   That's probably about right, yes.

23   Q   Over the years you've worked on more than 150 different

24   lawsuits as an economic consultant or expert?

25   A   Probably of different kinds, not just patents, but

1    antitrust and other things.

2    Q    And you've testified over 20 times in court; is that

3    right?

4    A    I think so, yes.

5    Q    Now, you were hired by Motorola for this case, after the

6    trial to set the RAND royalty last fall, right?

7    A    Yes.

8    Q    And at that trial last fall Motorola used a different

9    economist, didn't they?

10          MR. CANNON:  Objection, relevance.

11          THE COURT:  I'll permit the question at this time,

12   without prejudice --

13   A    In reviewing the materials it seemed like, yes, there was

14   an economist involved on the side of Motorola at that time.

15   Q    You have reviewed the materials from that trial, haven't

16   you?

17   A    Yes.

18   Q    And the economist that they used the last time was

19   Professor Richard Schmalensee, who is a professor of

20   economics at MIT, right?

21   A    He is, yes.

22   Q    And you've read his trial testimony?

23   A    Yes.

24   Q    And so you're aware that Professor Schmalensee testified

25   in this courtroom that when the owner of standards-essential

1    patents and a company that uses the standard have a dispute

2    about what a RAND royalty should be, it's proper for the

3    matter to be presented to a court?

4    A    Um, I don't recall that specifically, but I'll take your

5    word for it.

6    Q    Now, let's turn to the offer letters that Motorola sent in

7    October of 2010.  And by now the jury is pretty familiar with

8    the terms of those letters, so I'm not going to dwell on

9    that.

10   A    Thank goodness.

11   Q    But we do know from the court's earlier ruling that the

12   rates in those letters were not RAND?

13   A    They were higher than what turned out to be the court's

14   RAND rate, yes.

15   Q    And among other things, Motorola had asked Microsoft to

16   pay a royalty on the end-product value?

17   A    I mean, that's what the letter says for -- well, sorry,

18   which end product do you mean?  I guess, just to be clear.

19   Q    In the case of H.264, in the case of a computer, a

20   Windows-based computer?

21   A    Yeah, for Windows products -- I guess it would be on the

22   final product, yes.

23   Q    But at the time Motorola's policy was normally to license

24   the -- was not to license -- at the time Motorola's policy

25   normally was to license the end-product manufacturer not the

1    component supplier like Microsoft, right?

2    A   Well, actually I think, though, that's why they did it

3    that way, is because they were thinking, normally we are

4    licensing the end product.  So here Microsoft isn't the

5    end-product manufacturer, but to be fair to those other

6    companies, we better license the end-product here, too, or at

7    least base the royalty on that.  So, again, I think that was

8    their motivation as I heard the witnesses testify.

9    Q   Do you think Motorola was trying to be fair when it asked

10   Microsoft to pay a royalty on the downstream customers'

11   computer products.  Is that your analysis of it, sir?

12   A   Well RAND -- we've been talking, I think mainly about the

13   "R" in RAND, which is "reasonable."  But there's also the

14   "ND" at the end, which is "non-discriminatory."  And that

15   means you're supposed to treat similarly-situated licensees

16   similarly.  And, I think, again, as I heard their testimony,

17   they thought that's what they were doing when they set that

18   up in the letters that way.

19   Q   Let's talk about non-discriminatory.  At the time your

20   report was prepared you were not aware of any other instance

21   in which Motorola had asked a licensee to pay a royalty on

22   the products manufactured by their downstream customers, were

23   you?

24   A   Well, I think because their practice, again, was to

25   license with the downstream manufacturers themselves in order

1    to get cross-licenses with them that would give everyone the

2    freedom to operate.

3    Q   Sir, let me ask you the question, again, and see if you

4    can answer the question that I have posed.  Which is:  At the

5    time your expert report was prepared, you were not aware of

6    any other instance in which Motorola had asked the licensee

7    to pay a royalty on the products manufactured by their

8    downstream customers?

9    A   Right.  Because they had licensed consistent --

10        THE COURT:  You can answer that yes or no, sir.

11   A   Okay.  Yes, that was my understanding.

12   Q   Now, you talked about information that was known and that

13   was not known.  But there is publicly-available information

14   on global sales of personal computers; isn't there?

15   A   There is, yes.

16   Q   And it would have been fairly easy for Motorola to

17   determine that the royalty demand of 2.25 percent on all

18   Windows-based computers was going to produce more than

19   $4 billion a year in royalties, correct?

20   A   I mean, in a sense they could have gotten that

21   information, that's certainly something that was possible.

22   Q   You doubt that Microsoft would have accepted the H.264

23   offer at the level demanded by Motorola in October 2010;

24   right?

25   A   Well, yes.  Among other reasons, it's not Microsoft's

1  practice to accept initial offers.  But -- so I think they

2  would have looked at it.  I would have looked at it if I was

3  them.

4  Q  Let's talk for a moment about opening offers, which you

5  said aren't very important.  If a party's real intent is to

6  negotiate a RAND license, you would not expect them to make

7  an opening offer on completely outlandish and unreasonable

8  terms, would you, sir?

9  A  I think it depends on the context of the situation.

10  Q  Well, in general, you would agree that parties engaged in

11  negotiation have to be a little careful with opening offers

12  because they don't want to put off the other side?

13  A  That's exactly -- I said that in my deposition -- that's

14  exactly why it's irrational to try to use an outrageous offer

15  in order to extract hold-up.  All you're going to do is

16  destroy any chance you have for agreement.  And agreement is

17  the only way you can get paid.

18  Q  Well, there's another purpose these letters might have

19  served; isn't there, sir?

20  A  What's that?

21  Q  Well, you're aware that the letter said that the offer

22  would remain open for 20 days?

23  A  I'm aware of that, yes.

24  Q  And it asked Microsoft to confirm whether it accepted the

25  offer?

1    A    It did say that, yes.

2    Q    And you also are aware, are you not, sir, that Motorola's

3    policy was not to sue on its standards-essential patents

4    without first making an offer?

5    A    That was their policy, yes.

6    Q    Now, I want to talk for a moment on the 2.25 percent.  You

7    gave some testimony about that earlier.  And I want to ask

8    you about some statements that you made when you put your

9    expert report together.  And if you have it handy there,

10   could you open up your expert report and turn to paragraph

11   66?

12   A    Okay.

13   Q    You wrote here that as of October 2010 Motorola had no

14   experience licensing its 802.11 and H.264 SEP portfolios on a

15   standalone basis.  You believed that that was true and

16   correct at the time you wrote it in your report, sir?

17   A    Yes.

18   Q    And let's look a little further down in the paragraph

19   where you wrote "While these portfolios," and that's

20   referring to 802.11 and H.264?

21   A    Yes.

22   Q    "While these portfolios had been included as licensed

23   patents in some Motorola license agreements, these licenses

24   were all broad and complex cross-licenses covering hardware,

25   with the primary focus generally being the cellular SEPs."

1    Do you believe that statement to be true and correct?

2    A    Yes, I do.

3    Q    Then you said, "It is difficult or impossible to break out

4    a separate royalty rate for the 802.11 and H.264 SEP

5    portfolios in these agreements, and they do not cover

6    software."  You believe that statement to be true and

7    correct?

8    A    I do.

9    Q    And then you said, "Accordingly, Motorola had no past

10   experience on which it could draw when it attempted to

11   negotiate a RAND license with Microsoft."  Do you believe

12   that to be a true and correct statement?

13   A    Yes.

14   Q    You would agree with me, would you not, sir, that the

15   royalties that Motorola has received on its cellular

16   portfolios do not shed any light on the value of the 802.11

17   and H.264 portfolios?

18   A    In light of what we know about the -- you know, what the

19   court learned during the previous proceeding, that's correct.

20   Q    Now, would you turn over to page 76 of your report?

21   A    Sorry, which page?

22   Q    Excuse me, um --

23   A    I was going to say I don't think there are that many

24   pages.

25   Q    Now, you told us that when Motorola used this 2.25 percent

1    rate in the October letters -- I think you called it a

2    default offer.  Was that your word?

3    A    Yeah.  The idea that you -- in that kind of situation you

4    go with what you know.  And what they knew was the previous

5    licensing history in the cellular handset business.

6    Q    So what you're telling us is that the 2.25 percent in

7    those letters wasn't really a RAND rate for the H.264 and the

8    802.11 portfolios, but it was what you called a "default

9    offer"; is that right?

10   A    Well, I'd say that their behavior was consistent with

11   RAND.  But the rate itself, as the court later determined,

12   was not a RAND rate.  But of course Motorola didn't know that

13   at the time.

14   Q    The letters didn't say that this was a default rate, did

15   they?  The letters said that it was a RAND rate, did they

16   not?

17   A    I can't remember the exact wording.  We can take a look.

18   Q    Well, let's take a look.  Let's pull up Exhibit 1.  Let's

19   go down to this.

20        "Motorola offers to license the patents under

21   reasonable and non-discriminatory terms and conditions (RAND)

22   including a reasonable royalty of 2.25 percent per unit."

23   The letters described it as a "RAND rate".  They didn't

24   describe it as what you called a "default offer," did they?

25   A    I think you're asking for a bit too much here.  They

1    thought they were making an offer consistent with having a

2    RAND negotiation.  You know, as we know now, 2.25 percent is

3    higher than the RAND rate that the court determined.  But at

4    the time this was just an opening offer.

5    Q   Now, the explanation that you gave us for why they used

6    this default rate and didn't try to come up with a true RAND

7    rate at the time they made the offer, is they were in a big

8    hurry.  Is that what you were telling us?  They were

9    scrambling around and hadn't had a chance to figure out what

10   their patent situation was vis-à-vis Microsoft?

11   A   Well, I mean, there are a couple things.  One is a very

12   tight timeframe.  Number two is the level of analysis that

13   one needs to do to dig down into this.  And you saw how long

14   it took this court proceeding to work it out.  That can't be

15   compressed into a two-week period.

16   Q   All right.  Let's look back at paragraph 76 of your

17   report.  What you wrote there was that Motorola had not been

18   prepared for in-depth cross-licensing discussion when

19   Microsoft unexpectedly filed its lawsuit on October 1, 2010,

20   and thus had to start from scratch to quickly identify its

21   patents to Microsoft at Microsoft's request.  And is that

22   your understanding of why it was that they used this default

23   rate?

24   A   I don't think this is explaining why they used the default

25   rate.  I think this is explaining -- I mean, the timeframe,

1    yes.  But this is, I think, talking more about identifying

2    the patents.  And just even doing that is time consuming.

3    But I think it's more just talking about the process that was

4    going on at the time.

5    Q   The point you were making was it would have been difficult

6    to do that in the couple weeks after October 1st?

7    A   Well, they did this part in a couple weeks.  They

8    identified the patents.  And I think we heard these are the

9    patents where they already had the claim charts done.  Claim

10   charts is how you kind of figure out whether somebody is

11   infringing or not.  And when you have to go and hurry, the

12   stuff you have done is the stuff you use.  So I think that's

13   what I'm really trying to get at here.

14   Q   The truth of the matter is, they didn't scramble around

15   and do this in the three weeks between October 1st and

16   October 21st, did they, sir?

17   A   Do what?  I think all they felt they were able to do is

18   put together these lists of patents and the letters.  And,

19   you know, Mr. Dailey testified that he was dealing with

20   Motorola breaking up into these pieces.  I'm sure he had

21   family issues, like the rest of us do.  I mean, there's just

22   a lot of things that are going on.  And, you know, in that

23   kind of situation where you expect there to be more

24   negotiation and you want to get things going in a hurry, you

25   put together a letter in the way that it was done here.

1    Q    Let's turn back to paragraph 41 of your expert report.

2    And you wrote here, "In May of 2010" -- now that's six months

3    before the October letters, right?

4    A    Right.

5    Q    "In May of 2010 I understand that Motorola's VP of

6    intellectual property, Kirk Dailey, attended an IP symposium

7    at George Washington University Law School, and served on a

8    panel with Microsoft's associate general counsel, Jeff Ranck.

9         "According to Mr. Dailey, he attended this symposium,

10   in part, to meet Mr. Ranck.  Mr. Dailey and Mr. Ranck

11   intended to engaged in licensing discussions, but the meeting

12   kept being rescheduled, until it finally occurred in October

13   of 2010."

14        So it's your understanding, based on conversations you

15   had with Mr. Dailey, that he was thinking about the licensing

16   situation vis-à-vis Microsoft at least as early as May of

17   2010; was he not?

18   A    I think he was trying to get Microsoft's attention just to

19   find out kind of what was going on.  Because there was this

20   whole business with the ActiveSync patents.  I think he was

21   just trying to start a discussion here.

22        Meanwhile, what we know is that Microsoft, during that

23   same period, is trying to analyze the Motorola patents.  It

24   took them, apparently from what I heard, five months just to

25   identify the patents.  And they didn't even get the ones that

1    they were eventually sued on.  It just shows -- it's

2    perfectly reasonable -- but it just shows that it takes a

3    long time to do this kind of stuff.  It's not easy or simple.

4    Q   Do you know, as you sit here, whether or not Motorola,

5    during those five months between May of 2010 and October, was

6    analyzing which of its patents could be asserted against

7    Microsoft?  Do you know for sure one way or the other?

8    A   As I'm sitting here I don't know exactly one way or the

9    other.

10   Q   Now let's talk briefly about some of the things that

11   Motorola did know and did have in it's possession at the time

12   it sent these letters in October of 2010.  It had identified

13   the specific Motorola patents that were asserted to be

14   essential to 802.11 and H.264 and listed on the attachments?

15   A   Yes, those were attached to the offer letters.

16   Q   So someone at Motorola had actually gone through to figure

17   out which of its patents were pertinent to each standard,

18   right?

19   A   Yes.  There's a question, of course, of whether they are

20   truly essential.  But I think they just tried to, you know,

21   just keep track.  When you file patents you have to keep

22   track of which ones might be relevant to what.

23   Q   And Motorola was familiar with the development of the

24   standards because its employees actively participated in the

25   development of each of them, right?

A    They were certainly involved.  Again, I don't know the extent of the involvement.  There are lots of parts of 802.11, and I'm not sure whether Motorola might have played a bigger or a smaller role.

Q    Well, Ajay Luthra was the co-chair of the JVT that developed the H.264 standard and was a senior Motorola employee.  You know that from reading the trial transcript from last fall, don't you?

A    For H.264, yes.

Q    You would expect that as co-chair of the group that developed the H.264 standard, he had a good understanding of the relative importance or unimportance of Motorola's contribution to the standard, wouldn't you?

A    When it was developed I don't know what patents it issued and that kind of thing.  So it probably depends.

Q    In any event, you reached your conclusions in this case that Motorola did not understand the relative unimportance of its contribution, without your talking to Dr. Luthra?

A    I did not talk to Dr. Luthra, no.

Q    Now let's turn back to 802.11 for a moment.  We looked at a passage a minute ago that you said Motorola had no past experience on which it could draw when it attempted to negotiate a RAND license with Microsoft and that it had to start from scratch.  By that you meant that Motorola had never actually succeeded in getting anyone to take a

1    standalone license to its 802.11 patents, right?

2    A   I don't think it had actively been trying to, at least

3    after the -- there was a Symbol acquisition before that.  So

4    Symbol was a separate company, Motorola acquired it, and

5    that's where at least some of the 802.11 patents came from.

6    Symbol had been involved in licensing activities, but

7    Motorola itself I don't think had, at least in a major way,

8    had been trying to.

9    Q   You don't mean to suggest that Motorola itself never tried

10   to value the 802.11 portfolio and tried to get companies to

11   take a standalone license?  You're not suggesting that, are

12   you?

13   A   I haven't seen -- there's certainly no licenses that were

14   consummated.  And almost all the companies they were trying

15   to get licenses with were the other cellular handset

16   manufacturers.  So whether there were some one-off situations

17   that were discussed, you know, I can't rule that out

18   entirely.

19           MR. PRITIKIN:  Your Honor, may we approach?

20           THE COURT:  Yes.

21   Q   Dr. Leonard, you've been handed Exhibit 6097, which is a

22   letter from Richard Sonnentag, a licensing counsel at

23   Motorola, to Mr. Ken Kao, Chief Executive Officer of D-Link

24   Corporation, dated 31 October 2003.

25           MR. CANNON:  Objection, Your Honor.  This exhibit is

1  not in evidence.

2      THE COURT:  He's been handed it.  That's all that's

3  happened so far.  I'll overrule the objection.

4      MR. PRITIKIN:  I'll move admission of this document,

5  and then I can question him about it.

6      MR. CANNON:  Objection.  No foundation.

7      THE COURT:  Sustained.

8      MR. PRITIKIN:  Your Honor, it is a Motorola document.

9  I think that that is sufficient.  There was not an

10  authentication objection made to this document.

11      THE COURT:  Did you object to authenticity?

12      MR. CANNON:  I don't know that we have an

13  authenticity objection, Your Honor, but we have a foundation

14  objection.  In addition, there's no foundation, or

15  authenticity, or the reliability of this document.  It's not

16  signed by the current witness at all.  It's neither to nor

17  from the witness.

18      THE COURT:  Okay.  Before we go any further, I'll see

19  you at side bar.

20      (Court and counsel met at side bar as follows:)

21      THE COURT:  Just concretely state what your objection

22  is, because right now you have at least five of them.

23      MR. CANNON:  We have an objection to the foundation

24  laid for this document.  No personal knowledge by the witness

25  of the contents of this document, or of its existence, prior

1  to him seeing it right now.  In addition, the parties did

2  agree that the produced information would be authentic.  But

3  we have no foundation for the authenticity of this particular

4  document, that it was, in fact, a letter sent or received on

5  the date on its face.

6        THE COURT:  Well, who produced it?

7        MR. PRITIKIN:  It's got the Motorola Bates stamp on

8  it.  It was produced from their files.

9        MR. CANNON:  Produced from our files, correct.

10       THE COURT:  Counsel, he's not asking as to the truth

11  of this.  This is a letter out of your client's files.  He

12  needs to ask a question before you can tell me that there's

13  some problem with it.  The fact that he's taken a document

14  that you've produced, wants to mark it as an exhibit, that's

15  fine.  I'm not sure he's going to be able to get it into

16  evidence.  But as it is right now, he asked the question:

17  Are you aware that Motorola, you know, did something or what

18  was Motorola's position?

19       MR. CANNON:  No problem with those questions at all,

20  Your Honor.  But if the truth of the content of the document

21  is entered into evidence, that's where I think the

22  evidentiary objection lies.

23       MR. PRITIKIN:  Well, Your Honor, first I think it's

24  an admission of Motorola.  It's a document.  It's a regular

25  document.  It's on their letterhead.  It's produced from

```
1    their files.  It's an admission.
2            THE COURT:  What is the admission, counsel?
3            MR. PRITIKIN:  My point is anyway, beyond the
4    question of hearsay, is I'm not using it for the truth of the
5    matter asserted.  I want to use it to show that contrary to
6    what he has said, they actually did go out and try to license
7    the 802.11 essential patents.  That's what I'm going to use
8    it for.
9            THE COURT:  Why don't you ask him?
10           MR. PRITIKIN:  He probably is not familiar with it.
11           THE COURT:  Then you can show it to him and ask him
12   if that refreshes his recollection.  And if he says no to
13   that, then you're going to have to come up with a good
14   question.  You're not going to get to just enter it as an
15   exhibit, because it's going to be perceived for the truth of
16   the matter asserted.
17           MR. PRITIKIN:  That would be all right since it's an
18   admission on behalf of Motorola.
19           MR. CANNON:  But I don't see it as an admission.  I
20   think it is being offered for the truth of the matter that
21   this licensing -- I haven't fully read it yet because it's
22   the first time I've seen it, I believe -- that the truth of
23   whatever these licensing offers are, are being offered for a
24   particular reason.  But I just don't see where there's an
25   admission that's relevant to this particular case from this
```

1   hearsay letter.

2          THE COURT:  Well, your client, through its expert,

3   has taken the position that they didn't separately negotiate

4   on these.  And if this indeed contradicts that, then it does

5   come in as an admission.

6          MR. CANNON:  He did say that he's not generally

7   aware, but he said if there's a one-off license that he

8   hasn't seen, then --

9          THE COURT:  Then let's get some proper questions.

10          MR. PRITIKIN:  I will, Your Honor.

11                    (The side bar concluded.)

12   Q   Dr. Leonard, while we were at side bar, have you had a

13   chance to read Exhibit 6097?

14   A   I have, yes.

15   Q   Were you aware that Motorola, in fact, did go out and try

16   to get some companies to take licenses to its 802.11

17   portfolio as early as 2003?

18   A   I was not aware of this particular letter.  It is 2003.

19   I'm not sure anything came of it.  And I'll also point out,

20   just for the record, that this is, again, before the Symbol

21   acquisition.  So these would only concern patents that

22   Motorola had at that time and not the Symbol portfolio.

23   Q   Now, my question -- let's go back to my question.  Were

24   you aware that, in fact, Motorola had gone out and had tried,

25   as early as 2003, to license its 802.11 patent portfolios?

1    A    I think --

2    Q    Standalone?

3    A    I mean, that makes it sound like they had some program to

4    do it.  This, you know, for all we know this could be some

5    one-off situation.  Maybe D-Link called them.  I don't know.

6    Q    Let me show you two more letters.

7    A    Sure.

8         MR. PRITIKIN:  May we approach, Your Honor?

9         THE COURT:  Do you have copies?

10        MR. PRITIKIN:  Yes, sir.

11   Q    And, Dr. Leonard, have you had a chance to take a look at

12   6098 and 6099?

13   A    I have, yes.

14   Q    And does this refresh your recollection that Exhibit 6097

15   was not one-off and, in fact, they approached other

16   companies, Melco and Netgear, to try to take a license to

17   802.11 patents on a standalone basis?

18   A    That's what they say here.  Again, I don't think it led to

19   any actual licenses.

20        MR. PRITIKIN:  Nothing further, Your Honor.

21        THE COURT:  Thank you.  Mr. Cannon.

22        MR. CANNON:  Nothing further, Your Honor.

23        THE COURT:  All right.  You may step down.

24        Motorola will call its next witness.

25        MR. PRICE:  Your Honor, subject to perhaps a few

1   exhibit issues, Motorola rests.

2        THE COURT:  All right.  Does Microsoft wish to put on

3   a rebuttal case?

4        MR. HARRIGAN:  Can we have a five minute recess, Your

5   Honor?

6        THE COURT:  We'll take our afternoon recess.  Ladies

7   and gentlemen, just to remind you how this goes, since it's

8   been a long time since you've heard that jury instruction:

9   Microsoft is the plaintiff, they put on their case.  Motorola

10  is the defendant, they put on their case.  Then Microsoft is

11  permitted to put on a rebuttal case, which means information

12  in rebuttal to what Motorola presented.  And then if they

13  chose to do so, Motorola would be able to put on a

14  surrebuttal case to what Microsoft presented.  It gets

15  smaller all the time.  And you have just heard that Motorola

16  rested.  And the question I'm asking Microsoft is, do they

17  wish to put on a rebuttal case?

18     If they don't, I'm probably going to send you home,

19  because tomorrow morning when you come in I'm going to read

20  you the jury instructions.  And it's important to me that you

21  hear closing arguments back-to-back, so that you don't hear

22  one, and then I send you home and you get to think about it

23  all night, and you wouldn't hear the other one until

24  tomorrow.  So, depending on if you're enjoying the afternoon

25  or not, you can figure out which side you're rooting for,

1    either no rebuttal or rebuttal.

2       Please rise for the jury.

3     (The following occurred outside the presence of the jury.)

4          THE COURT:  We'll be in recess for ten minutes.

5                  (The proceedings recessed.)

6

7          THE COURT:  Mr. Harrigan.

8          MR. HARRIGAN:  Yes, your Honor.  Microsoft is not

9    going to call any witnesses or present any additional

10   evidence.  We would like to make a five-minute judgment as a

11   matter of law.

12         THE COURT:  I think both of you do.  What I would

13   propose to do is ask you next, is there any reason not to

14   send the jury home at this time?

15         MR. HARRIGAN:  No, your Honor.

16         THE COURT:  Mr. Price, was that --

17         MR. PRICE:  I'm checking.  Let me check on one thing.

18   No reason, your Honor.

19         THE COURT:  Let's bring the jury in.  I will tell

20   them to be back at 9:00 tomorrow morning, to go through

21   instructions.  By my guess, 9:45 or 10:00 Microsoft will be

22   starting on its closing.  Mr. Harrigan, you said 60 minutes.

23   Mr. Price you get 90.  I am going to take a break in there,

24   and then they reserve 15, seems to be roughly the schedule.

25   Everyone in agreement that that's what we are talking about?

1   Please rise for the jury.

2   (At this time the jury entered the courtroom.)

3           THE COURT:  Please be seated.  Mr. Harrigan, I cut

4   you off in mid-sentence.

5           MR. HARRIGAN:  I thought it was 90 and 90.

6           THE COURT:  You wanted 60 and 30?

7           MR. HARRIGAN:  Yes.  In other words, if I go over 60,

8   I have --

9           THE COURT:  You get ninety total, and you were

10   reserving some.

11           MR. HARRIGAN:  Yes.

12           THE COURT:  That's all I'm trying to say.

13       Ladies and gentlemen, both sides have rested, which means

14   that we are going to do housekeeping for probably an hour and

15   a half to two, and then we will be all ready for you tomorrow

16   morning.  What we were just talking about is the schedule.

17   That will be your coming out at 9:00, provided I can get all

18   of the housekeeping done between now and then.  I am going to

19   read you the jury instructions.  There are about 42 of them.

20   I think roughly it will take about 45 minutes.  Then we will

21   be hearing from Microsoft doing its closing argument.  Notice

22   the subtle use of the word "argument."  You will finally get

23   your chance to hear these people argue.  They will take the

24   facts, they will have the law, and they will urge you to

25   reach the conclusion that they are advocating.

 1      At the conclusion of that, I'm not sure who is going to do

 2   it for Motorola, but a representative of Motorola will be

 3   giving its closing argument.  The same thing, they are going

 4   to talk about the facts, they are going to talk about the

 5   law, they may go through the verdict form with you on how

 6   they think you ought to fill it out.  Their time comes as a

 7   block.  There will be a break between Mr. Harrigan and

 8   whoever follows up on behalf of Motorola.  Mr. Price, are you

 9   closing?

10          MR. PRICE:  Yes.

11          THE COURT:  There will be a 15-minute break between

12   Mr. Harrigan and Mr. Price.  The law provides that the

13   plaintiff gets both the first word and the last word.

14   Microsoft has indicated that it is going to reserve some

15   portion of its time for rebuttal.  At the conclusion of that

16   we are going to escort you back into the jury room.  You will

17   have all of the exhibits.  You will finally be able to talk

18   about this case among yourselves.  And you will have a full

19   copy of the jury instructions that I read to you.

20      So, get a good night's sleep, show up bright and early,

21   and this case will be yours for decision tomorrow.  And I am

22   not going to read you the instructions.  So don't do anything

23   bad.  Please rise for the jury.

24   (At this time the jury left the courtroom.)

25          THE COURT:  I have a series of notes.  Mr. Price, I

1  was so looking forward to watching Mr. Harrigan cross Brad

2  Keller.  You ruined my whole day.  Mr. Palumbo will explain

3  to you why all of that is true, local Seattle gossip.

4      Note one:  "Parties want to know if you want to see trial

5  transcripts they intend to use at closing.  They are

6  confused" -- maybe "confirmed."  Do each of you intend to use

7  trial transcripts?

8          MR. HARRIGAN:  Yes, we do.

9          THE COURT:  And it is the official court reporter

10  transcript?  It is not your notes or whatever?

11          MR. PRICE:  Correct.

12          THE COURT:  I see no reason, unless one of you has an

13  objection to it.  And since you are both doing it, it doesn't

14  sound like you do.  Is that correct?

15          MR. HARRIGAN:  We are going to exchange tonight.  I,

16  for one, was a little confused about a comment earlier as to

17  whether the court wanted to look at those transcripts.

18          THE COURT:  I don't want to see them unless you are

19  having some dispute.  Regardless of how good these people

20  are, and they are really extraordinary reporters,

21  periodically someone will say this transcript is wrong.  If

22  you've got one of those, then I need to know about it, so

23  that we don't have that fight in front of the jury.  Other

24  than that, it is the official record and you are free to use

25  it.

1    Two, Mr. Harrigan, do you want to go home and garden; is

2    that correct?

3            MR. HARRIGAN:  That's it, your Honor.  I do my best

4    closing argument preparations that way.

5            THE COURT:  Mr. Price, do you want to take off also

6    so you can work on your closing?

7            MR. PRICE:  Thank you.

8            THE COURT:  Everyone else has to stay here and suffer

9    like me.  We will do that.  Any other matters that we should

10   take up before I hear motions?

11           MR. PRICE:  A logistics question for the IT people

12   here.  Do you allow video played back during deliberations?

13   In other words, is there a reason to have someone here to do

14   that?

15           THE COURT:  Sadly, yes.  The Ninth Circuit teaching,

16   as I understand it, is the video, not the transcript, but the

17   video is part of the official record.  And, therefore, if

18   they want to see a video deposition they get to see it.  I

19   suspect if you wanted you could stipulate around that, and

20   that way each of you would be able to send your IT people

21   home.  So talk about that if you want to.

22       Any other questions?  All right.  Mr. Harrigan, you wanted

23   to do motions?

24           MR. HARRIGAN:  Actually, Mr. Pritikin does.

25           THE COURT:  Mr. Pritikin.  Ms. Sullivan, you're next.

1    I'm sure you will be briefer than this morning?

2         MS. SULLIVAN:  Yes, your Honor.

3         THE COURT:  There was less testimony.

4         MR. PRITIKIN:  Your Honor, I was intending to be very

5    brief, because, as I understand it, you are going to permit

6    us to submit a complete written statement.  We will have that

7    for you, I think it is by noon tomorrow, our JMOL motion.

8    But for the record, what I thought would do is simply list

9    the grounds on which we are moving.  I think I can do that in

10   about five minutes.

11       Let me just run through the grounds at this point.  First,

12   that Motorola breached its RAND commitments by seeking

13   judgments on its standards-essential patents.

14       That Motorola breached its RAND commitments by seeking

15   injunctions after Microsoft filed this lawsuit, and after it

16   committed to take a license on RAND terms.

17       Motorola breached its contracts with the ITU and IEEE by

18   seeking injunctions on its standards-essential patents before

19   attempting to offer a license on RAND terms.

20       Motorola breached its RAND obligations by rejecting

21   Microsoft's above-RAND Orange Book offer in continuing to

22   pursue injunctions.  Motorola also has not presented a

23   legally sufficient mitigation or causation defense.  That's

24   with respect to damages.

25       Motorola breached the duty of good faith and fair dealing,

1    and in that regard the actions were contrary to the

2    reasonable and justified expectations of the parties.

3        Motorola engaged in commercially unreasonable conduct.

4        Motorola engaged in conduct that frustrated the purpose of

5    its RAND licensing commitments.

6        Motorola's conduct failed to conform to ordinary custom

7    and practice in the industry.

8        And the subjective factors confirm that Motorola breached

9    its duty of good faith and fair dealing, and no reasonable

10   jury could conclude otherwise.

11       Motorola breached its contract with the IEEE by failing to

12   make a license to its 802.11 essential patents available at

13   nominal competitive cost.  It breached its contracts with the

14   IEEE and the ITU by failing to make licenses to its 802.11

15   and H.264 patents available on RAND terms.

16       Motorola breached its contracts with the IEEE and the ITU

17   by making blatantly unreasonable offers for licenses to its

18   standards-essential patents.

19       Motorola's defenses of invalidity -- excuse me,

20   Microsoft's defenses of invalidity and non-infringement are

21   irrelevant to Motorola's liability for breach of contract.

22       And, finally, all three Motorola defendants are liable for

23   breach of contract.

24       And we will supply the information in the written

25   submission tomorrow, fleshing this out, your Honor.

```
 1              THE COURT:  All right.  Ms. Sullivan, this morning --
 2    I want to make sure, you indicated that you thought that one
 3    of the Motorola parties was not a party to the German
 4    injunction request.
 5              MS. SULLIVAN:  That's correct.
 6              THE COURT:  And I wrote down Motorola Solutions.
 7              MS. SULLIVAN:  That's correct, your Honor.
 8              THE COURT:  Is Motorola Solutions a party to this
 9    lawsuit?
10              MS. SULLIVAN:  Your Honor, yes, with respect to the
11    offer letters; no, with respect to the German injunction,
12    because the split occurred before the seeking of injunctions
13    in Germany.
14              THE COURT:  Okay.  It seems a little funny to me.  As
15    I understand the caption in this, it is Microsoft Corporation
16    versus Motorola, Inc., Motorola Mobility and General
17    Instrument, those three.  And, therefore, I couldn't figure
18    out why we were going to deal with Motorola Solutions.
19              MS. SULLIVAN:  May Mr. Dailey answer that question?
20              MR. DAILEY:  Motorola, Inc. was renamed Motorola
21    Solutions.  That is the entity.
22              THE COURT:  All right.  Those counsel who are
23    departing, I guess, Ms. Sullivan do you want them to stay or
24    will you let Mr. Price go?
25              MS. SULLIVAN:  Yes, Mr. Price is free to go.
```

1          MR. PRICE:  One quick thing before I go, and that is

2     Exhibit 2970, your Honor, that you handed out earlier and

3     highlighted the portions we had read.  I have looked at it.

4     From the best I can tell, what you highlighted is what we

5     read into evidence.  We still think the entire document

6     should come in because it gives the context for the

7     interpretation.

8          I would also ask, although it was not read in, the last

9     page has two signers, Mr. Heiner and also Amy Marasco.  It

10    seems that it would be appropriate to have both -- everyone

11    who signed the document come in -- have that come into

12    evidence as well.

13         THE COURT:  All right.  I'm going to stay with my

14    ruling that we are only going to admit the portions of it

15    that were made reference to during the course of the trial.

16    I think under 403, if you just glance through some of these,

17    for example, on Page 5, the government should take an

18    inclusive view towards SSO's diverse IPR policies and not

19    promote one approach over another.  That just gets us into

20    stuff that is not part of this trial.  I really would urge

21    all of you to get this job for a while and have a chance to

22    talk to juries.  It would amaze you what they can create out

23    of the material that is in the pleadings that they don't have

24    any testimony about.

25         Does Microsoft have any view on 2970?

```
1          MR. HARRIGAN:  No, your Honor.

2          THE COURT:  So it is acceptable in the form handed

3    out, with the addition of underlining Amy Marasco as a

4    signatory?

5          MR. HARRIGAN:  Yes.

6          THE COURT:  Counsel, you are free to go.

7       Ms. Sullivan, to the podium.

8          MS. SULLIVAN:  Your Honor, Motorola respectfully

9    additionally files a motion for judgment as a matter of law

10   pursuant to Federal Rule of Civil Procedure 50(a)(1), this

11   time at the close of all evidence, because Microsoft has

12   failed to make a legally sufficient case by which a

13   reasonable jury could find that Motorola breached its

14   contract with the ITU or IEEE with respect to any of the

15   three theories they have presented, or with respect to those

16   theories in combination.

17      Your Honor, for brevity, and in accord with your Honor's

18   permission to us to amplify our written submission, I will

19   simply say that all of the arguments we made in our first

20   motion apply here.  I would just like to highlight some of

21   the ways in which the additional evidence makes those points

22   even stronger, and to add the one issue on which Motorola

23   bears the burden of proof.

24          THE COURT:  All right.

25          MS. SULLIVAN:  Just to begin, your Honor, with the
```

1    offer letters, at the close of evidence, in addition to the

2    prior arguments, we heard undisputed evidence that

3    2.25 percent in the opening letter was a standard term, in

4    the sense that it was the term previously used in the prior

5    experience of the negotiator.  We also heard, your Honor, the

6    testimony that it would be irrational from an economic

7    perspective to knowingly use an offer so disproportionate

8    that it was sure to be rejected, because that would be a poor

9    strategy for achieving the attainment of hold-up, which means

10   payment or success in a subsequent legal proceeding.  So

11   those two pieces of additional evidence on the Motorola case

12   reinforce the argument that the opening letters were not an

13   either subjective or objective lack of good faith.

14       Turning to the additional evidence that we would add to

15   our arguments on the injunction piece, again, we would

16   reiterate there is no theory in the case about failing to

17   withdraw injunction requests.  The theory in the case is that

18   injunction requests were sought.  And, your Honor, just for

19   the record, we will be arguing that there were serious

20   Noerr-Pennington problems with trying to tell a party that

21   its failure to take action in a lawsuit on its defenses were

22   arguments that in itself become a de facto new form of breach

23   pleading in the course of the case.  So we think there is a

24   problem with that theory that is legal in nature, and

25   therefore makes that new theory insufficient as a matter of

 1    law to cure the defects in the part of the injunction case

 2    that goes to actually seeking the injunctions.

 3        In addition, your Honor, with respect to the duty of good

 4    faith, the objective basis on which Motorola acted in good

 5    faith in seeking injunctions, we would add to our earlier

 6    argument the evidence that came in in Motorola's case that

 7    established, without dispute, an injunction is not automatic,

 8    it can only be granted by a court; and the evidence that is

 9    not contradicted by Microsoft's case, that in fact there is a

10    very low probability of success in attaining an injunction in

11    a patent infringement case on a standards-essential patent

12    because of the nature of the RAND commitment.  That is now

13    undisputed evidence that hold-up strategy through seeking an

14    injunction on a standards-essential patent with respect to

15    outcome is an irrational strategy, and, therefore, cannot be

16    objectively attributed to Motorola.

17        Your Honor, I would rest on my earlier arguments about

18    Marvell.

19        Just turning to the combination theory, again, your Honor,

20    zero plus zero plus zero, or an inadequacy of a legally

21    sufficient case on each of the three factors makes the

22    combination theory fail as a matter of law.

23            THE COURT:  They promised me there was no math in

24    this job.

25            MS. SULLIVAN:  That equation was the one I could do.

1    Your Honor, I would like to speak briefly to one issue

2    that couldn't have been covered by the earlier motion, and

3    that is the issue of mitigation of damages.  We actually

4    believe the causation is Microsoft's burden.  So I would

5    respectfully disagree with Mr. Pritikin suggesting we failed

6    to prove lack of causation.  Causation is Microsoft's burden.

7    They failed to prove it.

8    We accept that mitigation is our burden.  But we feel that

9    no rational jury could reject the argument that Microsoft

10   failed to mitigate damages with respect to the attorneys

11   fees, because they could have raised the very same arguments

12   they did in this lawsuit as a defense in the infringement

13   actions and therefore avoided the dispute.  They could have

14   answered -- they could have answered Motorola's letters.

15   So as to attorneys fees, it was within their capacity to

16   mitigate damages by taking other action, specifically a

17   response in the negotiations, in accord with industry custom

18   and practice and/or an effort to work out their case in the

19   existing infringement suits rather than taking this separate

20   action.

21   Finally, your Honor, we think that Microsoft -- that

22   Motorola has proved its case with respect to failure to

23   mitigate with respect to the German move; or, put another

24   way, no rational jury could fail to find that Microsoft

25   failed to mitigate damages, because it had several options to

1    avoid the German move all together.  One, obviously, it could

2    have entered into negotiations, as with attorneys fees.

3    Second, it could, under undisputed testimony in the case,

4    including undisputed expert testimony, have filed an Orange

5    Book procedure, known as a Section 315 proceeding, whereby

6    the probability of avoiding an injunction by placing money in

7    escrow at a rate that Microsoft thought fair and reasonable,

8    was very high.  So the threat of the injunction could have

9    been averted by Microsoft's election of an Orange Book

10   remedy.  It failed to elect that remedy.  It therefore failed

11   to mitigate damages.

12       And, finally, we think the evidence that came in on

13   Motorola's case showed that no rational jury could disagree

14   that Microsoft could have lowered its costs of relocation by

15   moving earlier.

16       So, your Honor, we will elaborate all of those in the

17   follow-up written submission.  I just wanted to put on the

18   record those additional aspects of our case at the close of

19   evidence.  Thank you.

20           THE COURT:  Thank you, counsel.

21           MS. SULLIVAN:  Any questions, your Honor?

22           THE COURT:  No.  There are so many of those no

23   rational jury could reach any other conclusion, which drives

24   me back to look at the transcript, as it doesn't take much to

25   defeat that particular argument.  But there are times what I

1    thought I heard doesn't correspond to what I read on the

2    paper.  I don't have questions, other than for my own

3    internal investigation.

4            MS. SULLIVAN:  Understood, your Honor.  We will try

5    and focus in our written on the evidence that is undisputed,

6    as well as our issues of law.

7            THE COURT:  All right.

8            MS. SULLIVAN:  Thank you, your Honor.

9            THE COURT:  How long would you all like before we

10   come out here and take exceptions?

11           MR. PRITIKIN:  I think we are basically ready to go,

12   your Honor.  There is one other short housekeeping matter.

13           THE COURT:  Mr. Cannon, how long do you need?

14           MR. PRICE:  I have a 30 second housekeeping matter.

15           THE COURT:  In terms of exceptions.  I thought you

16   were taking exceptions.

17           MS. SULLIVAN:  In terms of exceptions, your Honor, I

18   think we can do it in about a half hour.  What is your

19   Honor's customary practice?

20           THE COURT:  How long do you need to get ready?

21           MS. SULLIVAN:  If Mr. Pritikin asked for time, I'm

22   afraid I didn't hear it.

23           THE COURT:  He said he is ready to go.  I am asking

24   you the same question.

25           MS. SULLIVAN:  In order to have the right lawyers in

1    the courtroom, if your Honor could give us until 3:30, we

2    would be grateful.

3            THE COURT:  That's what I was trying to find out.

4        Housekeeping matters.  Microsoft first.

5            MR. PRITIKIN:  Quick item, your Honor.  They filed a

6    request for a judicial notice of certain items, and we are

7    going to be filing a response to that imminently.  It is a

8    written response which I am told should be filed within the

9    next half hour.

10           THE COURT:  When was the request filed?

11           MR. PRICE:  It was filed yesterday evening.

12           MR. PRITIKIN:  In the wee hours of the morning, I

13   think.

14           MS. SULLIVAN:  No.  7:00 p.m.

15           THE COURT:  We will await your response before we do

16   anything.

17           MR. CANNON:  My housekeeping matter was exactly that,

18   asking the court to take judicial notice.  We just wanted to

19   make sure that even though the evidence is closed and we have

20   rested that we have the opportunity to bring that up with

21   your Honor, since we filed that last night.  It sounds like

22   Microsoft has filed it as well.

23           THE COURT:  Who is taking judicial notice of it, me,

24   in connection with the motions?

25           MR. CANNON:  I believe it is the court, your Honor.

1          THE COURT:  All right.  Counsel, I will be back out

2    at 3:30.  The court reporter will go rest his fingers, and we

3    will see you all then.  We will be in recess.

4                    (The proceedings recessed.)

5          THE COURT:  Who, Mr. Pritikin, is going to be doing

6    exceptions?

7          MR. PRITIKIN:  Mr. Love is going to do it for

8    Microsoft.

9          THE COURT:  I would describe that as going to the

10   bench, except last time he spoke he seemed to be a starter.

11         MR. PRITIKIN:  Not with Mr. Love, no, we are not

12   going to the bench.

13         MR. LOVE:  Thank you, your Honor.  We have prepared

14   our exceptions.  We are prepared to file those electronically

15   or submit them to the clerk, whatever mechanism you would

16   prefer.

17         THE COURT:  You are doing them orally, and then you

18   can file them.

19         MR. LOVE:  Microsoft respectfully submits the

20   following exceptions to the court's final jury instructions

21   and verdict form, as distributed to the parties.  I believe

22   we got the final copy from the clerk at noon today.

23       First, as to Instruction Number 8.  Microsoft takes

24   exception to Instruction Number 8 on the credibility of

25   witnesses, which might leave the jury uncertain how to

1    consider certain undisputed facts that came in through

2    witness testimony.  The court's rulings required Microsoft to

3    put certain findings of fact in the court's findings of fact

4    and conclusions of law, Docket 673, into the record through

5    witnesses.  Microsoft proposes resolving this issue with an

6    instruction on undisputed facts.  Reading facts represented

7    during the trial as undisputed should be taken as true, but

8    are not entitled to any more weight in your decision than any

9    other facts.  This instruction would precede Instruction

10   Number 10 on stipulated facts and will assist the jury in

11   understanding the distinction in how certain facts have been

12   entered into the trial record.

13        Instruction Number 14.  Microsoft takes exception to

14   Instruction --

15            THE COURT:  Let me stop you.  On 10, do you have any

16   disagreement with the court's adding a definition or a

17   description of plaintiff or defendant so that the parties are

18   clear?

19            MR. LOVE:  No, your Honor.

20            THE COURT:  All right.  14.

21            MR. LOVE:  Microsoft takes exception to Instruction

22   Number 14 for two reasons.  First, the portion of the

23   instruction concerning Marvell should read, "That Motorola

24   breached," quote, "by failing to offer a RAND license

25   covering its 802.11 standards-essential patents to Marvell,

1  Microsoft's chip supplier, and instead offering Marvell a

2  license that was not RAND and was discriminatory in excluding

3  Marvell's products sold to Microsoft from the scope of the

4  license Motorola proposed."

5       THE COURT:  I'm sorry.  Why don't you go ahead and

6  finish that, and then I will ask my question.

7       MR. LOVE:  The current language, "By having not

8  executed a license agreement," suggests to the jury that

9  Marvell's response to Motorola's offer is relevant.  It is

10  not relevant, because only unreasonable and discriminatory

11  terms were ever offered.  There was no path for Marvell to

12  conclude a RAND license with Motorola.

13     The proposed articulation of Microsoft's claim as to

14  Marvell is consistent with what it laid out in the pretrial

15  order, Docket 803, at Pages 2 to 4.

16     And, second, as to both the IEEE and the ITU contract, the

17  additional clause, quote, "By violating the covenant of good

18  faith and fair dealing implied in every contract," end quote,

19  should be added.  Microsoft has alleged both a straight

20  breach of contract and a breach of the duty of good faith and

21  fair dealing.  Those grounds were separately and specifically

22  stated in the pretrial order as well.

23       THE COURT:  Let's take those one at a time.  The

24  court has held that while it is conceivable to offer a

25  license on terms that would be a violation of good faith and

1    fair dealing, that an initial offer -- we will start with an

2    initial offer, does not need to be on RAND terms.  It seems

3    to me that your proposed language in your jury instruction

4    contradicts that.

5         MR. LOVE:  Respectfully, your Honor, I submit that it

6    does not.  I think the court's prior ruling in Docket -- I

7    believe 188, was the summary judgment order, addressed that

8    issue.  The focus that the parties had set forth in the

9    briefing was on the economic terms, really the reasonable

10   prong, and to the extent that the economic terms reflect in

11   royalty were discriminatory.  That is an aspect as well.  But

12   there was no focus in that summary judgment briefing as to

13   discriminating against a particular party.  And the aspect

14   that we believe is particularly relevant in the record that

15   has been created is that Marvell sought a license to protect

16   a particular customer, Microsoft.  And the license they were

17   offered was really no license at all, because it excluded

18   Microsoft.

19        THE COURT:  All right.  And then your second point

20   has to do with an intellectual discussion that we have kicked

21   back and forth multiple times, which is there is, in

22   connection with the IEEE, only one contractual commitment or

23   agreement.  I will use the phrase "agreement."  And therefore

24   you have to breach that agreement.  You can breach it in

25   multiple ways, one of which would be a violation of an

 1    expressed term, or one of them would be a violation of the

 2    covenant of good faith and fair dealing.  Your proposed

 3    language seems to suggest that there is not subsumed under a

 4    violation of good faith and fair dealing a violation of the

 5    agreement, and instead lists them as two more or less

 6    separate and distinct items, as opposed to our proposal,

 7    which has to do with taking the agreement and listing the

 8    ways that you say it has been violated.  So I would like to

 9    hear your response to that, if you tracked all of that

10    language?

11         MR. LOVE:  I hope that I have, your Honor.  As you

12    noted, this issue, as to the nature of Microsoft's claim,

13    whether Microsoft's claim is presented at trial here has been

14    only for a breach of the duty of good faith and fair dealing,

15    really with respect to both the IEEE and the ITU, or whether

16    Microsoft is also alleging a straight breach of contract -- a

17    breach of the terms -- the explicit terms of the contract in

18    addition to a breach of the implied duty of good faith and

19    fair dealing.  Our effort in taking this exception here - and

20    we recognize what the court has done with respect to this

21    argument, which was in the pretrial order, and was presented

22    in the informal conference - we are trying to make sure we

23    have preserved our argument that both of those claims are

24    distinctly presented at trial.

25         THE COURT:  Do you not feel then that the instruction

1    on the duty of good faith and fair dealing gives you a basis

2    to argue that?

3            MR. LOVE:  I believe that it does, your Honor.  I

4    think this instruction in isolation --  And I apologize.  I

5    am actually not looking at construction at the moment.  To

6    the extent it is enumerating all of the breach of contract

7    theories that the jury is to consider, our concern was that,

8    in isolation, left it unclear, the status of good faith and

9    fair dealing.

10           THE COURT:  I understand your exception.  Please

11   continue.

12           MR. LOVE:  Instruction Number 15.  Microsoft takes

13   exception to Instruction Number 15 for the language that - I

14   apologize, this may have been addressed in the red line -

15   that Microsoft was damaged as a result of Motorola's breach.

16   The word "damage" should be replaced by "harmed," because

17   this is a case where nominal damages are relevant and

18   Microsoft has sought equitable relief --  Let me correct

19   myself.  I think this is one of the issues that we had

20   concerns about, the interchanging of the words "damage" and

21   "harm."  Damage is an element in breach of contract.  I

22   believe this is the place that in the current draft -- this

23   is one issue that hasn't been resolved.  Our position is the

24   jury needs only to find that the breach harmed Microsoft in

25   some way.  That does not have to be a way that is legally

 1    compensable by damages or that it is a theory of damages that

 2    Microsoft has articulated for recovery in this case.  But a

 3    finding of that harm alone is sufficient to establish breach.

 4         THE COURT:  We considered that, looked at the

 5    Washington law, and didn't agree with you.

 6         MR. LOVE:  Instruction Number 16.  Microsoft takes

 7    exception to Instruction Number 16 in its entirety.  As your

 8    Honor suggested, seeks a directed verdict that Motorola

 9    breached the duty of good faith and fair dealing for the

10    reasons set forth in Microsoft's July 3rd, 2013 motion for

11    summary judgment, and the state of the record at trial.

12         Additionally, Microsoft takes exception to the exclusion

13    of factor 6 on subjective factors.  Our position is this

14    factor should not be included.  Motorola's lack of ill intent

15    would not excuse its conduct if it had breached under one or

16    a combination of the other grounds that are enumerated there.

17    And as the current language of the instruction states, bad

18    motive or intent does not necessarily imply bad faith, and

19    good motive or intent does not necessarily imply good faith.

20    Likewise, bad motive or intent is not a prerequisite to bad

21    faith, nor is good motive or intent a prerequisite to good

22    faith.  That statement of the law, which is drawn from the

23    court's summary judgment order, means that in this case there

24    is no need for an instruction on subjective intent.  Whether

25    the jury believes that Motorola acted with bad motives or

 1    good motives, that belief will not determine the result on

 2    liability.  If the jury believes Motorola had bad motives

 3    based on the instruction, that will not necessarily imply bad

 4    faith, and Microsoft will have to establish breach on one of

 5    the other grounds if the claim is a breach of the duty of

 6    good faith and fair dealing.

 7              THE COURT:  What should the court do then with the

 8    Washington case law that specifically says you can have a bad

 9    motive and not breach a contract?

10              MR. LOVE:  I think our position is the jury should

11    not be instructed that they should consider the motive at

12    all, because it won't be dispositive of the issue.  If the

13    jury believes Motorola had good motives, Microsoft can still

14    prevail under breach of good faith and fair dealing by

15    establishing the other grounds.  The suggestion that the

16    consideration of Motorola's good faith or bad faith --

17    subjective good faith or bad faith is required or should be

18    considered by them as part of evaluating the breach of good

19    faith and fair dealing, Microsoft is going to have to

20    establish the other -- some combination, alone or in

21    combination, the other factors in order to prevail on that

22    claim anyway.  It is not clear at all what they are supposed

23    to do with what they think of the intent.

24              THE COURT:  All right.

25              MR. LOVE:  Instruction 18.  Microsoft takes exception

to Instruction Number 18 for suggesting that frustration of
purpose is only one factor -- I apologize - is only one
factor to consider in determining if Motorola breached.  That
language Microsoft proposes should read, "One factor that may
alone or in combination with other factors demonstrate that
Motorola breached."  And those are for the same reasons
outlined in Microsoft's exception I believe to previously
numbered Instruction 16.

Additionally, Item Number 4 should be removed as one of
the purposes of the RAND commitment, as Microsoft has not
argued that Motorola's conduct frustrated that purpose.  We
don't believe there is a reason the jury needs to be
instructed on that purpose of the RAND commitment, since this
is part of the breach theory for frustration of purpose.  And
there hasn't been evidence on that.

Number 19.  Microsoft takes exception to Instruction
Number 19 in its entirety and seeks a directed verdict; that
Motorola's October 2010 demands were blatantly unreasonable
and thereby breached the RAND commitment for the reasons set
forth in Microsoft's March 30th, 2012, and July 3rd, 2013
motions for summary judgment and the state of the record at
trial.

Microsoft also takes exception to Instruction Number 19
for suggesting that Microsoft's only claim is for the breach
of duty and good faith and fair dealing.  The opening

1    sentence, Microsoft submits, should begin, quote, "One of

2    Microsoft claims in this case is that Motorola's," and then

3    continuing from there.

4        Microsoft also takes exception to Instruction Number 19,

5    stating that, quote, "Initial offers in a RAND licensing

6    negotiation do not need to be on RAND terms."  And that is

7    for the reasons set forth in Microsoft's August 18th, 2011

8    summary judgment brief and reply brief.  Those are Docket

9    Numbers 77 and 96.  And our position is that Motorola's

10   initial offer was required to be RAND.  Of course, we

11   understand the court's ruling at 188 on those issues.

12       Additionally, legal principle number two, the phrase,

13   quote, "And, in particular, an offer must not be blatantly

14   unreasonable," should added in light of the court's June 6th,

15   2012 summary judgment ruling at Docket Number 335.  And

16   Microsoft has also proposed the alternative phrase, quote --

17   again to be added to legal principle two, quote, "In

18   particular, an offer must not be so high as to be a breach of

19   the that duty.  The economic terms of an offer alone may

20   breach the duty if the jury finds the offer so high as to

21   constitute, for example, commercially unreasonable conduct."

22   Under legal principle three, the language, quote, "However,

23   the size of an offer alone is not exclusively dispositive of

24   whether Motorola has breached its duty of good faith and fair

25   dealing," end quote, should be removed, because the size of

1  the offer may be exclusively dispositive.  The following

2  sentence should be modified to read, quote, "You may use that

3  comparison to decide whether Motorola's offer breached its

4  duty of good faith and fair dealing using the standards set

5  forth in Instruction Number 16."  Again, I apologize.

6  Switching the number 16 and 17.  Change that.

7       Instruction Number 20.  Microsoft takes exception to

8  Instruction Number 20 as to the last sentence of the second

9  paragraph concerning the court's method of determining RAND

10  by modeling the negotiation, which may mislead the jury to

11  concluding that Motorola would have come to this or to any

12  other RAND royalty through negotiation.

13       Additionally, Microsoft takes exception to the statement

14  of the RAND royalty rate for Motorola's H.264

15  standards-essential patents as 0.555 cents per unit, with the

16  upper bound being 16.389 cents per unit, and the lower bound

17  0.555 cents per unit.  For the reasons set forth in

18  Microsoft's proposed findings of fact and conclusions of law

19  that followed the November trial, the RAND royalty for

20  Motorola's H.264 standards-essential patents is 0.197 cents

21  per unit, with a range of 0.065 to 0.204 cents per unit.  And

22  the citation for that is Docket 621, at paragraphs 345

23  through 346.  And the factual bases for those numbers are

24  laid out at paragraphs 347 to 428.

25       Microsoft also takes exception to the statement of the

1    upper bound of 19.5 cents for Motorola's 802.11

2    standards-essential patents.  The citation for that is the

3    same document.  Our position laid out in the proposed

4    findings and conclusions for the November trial was that the

5    upper bound of that range is 6.5 cents per unit, Docket

6    Number 621 at Paragraph 453.

7         Instruction Number 21.  Microsoft takes exception to

8    Instruction Number 21 in its entirety, in particular because

9    it is based on the statement that, quote, "The RAND

10   commitment does not by itself bar standards-essential patent

11   owners from ever in any circumstances seeking injunctive

12   relief to enforce the patents," for the reasons set forth in

13   Microsoft's July 12th, 2013 opposition to Motorola's July 3rd

14   motion for summary judgment.  Microsoft's brief is at Docket

15   Number 740.  The RAND commitment bars standards-essential

16   patent owners from seeking injunctions against implementers,

17   and the jury should be so instructed, replacing the entirety

18   of Instruction Number 21.

19        Additionally, Microsoft takes exception to Instruction

20   Number 21 because it fails to instruct the jury that Motorola

21   breached its RAND commitments if it sought injunctions

22   without first making a RAND offer.  And we cite Realtek

23   Semiconductor, which is cited in those briefs, 2013 Westlaw

24   2181717, Northern District of California, May 20th, 2013.

25   Microsoft's argument about that case is at Docket 740, pages

 1    3 to 8.

 2        Moving along to Instruction Number 22.  Microsoft takes

 3    exception to Instruction Number 22 because it fails to

 4    include two other legal grounds upon which Microsoft did not

 5    repudiate its RAND rates, but that Motorola has presented

 6    evidence and arguments to suggest the contrary.  The

 7    statement, quote, "Microsoft did not repudiate or forfeit any

 8    of its rights under the contracts by arguing that Motorola's

 9    standards-essential patents were invalid, were not infringed

10    by Microsoft," end quote, should be added to the instruction.

11    For the reasons outlined in Microsoft's bench memorandum at

12    Docket 887, Motorola has advanced arguments to the contrary,

13    to suggest that Microsoft was an unwilling licensee or not

14    entitled to a RAND license because if did not concede the

15    validity and essentiality of Motorola's standards-essential

16    patents.

17        That position is wholly inconsistent with the conclusions

18    reached by the two regulatory agencies that have been

19    investigating Motorola's conduct with respect to its

20    standards-essential patents.  Statements from both -- the

21    Federal Trade Commission appear in the consent order, and

22    statements from the European Commission in its press releases

23    concerning its investigation of Motorola's conduct made clear

24    that contesting validity and contesting essentiality or

25    infringement did not make an implementer an unwilling

 1    licensee.  Motorola has presented a contrary position to the

 2    jury.  We also believe that position is without any other

 3    independent legal basis, regardless of what the regulatory

 4    agencies submit.

 5              THE COURT:  Remember to breath, Mr. Love.

 6              MR. LOVE:  I will take one here.

 7        Second, the statement, quote, "Microsoft did not repudiate

 8    or forfeit any of its rights under the contracts by filing

 9    lawsuits against Motorola on patents unrelated to the

10    standards at issue here," unquote, should also be added to

11    this instruction.  There is no authority for the proposition

12    that as a matter of contract law Motorola could condition the

13    availability of a RAND license on the presence of other

14    patent disputes with a potential patent RAND licensee.

15    Motorola has never identified any terms of the contract or

16    principles of contract law that would so suggest.  In any

17    event, Microsoft's October 1st, 2010 suits came before the

18    November 9th, 2010 complaint in this action.  Both the filing

19    of those suits on patents wholly unrelated to the standards

20    at issue here and the filing of this complaint were part of

21    the factual background of Motorola's motion to dismiss

22    brought on repudiation grounds in December 2010.  That's

23    Docket Number 36 at 9.

24        Motorola did not then, and has not through today,

25    articulated how the filing of the October 1st suits had any

1    impact on Motorola's contractual obligations.  The

2    instruction is necessary to cure the confusion injected into

3    this case by Motorola's attempt to put Microsoft's conduct on

4    trial.  Microsoft's conduct is not relevant to whether

5    Motorola satisfied its contractual obligations.  Motorola's

6    own 30(b)(6) witness, whose deposition was played in this

7    case, testified Motorola understood it could not condition

8    the availability of a license on RAND terms to its

9    standards-essential patents on a cross-license to an

10   implementer's non-standards-essential patents.

11       Instruction Number 24.  Microsoft takes exception to

12   Instruction Number 24, part (a), and would replace the

13   contents with, quote, "The costs that Microsoft incurred for

14   relocating Microsoft's distribution center to the Netherlands

15   in the spring 2012 to avoid the consequences of the

16   injunctive relief sought in Germany."  The insertion of only

17   MMI and General Instrument Corporation presumes that the

18   conduct of Motorola Solutions was unrelated to the

19   consequences that Microsoft endured in Germany.  But the

20   theory of Microsoft's case, as presented to the jury, is that

21   all of the Motorola entities, collectively, withheld from

22   Microsoft through a hold-up strategy a license to all

23   relevant patents held by all entities essential to the two

24   standards.  The evidence in the record establishes that

25   Motorola, through Mr. Dailey, was unwilling to settle the

1    H.264 issue alone, and instead insisted on including all

2    Microsoft non-standards-essential patents rights sought by

3    Motorola entities and the 802.11 standards-essential patents

4    held by the relevant Motorola entities in any such

5    discussion.  In other words, Motorola, and I am referring to

6    the defined term "Motorola," Motorola collectively made the

7    availability of a RAND license, including a RAND license on

8    H.264, contingent on a license to Microsoft's

9    non-standards-essential patents.  And the 802.11 patents and

10   portfolio is wrapped up in that as well.  So that refusal to

11   make available an H.264 license on RAND terms is an element

12   of Microsoft's claim that Motorola Solutions shares

13   liability.  And that means Microsoft, lacking a license, had

14   to relocate from Germany in the face of the injunction.  Our

15   position is that it is irrelevant, that only MMI and General

16   Instrument are the named plaintiffs in the German suit,

17   because all of the defendants collectively contributed to the

18   circumstances which required relocation.

19        Additionally, Microsoft takes exception to Instruction 24,

20   and would eliminate the portion of part (b) that states,

21   "Regarding part (b), you may only award such damages if you

22   find that Motorola's lawsuits seeking injunctive relief apart

23   from Motorola's general course of conduct violated Motorola's

24   duty of good faith and fair dealing.  Microsoft's ability to

25   recover fees as damages should not be limited to a Motorola

1   breach that is only for pursuit of injunctions.

2       First of all, Motorola's obligation was to grant licenses

3   on RAND terms.  When it failed to do so, meaning Microsoft

4   was deprived of a RAND license, that would have immediately

5   ended any injunctive lawsuit brought by Motorola.

6   Accordingly, those fees are a direct and foreseeable

7   consequence of Motorola's breach of its obligation to grant

8   RAND licenses.

9       Second, and in the alternative, Microsoft would replace

10  the identified statement of part (b) with, quote, "Regarding

11  part (b), you may only award such damages if you find that

12  Motorola's lawsuits seeking injunctive relief, either alone

13  or as part of Motorola's general course of conduct, violated

14  Motorola's duty of good faith and fair dealing.

15      As currently drafted, with the words "apart from

16  Motorola's general course of conduct," the jury could find

17  that Motorola's course of conduct, including both the terms

18  of the letters and the subsequent content of pursuing

19  injunctions, breached the duty of good faith and fair

20  dealing, but the jury could conclude it cannot award fees for

21  defending against those injunctions.  Instructions drafted

22  could suggest that the jury should ignore Motorola's other

23  conduct when assessing whether the pursuit of injunctions

24  entitled Microsoft to this form of damages.  Microsoft

25  recognizes the court has added additional language suggesting

1  to the jury that, quote, "It shall consider the circumstances

2  surrounding each lawsuit."  But the jury may be confused as

3  to how to reconcile that direction with the prior direction

4  to assess this issue, quote, "apart from Motorola's general

5  course of conduct."

6      As court explained in the summary judgment order on this

7  issue of the recoverability of fees as damages, quote, "The

8  argument for the exceptions application is simple; in certain

9  circumstances it may violate the duty of good faith and fair

10  dealing for an SEP holder to seek an injunction to enforce a

11  RAND committed patent."

12      So our position is the jury may permissibly conclude that

13  Motorola's conduct in seeking injunctive relief was in bad

14  faith of because of the surrounding circumstances which may

15  include their entire course of conduct that we have put at

16  issue, which includes the excessive demands.  And our

17  position is in that instance the jury awarding attorneys fees

18  as damages would be entirely consistent with the legal

19  principles the court laid out in that order.

20      Finally, the instruction fails to adequately direct the

21  jury that if they find Motorola's lawsuits seeking injunctive

22  relief, apart from Motorola's general course of conduct, as a

23  breach, they may award fees as damages even if they also and

24  independently find that Motorola's general course of conduct

25  or any other identified instance of Motorola's conduct

1    constitutes a breach.

2        Along that alternative, Microsoft proposes the addition,

3    quote, "If you find that Motorola's lawsuits seeking

4    injunctive relief apart from Motorola's general course of

5    conduct constitute a breach, but also find that Motorola's

6    general course of conduct constitutes a breach, you may still

7    award Microsoft damages corresponding to its costs that

8    Microsoft incurred in defending against lawsuits filed by

9    Motorola seeking injunctive relief."

10       Number 26.  Microsoft takes exception to Instruction

11   Number 26, as the jury should be instructed that Motorola did

12   not carry its burden to argue that the Orange Book procedure

13   in Germany was a reasonable effort that Motorola -- I

14   apologize, that Microsoft could have taken to minimize its

15   loss, because Motorola's witness, Maximilian Haedicke, could

16   not identify the amount of damages that could have been

17   minimized or avoided.  And that is part of the instruction.

18       The jury should also be instructed that Motorola did not

19   carry its burden to show that Microsoft's efforts in

20   defending itself in Motorola's injunctive actions were not

21   reasonable.  There was no testimony on the issue.  Mr. Keller

22   did not testify.

23       Instruction Number 27.  Microsoft takes exception to

24   Instruction Number 27 because it lacks instruction on

25   corporate knowledge.  We propose language previously, quote,

1    "A corporation is considered to have any knowledge acquired

2    by an employee of the corporation if the employee acquired

3    that knowledge within the scope of his or her powers of

4    duties.  This is so without regard to whether the employee

5    actually communicates the facts to other employees in the

6    corporation," end quote.  Motorola has put this at issue by

7    claiming that one of its employees acting on behalf of the

8    corporation, in fact all three of the entities here, was

9    unaware of certain facts.  An instruction on corporate

10   knowledge is necessary to resolve any confusion as to what

11   Motorola's state of mind is considered to be.  Motorola knows

12   what its employees know.

13        Finally, exceptions to the verdict form.  Microsoft takes

14   exception to item --

15             THE COURT:  Hold it a moment.  A different piece of

16   paper.  Okay.  I'm with you.

17             MR. LOVE:  Going to Item Number 3, Microsoft takes

18   exception to Item Number 3 on the verdict form, suggesting

19   that only MMI and General Instrument Corporation, having

20   breached there contractual commitments to the ITU, is

21   relevant to the relocation -- the recovery of relocation

22   costs for damages.  That is for the same reasons discussed

23   with respect to Instruction Number 24.  We believe Motorola

24   Solutions' conduct is also relevant.

25        And as to Item Number 4 on the verdict form, again, this

1    is for another ground that was discussed with respect to

2    Instruction Number 24, we believe that item should read,

3    quote, "Attorneys fees and litigation costs may only be

4    awarded if you find that Motorola's conduct in seeking

5    injunctive relief was part of a breach of Motorola's duty --

6    breached Motorola's duty of good faith and fair dealing."

7        We would also add that we believe the items should begin,

8    "Attorneys fees and litigation costs may only be awarded as

9    damages," to avoid any confusion as to the nature of

10   Microsoft's claims for fees and costs as damages in this

11   case.

12            THE COURT:  Say that one again.  I didn't follow you.

13            MR. LOVE:  I believe, as drafted, it says "Attorneys

14   fees and litigation costs may only be warded," and then

15   continues straight on --  The word "damages" used to appear

16   in the sentence.  Maybe the reason it was removed is the

17   place it was in was not as clear.  We would propose that it

18   reads, "Attorneys fees and litigation costs may only be

19   awarded as damages," to make clear to the jury it is part of

20   a damages claim, and not an award of fees and costs in this

21   action, or for any other reason.  Again, just to be clear, as

22   to Instruction Number 24, those same reasons apply as to why

23   we think Number 4 should change.

24       4 (a) and 4 (b) are similarly drafted.  And we would

25   propose those should read, quote, "Do you find that

1    Motorola's conduct in seeking injunctive relief is part of a

2    breach of Motorola's duty of good faith and fair dealing,"

3    simply to make it clear that it doesn't have to be the

4    exclusive.

5         That's all I have got.  Thank you, your Honor.

6              THE COURT:  Thank you, sir.  Ms. Sullivan.

7              MS. SULLIVAN:  Thank you, your Honor.  Your Honor, I

8    beg your indulgence with a little more patience.  Being a

9    little more senior than Mr. Love, I'm not sure I can speak as

10   quickly or even think as quickly as he can speak.  So it may

11   take me just a little bit longer.

12        Motorola first takes exception to Instruction Number 15

13   with respect to Lines 11 to 15.  And here I'm going to use

14   today's red line.  Is that the appropriate copy that you are

15   looking at, your Honor?

16             THE COURT:  Yes.

17             MS. SULLIVAN:  At Page 20 of today's red line, on

18   Lines 11 to 15 -- I'm sorry, 11 to 19, Motorola respectfully

19   takes exception to the instructions that, based on your prior

20   findings that Motorola entered into contracts, and that

21   Microsoft is a third-party beneficiary.  Our reasons for that

22   are the ones we have stated unsuccessfully to your Honor

23   before, but I would like to renew them for the record now.  A

24   letter of assurance is not under Washington law a contract,

25   under Keystone Land and Development Company versus Xerox

1   Corporation.  Courts cannot make new contracts for the

2   parties under Menger versus Inland Empire Farmers' Mutual

3   Fire Insurance Company.  So in the absence of a textual

4   demonstration that a letter assurance is a contract, as

5   opposed to an agreement, which is not enforceable under

6   Washington law, we respectfully take exception to the court

7   now instructing the jury on what we think is a legally

8   improper construction of the contracts at issue in this case.

9       For similar reasons, we respectfully take exception to the

10  language about Microsoft having been found to be a

11  third-party beneficiary.  We suggest here, respectfully, that

12  under Washington law both parties must intend that a

13  particular third-party beneficiary contract be created.

14  That's Rajagoplan versus Noteworld, quoting Postlewait

15  Construction, which is a Washington case.

16      Here, your Honor, our point, just to summarize it is,

17  there may have been a class of third-party beneficiaries who

18  were envisioned by the letters of assurance containing an

19  election of a RAND commitment.  But it is not a given that

20  Microsoft is itself one of those intended third-party

21  beneficiaries unless or until -- unless and until it

22  indicates it is a willing licensee.  In other words, your

23  Honor, it is the point I have made to you earlier, there is

24  not a regulatory requirement here to give the license to all

25  comers.  The expectation of the contracting party, the ITU or

1   the IEEE, is that there would be negotiations between the

2   parties, and there is a RAND commitment to a willing

3   licensee.  So, your Honor, we respectfully take exception to

4   stating that Microsoft is a third-party beneficiary without a

5   determination allowed to the jury that they were a willing

6   licensee, and therefore within the class of third-party

7   beneficiaries contemplated by the contract.

8       So, finally, in support of that, your Honor, we would just

9   cite to Harrison versus Pacific Ten Conference, which is a

10  Ninth Circuit case, holding under Washington law, that, "The

11  parties must intend that the promisor assumed a direct

12  obligation to the intended beneficiary," and was a specific

13  beneficiary here.

14      With respect, we think in Coet (phonetic), under intent to

15  benefit a class of beneficiaries, insofar as they are willing

16  licensees, is not a specific enough contractual obligation on

17  the part of the standard-setting organizations to make

18  Microsoft in particular an intended beneficiary here.  We

19  think that raises facts that are within the jury's province

20  in deciding whether there is a breach.

21      Finally, your Honor, for reasons we have already briefed

22  extensively to your Honor, and will cite in our written

23  submission, we believe that the Seventh Amendment waiver of

24  jury trial is obviously a waiver of constitutional rights

25  that should be construed narrowly.  We cite Beacon Theaters,

1    a United States Supreme Court case from 1959; Dairy Queen

2    versus Wood, a United States Supreme Court case from 1962,

3    and in the Ninth Circuit adopting those decisions, the Dollar

4    Systems case, a Ninth Circuit, 1989.  Again, we will provide

5    specific citations in a written submission.

6        Your Honor, the essence here is to the extent you are

7    instructing that these are contracts, and Microsoft is the

8    third-party beneficiary of these contracts, we respectfully

9    think we didn't waive our jury trial right with respect to

10   those issues, and that therefore they should have been

11   allowed to be determined by the jury in connection with the

12   breach claim.

13       In particular, your Honor, we would cite Federal Rule of

14   Civil Procedure 38(c), "Where a party has not specified the

15   issues to be tried by jury, it is considered to have demanded

16   a jury trial on all issues so triable."  And we would

17   respectfully submit that the existence of the contract here

18   and the existence of Microsoft as a determined third-party

19   beneficiary were jury issues.

20       That concludes the objections on Instruction Number 15,

21   unless your Honor has questions.

22           THE COURT:  I would like to go back.  You passed over

23   10, stipulations of fact.  Did you have any comment on that?

24           MS. SULLIVAN:  Just allow me to confer for one

25   moment, your Honor.  Thank you, your Honor.  What we have

1   attempted to do, your Honor, is put in our request for

2   judicial notice, which is now submitted to you by Motorola as

3   of last evening, and we understand Microsoft will have a

4   response.  It is in the request for judicial notice that we

5   have added some additional statements that we believe you

6   should instruct the jury on if you agree with them.  That is

7   the vehicle by which we have tried to suggest to you facts

8   that are not here as stipulated facts, but that we think are

9   facts that you could instruct the jury on.  Does that answer

10  your question?

11          THE COURT:  No, because I haven't seen it.  What I am

12  interested in is, for example, if you look on Page 12 -- look

13  on Page 13 of the draft, there is a stipulated fact, now

14  Number 16, that says, before we changed it, "Defendants sent

15  Microsoft a letter."  It occurred to us we didn't know who

16  "defendants" were, and therefore we, in rewriting 10, started

17  to put words like "Microsoft."  So that when you ran into

18  that problem of the uncited Motorola there was -- a default

19  position was it was everyone unless it separately

20  acknowledged some distinct entity.  And you didn't comment on

21  that.  I wanted to make sure if you have a problem with it

22  that I know what it is.

23          MS. SULLIVAN:  We do not have a problem with the use

24  of the word "Motorola" as a collective defendant entity with

25  respect to the letters.  Our sole problem with Motorola

 1   Solutions, which post split is the successor in interest to
 2   what is named Motorola in the caption, is that Solutions owns
 3   only 802.11 patents.  None of those were at issue in the
 4   German litigation, which was solely about H.264 patents.
 5   And, therefore, with respect to German relocation damages, we
 6   would separate Solutions out.  But we did not seek to
 7   separate them out with respect to the letters, which were
 8   prior to the split in January 2011.

 9           THE COURT:  Then my second question for you has to do
10   with your Seventh Amendment position.  How can Motorola have
11   consented to my determination of a RAND rate between Motorola
12   and Microsoft and say, "but we didn't consent to your
13   determination if they were a party to the contract or the
14   existence of the contract"?  I am still apparently too feeble
15   to understand that argument.

16           MS. SULLIVAN:  Your Honor, it has a couple of steps,
17   so let me take a step back.  First, we think that we did --
18   Motorola did object to the bifurcation of the trial into a
19   jury breach determination separate from a judicial rate
20   determination.

21           THE COURT:  Where did you do that?

22           MS. SULLIVAN:  In the motions for summary judgment in
23   July of 2012, your Honor.  And with respect to the sequence,
24   we made objections at that time as well to the determination
25   of the rate, which is in an ordinary action a remedy

1    determination prior to the determination of the breach.  I'm

2    not saying that we were right or wrong, your Honor, I am just

3    suggesting that there was a preservation of Seventh Amendment

4    rights with respect to the issue of breach.  And I think it

5    was --  We will go back and find the exact language, your

6    Honor.  But it was, if anything, a contingent concession; if

7    you are going to proceed with the bifurcation, then there was

8    a representation that it would be less complex for you or

9    more -- how can I put this, that you would be far more able

10   to determine a rate without confusion than the jury would be.

11   But we saw that as just a contingent concession once the

12   decision was made to bifurcate and do them in that sequence,

13   which we think was not waived -- was not consented to by

14   Motorola with the clarity required for a waiver of Seventh

15   Amendment rights.

16            THE COURT:  All right.

17            MS. SULLIVAN:  You may disagree, your Honor, but I am

18   putting that exception on the record.

19            THE COURT:  You are free to put it on the record.  I

20   find it incredulous that you take that position.  To me, it

21   is everything that is wrong with the litigation process, of

22   having taken position on the record in the course of the

23   litigation, and then unhappy with the result, announced, "we

24   had our fingers crossed and didn't mean it."  That is my view

25   on the record.  Please continue.  You are on whatever is

1    following 15.

2         MS. SULLIVAN:  Your Honor, turning to Instruction

3    Number 16, at Page 22, Line 2.  Forgive me.  I may be looking

4    at something that is the old draft.

5         THE COURT:  I don't believe there are any changes to

6    16, which last time around you liked.

7         MS. SULLIVAN:  It has many, many good things, your

8    Honor.  I'm sorry.  It is now on Page 23, Line 2.  Forgive

9    me.  It was a shift in the red-line version.  Actually, your

10   Honor, you did make a change I believe to "alone or in

11   combination."

12        THE COURT:  I adopted your language.  My person who

13   knows these better than I do tells me it is Microsoft's

14   language.  So I will withdraw that last comment.

15        MS. SULLIVAN:  Thank you.  Microsoft's language.

16   Yes, your Honor.  Thank you.

17     Motorola, with respect, your Honor, has argued that your

18   prior instruction was correct, because you didn't say that

19   "alone" would be dispositive.  In other words, Motorola's

20   position is that under Washington law no one factor can be

21   dispositive.  And so the list of the six factors was one that

22   we respectfully asked your Honor to say was left to the

23   waiting by the jury; and, therefore, by the addition of the

24   term, "alone or in combination," we think that it has

25   introduced legal error under Washington law by permitting one

1    factor to be dispositive.  The jury could well read it that

2    way.  What we had asked you to do was to tell the jury that

3    it may give such weight to each of these factors as it

4    believes appropriate.  And we take this, your Honor, from

5    Washington law that says, as you are well familiar with, good

6    faith is a question for the fact finder, taking all factors

7    into account, and it depends on the facts and circumstances

8    of every particular case.  We think to say in a

9    multi-factored test, such as the one that your Honor set

10   forth here -- again, we don't quarrel with the listing of the

11   factors, what we quarrel with is the notion that any one of

12   them could be dispositive.  So we take exception to the

13   inclusion of the term "alone" in Instruction Number 16, new

14   Page 23, Line 2.  We would just strike "alone or in

15   combination."  We would simply end it at, "may consider the

16   following factors."  And, your Honor, we cite in connection

17   with that, in particular, 25 Washington Law & Practice -- I

18   am misreading the handwriting -- 25 Washington Law &

19   Practice, Section 5, colon 12.  This is the --  It is a

20   summary of Washington law.  It is treatise authority, your

21   Honor, it is not case law; but it summarizes, we believe, the

22   case law accurately, to say that the fact finder is entitled

23   to consider all factors.  With respect, we would request --

24   Motorola takes exception to "alone or in combination," and

25   suggest the sentence end with colon after the term "follow

 1    factors."

 2         THE COURT:  You had the language a moment ago "giving

 3    such weight."

 4         MS. SULLIVAN:  That was in our suggested instruction

 5    at the informal conference, your Honor.  We suggested that

 6    you delete the paragraph at the end after Paragraph 6 and

 7    simply say, "You may give to each of these factors such

 8    weight as you believe appropriate."

 9         THE COURT:  Thank you.

10         MS. SULLIVAN:  Just to finish Jury Instruction Number

11    16, your Honor.  Motorola takes exception to the inclusion of

12    the last paragraph on 22, which we objected to before, and

13    suggested you replace with the sentence, "You the jury should

14    give to each of these factors such weight as you think

15    appropriate."  We respectfully suggest it makes suggestive

16    factors seem less equal to the other factors.  In other

17    words, now you have said, "no one factor alone" -- "all the

18    factors alone can be dispositive except subjective intent."

19    And we believe the case law actually requires subjective good

20    faith to be treated at least on a par with any of the

21    objective factors.  And that's because no one factor is

22    dispositive.  On that, we would cite the authorities I have

23    already mentioned to you, plus the RealTek Semiconductor

24    case.  In particular, as we have said in our good faith memos

25    and motions for summary judgment, there is numerous

1    Washington cases that say that subjective elements are

2    important considerations in Washington case law on good

3    faith.  Just to recite the principal cases, Fairhaven Land &

4    Livestock, The Matter of Hollingsworth Estate, Cavell versus

5    Hughes.  And by way of summary, Restatement (Second) of

6    Contracts, Section 205(d).

7           Your Honor, each of these cases and the Restatement remind

8    us that willfulness, intent, state of mind are relevant

9    factors in good faith.  And so what we are concerned with,

10   your Honor, is that you have now said each of these factors,

11   1 through 5, can be independently dispositive, because you

12   said that the jury can consider them alone.  But your last

13   paragraph subjugates "subjective intent" to a status below

14   that of all the others.  And we think that is incorrect.  And

15   the better way to capture Washington law would be to go with

16   Motorola's suggested approach, which is Page 23, end of

17   line -- I'm sorry, Line 2, end of the sentence, with the term

18   "factors," colon; strike the last paragraph at Lines 13

19   through 17, and then insert a sentence that says to the jury,

20   "You may give to each factor the weight you believe

21   appropriate."  We think that captures your point about

22   subjective intent can't be dispositive one way or the other,

23   but it doesn't make "subjective intent" seem to the jury less

24   worthy of consideration than the other factors listed.

25           THE COURT:  All right.

1          MS. SULLIVAN:  Thus endth exceptions to Number 16.

2     If we could turn to Number 17.  Motorola respectfully objects

3     and takes exception to Instruction Number 17 at red line

4     Page 24, Lines 3 and 6, insofar as it says "to grant

5     Microsoft a license" -- "to grant Microsoft a licensee."  We

6     would have preferred you simply state as a matter of law, "to

7     a willing licensee," because it is a contested matter of fact

8     in the case whether Microsoft is such a willing licensee, and

9     at what time it became so.

10         The citation on that is simply in Exhibits 2838 and 2839,

11    the contracts themselves.  There is expressed language saying

12    that no implied license is a consequence of the filing of the

13    letter of assurance.  And I would cite as well to Docket

14    Number 318 at 16, note 12.  That's where your Honor found

15    that Motorola --  I'm sorry.  That's where your Honor found

16    that Microsoft had not pleaded in its complaint that it was

17    seeking a license on RAND terms, but had made that

18    concession.  Later in the pleadings your Honor said in

19    May 2012 it was in recent pleadings.  The earliest Microsoft

20    has suggested in the case could have been September 30th,

21    2011.  So with respect, we think the language in Instruction

22    Number 17 should be changed to "a willing licensee," rather

23    than "Microsoft," so that you are not directing that

24    determination by the jury.

25         Moving on to Number 18, your Honor, the purpose of the

 1   RAND commitment.  Motorola respectfully takes exception to

 2   purposes 2 and 3, listed at Lines 6 through 9, on the grounds

 3   that there was no evidence in the case that the ITU and the

 4   IEEE, in particular, in drafting the contract language or the

 5   policies identified hold-up and stacking as the purposes of

 6   the RAND commitment.  There was considerable evidence about

 7   whether that would be an objectively appropriate

 8   understanding of the contracts.  We would simply cite to

 9   Washington law, in particular, In Re Marriage of Schweitzer,

10   that extrinsic evidence of the parties intent is generally

11   not admissible, and certainly not for the purpose of showing

12   intention independent of the instrument; and that however

13   objectively appropriate the attribution of those purposes

14   might seem, it is inconsistent with Washington law to

15   attribute them to the contracting parties here, absent

16   evidence that it was their intent, and there was no need to

17   go to extrinsic evidence anyway because the contract language

18   was not ambiguous.

19          THE COURT:  Counsel, let me rephrase your exception,

20   since those are direct findings from the first trial.  I

21   think you want to preserve it under your Seventh Amendment

22   argument.

23          MS. SULLIVAN:  Thank you, your Honor.  That was going

24   to be my last point.  Insofar as these findings have already

25   been made in the findings of fact and conclusions of law, we

1    would reiterate our exception based on the Seventh Amendment.

2        Turning to Number 19.  Your Honor, Motorola takes

3    exception to Instruction Number 19, paragraph sub-3, at

4    Lines 13 through 19, insofar as it invites the jury to

5    compare Motorola's offers against the RAND royalty rate and

6    range determined by the court.  We object to those RAND rate

7    and range being given to the jury for the reasons already

8    expressed in our Seventh Amendment objections.

9        Similarly, your Honor, turning to Instruction Number 20,

10   again, we respectfully object, take exception to giving the

11   Jury Instruction 20 in its entirety for all the reasons we

12   have already expressed in our Seventh Amendment arguments,

13   and on the ground that under Washington law a court can't

14   create a contract term.  And under the Seventh Amendment

15   Beacon Theaters, Dairy Queen, and again the Dollar Systems

16   case, a prior bench trial cannot determine common issues at

17   law as to which a party has not waived its right to a jury

18   trial.  So we take exception to the giving of the RAND rate

19   and range in Instruction 20 in its entirety.

20       Turning, your Honor, to Instruction Number 22.  Motorola

21   takes exception to Instruction Number 22 in its entirety; and

22   in the alternative, we take exception to it without --

23       I'm sorry, your Honor.  I am informed that I skipped

24   Instruction Number 21.  Forgive me.  It has been a long day.

25   Your Honor, in Instruction Number 21, Motorola respectfully

1    takes exception to Paragraph 2, that is in the red line copy

2    at Page 29, Lines 10 through 14, on the grounds that, with

3    respect, under our Noerr-Pennington arguments we do not think

4    it can be a breach to seek injunctive relief without

5    prejudicing the rights of the parties to pursue their

6    remedies in court.  So insofar as your phrasing here at

7    Line 11 is to seek injunctive relief against a

8    standards-essential patent implementer, we take exception on

9    Noerr-Pennington grounds already made; and on the grounds

10   that since the court will determine whether an injunction

11   issues, that it can't be a breach as a matter of law for

12   reasons we have already briefed.

13        Now, your Honor, on to 22.  Motorola takes exception to

14   Number 22 in its entirety, and in the alternative takes

15   exception to it being given without two additional

16   instructions which we proposed to your Honor in our filing

17   after the informal conference.  In particular, we object

18   to -- we take exception to instructing the jury that

19   Microsoft did not repudiate or forfeit any of its rights

20   under the contracts by seeking the court's assistance through

21   the present lawsuit against Motorola on the grounds that

22   repudiation or forfeiture are not issues before the jury in

23   this case.  Your Honor has made that clear by the prior

24   rulings, rejecting our request that the jury be permitted to

25   make findings of fact on those issues, and by your Honor's

1    prior rulings rejecting those defenses as a matter of law.

2    So we don't see the need to put Microsoft's right to enforce

3    in here.

4        However, if you are going to put it in at all, we think --

5    we take exception to you putting it in without adding what we

6    thought were the balancing additional instructions we urged

7    your Honor to adopt.  In particular, those were in the

8    original disputed jury instructions, a request to instruct

9    the duty of good faith runs both ways.  That's well

10   established Washington law.  For example, Zuver versus

11   Airtouch Communications, a 2004 Washington case.  Washington

12   courts have long held that mutuality of obligation means both

13   parties are bound to perform the contract's term.  And,

14   second, Restatement (Second) of Contracts, Section 205, which

15   says, "Every contract imposes upon each party a duty of good

16   faith and fair dealing in its performance and enforcement."

17       Our concern here, your Honor, is if you instruct that

18   Microsoft didn't repudiate, it will be understood that one

19   side acted in good faith and didn't have any further

20   obligations, whereas the other side is the only one who bears

21   the burden of good faith.

22       What we had suggested, your Honor, was in our proposed

23   alternative wording, was that you give, in addition, to two

24   additional instructions that you chose not to give.  And I am

25   reading here from the filing in Docket 893, filed on

1  August 30th.  We proposed for Instruction Number 2 that you

2  add the sentence, "Motorola had no obligation to make a RAND

3  offer to Microsoft before filing a patent infringement

4  lawsuit on SEPs.  Microsoft's filing of this lawsuit on

5  November 9th, 2010 did not constitute an offer or commitment

6  to license on RAND terms."  The basis for the second

7  sentence, your Honor, again, was your footnote in Docket 318

8  at 16, note 12, stating that Microsoft only came to the

9  position that it was a willing licensee that would take a

10  RAND license much later in the litigation than the time it

11  filed the lawsuit on November 9th, 2010.  We are not asking

12  you to instruct on when it took that position, because that

13  is disputed, but you found that it didn't do so in the filing

14  of the complaint.

15      So, your Honor, we respectfully take exception to

16  Number 22 in its entirety; and, alternatively, take exception

17  to it as given without the addition of those requested

18  sentences.

19      Turning to Instruction Number 24.  Motorola respectfully

20  takes exception to paragraph (b).  That's in the red line

21  copy at Page 33, Lines 9 through 12.

22          THE COURT:  You must have some kernel of truth in it,

23  everyone hates it.

24          MS. SULLIVAN:  I'm sorry, your Honor?

25          THE COURT:  It must have some kernel of truth in it

 1    because both sides hate it.

 2         MS. SULLIVAN:  I wouldn't characterize Motorola as

 3    hating it.  I think I am obliged, your Honor, to reiterate

 4    our Noerr-Pennington position.  As your Honor has advised us,

 5    we have to make our exceptions specific that your Honor has

 6    rejected.  We don't think seeking injunctive relief was

 7    capable of being a breach of contract subject to damages.

 8    Second, your Honor, we would like to reiterate our point that

 9    your interpretation as to --  I'm sorry.  That's it on 24(b).

10        Your Honor, I have to add a second reason for objecting to

11    Instruction Number 24, paragraph (b); and that is, that we

12    respectfully disagree with your Honor's view that this novel

13    interpretation of Washington law that attorneys fees can be

14    recoverable as damages despite the American rule based on the

15    notion that a RAND commitment is a covenant not to sue for

16    injunctive relief.  We respectfully suggest that is not a

17    correct rule of law, it is not a correct prediction of what

18    the Washington courts would hold, and that a RAND commitment

19    should not be viewed as a covenant not to sue.  It is not an

20    implied license.  And, in fact, since an entity would have to

21    go to court to find out, under your Honor's own instructions,

22    is this the kind of circumstance in which injunctive relief

23    is permissible, it by definition can't be a covenant not to

24    sue because you would have to sue to find if these are the

25    circumstances in which it is permissible to sue.  So for all

1  of these reasons, we respectfully reiterate our objection to

2  your Honor's permission of the attorneys fee damages theory

3  in the case, and that includes taking exception to

4  paragraph (b) of Instruction Number 24.

5      Almost done, your Honor.  If we could turn to Instruction

6  Number 25.  Motorola respectfully takes exception to

7  Instruction Number 25 in its entirety for reasons we have

8  briefed to your Honor previously and reiterate here.  We

9  believe the correct reading of Washington law is that when a

10  contract claim seeks actual damages as the only form of

11  damages, without seeking specific performance - which wasn't

12  sought in the original complaint - that by Washington law, as

13  reiterated, including by this court in Merrell versus Renier,

14  citing Washington law, Ketchum versus Albertson Bulb Gardens,

15  we think that this was a case in which Microsoft elected to

16  seek actual damages.  That's how it pleaded its complaint --

17  its amended complaint.  Notwithstanding that, it also asked

18  for declaratory and injunctive relief.  With respect to RAND

19  royalty and rate, it sought actual damages, and therefore it

20  is not entitled to a nominal damages instruction.  So we

21  would respectfully suggest that instruction is improper, and

22  take exception to its in its entirety.

23      We would also note, your Honor, that the Ninth Circuit

24  model Instructions, 5.6, on which it is modeled, applied the

25  federal law.  And that is not the relevant consideration

1   here.  The relevant consideration is Washington law.  Under

2   Washington law we think that Microsoft elected not to make a

3   request for specific performance, and therefore forfeited its

4   right to seek nominal damages in this case.

5       Finally, we would just cite in support of that, to the

6   extent there is kind of an Article III issue about nominal

7   damages claim in addition to a Washington law issue, the

8   decision in Apple, Inc., versus Motorola, the Illinois

9   iteration of that at 869 F.Supp. 2d 901 at 909.  This is the

10  statement saying that it is not a sufficient ground for

11  federal jurisdiction to say, you had a contract with X, X

12  broke it, you are really annoyed, so please give me a

13  judgment for $1 that I can pin on my wall.  That is our last

14  authority on that point.

15      If I can confer for one moment, I believe that will be it.

16  Thank you, your Honor.  That concludes Motorola's exceptions

17  to the instructions.

18      The last order of business is just to make related

19  objections to the verdict form.  I am referring to today's --

20  I will do it by paragraph number.  Motorola respectfully

21  takes exception to the Paragraph 4 on the verdict form,

22  insofar as it permits the award of attorneys fees and

23  litigation cost damages for the reasons that the -- the very

24  same reasons we took exception to Instruction Number 24(b);

25  that is, that damages for attorneys fees should not be

1  allowable in this case under the American rule, and that we

2  don't think an equitable exception is provided for here under

3  Washington law, nor do we predict that's what the Washington

4  courts would adopt.

5        THE COURT:  I have one question I am going to ask

6  you, where something that Microsoft has raised I think may

7  have some merit.  And that has to do with Number 4, saying,

8  attorneys fees and litigation costs may be awarded as

9  damages.

10       MS. SULLIVAN:  We have no objection to that

11  clarification if you keep the instruction.  We just take

12  exception to giving that instruction at all with respect to

13  whether attorneys fees and litigation costs may be damages in

14  this case.

15       THE COURT:  All right.

16       MS. SULLIVAN:  Thank you, your Honor.

17       THE COURT:  Thank you.  Mr. Love, I have one of those

18  for you.  Would you go back to 16, duty of good faith and

19  fair dealing on Page 23?

20       MR. LOVE:  I'm there.

21       THE COURT:  The suggestion was made by Ms. Sullivan

22  that we change the second line to say, "May consider the

23  following factors," colon, list the six factors, and then

24  delete that last paragraph and say, "You may give such weight

25  as you think is appropriate."  What is your comment on that?

1          MR. LOVE:  I would be happy to offer a comment on

2    that.  I think, first of all, for the reasons that we

3    explained as to why we think subjective factors are actually

4    not relevant to instruct the jury on, the principle that was

5    laid out here really shows why, at a minimum, it was

6    appropriate to subrogate that subjective consideration to

7    something lower than the other considerations.  Before we got

8    this red line this morning, I apologize I had a longer

9    exception to this instruction, which included support for our

10   "alone or in combination" argument.  The reason for that is,

11   if you go to these cases -- a series of cases for each of

12   these factors, 1 through 5, where the reason why the

13   contracting party was found to be liable for a breach of the

14   duty of good faith and fair dealing was because of one of

15   these factors.  And you can't go to those cases and find all

16   the factors listed and the court balancing them or weighing

17   them or a jury balancing or weighing them.  The findings in

18   those cases are, for example, the conduct frustrated the

19   purposes of the contract, so the party is liable for breach.

20   So that's why we are suggesting strongly that the appropriate

21   language is "alone or in combination."  That handles the

22   first five factors.  We would be happy in our filed

23   submission to include what I was going to include, which is a

24   list of those cases.

25          And for the reasons stated before, I think the subjective

1    factors really do have a different standing, in that unlike

2    those first five, as your Honor pointed out in the reasoning

3    explained in the summary judgment order, it is not going to

4    dispose of the issue of liability in this case if the jury

5    thinks Motorola had a bad motive or Motorola had a good

6    motive.  We will still have to establish breach on the other

7    grounds.

8         THE COURT:  You chose to ignore in your briefing, and

9    in your jury submissions, the cases that talk about those

10   subjective factors, and therefore I'm not sure how I can just

11   delete 6, which I understand to be your first line position.

12   And now I understand your second line position is, if I won't

13   do that one, how about saying, "to a lesser extent subjective

14   factors," in some manner weighing them is less important than

15   1 through 5.

16        MR. LOVE:  The red line we are current looking at,

17   the treatment of factor 6 in the paragraph that follows, I

18   think is appropriate, in that it calls out factor 6 as being

19   only one consideration that cannot dictate the final

20   decision.

21        I think the position that we have consistently have taken,

22   again going to frustration of purposes as an example, if the

23   jury finds that Motorola's conduct frustrated the purpose of

24   the contract, at that point the jury should find for

25   Microsoft.  There is no support in the law to say they can go

1    back and consider other factors, and say, well, there are

2    aspects -- we know they frustrated the purpose of the

3    contract, but there are aspects of their conduct which we

4    think maybe were commercially reasonable, therefore maybe

5    they didn't breach.  We don't think the law supports that at

6    all.  In particular, if they find the actions frustrated the

7    purpose of the contract, but found that somehow Motorola was

8    ignorant of those reasons, or didn't bother to find out, so

9    they didn't know, that's not a defense.  And I think that

10   issue, as to whether or not the lack of a bad motive would

11   sink our claim, that has been addressed on summary judgment.

12   I think the instruction here accurately captures that.

13            THE COURT:  Thank you.  Counsel, let me summarize

14   then.  On the verdict form we are inserting in question 4 "as

15   damages."  And I understand both of you support that.

16       When you come in tomorrow you will get a surprise, and one

17   of you will have prevailed on 16.  I'm not prepared to say at

18   this time that we are changing it, but I appreciate your

19   wisdom in regards to it.

20       Counsel, anything else that we should take up now before

21   you all go home and prepare for tomorrow?

22            MR. PRITIKIN:  Nothing further from us, your Honor.

23            MS. SULLIVAN:  Just one question, your Honor.  What

24   time would be the latest it would be useful for you to

25   receive written summaries of this instruction exceptions as a

1   deadline?

2        THE COURT:  About ten minutes ago.  You need to

3   recognize that we need to get these done.  The government

4   gives us a rather weak copying machine, so we have to

5   basically duplicate them tonight in order to have them ready

6   to go tomorrow.  That's why I asked for oral exceptions.

7   Frankly, counsel, to the extent you can, I would urge you to

8   file your written exceptions, because I think -- you have

9   heard me say this over and over again, depending on what

10  panel of the Ninth Circuit you get, some have gone as far as

11  to say if have you not proposed a written alternative you

12  have waived the objection.  It is not a well-settled area of

13  law up there.  The more you have in the record, the better

14  off you are in protecting your client.

15       MS. SULLIVAN:  Thank you, your Honor.

16       THE COURT:  Counsel.  Thank you.  We will be in

17  recess until 9:00 tomorrow morning.  Mr. Cannon, I'm sure you

18  won't have any last minute matters to take up tomorrow.

19       MR. CANNON:  I hope not, your Honor.

20       THE COURT:  Thank you, counsel.  We will be in

21  revest.

22            (The proceedings recessed.)

23

24

25

1                   C E R T I F I C A T E

2

3

4        We, Barry Fanning and Debbie Zurn, Official Court

5   Reporters for the United States District Court, Western

6   District of Washington, certify that the foregoing is a true

7   and correct transcript from the record of proceedings in the

8   above-entitled matter.

9

10

11   DATED this ^  day of August, 2013.

12

13

14   /s/ Barry Fanning              /s/ Debbie Zurn

15   Barry Fanning, Court Reporter   Debbie Zurn, Court Reporter

16

17

18

19

20

21

22

23

24

25