<pre>
 1                  UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    _____

 4    MICROSOFT CORPORATION,          )
                                      )
 5                    Plaintiff,      )  C10-1823-JLR
                                      )
 6    v.                              )  SEATTLE, WASHINGTON
                                      )
 7    MOTOROLA INC., et al,           )  September 4, 2013
                                      )
 8                    Defendant.      )        TRIAL
                                      )
 9    _____

10                 VERBATIM REPORT OF PROCEEDINGS
              BEFORE THE HONORABLE JAMES L. ROBART
11                UNITED STATES DISTRICT JUDGE
      _____

12

13
      APPEARANCES:
14

15


16     For the Plaintiff:      Arthur Harrigan, Christopher
                               Wion, David Pritikin Richard
17                             Cederoth, Andy Culbert,Nathaniel
                               Love and Ellen Robbins
18

19


20     For the Defendants:     Ralph Palumbo, William Price
                               Brian Cannon, Kathleen Sullivan
21                             Andrea Roberts and Philip McCune

22

23

24

25
</pre>

1          THE COURT:  We will do appearances, please.

2          MR. HARRIGAN:  Good morning, your Honor.  Art

3  Harrigan representing Microsoft.  To my right is Ms. Ellen

4  Robbins from the Sidley firm.

5          MS. ROBBINS:  Good morning, your Honor.

6          MR. HARRIGAN:  Mr. David Pritikin.

7          MR. PRITIKIN:  Good morning, your Honor.

8          MR. HARRIGAN:  Mr. Rick Cederoth.

9          MR. CEDEROTH:  Good morning, your Honor.

10         MR. HARRIGAN:  Mr. Andy Culbert from Microsoft.  My

11  partner Chris Wion.

12         MR. WION:  Good morning, your Honor.

13         MR. HARRIGAN:  And David Killough.  And we also have

14  Mr. Gutierrez with us this morning.

15         THE COURT:  Thank you.  Mr. Palumbo.

16         MR. PALUMBO:  Good morning, your Honor.  Ralph

17  Palumbo.  I have with me this morning Andrea Roberts from

18  Quinn Emanuel.

19         MS. ROBERTS:  Good morning, your Honor.

20         MR. PALUMBO:  Brian Cannon, also with Quinn Emanuel;

21  Kirk Dailey from Motorola, and Bill Price from Quinn Emanuel.

22         THE COURT:  Thank you.  Counsel, I have on my list of

23  things to do to rule on the request for judicial notice, and

24  then to begin the process of reading the jury instructions.

25  Ms. Sullivan, you are welcome to come forward.  But,

1    Mr. Cannon, I understand you have another matter you want to

2    take up.

3            MR. CANNON:  Thank you, your Honor.  At the court's

4    convenience, we would like to take up the matter of

5    Microsoft's reliance on the FTC investigation in its closing

6    argument, and a couple of slides that lay out some

7    information about the FTC investigation.  We can handle that

8    now or at the conclusion of what your Honor may wish to

9    address.

10           THE COURT:  Let's get it out of the way.

11           MR. CANNON:  May I approach, please?

12           THE COURT:  Yes.  I'm not sure whose forest of stands

13   we have over here, but since they obscure my view, can we

14   slide them back a ways until needed?

15           MR. CANNON:  So, your Honor, as you may recall, at

16   the end of last week in this trial Microsoft convinced the

17   court to allow some limited testimony about the FTC

18   investigation, and the purpose of that testimony, according

19   to Microsoft, was to challenge Motorola's pure heart.  It

20   went to Motorola's intent during the course of this case.

21       And what turned out to be when the evidence rested was

22   that Microsoft never asked any of the Motorola witnesses

23   about the investigation, they never used the FTC evidence

24   that your Honor allowed in in order to challenge the pure

25   heart of any of the witnesses, such as Mr. Dailey.  And now

1    at closing, your Honor, it appears that Microsoft wants to

2    offer the FTC -- not offer, excuse me, rely upon the FTC

3    evidence for the proof of the matter alleged, and that is in

4    fact in direct contradiction, we believe, to your Honor's

5    order and your Honor's curative instruction during the course

6    of the case.  And so we would request that the testimony on

7    FTC investigation be stricken, and that slides with

8    FTC-related evidence not be used.

9        THE COURT:  I also seem to have a chronology here.

10   What's that about?

11       MR. CANNON:  Yes, your Honor.  The chronology is not

12   objectionable except for the references to the FTC

13   investigation.  There is three references on there.  So other

14   than the FTC references, Motorola does not have any objection

15   to that demonstrative being used in closing.

16       THE COURT:  All right.  I will hear from, it looks

17   like, Ms. Robbins.

18       MS. ROBBINS:  Good morning, your Honor.  The

19   slides -- there are two slides that we intend to use, which

20   are quotes from the record.  Again, I believe the scope of

21   your Honor's ruling was that we were entitled to reference

22   certain portions, although the exhibits were not going to be

23   admitted.  These are quotes from the record.  The timeline

24   references various dates that came into the record through

25   witnesses.  All of these dates are in the record.  We are not

1    characterizing anything.  We are not improperly going into

2    details of the investigation.  The timeline merely references

3    dates of when certain things happened, and the chronology.

4    Again, there was testimony and evidence elicited during the

5    trial to support each of these dates.

6        For the other two slides:  One, simply put -- the FTC's

7    public interest statement, that comes from Exhibit 1035 that

8    was testified to by Mr. Heiner.  The other statement -- FTC

9    statement regarding its complaint also comes directly from

10   the testimony of Mr. Heiner.

11           THE COURT:  To the extent that was --  Mr. Cannon,

12   where are you?  There you are.  Mr. Cannon, to the extent

13   that was an objection, as opposed to bringing this to the

14   court's attention, I am going to overrule the objection.

15   They are in the record.  They came into the record with my

16   explanation that they were not going to the truth of those

17   matters; that they were being asserted to allow Microsoft to

18   argue that Motorola was on notice that its conduct was of

19   question.  Therefore, I'm going to stay with my original

20   ruling and allow them.

21           MR. CANNON:  Thank you, your Honor.  Just to clarify

22   for our purposes, we also object to the underlying

23   FTC-related testimony, even if it is not on the slides.  But

24   we understand your Honor's ruling.

25           THE COURT:  You don't get to now object to something

1   that happened on August 30th.  Is that what you're saying?

2          MR. CANNON:  It is the testimony in the slides, but

3   it is the underlying testimony as well that we object to.  I

4   am just clarifying the objection.

5          THE COURT:  All right.  Counsel, anything else?  All

6   right.

7      I believe there is one other matter, and that is found in

8   the docket at 896, which is, "Defendants Request for Judicial

9   Notice," filed on Monday, September 2nd.  In that request

10  Motorola asked the court to take judicial notice of 12 or 13

11  facts - I'm not sure how many there are.  Thirteen - because

12  they are generally known and capable of accurate and ready

13  determination pursuant to the language of Evidence Rule 201,

14  judicial notice of adjudicated facts.

15     And then following that request, asks that the court

16  invoke Evidence Rule 201(f), which provides that, "In a civil

17  case, the court must instruct the jury to accept the noticed

18  fact as conclusive."  The remainder of (f) pertains to what

19  happens in criminal cases.

20     The net effect of the proposal set forth by Motorola would

21  be to add to the court's jury instructions.  The language

22  simply says, "In a civil case the court must instruct the

23  jury to accept the noticed fact as conclusive."  I have

24  struggled in this case for a month or six weeks following

25  Motorola's expression of concerns over the use of the court's

1    findings and conclusions.  In the course of that I have done

2    a substantial amount of research to determine how one could

3    use the findings and conclusions from the earlier trial.  I

4    have set that out, and the parties have followed it, more or

5    less, during the course of this trial, not without some angst

6    on their parts.  The only mechanism which would now be

7    available to the court would be as part of the jury

8    instructions, or before the jury instructions, announce these

9    13 facts as being established by the court, which seems to me

10   to substantially single them out; or, alternatively, include

11   them, in I believe it is Instruction 10, which is the

12   stipulated facts instruction -- or undisputed facts

13   instruction that the court is giving as part of its

14   instructions to the jury.

15       Therefore, I am going to deny the request for judicial

16   notice.  And I do so on two grounds:  One, 201(b) provides

17   the kinds of facts that may be judicially noticed.  And there

18   are several of those that raise concern for me.  I note that

19   many of these things are issues about which we have had

20   testimony at trial, and therefore to now ask the court to

21   take judicial notice of it and instruct the jury that it is

22   undisputed raises in my mind the question of why we wasted

23   trial time to have testimony about them.  I would note, for

24   example, a question that has been asked repeatedly about does

25   Microsoft's complaint in this action include an express

1    statement that Microsoft seeks a license.  And that is the

2    fact expressed in the negative.  Microsoft's complaint in

3    this action does not include an express statement.

4        I think there are a number of difficulties with these.

5    Some are not facts that I feel comfortable taking judicial

6    notice of; some are simply not capable of judicial notice;

7    third, I believe that, given the presentation at this date,

8    would present those facts in a manner that would amplify

9    their significance to the jury; and, fourth, this was filed

10   well, well after the requests -- or the direction to file

11   your jury instructions; the pretrial order, none of which

12   mentioned this step; the court's informal jury conference in

13   which it allowed the parties to be heard, and were filed --

14   the request was filed on the evening before the day where

15   exceptions were being taken to the jury instructions.  For

16   all of those reasons, I am denying the request to take

17   judicial notice of the facts that are contained in Docket

18   896.

19       Counsel, I believe with that ruling I have exhausted all

20   of the things you have asked me to do as homework.

21   Mr. Harrigan, is that correct?

22       MR. HARRIGAN:  Yes.  We just wanted to put on the

23   record that Microsoft's judgment as a matter of law brief was

24   filed at 8:50 this morning.

25       THE COURT:  I'm not sure if it is Mr. Cannon,

1   Ms. Sullivan or Mr. Price.

2            MS. SULLIVAN:  Your Honor, if it would be of

3   interest, Motorola's was filed at 8:54 this morning.

4            THE COURT:  Counsel, I will note for you, one

5   additional fact is that we have all failed to notice that the

6   jury is now having theme day.  Apparently yesterday was blue

7   day -- green day, and today is sport shirts day.  You must be

8   very entertaining to them, because they seem to be having a

9   good time.

10      Any reason not to bring the jury in and have me read jury

11  instructions?  Mr. Harrigan?

12           MR. HARRIGAN:  No, your Honor.

13           THE COURT:  Mr. Price?

14           MR. PRICE:  No, your Honor.

15           THE COURT:  Please bring the jury in.

16  (At this time the jury entered the courtroom.)

17           THE COURT:  Good morning, ladies and gentlemen.  We

18  are going to hand to you the court's jury instructions and

19  the court's verdict form.  The original of the verdict form

20  will go back into the jury room with you, and so that you

21  won't have any confusion, it is stamped "original."  That's

22  the one that you will fill out and return to the court once

23  you reach a verdict.  In regards to the jury instructions, we

24  are giving each of you a copy so that you will have them

25  available during your deliberations.

1    As we talked about when I did the preliminary

2 instructions, I would ask that you follow along with me as I

3 read these.  The research suggests that you somehow

4 accumulate more of the substance if you are reading along

5 with me as opposed to paging ahead to find out who did it in

6 the last instruction.

7    Before I commence reading all of these, let me tell you,

8 here is our schedule for the day:  After I finish reading the

9 instructions, Microsoft will begin its closing argument.

10 They have the ability to reserve some of their time for

11 rebuttal.  I believe that Mr. Harrigan is going to be doing

12 Microsoft's closing.  Then, at the conclusion of that, I am

13 going to take a 15-minute break, so you will have a chance to

14 go back and stretch your legs and drink more coffee, use the

15 restroom, whatever.  When we come back, Mr. Price is going to

16 be doing Motorola's closing arguments.  I have given each

17 side up to 90 minutes.  That doesn't mean they need to fully

18 use it, but that's how long they have.  And at the end I will

19 start coughing loudly or whatever.  We won't then take a

20 break, but will go directly into Microsoft's remaining time.

21 At the conclusion of all of that you will receive the case

22 for deliberation, which means you go back into the jury room.

23 But then you will finally be able to talk among yourselves,

24 which I'm sure will be a great relief.

25    Lunch will be brought in, so you don't get to go outside.

1    Deliberations normally run until 4:30, and at 4:30 I bring

2    you out, and guess what I read to you, because even though

3    you can now talk to your fellow jurors, you can't talk to

4    anyone else, and then send you on your way.

5        I am going to talk about scheduling for jury

6    deliberations.  Nothing that I say suggests how long it

7    should take you.  It is just a matter of I want you to know

8    what the court's schedule is and whatever.  If you are

9    deliberating tomorrow, then you would start at 8:30 or 9:00,

10   your choice; you just can't begin until all of you are here.

11   We don't have you come into the courtroom and do a head count

12   or anything.  The clerk does that.  The lunch will be brought

13   in for you.  I need to go to Spokane tomorrow in the

14   afternoon.  The judges of the federal court and the justices

15   of the Washington Supreme Court get together, break bread and

16   make peace.  We have a procedure whereby we can certify

17   questions to the state supreme court for decision.  They run

18   for reelection, and they just love it when we send questions

19   like gay marriage down there to be decided.  So annually we

20   get together and make up.  You are going to be able to

21   continue to deliberate while I am not here.  I will arrange

22   for there to be another judge.  But if you send out

23   questions, there may well be some delay while they try and

24   get me on the phone and we try and figure it out.  If you

25   reach a verdict, and if I'm not here, I am going to seal it,

1   and we will deal with it at 9:00 on Friday morning.  Once

2   again, I am not going to tell you that you need to reach a

3   verdict in any particular timeframe, it is just that that is

4   the schedule.

5       I do that because I want to be able to review your verdict

6   and make sure that it is consistent internally before it is

7   read to the parties.  And then afterwards I would like the

8   opportunity to meet with you and thank you personally for

9   your service.

10      That's the schedule for the remainder of the week, even

11  though it is early on Wednesday morning.  That will give you

12  some sense.  If at some point you want to modify that, you

13  decide you don't want to quit at 4:30, you want to go until

14  5:00, we can accommodate that.  I do have a hard stop because

15  we need to send people home, including you.  We are somewhat

16  limited in those hours.

17      With all that said, ladies and gentlemen, the instructions

18  of the court.

19      Number 1.  Members of the jury, now that you have heard

20  all of the evidence and the arguments of the attorneys, it is

21  my duty to instruct you as to the law of the case.  Each of

22  you has received a copy of these instructions that you may

23  take with you to the jury room to consult during your

24  deliberations.  You must not infer from these instructions or

25  from anything I may say or do as indicating that I have an

1   opinion regarding the evidence or what your verdict should

2   be.

3       It is your duty to find the facts from all the evidence in

4   the case.  To those facts you will apply the law as I give it

5   to you.  You must follow the law as I give it to you, whether

6   you agree with it or not, And you must not be influenced by

7   any personal likes or dislikes, opinions, prejudices, or

8   sympathy.  That means that you must decide the case solely on

9   the evidence before you.  You will recall that you took an

10  oath to do so.

11  In following my instructions, you must follow all of them and

12  not single out some and ignore others; they are all

13  important.

14      When a party has the burden of proof on any claim by a

15  preponderance of the evidence, it means you must be persuaded

16  by the evidence that the claim is more probably true than not

17  true.  You should base your decision on all of the evidence,

18  regardless of which party presented it.

19      What is evidence?  The evidence you are to consider in

20  deciding what the facts are consists of:  The sworn testimony

21  of any witness; the exhibits which are received into

22  evidence; and any facts to which the lawyers have agreed.

23      Number 4.  What is not evidence?  In reaching your

24  verdict, you may consider only the testimony and exhibits

25  received into evidence.  Certain things are not evidence, and

1   you may not consider them in deciding what the facts are.  I

2   will list them for you:  Arguments and statements by lawyers

3   are not evidence.  The lawyers are not witnesses.  What they

4   have said in their opening statements, closing arguments, and

5   at other times is intended to help you interpret the

6   evidence, but it is not evidence.  If the facts as you

7   remember them differ from the way the lawyers have stated

8   them, your memory of them controls.

9       Questions and objections by lawyers are not evidence.

10  Attorneys have a duty to their clients to object when they

11  believe a question is improper under the rules of evidence.

12  You should not be influenced by the objection or by the

13  court's ruling on it.  Testimony that has been excluded or

14  stricken, or that you have been instructed to disregard, is

15  not evidence and must not be considered.  In addition,

16  sometimes testimony and exhibits are received only for a

17  limited purpose; when I have given a limiting instruction,

18  you must follow it.  Anything you may have seen or heard when

19  the court was not in session is not evidence.  You are to

20  decide the case solely on the evidence received at the trial.

21      Number 5.  Some evidence may be admitted for a limited

22  purpose only.

23      When I instructed you that an item of evidence has been

24  admitted for a limited purpose, you must consider it only for

25  that limited purpose and for no other.

1      Number 6.  Evidence may be direct or circumstantial.

2 Direct evidence is direct proof of a fact, such as testimony

3 by a witness about what that witness personally saw or heard

4 or did.  Circumstantial evidence is proof of one or more

5 facts from which you could find another fact.  You should

6 consider both kinds of evidence.  The law makes no

7 distinction between the weight to be given to either direct

8 or circumstantial evidence.  It is for you to decide how much

9 weight to give to any evidence.

10      By way of example, if you wake up in the morning and see

11 that the sidewalk is wet, you may find from that fact that it

12 rained during the night.  However, other evidence, such as a

13 turned-on garden hose, may provide a different explanation

14 for the presence of water on the sidewalk.  Therefore, before

15 you decide that a fact has been proved by circumstantial

16 evidence, you must consider all the evidence in the light of

17 reason, experience, and common sense.

18      There are rules of evidence that control what can be

19 received into evidence.  When a lawyer asks a question or

20 offers an exhibit into evidence, and a lawyer on the other

21 side thinks that it is not permitted by the rules of

22 evidence, that lawyer may object.

23      If I overruled the objection, the question was answered or

24 the exhibit received.  If I sustained the objection, the

25 question was not answered or the exhibit was not received.

1    Whenever I sustained an objection to a question, you must

2    ignore the question and must not guess at what the answer

3    might have been.

4         Sometimes I ordered that evidence be stricken from the

5    record and that you disregard or ignore the evidence.  That

6    means that when you are deciding the case, you must not

7    consider the evidence that I told you to disregard.

8         In deciding the facts in this case, you may have to decide

9    which testimony to believe and which testimony not to

10   believe.  You may believe everything a witness says, or part

11   of it, or none of it.  Proof of a fact does not necessarily

12   depend on the number of witnesses who testify about it.

13        In considering the testimony of any witness, you may take

14   into account:  The opportunity and ability of the witness to

15   see or hear or know the things testified to; the witness's

16   memory; the witness's manner while testifying; the witness's

17   interest in the outcome of the case and any bias or

18   prejudice; whether other evidence contradicted the witness's

19   testimony; the reasonableness of the witness's testimony in

20   light of all the evidence; and any other factors that bear on

21   believability.

22        The weight of the evidence as to a fact does not

23   necessarily depend on the number of witnesses who testify

24   about it.

25        Number 9.  Expert Opinion.  Some witnesses, because of

1    education or experience, are permitted to state opinions and

2    the reasons for those opinions.

3       Opinion testimony should be judged just like any other

4    testimony.  You may accept it or reject it, and give it as

5    much weight as you think it deserves, considering the

6    witness's education and experience, the reasons given for the

7    opinion, and all the other evidence in the case.

8       Number 10.  Stipulations of Fact.  The parties have agreed

9    to certain facts that will be read to you.  You should

10   therefore treat these facts as having been proved.  The

11   parties have stipulated to the following facts:  Plaintiff

12   Microsoft Corporation ("Microsoft") is a Washington

13   corporation having its principal place of business in

14   Redmond, Washington.  Defendant Motorola, Inc. has changed

15   its corporate name to Motorola Solutions, Inc.  Motorola

16   Solutions, Inc. is a Delaware corporation, having its

17   principal place of business in Schaumburg, Illinois.

18   Motorola Mobility LLC is a Delaware limited liability

19   company, having its principal place of business in

20   Libertyville, Illinois.  Motorola Mobility LLC

21   predecessor-in-interest was Defendant Motorola Mobility,

22   Inc., (MMI), which was a Delaware corporation having its

23   principal place of business in Libertyville, Illinois.  MMI

24   was a wholly-owned subsidiary of Motorola Mobility Holdings,

25   Inc., which was a wholly-owned subsidiary of Motorola, Inc.

1    MMI was spun off from Motorola, Inc. on January 4, 2011.  MMI

2    was acquired by Google, Inc. on May 22, 2012.  Motorola

3    Mobility, LLC is MMI's successor-in-interest and a

4    wholly-owned subsidiary of Google, Inc.

5        Defendant General Instrument Corporation is a Delaware

6    corporation, having its principal place of business in

7    Horsham, Pennsylvania.  General Instrument Corporation was a

8    wholly-owned subsidiary of MMI and now is a wholly-owned

9    subsidiary of Motorola Mobility, LLC.

10       Plaintiff Microsoft Corporation will be referred to in

11   these instructions as "Microsoft."  Unless specifically

12   identified by its corporate identity, Defendants

13   Motorola, Inc., MMI, and General Instrument Corporation will

14   be referred to in these instructions collectively as

15   "Motorola.".

16       The parties are members of the Institute of Electrical and

17   Electronics Engineers (IEEE).  The Institute of Electrical

18   and Electronics Engineers Standards Association (IEEE-SA) is

19   the division of the IEEE devoted to the development of

20   industry standards.  The IEEE-SA developed the 802.11

21   wireless communication standard.  The 802.11 standard was

22   initially released in 1997.  It has been amended and revised

23   numerous times since 1997, for example, 802.11a, 802.11b,

24   802.11g, and 802.11n).

25       The parties are members of the International

1   Telecommunications Union (sic) (ITU).  The ITU

2   Telecommunications Standardization Sector (ITU-T) is one of

3   the three sectors (divisions or units) of the International

4   Telecommunications Union; it coordinates standards for

5   telecommunications.  The ITU-T is responsible for the

6   development of thousands of standards.  The ITU-T, in

7   conjunction with two other standards bodies, the

8   International Organization for Standardization (ISO) and the

9   International Electrotechnical Commission (IEC), developed

10   the H.264 video compression standard.

11       Motorola submitted numerous Letters of Assurance to the

12   IEEE-SA in connection with its development of the 802.11

13   standard.  Motorola submitted numerous Patent Statement and

14   Licensing Declarations to the ITU-T in connection with the

15   development of the H.264 standard.  In submitting Letters of

16   Assurance to the IEEE-SA covering their 802.11

17   standards-essential patents, Motorola stated that they "will

18   grant" or "are prepared to grant" worldwide, irrevocable,

19   non-exclusive licenses to their 802.11 standards-essential

20   patents covered by each Letter of Assurance on Reasonable and

21   Non-Discriminatory (RAND) terms and conditions.

22       Motorola sent Microsoft a letter on October 21, 2010, that

23   contained certain proposed royalty terms for a license to

24   Motorola's patents that "may be or become" essential to the

25   802.11 standard, and stated that, "Motorola will leave this

offer open for 20 days.  Please confirm whether Microsoft

accepts the offer."

Motorola sent Microsoft a letter on October 29, 2010, that

contained certain proposed royalty terms for a license to

Motorola's patents essential to the H.264 standard, and

stated that, "Motorola will leave this offer open for 20

days.  Please confirm whether Microsoft accepts the offer."

**Number 11.  Summaries and charts not received in evidence.**

**Certain charts and summaries not received in evidence have**

**been shown to you in order to help explain the contents of**

**books, records, documents, and other evidence in the case.**

**They are not themselves evidence or proof of any facts.  If**

**they do not correctly reflect the facts or figures shown by**

**the evidence in the case, you should disregard these charts**

**and summaries and determine the facts from the underlying**

**evidence.**

Certain charts and summaries have been received into

evidence to illustrate information brought out in the trial.

Charts and summaries are only as good as the underlying

evidence that supports them.  You should, therefore, give

them only as much weight as you think the underlying evidence

deserves.

Number 13.  A contract is a legally enforceable promise or

set of promises.

Number 14.  Breach of contract.  The following is a

1   summary of the claims of the parties provided to help you

2   understand the issues in the case.  You are not to take this

3   instruction as proof of the matters claimed.  It is for you

4   to decide, based upon the evidence presented, whether a claim

5   has been proved.

6       Microsoft claims that Motorola breached its contractual

7   commitment with the IEEE in one or more of the following

8   ways, or a combination thereof:

9       **By the terms contained in the October 21, 2010, letter**

10  **offering to license Motorola's 802.11 standards-essential**

11  **patents; by filing lawsuits and seeking injunctive relief**

12  **based on standards-essential patents in the International**

13  **Trade Commission (ITC), United States District Courts, and/or**

14  **Germany; and/or by having not executed a license agreement**

15  **covering its 802.11 standards-essential patents with Marvell,**

16  **Microsoft's chip supplier.**

17      **Microsoft also claims that Motorola breached its**

18  **contractual commitment with the ITU in one or more of the**

19  **following ways, or a combination thereof:  By the terms**

20  **contained in the October 29, 2010, letter offering to license**

21  **Motorola's H.264 standards-essential patents; by filing**

22  **lawsuits and seeking injunctive relief based on**

23  **standards-essential patents in the ITC, United States**

24  **District Courts, and/or Germany.**

25      **Microsoft also claims that it sustained damages as a**

 1    **result of these breaches of Motorola's commitments to the**

 2    **IEEE and ITU, and it seeks a judgment against Motorola for**

 3    **these damages.**

 4        **Motorola denies that any of its conduct breached its**

 5    **contractual commitments with the IEEE and ITU.**

 6        **Motorola further denies that Microsoft was damaged and**

 7    **denies that any damages were the result of Motorola's**

 8    **conduct.  Motorola further denies the nature and extent of**

 9    **the claimed damages.**

10        **Number 15.  The plaintiff, Microsoft, has the burden of**

11    **proving each of the following** four elements on its claims of

12    breach of contract with respect to the IEEE:  (1), that

13    Motorola entered into a contract with the IEEE; (2), that the

14    terms of the contract included: that Motorola was required to

15    make available and grant a license to its 802.11

16    standards-essential patents to an unrestricted number of

17    applicants on a worldwide basis under reasonable rates, with

18    reasonable terms and conditions that are demonstrably free of

19    any unfair discrimination; (3), that Motorola breached the

20    contract in one or more of the ways claimed by Microsoft;

21    and, (4), that Microsoft was damaged as a result of

22    Motorola's breach.

23        I have already ruled that Motorola entered into an

24    enforceable contract with the IEEE that included the language

25    in subsection (2) above.  The court has also already ruled

1    that Microsoft is a third-party beneficiary to this contract

2    because Microsoft is a member of the IEEE and is a

3    prospective user of the 802.11 Standard.  As a third-party

4    beneficiary, Microsoft may enforce Motorola's contract with

5    the IEEE.  You must follow these rulings, and therefore you

6    need not determine whether Microsoft proved the first two

7    elements of this claim.  However, you must determine whether

8    Microsoft has proven each of the other two elements,

9    subsections (3) and (4) listed above.  If you find from your

10   consideration of all of the evidence that either of these

11   other two elements listed above has not been proved, your

12   verdict should be for Motorola.  On the other hand, if both

13   of these elements have been proved, your verdict should be

14   for Microsoft on its claim with respect to the IEEE.

15        Microsoft also has the burden of proving each of the

16   following elements on its claims of breach of contract with

17   respect to the ITU:  That Motorola entered into a contract

18   with the ITU; the terms of the contract included:  That

19   Motorola was required to grant a license for its H.264

20   standards-essential patents to an unrestricted number of

21   applicants on a worldwide, non-discriminatory basis and on

22   reasonable terms and conditions to make, use and sell

23   products compliant with the H.264 Standard. (3), that

24   Motorola breached the contract in one or more of the ways

25   claimed by Microsoft; (4) that Microsoft was damaged as a

1  result of Motorola's breach.

2      I have already ruled that Motorola entered into an

3  enforceable contract with the ITU that included the language

4  in subsection (2) above.  The court has also already ruled

5  that Microsoft is a third-party beneficiary to this contract

6  because Microsoft is a member of the ITU and is a prospective

7  user of the H.264 Standard.  As a third-party beneficiary,

8  Microsoft may enforce Motorola's contract with the ITU.  You

9  must follow these rulings, and therefore, you need not

10  determine whether Microsoft proved the first two elements of

11  this claim as to Motorola.  However, you must determine

12  whether Microsoft has proven each of the other two elements,

13  subsections (3) and (4) listed above.  If you find from your

14  consideration of all of the evidence that either of these

15  other two elements listed above has not been proved, your

16  verdict should be for Motorola.  If, on the other hand, if

17  both of these elements have been proved, then your verdict

18  should be for Microsoft on its claim with respect to the ITU.

19      Number 16.  Duty of good faith and fair dealing is implied

20  in every contract.  A contract is breached by violation of

21  this duty.  The implied duty of good faith and fair dealing

22  arises out of the obligations created by a contract and only

23  exists in relation to the performance of specific contract

24  terms.  Thus, a party's duty is only to perform, in good

25  faith, the obligations imposed by the contract.  There is no

1    free-floating duty of good faith and fair dealing that

2    injects substantive terms into the parties' contract.

3         The following types of acts are examples of conduct that

4    in other cases have been found to violate the duty of good

5    faith and fair dealing:  (1), evasion of the spirit of the

6    bargain; (2), willful rendering of imperfect performance;

7    (3), interference with or failure to cooperate in the other

8    party's performance; (4), abuse of discretion granted by the

9    contract; or (5), lack of diligence in performing the terms

10   of the contract.  Each case, however, presents its own unique

11   circumstances, and you should view this list only as an

12   illustration of the kinds of conduct that can violate the

13   duty of good faith and fair dealing.  You are not to use this

14   list as a complete catalogue of conduct that violates the

15   duty of good faith and fair dealing or as a standard under

16   which to assess the parties' conduct.

17        It is your job to determine whether Motorola breached its

18   duty of good faith and fair dealing in carrying out the terms

19   of the contracts at issue in this case.  Good faith

20   performance of a contract requires being faithful to the

21   agreed common purpose of the contract and performing

22   consistently with the justified expectations of the other

23   parties.  On the other hand, bad faith performance involves

24   conduct that violates community standards of decency,

25   fairness, or reasonableness.

1        In deciding whether Motorola breached its duty of good

2    faith and fair dealing, you may consider the following

3    factors, alone or in combination:   (1), Whether Motorola's

4    actions were contrary to the reasonable and justified

5    expectations of other parties to the contract; (2), whether

6    Motorola's conduct would frustrate the purpose of the

7    contract; (3), whether Motorola's conduct was commercially

8    reasonable; (4), whether and to what extent Motorola's

9    conduct conformed with ordinary custom or practice in the

10    industry; (5) to the extent the contract vested Motorola with

11    discretion in deciding how to act, whether Motorola exercised

12    that discretion reasonably; (6), subjective factors, such as

13    Motorola's intent and whether Motorola had a bad motive.

14        If you consider subjective factors, such as Motorola's

15    intent or motive, you must be aware that this is only one

16    consideration and it need not dictate your final decision.

17    Bad motive or intent does not necessarily imply bad faith,

18    and good motive or intent does not necessarily imply good

19    faith.   Likewise, bad motive or intent is not a prerequisite

20    to bad faith, nor is good motive or intent a prerequisite to

21    good faith.

22        Number 17.   As explained above in Instruction Number 15,

23    element (2), Motorola's contract with the IEEE required

24    Motorola to grant Microsoft a license to Motorola's 802.11

25    standards-essential patents on a worldwide basis under

1    reasonable rates, with reasonable terms and conditions

2    demonstrably free of any unfair discrimination.  Likewise,

3    Motorola's contract with the ITU required Motorola to grant

4    Microsoft a license to Motorola's H.264 standards-essential

5    patents on a worldwide, non-discriminatory basis and on

6    reasonable terms and conditions.  For short, the parties have

7    referred to these requirements as Motorola's reasonable and

8    non-discriminatory RAND commitments.

9        Although Motorola is required to grant a RAND license, the

10   specific terms of the license are left to the parties.

11   Nevertheless, in connection with its RAND obligations,

12   Motorola must comply with its duty of good faith and fair

13   dealing, described above in Instruction Number 16.  If you

14   find that Motorola violated its duty of good faith and fair

15   dealing in connection with its RAND obligations with respect

16   to its contracts with either the IEEE or the ITU, then you

17   must find that Microsoft has proved Element (3) in

18   Instruction Number 15 for that contract.

19       Number 18.  Purpose of the RAND commitment.  As set forth

20   in Instruction Number 16, one factor to consider in

21   determining if Motorola breached its duty of good faith and

22   fair dealing is whether Motorola's conduct frustrated the

23   purpose of the contract.  The purposes of the RAND commitment

24   are:  To encourage widespread adoption of the standard; to

25   prevent patent "hold-up," which is the ability of a

1   standards-essential patent owner to demand more than the

2   value of its patented technology; to prevent royalty

3   stacking, which is the payment of excessive royalties to many

4   different standards-essential patent owners; and to induce

5   the creation of valuable standards by ensuring that owners of

6   valuable patents will receive reasonable royalties for their

7   patents.

8       Number 19.  Offers to license standards-essential patents.

9   In this case, Microsoft claims that Motorola's October 21

10  offer letter and/or Motorola's October 29 offer letter

11  breached Motorola's duty of good faith and fair dealing.  In

12  assessing this claim, you should rely on the good faith and

13  fair dealing standard set forth in Instruction Number 16.

14  Further, in the context of offering to license

15  standards-essential patents subject to a RAND commitment,

16  there are additional legal principles that you should be

17  aware of:

18      (1), Initial offers in a RAND licensing negotiation do not

19  need to be on RAND terms; any offer by Motorola, be it an

20  initial offer or an offer during a back-and-forth

21  negotiation, must comport with the duty of good faith and

22  fair dealing set forth in Instruction Number 16; in

23  determining whether Motorola's October 21 offer letter and/or

24  Motorola's October 29 offer letter complied with Motorola's

25  duty of good faith and fair dealing, you may compare

1   Motorola's offers against the RAND royalty rate and range

2   determined by the court and set forth in Instruction

3   Number 20.

4       However, the size of an offer alone is not exclusively

5   dispositive of whether Motorola has breached its duty of good

6   faith and fair dealing.  To determine whether Motorola's

7   offer breached its duty of good faith and fair dealing, you

8   must use the standard set forth in Instruction Number 16.

9       Instruction Number 20.  As I stated at the beginning of

10  the trial, this case has been conducted in two phases, and

11  this is the second phase.  In the first phase, I conducted a

12  bench trial, the purpose of which was to determine a RAND

13  royalty rate and range for Motorola's standards-essential

14  patents.  As I told you before, the IEEE and ITU do not set

15  RAND rates at which parties are required to license their

16  standards-essential patents.  Instead, determinations of RAND

17  rates are left to the parties.

18      Here, the parties never agreed on a RAND rate to license

19  Motorola's standards-essential patents.  However, in order

20  for you to properly assess Microsoft's breach of contract

21  claim, you must know what a RAND royalty rate and range would

22  be for Motorola's standards-essential patents.

23      I will now tell you again what those rates are.  For each

24  group of standards-essential patents, I have found both a

25  RAND rate and a RAND range.  This reflects the fact that more

1    than one licensing rate could be RAND.  The RAND ranges are

2    defined by an upper bound and a lower bound.  To determine

3    the RAND rate and range, I assumed that Microsoft and

4    Motorola engaged in negotiations and found the rate and range

5    that the parties would have agreed to through such

6    negotiations.

7        I found that a RAND royalty rate for Motorola's H.264

8    standards-essential patent portfolio is 0.555 cents per unit,

9    with the upper bound of a RAND royalty for Motorola's H.264

10   standards-essential patent portfolio being 16.389 cents per

11   unit, and the lower bound being 0.555 cents per unit.  This

12   rate and range is applicable to both Microsoft Windows and

13   Xbox products.  For all other Microsoft products using the

14   H.264 Standard, the royalty rate is the lower bound of 0.555

15   cents per unit.

16       I also concluded in that previous bench trial that the

17   RAND royalty rate for Motorola's 802.11 standards-essential

18   patent portfolio is 3.471 cents per unit, with the upper

19   bound being 19.5 cents per unit and the lower bound being 0.8

20   cents per unit.  This rate and range is applicable to

21   Microsoft Xbox products.  For all other Microsoft products

22   using the 802.11 Standard, the royalty rate is the lower

23   bound of 0.8 cents per unit.

24       In the bench trial, I did not decide whether Motorola

25   breached its contracts with the IEEE and ITU.  That is for

you to decide, and you alone.  Throughout this trial, you may

have heard lawyers refer to the bench trial and to the

findings of fact and conclusions of law that I made in that

trial.  You must follow the legal rulings I made in that

trial and accept the facts that I found as related to you in

these instructions and during the course of the trial, but

you are not to take any reference to the previous trial as

deciding the breach of contract issues in this case or as

implying for which side your verdict should be rendered.  In

the prior trial, I did not examine whether Motorola breached

its contractual commitments with the IEEE and ITU by

violating the covenant of good faith and fair dealing that is

implied in those contracts.  I have not made a decision on

those issues.  It is for you, and you alone, to determine

whether Motorola breached its contractual commitments based

on the evidence you have heard in this trial.

Instruction 21.  Microsoft claims that Motorola's actions

in seeking injunctive relief in the ITC, United States

District Courts, and/or in Germany, violated Motorola's duty

of good faith and fair dealing.  In assessing this claim, you

should again rely on the good faith and fair dealing standard

set forth in Instruction Number 16.  Further, in the context

of seeking injunctive relief for standards-essential patents

subject to a RAND commitment, there are additional legal

principles that you should be aware of:

1    (1), The RAND commitment does not by itself bar

2   standards-essential patent owners from ever, in any

3   circumstances, seeking injunctive relief to enforce their

4   patents.

5    (2), However, in some circumstances, it may be a breach of

6   the duty of good faith and fair dealing for a

7   standards-essential patentholder to seek injunctive relief

8   against a standards-essential patent implementer.  To

9   determine whether Motorola's actions in seeking injunctive

10   relief violated Motorola's duty of good faith and fair

11   dealing, you must use the standard set forth in Instruction

12   Number 16.

13    Microsoft did not repudiate or forfeit any of its rights

14   under the contracts by seeking the Court's assistance through

15   the present lawsuit against Motorola.  Microsoft had neither

16   a duty to first apply for a license from Motorola nor a duty

17   to negotiate with Motorola before Motorola's RAND licensing

18   obligations were triggered.

19    Number 23.  It is the duty of the court to instruct you as

20   to the measure of damages.

21    By instructing you on damages the court does not mean to

22   suggest for which party your verdict should be rendered.

23    In order to recover actual damages, Microsoft has the

24   burden of proving that Motorola breached a contract with the

25   IEEE or the ITU, and that Microsoft incurred actual economic

1    damages as a result of the breach, and the amount of those

2    damages.

3        If your verdict is for Microsoft on Microsoft's IEEE

4    breach of contract claim, and if you find that Microsoft has

5    proved that it incurred actual damages and the amount of

6    those actual damages, then you shall award actual damages to

7    Microsoft.

8        Similarly, if your verdict is for Microsoft on Microsoft's

9    ITU breach of contract claim, and if you find that Microsoft

10   has proved that it incurred actual damages and the amount of

11   those actual damages, then you shall award actual damages to

12   Microsoft.

13       Actual damages are those losses that were reasonably

14   foreseeable, at the time the contract was made, as a probable

15   result of a breach.  A loss may be foreseeable as a probable

16   result of a breach because it follows from the breach either:

17           (A) in the ordinary course of events, or;

18           (B) as a result of special circumstances, beyond the

19   ordinary course of events, that the party in breach had

20   reason to know.

21       In calculating Microsoft's actual damages on its IEEE

22   contract claim, you should determine the sum of money that

23   will put Microsoft in as good a position as it would have

24   been in had Motorola performed all of its promises under the

25   IEEE contract.

1       In calculating Microsoft's actual damages on its ITU

2   contract claim, you should determine the amount of money that

3   will put Microsoft in as good a position as it would have

4   been in had Motorola performed all of its promises under the

5   ITU contract.

6       The burden of proving damages rests with Microsoft, and it

7   is for you to determine, based upon the evidence, whether any

8   particular element has been proved by a preponderance of the

9   evidence.  You must be governed by your own judgment, by the

10  evidence in the case, and by these instructions, rather than

11  by speculation, guess, or conjecture.

12      Number 24.  With regard to Microsoft's breach of contract

13  claims, in your determination of damages you are to use the

14  following measure of damages, in the amounts proved by

15  Microsoft: (a), the costs that Microsoft incurred for

16  relocating Microsoft's distribution centers to the

17  Netherlands in Spring 2012 to avoid the consequences of the

18  injunctive relief sought by MMI and General Instrument

19  Corporation in Germany; and (b), the costs that Microsoft

20  incurred in defending against lawsuits filed by Motorola

21  seeking injunctive relief against Microsoft in District

22  Courts within the United States, before the ITU, (sic) and in

23  German courts.  I believe that is supposed to be ITC.  24,

24  Line 11.  We picked up our typo.

25      Ladies and gentlemen, if we counted up the number of

1   lawyers and the years of education we have here, it would be

2   staggering, but apparently we are not very good proofreaders.

3   So in Instruction Number 24, in Line 11, where it says

4   "before the ITU," it should say before the ITC, and German

5   courts.

6       Regarding part (b), you may only award such damages, if

7   you find that Motorola's lawsuits seeking injunctive relief,

8   apart from Motorola's general course of conduct, violated

9   Motorola's duty of good faith and fair dealing.  In

10  determining whether Motorola's lawsuits seeking injunctive

11  relief violated the duty of good faith and fair dealing, you

12  shall consider the circumstances surrounding each lawsuit.

13  Each lawsuit seeking injunctive relief shall be considered

14  individually.

15      Keep in mind that there are two contracts at issue in this

16  case, the ITU contract and the IEEE contract.  If you find

17  that only one of the contracts has been breached, you must

18  determine the amount of damages caused by that breach and

19  award only that amount.

20      Number 25.  The law that applies to this case authorizes

21  an award of nominal damages.  If you find that Motorola

22  breached its contract with either the ITU or the IEEE, and

23  that Microsoft was harmed as a result, but you find that

24  Microsoft has failed to prove damages as defined in these

25  instructions, you must award nominal damages.  Nominal

1  damages must be greater than zero and may not exceed $1.00.

2      Number 26.  A plaintiff who sustains damage as a result of

3  a defendant's breach of contract has a duty to minimize its

4  loss.

5      Microsoft is not entitled to recover for any part of the

6  loss that it could have avoided with reasonable efforts.

7  Motorola has the burden to prove Microsoft's failure to use

8  reasonable efforts to minimize its loss and the amount of

9  damages that could have been minimized or avoided.

10      27.  Under the law, a corporation is considered to be a

11  person.  It can only act through its employees, agents,

12  directors, or officers.  Therefore, a corporation is

13  responsible for the acts of its employees, agents, directors,

14  and officers performed within the scope of authority.

15      28.  When you begin your deliberations, you must elect one

16  member of the jury as your presiding juror.  That person will

17  preside over the deliberations and speak for you here in

18  court.

19      You will then discuss the case with your fellow jurors to

20  reach agreement, if you can do so.  Your verdict must be

21  unanimous.

22      Each of you must decide the case for yourself, but you

23  should do so only after you have considered all of the

24  evidence, discussed it fully with the other jurors, and

25  listened to the views of your fellow jurors.

1    Do not hesitate to change your opinion if the discussion

2    persuades you that you should.

3    Do not come to a decision simply because other jurors

4    think it is right.

5    It is important that you attempt to reach a unanimous

6    verdict but, of course, only if each of you can do so after

7    having made your own conscientious decision.  Do not change

8    an honest belief about the weight and effect of the evidence

9    simply to reach a verdict.

10    Some of you have taken notes during the trial.  Whether or

11    not you took notes, you should rely on your own memory of

12    what was said.  Notes are only to assist your memory.  You

13    should not be overly influenced by the notes.

14    30.  Conduct of the jury.  I will now say a few words

15    about your conduct as jurors.

16    First, because you must decide this case based only on the

17    evidence received in the case and on my instructions as to

18    the law that applies, you must not be exposed to any other

19    information about the case or to the issues it involves

20    during the course of your jury duty.  Except for discussing

21    the case with your fellow jurors during your deliberations:

22    Do not communicate with anyone in any way and do not let

23    anyone else communicate with you in any way about the merits

24    of the case or anything to do with it.  This includes

25    discussing the case in person, in writing, by phone or

1    electronic means, via e-mail, text messaging, or any Internet

2    chat room, blog, Web site or other feature.  This applies to

3    communicating with your fellow jurors until I give you the

4    case for deliberation, and it applies to communicating with

5    everyone else, including your family members, your employer,

6    and the people involved in the trial, although you may notify

7    your family and your employer that you have been seated as a

8    juror in the case.  But, if you are asked or approached in

9    any way about your jury service or anything about this case,

10    you must respond that you have been ordered not to discuss

11    the matter and to report the contact to the court.

12        Because you will receive all the evidence and legal

13    instruction you properly may consider to return a verdict, do

14    not read, watch, or listen to any news or media accounts or

15    commentary about the case or anything to do with it; do not

16    do any research, such as consulting dictionaries, searching

17    the Internet or using other reference materials; and do not

18    make any investigation or in any other way try to learn about

19    the case on your own.

20        Second, during the trial, do not talk with or speak to any

21    of the parties, lawyers, or witnesses in this case - when it

22    says "during the trial," that includes you deliberations -

23    not even to pass the time of day.  It is important not only

24    that you do justice in this case, but also that you act

25    accordingly.  If a person from one side of the lawsuit sees

1    you talking to a person from the other side, even if it is

2    just about the weather, that might raise a suspicion about

3    your fairness.  So, when the lawyers, parties or witnesses do

4    not speak to you in the halls, on the elevator or the like,

5    you must understand that they are not being rude.  They know

6    they are not supposed to talk to you while the trial is going

7    on, and they are just following the rules.

8        The law requires these restrictions to ensure the parties

9    have a fair trial based on the same evidence that each party

10   has had an opportunity to address.  A juror who violates

11   these restrictions jeopardizes the fairness of these

12   proceedings, and a mistrial could result that would require

13   the entire trial process to start over.  If any juror is

14   exposed to any outside information, please notify the court

15   immediately.

16       If it becomes necessary during your deliberations to

17   communicate with me, you may send a note through the

18   courtroom deputy, signed by your presiding juror or by one or

19   more members of the jury.  No member of the jury should ever

20   attempt to communicate with me except by a signed writing.  I

21   will communicate with any member of the jury on anything

22   concerning the case only in writing, or here in open court.

23   If you send out a question, I will consult with the parties

24   before answering it, which may take some time.  You may

25   continue your deliberations while waiting for the answer to

 1    any question.  Remember, you are not to tell anyone,

 2    including me, how the jury stands, numerically or otherwise,

 3    until after you have reached a unanimous verdict or have been

 4    discharged.  Do not disclose any vote count in any note to

 5    the court.

 6        And, finally, Number 32.  Return of verdict.  A verdict

 7    form has been prepared for you.  After you have reached

 8    unanimous agreement on a verdict, your presiding juror will

 9    fill in the form that has been given to you, sign and date

10    it, and advise the court that you are ready to return to the

11    courtroom.

12        Ladies and gentlemen, also attached to the material we

13    gave is a copy of the form that you are free to use when you

14    are back in the jury room.  It is only the original that will

15    be signed and returned, but this is for to you to help keep

16    track of your decisions.

17        At this time I would ask you to give your attention to

18    Microsoft, which is going to present its closing argument.

19    Mr. Harrigan.

20        MR. HARRIGAN:  Thank you, your Honor.  Your Honor,

21    would it be okay if I started while the easels are being set

22    up?

23        THE COURT:  Yes.

24        MR. HARRIGAN:  I would like to start by thanking all

25    of you by taking a chunk of a pretty nice Seattle summer to

1    help us resolve this important case.

2        It is an important case, and the importance stems from the

3    importance of the RAND commitment to the entire standards

4    system.  As you heard many times in the last week or so, the

5    RAND commitment is a fundamental element in the success of

6    standards, and standards are an emblem of the achievement

7    that can be reached by human cooperation and ingenuity.  But

8    it requires cooperation, and it requires cooperation with

9    respect to the willingness of companies using the standard to

10   adopt it and put it into their products, which in turn

11   depends upon being able to do so at a reasonable cost.

12       In Phase I of this case, as you know, the court reached

13   what is actually a landmark decision in determining RAND for

14   these Motorola's standards-essential patents, and in

15   enforcing the RAND contract.  In the course of that, the

16   court decided that true value of Motorola's WiFi and H.264

17   patents.

18       And it is not disputed in this case that Motorola's

19   patents in those two standards were, in fact, a mere sliver

20   of the total technology in the two standards, which is

21   important to bear in mind in evaluating Motorola's conduct.

22   These slivers have a lot of power when they are misused.  It

23   is a very small part of the standard, but because of the

24   nature of the standards system, a sliver of a standard can be

25   as powerful as the whole standard, because if you withhold

1    your sliver you prevent the adopting party from using the

2    standard.  It is all one piece, and it has to interoperate,

3    so a sliver is a very powerful weapon.  If you can't use the

4    sliver, you can't use the standard.

5         Now, this case began when Motorola demanded what I hope

6    will persuade you was the hold-up value of its

7    standards-essential patents in these two standards.  When

8    Microsoft got those letters, and we will go into this in more

9    detail, it immediately recognized what was happening.

10   Motorola was using standards-essential patents, which are

11   very powerful, but they are only powerful if you don't obey

12   the RAND commitment.

13        So Microsoft noted that these letters were addressing only

14   standards-essential patents, and were seeking what were

15   obviously outrageous royalties.  So what Microsoft did was it

16   came to this court and asked the court to enforce the RAND

17   obligation, asked the court to determine what the RAND

18   royalty was, and asked the court to do an accounting of what

19   Microsoft owed to Motorola for the use of its share of these

20   two standards once the court had determined what the RAND

21   rate was.

22        Once Microsoft filed this action and asked the court to do

23   those things, Motorola knew that it could get everything it

24   was ever entitled to for its slice of these two standards

25   right here in this court.  All it had to do was present its

1   view on what the royalty should be, the court would decide

2   what the royalty should be, what the royalty was, what the

3   RAND rate was, and Motorola would be paid exactly what it was

4   entitled to, and that's all it is entitled to.

5       But that isn't what Motorola wanted, as its conduct

6   demonstrates.  Because what Motorola did was it immediately

7   turned around and filed actions for injunctive relief based

8   on these very same standards-essential patents that this

9   court was dealing with here.

10      Now, with the court's ruling, it is now beyond dispute

11  that Motorola's demands in its October letters exceeded the

12  actual RAND royalty by a vast amount, and it certainly far

13  exceeded the true value of its small part of each of these

14  standards.  However, this enormous disparity between their

15  demands and RAND was also self-evident at the time of the

16  letters.  It was evident to Microsoft and it was also evident

17  to Motorola, which is a matter which I will discuss shortly.

18      Now, why did Motorola make these demands?  They were

19  basically sham offers.  Their purpose was to pave the way for

20  the next step, which was to seek injunctive relief against

21  Microsoft's most valuable products, as a lever in the other

22  larger negotiation.  Motorola was using the

23  standards-essential patents because of their unique power to

24  gain leverage in the larger patent portfolio negotiations

25  between the parties, but it could only do that by demanding

 1   much more than RAND; because if Motorola had in fact made a

 2   RAND offer, Microsoft could simply have accepted it, paid the

 3   modest royalty and we wouldn't be here.

 4       The purpose of the demands was so that Motorola could say

 5   that it had offered a license.  It could claim, just as the

 6   letters themselves claim, that it had offered a license on

 7   RAND terms.  But then on day 21 when the offer expired,

 8   because no -- Microsoft couldn't conceivably accept it,

 9   Motorola could go to court and say we offered a license,

10   Microsoft didn't take it, therefore they don't have a license

11   to use our standards-essential patents, they are infringing

12   them, and we want injunctive relief against Microsoft's

13   products that embody these patents.

14       But Motorola had no right to injunctive relief at that

15   time, because Motorola had not complied with its contract.

16   It had not made these patents available to Microsoft on RAND

17   terms, on reasonable terms.  And there isn't really any

18   dispute about that, because this court has decided what RAND

19   was, and Motorola's demand was vastly more than that.  It

20   doesn't make any sense that you can go into court and

21   complain that someone is using your patents without a license

22   when you have an obligation to offer them for a reasonable

23   amount, and, instead, you offer them only for an utterly

24   unreasonable amount, and then use that offer as a basis for

25   seeking injunctive relief.

1        Now, the standards-setting organizations required Motorola

2    to commit to RAND before they accepted its technology into

3    the standard.  And Motorola made those commitments, as you

4    know, and then years later when the standards were widely

5    adopted and widely used and embedded in many products,

6    Motorola turned and did not honor that commitment.

7        Motorola's conduct here actually became a threat to the

8    standards system if it had been allowed to go unchecked.  I

9    would like to remind you of what Mr. Horacio Gutierrez,

10   Microsoft's corporate vice-president and deputy general

11   counsel, said here in court about the reason Microsoft

12   brought this case.

13       He was asked if there was anything besides money that

14   Microsoft was asking for in this case.  He said, "Actually

15   there is a broader principle at stake here."  I am not going

16   to read this whole thing to you.  But basically what he is

17   saying is, if people can breach their contract obligation

18   with standards organizations then it would really make it

19   impossible for companies to be able to rely on those RAND

20   promises, and would put companies in the position where they

21   would be reluctant to implement those standards.  So the

22   point here is, that Microsoft's effort to enforce this

23   contract is a key step in assuring that the next company that

24   thinks about this will not do it.  And if that were

25   otherwise, this would threaten the whole basis of the

1  standards system.

2      Now, the RAND promise that Motorola made is a pretty

3  straightforward statement.  I would like to put up those

4  promises for you.  The first one is the H.264 promise.  It

5  says basically what Motorola committed to was that it would

6  grant a license for its H.264 standards-essential patents to

7  an unrestricted number of applicants on a worldwide

8  non-discriminatory basis and on reasonable terms and

9  conditions.

10     The next one is the WiFi commitment.  And it is

11  essentially the same.  However, there is a difference with

12  respect to the WiFi commitment to the IEEE, because in

13  addition to the requirement to offer on reasonable terms,

14  that term is more precisely stated, where, if you look at the

15  bottom, Motorola agreed that it would make its

16  standards-essential patents available at nominal competitive

17  cost.  So it would be important to compare the WiFi actions

18  by Motorola to that requirement, that they be made available

19  at nominal competitive cost.

20     Now, what was wrong with Motorola's injunction actions

21  under this contract?  There is at this point not a flat

22  prohibition against seeking injunctions related to

23  standards-essential patents.  But, first, the patentholder

24  has to meet its obligations.  It has to make the

25  standards-essential patents available on reasonable terms

1    before it can -- and then the person, the company to whom it

2    is making this proposal, has to turn it down.  In other

3    words, the proposal has to comply with the contract

4    obligation to offer on reasonable terms.  And then if the

5    company that has been made an offer on RAND terms turns it

6    down, an action for injunctive relief may be appropriate.

7    But it makes no sense to say that Motorola could make a

8    demand that is vastly higher, and in breach of its contract,

9    and then use the fact that Microsoft doesn't have a license

10   as a basis for injunctive relief.

11        And we know that, in fact, Motorola's letters were not

12   offers on RAND terms, because the court has decided what that

13   is, and they are enormously higher -- they call for

14   enormously higher royalties.  And, in fact, to this day

15   Motorola has never made a RAND offer for the

16   standards-essential patents at issue here.

17        So after making these excessive demands, and after the

18   deadline of 20 days expired, Motorola launched an injunction

19   blitz, with a German injunction action as the centerpiece.

20   The German action was filed in July 2011.  And I think you

21   heard some testimony yesterday about how long it takes to get

22   to trial and get an injunction, but the fact is that is not

23   true in Germany.  In Germany, with the filing in July, an

24   injunction was imminent seven months later.  Injunctions are

25   routine in Germany, and they are fast.  And defenses that are

1    available to a company that is using a patent in the United

2    States are not available in Germany.  In fact, Professor

3    Haedicke testified that the German legal system does not even

4    recognize RAND.  So going to Germany is a good strategy if

5    you want to use standards-essential patents as a leverage.

6        This hold-up campaign came very close to succeeding.  It

7    failed for two reasons:  One, timely intervention by this

8    court.  Just as the injunction in Germany was about to issue,

9    Microsoft had asked the court to block Motorola from

10   enforcing it so that this court could proceed to decide what

11   the contract required, and give Motorola the royalty that it

12   was entitled to.  Actually, Motorola did get an injunction in

13   Germany.  But what happened is this court, before Motorola

14   could actually enforce it, ordered Motorola not to enforce

15   it, so that this case could proceed, and the contract could

16   be upheld, and Motorola would receive everything it was

17   entitled to.

18       Secondly, the order that the court entered was a temporary

19   order.  Even when it was extended, Motorola appealed that

20   order to the Ninth Circuit.  So there was still uncertainty

21   hanging over whether Motorola would be prohibited from

22   enforcing the injunction.  At the same time, Microsoft, in

23   order to protect itself, proceeded with an alternative

24   approach, which was to move its distribution center out of

25   Germany so that any injunction that was entered would not

1    stop its distribution process.  And it did so with enormous

2    haste, as you heard the testimony the other day of

3    Mr. Davidson, and considerable expense.  But this was the

4    insurance, assuming it could be accomplished in time, against

5    having the devastating effect of a German injunction.

6        Now, Motorola says it has wanted to arrive at RAND terms,

7    but that is actually clearly not true.  Microsoft filed this

8    action in November of 2010.  Motorola could have gotten a

9    RAND license right here.  And that is powerful evidence of

10   why it actually filed these actions for injunctive relief.

11   Since it could have gotten whatever -- everything it was

12   entitled to here, it didn't need injunctions to get it.  It

13   filed for injunctive relief in order to gain leverage in the

14   broader negotiations.

15       Now, the second phase of the case is where we are today.

16   In this phase, Microsoft is seeking another point ruling by

17   this jury, which is that parties who are subjected to hold-up

18   for standards-essential patents and who resist by opposing

19   the injunctions, or, in this case also by moving out of

20   harm's way, can recover the costs of doing so.

21       Not every company that gets into a situation like this has

22   the financial resources that Microsoft has, and it is

23   important to the integrity of the standards system for a

24   company that faces this to know that if it stands up for its

25   rights it can recover the costs of doing so at the end of the

1    day.

2        Now, I would like to turn to some of the significant facts

3    established during the trial.  First of all,

4    standards-essential patents are a world apart from other

5    patents.  They are subject to the RAND commitment, because of

6    the fact that they are very powerful instruments.  The reason

7    is, Microsoft and hundreds of other companies rely on the

8    standards, and they incorporate the standards into their

9    products, and they wouldn't dare to do so if it were not for

10   the RAND commitment.

11       David Treadwell, who was Microsoft's corporate

12   vice-president for the Xbox software, explained this.  He

13   said, "There has been quite a bit of discussion" --  The

14   question was, "There has been quite a bit of discussion were

15   RAND commitments so far.  What role, if any, do RAND

16   commitments in relation to an industry standard play in the

17   Xbox decision as to whether to include that industry standard

18   in the Xbox?"  He said, "The existence of RAND commitments

19   are a foundational part of our decision to include standards

20   in the Xbox.  We need to know that we can depend upon them in

21   including that technology for the benefit of our customers at

22   reasonable price to us."

23       Jon Devaan, for Windows, testified to essentially the same

24   effect.

25       Now, contrast standards-essential patents with regular

1   patents.  You can't make an appealing product without

2   including many of these standards, including H.264 and WiFi.

3   On the other hand, with respect to regular patents, the

4   situation is totally different.  Frequently you can take

5   whatever feature of your product is potentially infringing a

6   regular patent and you can design around the patent, you can

7   drop the feature, even if you are being subjected to an

8   excessively high royalty demand.

9        But with standards-essential patents, the owner of even a

10  sliver of each standard has everyone over a barrel.  You

11  can't take the sliver out, because then you are not in

12  compliance with the standard.  So the ways that people deal

13  with regular patent infringement cases simply don't work with

14  respect to standards.  For WiFi to work, it has to mesh with

15  everybody else that is using WiFi.  If you remove any part of

16  it, you no longer comply with the standards.  So the owner of

17  a sliver has the power of the whole standard.

18       Now, Motorola has suggested that Microsoft started this

19  argument, that it was trying to put Motorola out of business

20  with respect to its Android phones, and that Microsoft was

21  simply -- and that Motorola was simply responding in kind and

22  putting its patents on the table.  But that isn't what

23  actually happened.  And the argument doesn't make sense.

24  RAND is a contract obligation.  There is no exception to that

25  obligation just because you are annoyed at somebody for

 1    filing an infringement action on normal every day patents.

 2    Motorola's reason for -- or motivation for doing what it did

 3    is not an exception to the RAND obligation.

 4        So here is what actually did happen.  I should remind you

 5    that Mr. Leonard agrees with this when he was asked

 6    yesterday, "Now, Microsoft's October 1 lawsuit did not excuse

 7    or release Motorola from its H.264 and 802.11 RAND

 8    commitments, did it?"  And he basically says, "I would say

 9    probably not."

10        So the action that Microsoft filed on October 1st with

11    respect to Motorola's infringement of Android -- of

12    Microsoft's regular patents in its Android phones was not a

13    standards-essential patent action, and it was not, as

14    Motorola contends, an out-of-business scenario for Motorola.

15    First of all, Motorola could have removed the feature that

16    Microsoft was suggesting was infringed.  Second, it could

17    have designed around Microsoft's patents.  It could have

18    accomplished the same thing in a different way.  Or, third,

19    it could have paid a reasonable royalty.  There is no

20    contention in this case that the royalty that Microsoft was

21    seeking in connection with the Android phone patent

22    infringement was anything but reasonable.  And in fact, the

23    evidence here is that most of the other companies who are

24    producing Android phones have signed license agreements with

25    Microsoft, and they are not paying excessive royalties.  So

1    there was a simple solution -- there was one or more simple

2    solutions for Motorola to that problem.

3         And here is what Mr. Gutierrez said about that Android

4    phone situation.  He testified that, "Microsoft has invested,

5    over decades, billions of dollars every year in developing

6    technologies for operating systems."  And then he goes on to

7    say that -- down here, "About 80 percent of all the Android

8    smartphones that are sold in the U.S. come licensed to

9    Microsoft's full portfolio of 70,000 patents.  So the vast

10   majority of the Android devices in the U.S. market are

11   covered by a Microsoft license."  And he says, "The notable

12   exception to this is Motorola."

13        So there was nothing devastating about the situation

14   Motorola faced with regard to its Android phones.  All it had

15   to do was either design around the problem or pay a

16   reasonable royalty.  No one is contending that Microsoft was

17   asking fore the kind of royalties for the Android patents

18   that Motorola was asking for for its standards-essential

19   patents.

20        Now, what would have been the logical way for Motorola to

21   deal with this?  You recall that Mr. Dailey testified that he

22   had been researching for months regarding Motorola's patents

23   in anticipation of a global negotiation with Microsoft with

24   respect to their portfolio and Microsoft's portfolio.  If you

25   wanted to start a normal negotiation in that situation you

 1   would put on the table those patents, the ones that he had

 2   been researching.  But what did he, in fact, do?  Motorola,

 3   in fact, put its standards-essential patents in the two

 4   standards on the table in the form of the two letters.  The

 5   only reason to do this is to gain leverage; and the only way

 6   to gain leverage is to demand more than the RAND rate for the

 7   patents.  Because if you make the offer on RAND rate, there

 8   is no leverage, Microsoft simply pays the modest royalty and

 9   the issue is over.

10       There is another big difference between the action by

11   Motorola with respect to its standards-essential patents and

12   Microsoft's action regarding its Android phone patents; and

13   that is, that Motorola was in fact threatening Microsoft's

14   basic business.  The three injunction actions would have

15   stopped all Windows and Xbox sales in a large part of the

16   globe.  That had nothing in common with the situation

17   Motorola was dealing with with respect to Android.

18       So I think it would be a good time to look at what the

19   instructions say about the obligations of Motorola.

20           JUROR:  I can't see this at all.  Are they the same

21   as what are printed in our pages?  And, if so, if

22   Mr. Herrington could refer to the pages, we can follow along

23   with our pages.

24           THE COURT:  I can't see it at all either.

25           JUROR:  If you could refer to the pages, please, so

1    we can follow along.

2           MR. HARRIGAN:  Since the instructions are numbered, I

3    will simply give you the number and tell you what the

4    significance is of certain parts.

5       So Number 16 defines the duty of good faith and fair

6    dealing.  And Microsoft is contending in this case that

7    Motorola breached its duty of good faith and fair dealing.

8    And it gives you the factors to consider, alone or in

9    combination, in deciding whether Motorola did breach.

10      First, is whether Motorola's actions --

11          THE COURT:  Mr. Harrigan, let me stop you for a

12   second.  Ladies and gentlemen, when Mr. Harrigan is facing

13   the boards, can you hear him?

14      You are going to need to project towards the jury.  They

15   can't hear you when you are facing that way.

16          MR. HARRIGAN:  Yes.  I am going to call your

17   attention to Item Number 2 in these factors, and talk about

18   that for a minute.  Item Number 2 is, "Whether Motorola's

19   conduct would frustrate the purpose of the contract.  So a

20   key factor in whether there has been a breach of the covenant

21   of good faith and fair dealing is whether Motorola's conduct

22   would frustrate the purpose of the contract.  That leads us

23   to Instruction Number 18, which describes what the purpose of

24   the RAND commitment are.  And here, I am going to call your

25   attention to the purpose in that instruction, which is

1  described as "To prevent patent hold-up, which is the ability

2  of the standards-essential patent owner to demand more than

3  the value of its patented technology."  That's up on your

4  screen now.

5      So we know that a purpose -- a key factor in whether the

6  duty of good faith and fair dealing has been breached is

7  whether the conduct would frustrate a purpose of the

8  contract.  And we know from Instruction Number 18 that a

9  purpose of this contract is to prevent patent hold-up, which

10  is the ability of a standards-essential patent owner to

11  demand more than the value of its patented technology.  That

12  is what happened here.  And it is not disputable, because we

13  know that Motorola demanded literally thousands of times the

14  amount of royalties that this court, in ruling on the RAND

15  contract, determined was actually the RAND royalty.

16      Now, there is also an instruction that addresses offers.

17  Instruction 19, which is over here for anybody that can read

18  it, has two important provisions.  One is, "Initial offers in

19  a RAND licensing negotiation do not need to be on RAND

20  terms."  But, "Secondly, any offer by Motorola, whether it is

21  an initial offer or an offer during a back-and-forth

22  negotiation must comport with the duty of good faith and fair

23  dealing," as set forth in Instruction 16.

24      So these have to be read together.  First, "Opening offers

25  do not have to be RAND, but every offer has to comply with

1    the duty of good faith and fair dealing."  Why is it not a

2    breach if the opening offer is higher than RAND?  Well, it

3    may not be bad faith.  For example, if the royalty is a

4    penny, and the offer is 1.1 cents, maybe the holder of the

5    standards-essential patents just missed it by a little bit,

6    and there is no reason why that would be indicating bad

7    faith.  But in this case we have --  This situation does not

8    resemble that at all.  Here, the opening offer was vastly

9    above RAND.  And that's where the second part of this

10   instruction comes in, which is, every offer, including the

11   October 21 -- including the October 2010 demands by Motorola

12   must comply with the duty of good faith and fair dealing.

13       So the question for you is whether Motorola, in demanding

14   enormously higher royalties than this court determined to be

15   RAND, was breaching the duty of good faith.  And the fact

16   that the demands were literally thousands of times what RAND

17   actually was is very compelling evidence that they were not

18   good faith offers.

19       Secondly, the fact that these offers were so high was not

20   an accident.  Motorola knew what the RAND range was for its

21   patents.  It had actually had a study done in 2003 to

22   determine what the value of its WiFi patents -- its portion

23   of the WiFi standard was.

24       In 2003 Motorola's consultant recommended an effective

25   royalty of one tenth of a percent of the price of products

1    containing WiFi for Motorola's patents.  We now know that

2    they actually overestimated Motorola's contribution to the

3    WiFi standard, because it didn't realize, as this court has

4    determined -- excuse me, it didn't realize what is undisputed

5    in this case, which is that Motorola's share of 802.11 was a

6    sliver.  The InteCap rates are actually 25 times higher than

7    they should be.  But what they are saying here is the

8    reasonable royalty was a tenth of a percent of the price, and

9    what Motorola asked for or demanded in October was

10   2.25 percent of the price.  So it was not difficult for

11   Motorola to determine that what it was demanding was

12   outrageous.

13       Motorola had other information about what a reasonable

14   royalty was.  It was directly involved in the MPEG LA

15   discussions.  Do you recall Mr. Garrett Glanz testifying

16   about that?  And that related to the H.264 standard.  In

17   those MPEG LA meetings Motorola argued for lower royalties

18   than were then under discussion.  And it actually succeeded

19   in getting the royalties that were ultimately adopted

20   reduced.  The discussions started at 20¢ per unit, with no

21   caps.  And Motorola said that that rate would be too high for

22   mobile phones, because it would discourage adoption.  In

23   fact, basically Mr. Bawel, Motorola's representative, said

24   that they would go looking for another way to do video

25   compression if the rate were as high as 20¢ per unit.  In

1    Motorola's demand letters they are asking for 2.25 percent of

2    the laptop price for each operating system, which is $11.25 a

3    unit for a $500 laptop.  So Motorola had plenty of

4    information from its own experience with MPEG LA to realize

5    that the demands in the letters were outrageous.

6        Motorola also knew that the effect of what it was asking

7    for would be a royalty just for H.264 of $4 billion a year,

8    when this court's RAND royalty would result in a total

9    royalty per year of $2 million.  We know that Motorola did

10   perform these estimates, so it did know that what it was

11   asking for for H.264 was in the range of $4 billion.

12       And Mr. Dailey testified:  "When you put together the two

13   letters that we looked at, did you understand how much

14   Motorola stood to gain in royalty revenue if Microsoft

15   accepted the terms as set forth in the letters?"  Answer:

16   "We had some calculations around in line with that somewhere,

17   yes."  And, of course, it is very easy to figure this out,

18   because the sales of laptops are publicly available, and

19   Motorola could compute that $4 billion number as easily as

20   anybody else.

21       Look at it this way:  Did Motorola really think that its

22   H.264 slice -- its slice of H.264 was really worth that much

23   money?  There is no evidence of Motorola licensing its H.264

24   patents ever before.  And if they are really worth

25   $4 billion, you would think somebody would be working pretty

1    hard to get some licenses.  So it is clear that Motorola's

2    corporate knowledge on this was that they knew they were

3    making offers that were far above RAND, and that knowledge is

4    compelling evidence of bad faith because their obligation was

5    to make their patents available on reasonable terms.

6        Now, there are a couple of other things about the letters

7    that tell us that Motorola was acting in bad faith.  Let's

8    put up the letter.  This is the H.264 letter.  First of all,

9    this letter doesn't say, here is a proposal, let's talk about

10   how to get to a RAND royalty.  The letter says, "Motorola

11   offers to license the patents on a non-discriminatory basis

12   on reasonable terms and conditions, RAND."  In other words,

13   Motorola is saying, this is RAND.  It is not saying, RAND is

14   something else, make us a counteroffer and we will negotiate

15   down to something sensible.  It is saying, this is our RAND

16   offer.

17       The other thing about --  Another element here that is

18   important is, this was not just a momentary lapse, because

19   Motorola continued to demand 2.25 percent for both standards

20   through 2012.

21       Mr. Gutierrez testified about this.  "Did you have a

22   further conversation with Mr. Dailey in December of 2012,

23   after the trial?"  That is the trial in this case that set

24   the RAND rate.  But, of course, it hadn't happened yet,

25   because the rate was set in April after the trial.  "Yes."

1   "And in that conversation did Mr. Dailey tell you what the

2   royalty rate was that they wanted for their H.264 and 802.11

3   at that time?  And what did he tell you?"  "It was

4   2.25 percent."  So after all of the information was developed

5   for the November trial, the following month, Mr. Dailey's

6   position was we still we want 2.25 percent.

7        And, remember the video of Mr. Taylor, Motorola's

8   corporate vice-president in charge of IP and IP counsel?  He

9   was asked about what he thought about a royalty of a tenth of

10  a percent.  That's the same royalty percentage that the

11  InteCap study came up with.  Specifically, he was asked, "Why

12  did you think when the Exhibit 1 letter was sent that 2.25

13  was a reasonable rate as distinct, for example, from a tenth

14  of a percent?"  And he said, "A tenth of a one percent would

15  never have entered my mind that.  Would be a ludicrous rate.

16  It wouldn't justify the transaction cost and licensing, much

17  less provide any compensation for our R&D investment.  I

18  never considered a rate like that in my years at Motorola."

19       As we have already discussed, that tenth of a percent is

20  -- the actual demand by Motorola in the letters was 22 and a

21  half times that amount.  Obviously 2.25 percent is a lot more

22  than a tenth of a percent.  And Motorola was -- this

23  gentleman says Motorola would never even consider anything as

24  low as a tenth of a percent.  Yet, what the court determined

25  actual RAND was, is a half a cent for H.264.  And what

1    Motorola was demanding is, in the case of a $500 laptop, is

2    $11.25.

3        Mr. Dailey also says that he rushed these letters out and

4    just threw in the normal 2.25 percent.  That is not the case.

5    Motorola carefully tailored this letter to be unacceptable.

6        Let's put up the letter again.  There is an aspect of this

7    letter that raises the royalty enormously, and it is clear.

8    And that is that the royalty is applied to each PC laptop,

9    each smart phone, et cetera.  It is not applied to component

10   software, which is Microsoft's operating system.

11       What happens because of that is that the royalty doubles

12   when the operating system is in a thousand dollar laptop

13   versus a $500 laptop.  There is absolutely nothing different

14   about the role of H.264 in the operating system or the laptop

15   that varies with the price of the laptop.  So the entire

16   amount of the difference between 11.25 and 22.50, which is

17   the difference in the royalty under those two situations, is

18   the hold-up value.  That is, even if Motorola's patents were

19   worth 11.25, they are not worth another 11.25 when they are

20   included in a laptop that has more memory or a fancier case.

21       And Mr. Dailey testified that he had made a conscience and

22   deliberate decision to ask Microsoft to pay a royalty based

23   on the sales revenues of its downstream customers.  He says,

24   "That was the initial offer, yes."  In fact, this approach of

25   charging a percentage royalty on the downstream customers'

1    products was never done before by Motorola.  This letter was

2    custom tailored for Microsoft, and it was designed to be

3    unacceptable.

4        So what happened when the letters arrived at Microsoft?

5    Microsoft immediately realized what was actually going on

6    here.  The reason for that is not simply that the demands

7    were stunningly high, but that Motorola was using

8    standards-essential patents as weapons in this negotiation.

9    They were using standards-essential patents for their

10   leverage.  Remember, Mr. Dailey said he had been going

11   through the portfolio of Motorola looking for regular patents

12   to use in negotiations with Microsoft.  And yet, when this

13   letter was sent a short time after Microsoft sued on the

14   Android phones, what Motorola used in the letter were

15   standards-essential patents, not the ones that Mr. Dailey had

16   been researching.

17       Mr. Dailey knew that he could not use standards-essential

18   patents as leverage.  He testified in response to this

19   question:  "You can't use your standards-essential patents to

20   try to force someone to take a license on more favorable

21   terms on patents that are nonessential to the same standard?

22   You wouldn't do that, would you?"  "I'm not so sure what you

23   mean by that.  I don't think so."

24       What did Microsoft do when these letters came in?  It

25   decided to immediately ask for the help of this court in

1    enforcing Motorola's RAND obligations.  This lawsuit assured

2    that Motorola would get everything it was entitled to.

3         On November 9 Microsoft sued seeking a RAND determination

4    and an accounting of what Microsoft owed for a license.  Here

5    is what Microsoft asked for:  "A judicial accounting of what

6    constitutes a royalty rate in all aren't consistent with

7    Motorola's promises for WLAN" -- this is WiFi patents,

8    "identified as essential by Motorola and for H.264 patents

9    identified by Motorola."

10        So this lawsuit asked the court to do an accounting of

11   what Microsoft owed Motorola for a license after -- once the

12   court determined what the RAND royalty was.  That means from

13   this point forward Motorola could get everything it was ever

14   entitled to by simply proceeding through this case.  Instead,

15   the day after Microsoft filed this action, Motorola sued for

16   injunctive relief on its standards-essential patents.  It

17   filed a Wisconsin action to block all sales of Xbox and

18   Windows in the United States.

19        Later, in November, it compounded this action by filing in

20   the ITC seeking to block the importation of Xbox.  ITC

21   proceedings are very speedy and trial proceedings were set

22   for January 2012.

23        In this same timeframe, November and December,

24   Mr. Gutierrez and Mr. Dailey had some further discussions.

25   And in those discussions -- I think we've got this,

1    Mr. Gutierrez said that Mr. Dailey took the position that --

2    in their discussions about the patent portfolio negotiations,

3    "They were telling us that they didn't want to license those

4    patents to us.  So they were consistently putting an

5    exclusion in the scope, saying that Microsoft would not get a

6    license for its Windows products on H.264 and 802.11."

7        So, far from wanting to negotiate on those patents,

8    Mr. Dailey was taking them off the table because he wanted to

9    hold them back and use the leverage of seeking injunctions

10   based upon those patents as part of the overall negotiation

11   regarding the portfolio.

12       And this was actually a continuation of a pattern that

13   started at the MPEG LA meetings that Mr. Eric Glanz talked

14   about.  And I will just briefly remind you, after

15   participating in the entire process of putting together a

16   reasonable royalty for H.264, when the time came to put the

17   signature on the agreement among all the pool participants,

18   Motorola suddenly decided not to join.  What it was doing

19   was, it was holding the same standards-essential patents

20   back, so that it wouldn't be bound by the pool rates, which

21   were at that point ten cents a unit, and instead could turn

22   around and ask for $11.25 for the same patents if they were

23   installed in a $500 laptop.  So taking these

24   standards-essential patents off the table and using them for

25   leverage was standard operating procedure.

1        So here was the situation in the winter of 2011 to 2012.

2    First of all, there was the potential of early injunctions in

3    two cases.  Germany, at this point it was anticipated there

4    could be an injunction by the end of March of 2012.  In the

5    ITC an injunction would potentially issue later that year.

6    The German threat of an injunction was potentially

7    devastating.  As you already heard, that distribution center

8    handles distribution of all of Microsoft's packaged products,

9    Xbox and Windows, to a large part of the globe.  An

10   injunction would stop all of that distribution in a flash.

11       Bear in mind, that Motorola was pursuing this German

12   action and the ITC even though it could get everything it was

13   entitled to right here, and this case was pending, and the

14   trial was set for November of 2012.  So you have to ask

15   yourself, why was Motorola seeking injunctions when all it

16   was entitled to is a reasonable royalty, and it was going to

17   get that right here?

18       So what happened?  Well, you recall Professor Murphy's

19   analogy of the holdup in the park.  First, give me your

20   money.  Second, pull out the gun.  First, give me your money

21   were the demands in November; pull out the gun was filing for

22   injunctive relief.  And sometimes what happens is a policeman

23   comes along, and in this case the policeman was the Seattle

24   court.

25       First, the Seattle court said, we will decide RAND, and

1  there will be a license at a RAND royalty.  But, second, as

2  this German injunction loomed toward the end of March,

3  Microsoft came to the court and said, please order Motorola

4  not to enforce it, because if they can enforce it they will

5  inflict such damage on Microsoft's business that we will be

6  forced to enter into a licensing agreement on unreasonable

7  terms, and cut off what this court is in the process of

8  doing.  And, fortunately, this court did enter that order,

9  and ordered Motorola not to enforce the injunction that it

10  had just gotten in Germany.

11      Microsoft had to do something else also, because it was

12  not certain that the court would take this action.  And even

13  when it was taken, it was temporary.  And even after it

14  became permanent, Motorola appealed that to the Ninth

15  Circuit.  So to be safe, and because there was considerable

16  uncertainty about even -- about whether the injunction would

17  endure, Microsoft decided to move its distribution center out

18  of Germany to the Netherlands, where the jurisdiction of the

19  German court does not extend.  And as a result, before any

20  injunction could impact its business, Microsoft was operating

21  in the Netherlands at a cost of about $23 million.

22      Another thing happened in 2012 that effects the issue of

23  Motorola's good faith here; and that is that the FTC took an

24  interest in the situation.  Microsoft told the FTC what was

25  going on, and the FTC took some action, which I am going to

1   remind you of here.  First of all, it filed this statement

2   with the International Trade Commission where Motorola was

3   seeking the Xbox exclusion order.  The FTC said, "Simply put,

4   we are concerned that a patentee can make a RAND commitment

5   as part of a standard-setting process, and then seek an

6   exclusion order for infringement of the RAND encumbered

7   standards-essential patent as a way of securing royalties

8   that may be inconsistent with the RAND commitments.

9       So the FTC is saying that their concern that there can be

10  a RAND commitment, a promise to license on reasonable terms,

11  that is entered into during the standard-setting process, and

12  then after the standard is successful and it is embedded on

13  all kinds of products, turn around and seek an exclusion

14  order, which is an injunction, stopping the products from

15  being distributed or in this case imported as a way of

16  securing royalties that may be inconsistent with the RAND

17  commitments.  In other words, exactly what Motorola was

18  doing.

19      And Motorola knew this.  It knew it in June of 2012.  And

20  yet, it was still trying to get -- it was appealing the

21  German -- the order by this court stopping the German

22  injunction, and it was still pursuing its ITC exclusion

23  order, even knowing about this position on the part of the

24  FTC.

25      The FTC did something else a little earlier in May

1    of 2012; it opened an investigation into Motorola's conduct.

2    And in the complaint regarding that, the FTC said that,

3    "Before its acquisition by Google, Motorola reneged on a

4    licensing commitment made to several standard-setting bodies

5    to license its standards-essential patents relating to

6    smartphones, tablet computers and video game systems on FRAND

7    terms by seeking injunctions against willing licensees of

8    those standards-essential patents."  What that means is, for

9    willing licensees you can read Microsoft, because Microsoft

10   was standing by ready to take a license at whatever rate this

11   court decided was RAND.  So it was a willing licensee.  And

12   the FTC was concerned that Motorola had reneged on its RAND

13   commitment by seeking injunctions against willing licensees,

14   those who were ready to enter into a contract on reasonable

15   terms.

16        So in looking at whether Motorola was in bad faith, you

17   need to consider the fact that all through the second half of

18   2012 it knew what the FTC thought about what it was doing,

19   and it continued seeking an exclusion order in the ITC until

20   January of 2013 when it finally dropped that request in the

21   same timeframe as it entered into a consent decree with the

22   FTC.

23        To deal with the German situation, Microsoft took some

24   other steps.  First of all, it actually was held up in

25   Germany.  You will recall the discussion about the

1    Orange-Book offer.  Well, Microsoft used that Orange-Book

2    procedure.  It offered to pay Motorola about three U.S.

3    pennies for a license to its two German H.264 patents.  Not

4    to all of its patents, not to all of its H.264 patents, but

5    the two in Germany.  3¢.  This court decided that RAND was a

6    half a cent.  So Microsoft put on the table six times the

7    amount that the court determined was RAND, and Motorola

8    turned it down.  So Microsoft was held up, it just wasn't

9    held up enough for Motorola.

10        If that offer had been accepted, Microsoft would not --

11   that 3¢ offer for something that was only worth a half a

12   cent, Microsoft would not have had to move the warehouse.

13   When I say it is 3¢ versus a half cent, it really wasn't,

14   because it was only for two patents out of Motorola's H.264

15   patents.  It was the entire portfolio that this court said

16   was worth a half a cent.

17        Second, Microsoft moved its warehouse to escape the

18   potential German injunction.  As you heard from Mr. Davidson,

19   this was a massive crash program, and the fact that Microsoft

20   was willing to spend $23 million to do that shows that it was

21   very worried about the impact of this German situation.  And,

22   of course, it came to this court asking for relief in the

23   form of an order to Motorola not to enforce the injunction.

24        Now let's take a quick look at the instructions to see how

25   Motorola's conduct fits into the definition of the breach of

1   the covenant of good faith and fair dealing.  The opening

2   paragraph of Instruction 16 identifies the factors that you

3   can consider in determining whether Motorola's actions were a

4   breach of the duty of good faith.

5       And we have already --  The first one is, "Whether they

6   were contrary to the reasonable and justified expectations of

7   other parties to the contract."  Well, the justified

8   expectations of other parties to this contract were that they

9   would get -- they would be able to get a license on RAND

10  terms, and would not have to face injunctions as long as they

11  were willing to pay that reasonable amount.  That is not what

12  happened here.  Microsoft put a more than reasonable amount

13  on the table in Germany.  Microsoft committed in writing to

14  accept a license from this court on whatever the court

15  decided was a RAND rate.  So it had no -- Microsoft had a

16  reasonable expectation that having done that it shouldn't

17  need to worry about injunctions.  But Motorola was proceeding

18  with them anyway, contrary to the reasonable and justified

19  expectations of the other party.

20      And then the second factor is whether Motorola's conduct

21  would frustrate a purpose of the contract.  And we have

22  already talked about this.  The second item identified as the

23  purpose of the contract is to prevent hold-up, which is

24  defined as, "the ability of a standards-essential patent

25  owner to demand more than the value of its patented

1    technology."  Well, we now know that is exactly what Motorola

2    was doing.  So it was frustrating that purpose of the

3    contract.

4        Then the third one is whether Motorola's conduct was

5    commercially reasonable.  Remember, Motorola knew all about

6    the MPEG LA royalty discussions.  Twenty of the most

7    experienced companies in this field got together and came up

8    with what they thought was a fair royalty.  The amount they

9    came up with was a tiny fraction of what Motorola was

10   demanding.  So its demands, and the injunctions that were

11   predicated on Microsoft's not accepting those demands, were

12   not commercially reasonable.

13       The fourth factor is whether and to what extent Motorola's

14   conduct conformed with the ordinary custom and practice in

15   the industry.  Well, we know what the ordinary custom and

16   practice in the industry is.  It is to make your

17   standards-essential patents available at a reasonable

18   royalty.  That is the exact opposite of what Motorola was

19   doing.

20       The other element of the reasonable custom and practice in

21   the industry is that you don't go seeking injunctions against

22   standards-essential patents unless you have made a RAND offer

23   and the other party has turned it down.  If the other party

24   is a willing licensee, as Microsoft was, coming into this

25   court and saying, please set the RAND royalty and we will pay

1    it, there is no basis for seeking injunctive relief.  The

2    only reason to seek injunctive relief is to use it as an

3    improper leverage device in the larger negotiation about the

4    two patent portfolios.

5        And then the fifth one is, to the extent the contract

6    vested Motorola with discretion in deciding how to act,

7    whether Motorola exercised that discretion reasonably.  Well,

8    Motorola had the discretion to ask for a royalty.  It could

9    have exercised that discretion, let's say, by asking for a

10   little bit more than RAND, and nobody would have a complaint.

11   But what Motorola did was it asked for literally a thousand

12   or two thousand times RAND for H.264, and similarly for the

13   802.11, that was the technology embodied in Xbox.  It had

14   discretion, but it did not exercise that discretion

15   reasonably.  It used it as a lever.  It used it for the power

16   of withholding the standards-essential patents.

17       And, finally, subjective factors, such as Motorola's

18   intent and whether Motorola had a bad motive.  Well, I have

19   already discussed the fact that Motorola was well aware of

20   what industry rates were, what the specific rates were for

21   the pool, for H.264, and its own InteCap study on 802.11

22   showed that the rates were vastly lower than what it was

23   demanding.

24       THE COURT:  Mr. Harrigan, you have now used 60

25   minutes of your time.

1          MR. HARRIGAN:  Thank you, your Honor.

2      Now, another purpose of the RAND commitment is the third

3  one on this list, which is to prevent royalty stacking.  And

4  this can be disposed of rather quickly.  Royalty stacking is

5  what occurs if a -- if a royalty demand is made, that if

6  everybody asked for a proportionate amount would make the

7  technology too expensive for anyone to incorporate into their

8  products.

9      And it is pretty simple arithmetic.  Motorola asked for

10  2.25 percent on H.264 and it asked for 2.25 percent on

11  802.11.  There were 92 other companies with

12  standards-essential patents in the 802.11 standard.  That

13  means if they all did what Motorola did, the royalty, just

14  for H.264, would be over 200 percent over the price of the

15  product.  It would kill the standard.  That is royalty

16  stacking.  That was a key purpose of the RAND commitment.

17  And Motorola clearly violated it.

18      The similar arithmetic applies to the H.264 patents, where

19  there were 52 companies involved in the standard.  Obviously,

20  that arithmetic is still over 100 percent.  It makes no

21  sense.  It is absurd.  You can't pay more than you are

22  getting for your product just to get one part of one

23  standard -- get a license for one part of one standard.

24      Now, there is another chapter to this story, which I will

25  go through briefly.  Motorola got a request from Marvell for

a license to Motorola's part of the WiFi standard.  And
Marvell went to Motorola for a license because Microsoft
asked it to.

Motorola's response to Marvell was, we want 2.25 percent,
not of the value of your chip that you sell for $3 that
contains the WiFi function, but 2.25 percent of the product
price of any product in which that chip is included.

So if you just look at --  Say that the customer was
Microsoft.  Marvell sells this $3 chip to Microsoft, it gets
$3, that chip contains the WiFi function; not just Motorola's
part of the WiFi function, but the whole thing.  And yet, the
royalty on that, based on this proposal by Motorola, would be
2.25 percent of a $500 laptop, $11.25.  That's what Motorola
was telling Marvell it needed to pay for a license to a tiny
part of what is embodied in the chip that sells for $3.

So if you want to talk about stacking, it only took one
request by Motorola to stack Marvell out of business.  You
don't need to take into account the other 91 companies that
were part of that same standard.  So Motorola's conduct
toward Marvell was obviously -- was basically a statement, we
do not have any interest in licensing this technology on a
basis that would undercut our position with Microsoft where
we are trying to use it as leverage.  So they made exactly
the same proposal to Marvell that they were insisting upon
for Microsoft, and for exactly the same reason, so that they

1    could continue to seek injunctive relief without making a

2    RAND offer.

3        Now, it may be useful to put up some statements that we

4    heard from Dr. Leonard yesterday in the context of these

5    events we just reviewed.  He was asked this question

6    yesterday.  This is Motorola's economics expert.  "With

7    respect to the letters that were sent in October of 2010,

8    what is your reaction to the testimony that the letters might

9    have provided leverage?"  He said, "Again, the letter by

10   itself is just a piece of paper.  It can't provide any

11   leverage.  The only way --  And Motorola can't just say,

12   Microsoft, you have to pay us, and then Microsoft has to do

13   it.  What would have to happen is Motorola would ultimately

14   have to go to court, or, of course, they would have to reach

15   an agreement."

16       So he says, "These demand letters in October are just a

17   piece of paper."  Well, so is a ransom note.  A ransom note

18   is just a piece of paper unless you have a hostage.  And

19   here, at the time of those letters sent in October of 2010,

20   Motorola had a hostage.  It was holding its

21   standards-essential patents hostage, and it was sending

22   Microsoft a ransom note.

23       Dr. Leonard made another statement yesterday, and

24   Microsoft agrees with this one.  I just want to call your

25   attention to these parts.  "In a case where it is a

1  standards-essential patent, and the patent owner has agreed

2  that they are willing to exchange use of their patent rights

3  for money, then certainly money would seem to be a very

4  appropriate way to compensate the patent owner for any injury

5  that occurred without an injunction.  So from an economic

6  point of view, you don't really need an injunction, you just

7  award a money amount of damages."  This is a description of

8  exactly what this case was going to accomplish.  From

9  November of 2010 on Motorola could have gotten everything it

10  was entitled to, as Dr. Leonard says, a money amount of

11  damages right here, and you don't need an injunction.

12      So why was Motorola pursuing injunctions?  It was doing it

13  to put fear into Microsoft that its most valuable products

14  would be enjoined from being distributed or sold in a large

15  part of the globe, and to use the leverage of that

16  injunction, which Dr. Leonard says they don't need, in order

17  to get concessions in other areas in the larger patent

18  portfolio negotiations.

19      I am going to wrap up here by simply reminding you of the

20  amounts of damages Microsoft is seeking here.  If we could

21  have the two slides on that.  These are the costs that

22  Microsoft incurred in moving the distribution center from

23  Germany to the Netherlands, a total of $23.7 million.  The

24  11.6 is just the cost of actually doing the move and setting

25  up the new facility.  The $12 million is the difference in

 1   the operating costs at the Netherlands facility compared to

 2   the German facility.  That's part one of the damages claim.

 3        Part two is attorneys fees.  And they have been segregated

 4   into three components in case you should decide that Motorola

 5   breached one standard but not the other -- one RAND

 6   commitment but not the other.  So we have an amount for

 7   H.264.  And this is for work that was done by the lawyers

 8   that related to injunctions affecting H.264.  So, for

 9   example, that would be most of the German expense, because

10   that is the standard that was involved there.  And then the

11   second category is work on opposing injunctions on WiFi or

12   802.11.  And then the total.

13        And then the third category is work that was done that

14   can't really be divided between the two.  It dealt with both.

15   So the total amount is just under $6 million.  Thank you for

16   your attention.

17            THE COURT:  Ladies and gentlemen, Microsoft has some

18   remaining time, which they are permitted to use in rebuttal,

19   but we are going to take our break now.  We will give you

20   your full 15 minutes.  We will come back out at 11:25.  And

21   then Mr. Price is going to give you the closing argument on

22   behalf of Motorola.  And I have limited that also to 90

23   minutes.  Use your time wisely back there, and we will see

24   you back out at 11:25.  Please rise for the jury.

25            (The proceedings recessed.)

1          THE COURT:  Mr. Price, are you ready to go?

2          MR. PRICE:  I am, Your Honor.

3          THE COURT:  Let's bring the jury in.

4      (The following occurred in the presence of the jury.)

5          THE COURT:  At this time Mr. Price will give the

6   closing argument on behalf of Motorola.

7          MR. PRICE:  Thank you, Your Honor.  And thank you,

8   ladies and gentlemen, for so much.  You know, I've got to ask

9   you to think about this:  How many times in Mr. Harrigan's

10  presentation did he say that all Motorola had to do was

11  nothing, after November 9th?

12     You recall that on November 9th Microsoft filed a lawsuit

13  here.  That lawsuit has been characterized by Microsoft.  And

14  November 9th Microsoft sues for the third time in the Western

15  District of Washington.  And Mr. Harrigan said at that point

16  Motorola didn't have to do anything.  It didn't have to sue

17  Microsoft, it didn't have to ask for injunctions to be paid

18  on Motorola's patents.  And doing anything after that,

19  seeking injunctions, seeking a determination by a court that

20  Microsoft, in fact, infringes our patents and owes money,

21  that none of that was necessary, because on November 9, 2010,

22  Microsoft came to this court and said -- through filing a

23  complaint -- that, Your Honor, we want you to determine a

24  RAND rate and we will pay that rate.  No reason to do

25  anything else.

 1    And Mr. Harrigan said that throughout his presentation.

 2    It was kind of the key.  He was saying:  You need to evaluate

 3    Motorola's conduct in light of the fact that here we were in

 4    front of Judge Robart saying, "We will pay any rate you

 5    determine."  The problem with that is it is absolutely false.

 6    It is not what Microsoft did.

 7    And when you go back there, ladies and gentlemen, I'm

 8    going to ask you to look at Exhibit 7241.  7241 is the

 9    lawsuit that was filed.  There is this cover letter that I

10    may talk about later where general counsel sent -- general

11    counsel of Microsoft sends it to the general counsel of

12    Motorola saying, "I'll look forward to talking again and to

13    no doubt reading in the very near the work of your very good

14    litigation team."  But that suggests that they expect

15    something to be filed in response, not that they thought this

16    November 9th complaint would halt everything.  They knew it

17    wouldn't.

18    If you look through this complaint it contains causes of

19    action saying that Motorola breached its RAND obligation.  It

20    contains prayers for relief that they should be awarded

21    damages.  That they want a decree that Motorola has breached

22    its RAND obligation.  In one small section, in paragraph 9

23    you'll see it, it says, Microsoft seeks, among other things,

24    a judicial accounting of what constitutes a royalty rate in

25    all respects consistent with Motorola's basic RAND

1   obligations.

2       The one thing that's missing here is any commitment by

3   Microsoft to pay any royalty rate this court determines.

4   What Microsoft is asking for in this complaint is to get

5   damages -- and I'll explain that to you later, talk about why

6   they're not entitled to those damages -- and they're saying,

7   Your Honor, you set a royalty rate and then we can decide

8   whether or not we're going to accept it.

9       Because you've got to realize, Microsoft doesn't have a

10  contractual obligation to Motorola under that RAND

11  commitment.  That RAND commitment, Microsoft is a beneficiary

12  of, a beneficiary of Motorola's obligations.  But Microsoft

13  doesn't have to accept a license.  Microsoft can say what it

14  said throughout.  Microsoft can say, look, we don't think

15  your patents are essential patents.  We don't owe you a dime.

16  We don't infringe your patents.  We don't owe you a dime.

17  Your patents are invalid.  Therefore, we don't owe you a

18  dime.  They maintain the power to do that in this

19  November 9th complaint.  And they know it.

20      It is misleading to get up here and tell you that they

21  said they would accept whatever RAND royalty that this court

22  came up with.  And, in fact, it wasn't until Motorola had to

23  be put through all the hoops, that Motorola had to sue -- and

24  by the way, when Motorola sued, what was Microsoft's

25  response?  Microsoft's response was, we do not infringe those

1   patents.  Those patents are not essential.  Those patents are

2   invalid.  We don't owe you a dime.

3       They maintained that position up until the time they

4   actually had the threat of an injunction over their head.

5   And what the evidence will show is Microsoft understands that

6   that is the way RAND works, that the way RAND works and the

7   way it's enforced, so that someone like Microsoft will

8   finally come around and say, yes, they are essential.  Yes,

9   we do infringe.  Yes, they are valid.  The way you get them

10  to do that is sometimes with the threat of injunction.  And

11  I'm going to show you later that Microsoft, in fact, said

12  that to the FTC in 2011, that that's how you use these

13  lawsuits.

14      This November 9th lawsuit is not an agreement to pay a

15  dime.  It's not a commitment.  As a matter of fact, you can

16  imagine how easy it is to say:  We will pay you the RAND

17  rate.  We commit to that.  We're not going to say that the

18  patents aren't any good.  We're not going to say we don't

19  infringe.  That would be a very easy thing to say, and

20  Microsoft never said it.

21      I asked Mr. Gutierrez about this and this is I think --

22  here we go.

23      "Question:  It would be very easy to write down on a piece

24  of paper:  We will accept a RAND rate.  We will pay Motorola

25  a RAND rate.  You can do that in five seconds, right?

1    Correct?

2       "Answer:  Yes.

3       "Question:  The first time that was ever done verbally or

4    in writing was in September of 2011, correct?"

5       Then Mr. Gutierrez at that point said, "I don't know that

6    for sure."  But what he knew for sure was this lawsuit was

7    filed November 9, 2010.  What he knew for sure is this

8    lawsuit did not say that Microsoft was actually committing to

9    pay a RAND rate.  They still had the option and actually

10   elected that option throughout this time period of saying, we

11   don't have to pay anything.  Yes, judge, come up with a RAND

12   rate, but we're not committing to pay it.  We're saying the

13   patents aren't any good, and that we don't infringe, and that

14   we don't owe a nickel.

15      If Microsoft really wanted to avoid all this and say, we

16   will pay a RAND rate as determined by the court, it would

17   have been a very, very simple thing to do.  But they didn't.

18   They put Motorola through the hoops of having to go to courts

19   and try to establish that these were good patents, that, in

20   fact, Microsoft used these patents, and that whatever the

21   rate that was determined, Microsoft had to pay.

22      In fact, you also saw the evidence -- we read into the

23   evidence a statement by the court.  And this is Slide 19.

24   This was the court's order, May 14, 2012, where he says,

25   "Although an express statement that Microsoft seeks a license

1    for Motorola's standards-essential patents is missing from

2    its complaint" -- there is nothing in there saying that they

3    will actually get a license and pay -- "in its recent papers

4    to the court Microsoft has affirmatively stated that it is

5    ready and willing to take a license to such patents on RAND

6    terms." And here we're talking about recently. Recently

7    compared to May 14, 2012.

8        And the way we got there -- the way we got there where

9    Microsoft finally said, yes, we will pay -- is Motorola had

10   to go through these lawsuits and had to go through these

11   hoops.  And now Microsoft is complaining that we did that to

12   finally get them to agree that they would pay a RAND royalty.

13       In fact, what this case is about is it's an example of a

14   large, powerful company playing hardball and stage-managing

15   litigation to get what it wanted.  And in this case what it

16   wanted was to dominate the market for the operating systems

17   on smartphones.  And what happened here is Microsoft's

18   actions were totally inconsistent with the custom and

19   practice in the industry.  But Motorola's response to

20   Microsoft's actions were not only reasonable, given the time

21   pressures and given the context, not only were they

22   consistent with custom and practice, but Microsoft

23   anticipated exactly what Motorola was going to do before they

24   started this fight.

25       Microsoft knew what was going to happen.  I don't know if

1    you recall, I was examining Mr. Gutierrez.  And this is Slide

2    21.  And Mr. Gutierrez -- I asked:

3        "You knew that they," meaning Motorola, "were going to

4    file a lawsuit on any patents they thought they could use

5    against you and say:  We have value.  You have value.  You

6    knew that as of October 1, 2010?

7        "Answer:  We expected that, yes.

8        "Question:  Therefore you would expect them to file

9    lawsuits on standards-essential patents if they thought they

10   brought value to the table.  You said that yesterday,

11   correct?

12       "Answer:  Yes."

13       When Microsoft filed this lawsuit on October 1st, 2010,

14   they knew it would have been the standard in the industry,

15   the custom, that Motorola would sue back on the patents it

16   thought had value.  Standards-essential patents and

17   non-standards-essential patents.  That was their expectation.

18   And it didn't bother them at all that that was going to

19   happen.  It didn't bother them a whit whether or not that was

20   going to happen.

21       And the reason it didn't bother them, even though they're

22   now saying what Motorola did was outrageous, that it caused

23   them harm, they knew that Motorola was going to sue on these

24   patents, it didn't bother them because they knew they were

25   protected.  They knew that Motorola could not make them enter

1    into any license or pay anything that was greater than RAND.

2    And they knew that you never get an injunction unless a court

3    determined that that's what had happened, that Microsoft was

4    unwilling to pay RAND.

5        Now, remember, Microsoft didn't start this whole

6    litigation, I mean, didn't start -- didn't file the

7    October 1st complaint in order to get a license from Motorola

8    for technology Microsoft knew it was using.  I mean,

9    Microsoft had these, for example, these WiFi toggles to Xbox

10   since 2002.  Microsoft has known since 2002 it's using the

11   WiFi standard.  Okay?  Microsoft knows which companies have

12   declared patents essential on that standard.

13       The lawsuit didn't begin with Microsoft coming and saying:

14   Oh, by the way, we'd like to get your permission to use your

15   technology, even if it's a sliver, or whatever.  They didn't

16   come forward and say, that's what we're trying to get.  And,

17   in fact, they know they don't have to.  Their whole business

18   model is premised on the fact that they don't have to, that

19   they aren't afraid of people coming forward and saying, you

20   owe us a lot of money or we're going to stop you.  Because

21   they're protected.

22       You remember that Mr. Gutierrez said, when he was on the

23   stand he talked about -- I'm going to put up a slide which

24   Microsoft used.  I think it is Slide 1.  You recall you were

25   shown this slide which had 92 companies that had patents

1    essential to 802.11, and that's the WiFi standard.  Okay?

2    And you recall I was talking to Mr. Gutierrez up here and

3    said:  They didn't have licenses with the majority of those

4    companies on WiFi.  He said, probably not more than half the

5    companies.  And yet, as you heard, Microsoft has invested

6    millions and millions and millions of dollars into Xbox.

7    It's created this WiFi toggle.  It put WiFi into the Xbox.

8    And yet it didn't go to all of these companies and say, hey,

9    we'd like a license.  What if that company was unreasonable

10   and later came forward and sued and said, you owe us a lot of

11   money, we want an injunction.  Couldn't that stop your

12   business in its tracks?  Couldn't that put the fear of --

13   whatever fear you have -- into you?  And the answer is no.

14   It doesn't.  It doesn't put Microsoft into fear.  And why is

15   that?  Well, the reason is because they have a license if

16   they're willing to pay RAND.  And Mr. Gutierrez said that.

17        If we can go now to -- this is from the trial.

18   Mr. Gutierrez was asked, "One of the things you can rely on,

19   you don't need to contact these companies, because there's

20   the RAND obligation, correct?"  And he said yes.  "Answer:

21   That's correct."  Remember I asked him:  You don't know if

22   these companies you haven't approached are reasonable or not,

23   some could be really unreasonable.  You know, somebody could

24   come out of the woodwork and say, we have a

25   standards-essential patent, we're going to hold you up, we're

1    going to put a gun to your head, we're going to give you a

2    ransom note.

3         But the reason Microsoft isn't afraid of that, and the

4    reason it still invests millions and millions in Xbox and

5    other technologies, is because it knows that the most the gun

6    can have is a flag coming out saying, "Boo."  And it knows

7    the ransom note is totally ineffective because they are

8    protected by the law.

9         In fact, this is the question to Mr. Gutierrez.  "So even

10   if you think some people here, that you don't know, might be

11   unreasonable" -- that's referring to all those people who own

12   standards-essential patents -- "Microsoft feels comfortable

13   going forward with its investment in Xbox because it has the

14   protection of RAND.  These people aren't entitled to more

15   than a reasonable non-discriminatory rate, correct?"  And the

16   answer is, "Yes."  They aren't.  So we're not afraid of

17   people saying they want more.  We're not afraid of people

18   suing us saying they want an injunction, because they're not

19   entitled to one unless we're unwilling to pay a reasonable

20   and non-discriminatory rate.  And who determines that?  The

21   court.

22        And I think Mr. Treadwell testified about that:

23        "So what you talked about was that Motorola couldn't just

24   stop Microsoft from selling Xboxes; they would have to get

25   some sort of approval from a government entity or from a

1    court, right?

2       "Answer:  That's correct.  We knew that Motorola would

3    have to have some government-sponsored entity that would be

4    the thing that actually enjoins us from shipping Xbox or from

5    selling Xbox.

6       "Question:  So there would have to be some finding by some

7    entity that that was a reasonable and appropriate thing to

8    do?  Motorola couldn't do that on its own?"  And the answer

9    is, "Yes, that's correct."

10      By the way, this is the context to which Mr. Murphy,

11   Professor Murphy, I'm sorry, paid no attention whatsoever.

12   That is the context of, if you're trying to think

13   economically, from an economist's point of view or from a

14   rationality point of view, what would you try to do?  Would

15   you try to hold up someone?  Well, he didn't take into

16   account what Microsoft takes into account every day in its

17   business, which is, we don't have to fear people who are

18   unreasonable or who ask for injunctions, because we don't

19   have to identify them, because they can't obtain injunctions.

20   They can't make us pay more than RAND.  There is no question

21   that that's the law, and that Motorola knows that's the law.

22      That's what you have to think of when you're looking,

23   then, at what happened in this case.  Because what happened

24   is that Microsoft filed a lawsuit.  It knew what was going to

25   happen in response.  It knew it.  It wasn't surprised.  It

1   wasn't shaken.  It wasn't put in fear.  And it then

2   stage-managed it so that we're here now and Motorola is

3   defending what it was required to do to finally get Microsoft

4   to say -- to commit to say, we are going to pay RAND.

5       So let's look at that just for -- go through it kind of

6   chronologically so you can see the totality of what was

7   happening here.

8       Now, Microsoft in the 2009/2010 timeframe was in a bit of

9   a crisis, in a bit of a crisis because its operating systems,

10  you know, on the personal computers, has had great success.

11  I'm sure you all know that.  It had like 90 percent of the

12  market of operating systems on personal computers.  But the

13  market had changed.  The market was changing so that you had

14  operating systems not just on personal computers, but you had

15  laptops, you had tablets, you had iPhones.

16      And Mr. DeVaan was here from Microsoft, and he explained

17  that when you look at that bigger market, that Microsoft's

18  share was getting down to like 30 percent.  In fact, he said

19  that since the iPhone came out in 2005, which had multi-touch

20  functionality, that from then forth it declined until

21  Microsoft came out in October 2010 -- a date you know about

22  -- with the Windows iPhone 7 (sic), which is the first time

23  they had multi-touch.  But the market was getting away from

24  them.  There was the iPhone.  There was Apple.  And there

25  was, of course, also, Android.  And that market was getting

1    away from them because Motorola, which had used Windows

2    technology for its operating system, had announced it was now

3    committed to Android, which was a multi-touch operating

4    system.

5         So, Microsoft here is in a bit of a crisis.  And they want

6    to make a statement.  And they're going to plan how to make

7    that statement.  And by "plan" I don't mean just plan what

8    they're going to do, but they're going to plan and anticipate

9    what their opponent is going to do.  So leading up to

10   October 1, 2010, we have the following:

11        Motorola engages in what you have been told is the

12   standard custom and practice in the industry, and that is to

13   try and negotiate these disagreements among companies.  And

14   what happens is, you remember that Motorola had this

15   ActiveSync technology that it had a business license from

16   Microsoft for, it was four years, $100,000, not a big amount

17   of money.  So what happens is that license expires and so

18   Motorola is trying to contact Microsoft to say, hey, let's

19   get a deal together again where we have a license.  And it is

20   Motorola that has to keep kind of pursuing this and try to

21   engage in the standard custom and practice of, you know,

22   we're going to talk about this.

23        So in December 2007 Motorola sent Microsoft a draft

24   agreement to continue the license.  It wasn't until -- I'm

25   bad in counting months, apparently, and years, but this is

1   August 2008, so let's say eight months later, that Microsoft

2   sends Motorola a draft patent-license agreement for these

3   ActiveSync patents.  And that's the first time they have sent

4   a patent-license agreement, as opposed to a

5   business-technology agreement.

6       So then Motorola did what you've been told, it's

7   undisputed, is the standard practice in the industry.  They

8   said, oh, you've got patents, give us claim charts which show

9   how the patent deals with what we're doing.  And Microsoft is

10  in no hurry.  It's like over a year later when they finally

11  send claim charts for these patents.  And, by the way, this

12  was all testified to by Mr. Dailey.  It was concerning

13  discussions with a Joy Murray.  And Ms. Murray never came

14  here to dispute any of this.  Mr. Gutierrez, who had nothing

15  to do with any of this, characterized it later.  But what

16  actually happened is undisputed.

17      And so finally, in January of 2010, Kirk calls up Joy to

18  say, "Hey, let's have a broader licensing discussion."  And

19  she says, "I don't have the authority.  I'll call you back."

20  And she never called back.  Again, this is undisputed.

21      And, by the way, this is misleading, or you have been

22  misled here.  You heard Mr. Harrigan say a few times that

23  Mr. Dailey had done a search of Motorola's patent portfolio

24  to try to come up with patents to assert against Microsoft.

25  And that's not true.  What he said was:  We knew we had a

1    patent for wireless e-mail sync, which is similar to the

2    ActiveSync patents they sent us.  It was not a

3    standards-essential patent, and I wanted to talk to them

4    about that.  That was it.  There was no, "Let's look at our

5    portfolio."  There was in October, when they spent a million

6    dollars in one month looking at their portfolio to try to

7    find out how to respond to Microsoft's lawsuit, but not then.

8        And then in May, Kirk actually sort of crashes this

9    conference, or invites himself to this conference in DC, to

10   try to talk to Microsoft general counsel about this issue

11   which is just out there and has been out there for awhile,

12   you know.

13       And then later he sets up, with Mr. Gutierrez, an August

14   meeting.  And that's postponed due to "scheduling issues."

15   So Motorola thinks, okay, it's postponed.  And you heard what

16   Mr. Dailey said, that they then set up an October 22, 2010

17   meeting to talk about this fairly small, insignificant issue

18   about ActiveSync patents.  And what we didn't know -- and

19   this is contrary to industry-standard practice -- Mr. Dailey

20   said, if you have an issue with someone about patents in this

21   technology industry, what you do is you sit down and you say,

22   we think you're infringing our patents, here's our patents,

23   here's our claim chart, go examine it.  They go examine it.

24   They come back with their patents.  Well, we think you might

25   be infringing these.  And that can go on for a long time,

1    because you have to analyze patents.  And then when that

2    breaks down, there might be a lawsuit.

3        But, what happened in this case is that as Mr. Dailey was

4    engaging in these discussions about ActiveSync, Microsoft was

5    secretly, and behind the scenes, preparing an Android

6    lawsuit, a lawsuit about Motorola committing its company to

7    Android.  Can you put up Slide 41?  Remember I asked

8    Mr. Gutierrez:

9        "And so you're saying that the analysis for suing Motorola

10   and expecting what they're going to sue back on took place,

11   you think, several months before that?  You said spring?"

12       He said, "I'd probably say the late spring of 2010."

13       "So late spring, your seasons may be different from mine,

14   I'm not sure.  So give me your best estimate."

15       And he says he's from the tropics, and he's thinking

16   April.  So that's why, on our timeline, you have the spring

17   from the tropics and also here, April.  Beginning in April

18   Microsoft secretly begins preparing to sue Motorola on

19   patents it has never mentioned to them before.  Not just sue

20   Motorola on those patents, but also, also, anticipate the

21   lawsuits that are coming back.

22       Remember, Microsoft knows it's using the standard.

23   Microsoft knows that Motorola is one of the

24   standards-essential companies that has declared.  And

25   Microsoft knows it's not been paying anything.  It's

 1    anticipating exactly what's going to happen.  But the thing

 2    is, they have six months to prepare for this.  I think I've

 3    counted that correctly.  They have six months.  Six months to

 4    secretly prepare.

 5        And then October 1st they file a lawsuit.  And, remember,

 6    we went through that complaint, there were nine causes of

 7    action?  Seven of them are Android.  And Mr. Gutierrez

 8    said -- this is 42 --

 9        "And we've got seven patents now, and all of them pertain

10    to Android operating software, correct?

11        "Answer:  Correct.

12        "And none of them were ever discussed with Motorola prior

13    to the lawsuit being filed, correct?

14        "Answer:  Correct."

15        Now, there's nothing illegal about that.  But it's

16    contrary to the standard, the custom and practice in the

17    industry, to have a surprise attack, you know.  And we're

18    talking about it mainly because it deals with the context in

19    which Motorola had responded.  It didn't have six months, you

20    know, to come up with a response, and to look through all of

21    its patents, and to do thorough investigations.  It could

22    have if they had had negotiations.  But this was, as you

23    heard from Mr. Dailey, as you heard from Mr. Taylor, this was

24    a surprise attack.

25        And Microsoft was a sophisticated player in this industry.

 1    It knew that in response to this, Motorola would sue.  It

 2    knew that that is what was going to happen.

 3         So, let's talk about the lawsuit.  And first of all, the

 4    October 1, 2010 lawsuit.  And you heard Mr. Harrigan say:

 5    Oh, this basically wasn't really a big deal, because Motorola

 6    could design around patents or just pay a royalty, and this

 7    would be resolved.  Well, this was a huge deal.  These

 8    Android patents are not standards-essential patents.  So you

 9    don't have to -- you can't insist on a RAND royalty.

10    Basically, Microsoft could charge whatever it wanted.  If you

11    didn't pay it, they could keep you from using that

12    technology, because it's not covered by RAND.

13         And, yes, it's not standards essential for being in the

14    industry, I mean, for having software on your phone.  But

15    it's essential for doing Android on your phone.  Microsoft

16    was saying, these patents are why you can put Android on your

17    phone, Motorola.  And we're seeking an injunction preventing

18    you from doing that.  And Motorola had committed its company,

19    in a bet-the-life move, on the Android operating system.  And

20    so this was a huge deal.  Yeah, can you design around?  Maybe

21    you can.  Maybe you can't.  It wouldn't be Android.  And

22    that's what Microsoft was saying, is, you've got to take this

23    stuff off your phone and come up with something else.

24         Now, by the way, Mr. Harrigan says we should have just

25    capitulated, we should have just paid them.  If you recall,

1   there was a proceeding in the International Trade Commission,

2   because Microsoft sued there.  And it says:

3       "And, in fact, if you look at the situation today, the

4   October 1st lawsuit in the ITC, there was a finding that

5   Motorola did not infringe the Android patents that you

6   allege, except for one ActiveSync patent; isn't that right?

7       "Answer:  That's correct."

8       So, yes, we could have capitulated.  We could have been

9   fine with Microsoft.  But we didn't.  Because we didn't think

10  we were infringing their patent.  And the ITC found that we

11  didn't infringe those Android patents.  They found we

12  infringed one of those ActiveSync ones, which isn't essential

13  to Android, and that we were working around that, but not

14  these Android patents.  Later Mr. Gutierrez tried to say, oh,

15  I'm not sure they said we didn't infringe, but there was some

16  technical reason why Motorola won that.

17      So this was not a small matter for Motorola.  This was, in

18  fact, a company-threatening lawsuit.  Remember where we were

19  then?  Motorola was spinning off its businesses so that

20  Motorola Mobility had just the mobility patents and was going

21  to begin that business.  And that we were losing money.  And

22  that Microsoft's sales were like eight times what Motorola's

23  were.  And with all this going on, this lawsuit is filed out

24  of the blue, contrary to any expectations.

25      And that's the context in which we then go to what happens

1    next.  Because you'll remember Microsoft said, we know you're

2    going to sue us.  Microsoft knew that.  In fact, they

3    encouraged us.  You heard Mr. Taylor say, Microsoft said,

4    you're going to have to sue to establish the value of your

5    patents.  The value wasn't just the rate, it's whether or not

6    they are actually any good.  It's whether or not Microsoft

7    actually has to pay.  And so in response to that, you've

8    heard the testimony of Mr. Dailey about the October letters,

9    and also you heard the testimony yesterday from Mr. Taylor.

10        And let's look at these letters now.  If we can go to the

11   timeline, the October 1st lawsuit.  October 11th, Microsoft

12   unveiled the Windows Phone 7.  So, you know, we don't have

13   like direct evidence that all of this was about trying to

14   stop the industry from going to Android, and go to the Phone.

15        All we have is, you know, the fact that it was a surprise

16   attack, the fact that Motorola had gone Android, the fact

17   that Microsoft was unveiling its Windows Phone 7.  We have

18   all those facts.  That's called circumstantial evidence.  And

19   it can be just as compelling as someone with a confession.

20   You heard the court's example.  There are other examples.  If

21   eight people go to work one day, it's not St. Patrick's Day,

22   they're all wearing green.  There might be circumstantial

23   evidence that there is an agreement that they're going to

24   wear green.  And that's just as compelling as having someone

25   come in and contest it.  So, circumstantial evidence is

1    compelling here as to what was happening and why it was

2    happening.

3         So you go to these letters -- and I'm going to focus on

4    the October 21st one, because the October 21st one and the

5    October 29th one are really quite similar.  And the question

6    is, in this context, what was reasonable for Motorola to do?

7    And you heard Mr. Taylor say, look, we had 24,000 patents.

8    We're trying to put our patents on the table.  We spent a

9    million dollars that month trying to examine those patents,

10   because we're doing this quickly, we don't have six months.

11        The one thing we know we have, because it's already been

12   declared, are the standards-essential patents.  Those are

13   easy to identify, because we've declared them.  We did those

14   claim charts years ago, and we know that Microsoft is using

15   WiFi.  And so, okay, we can send out a letter on the

16   standards-essential patents.  And when we sued later, by the

17   way, we also sued on non-standards-essential patents, such as

18   the wireless e-mail patent, because we had some time to look

19   at them.  We spent that million dollars.

20        But the first thing, okay, we know the standards-essential

21   patents.  We send the October 21st letter, which I think is

22   Exhibit 1, which contains, attached to that, is the actual

23   patents.  This is putting patents on the table.  And the

24   second thing we're asked is, well, what royalty rate do we

25   put on it?  And one thing that Microsoft hasn't talked about,

1   which Mr. Dailey talked about, is we need to be reasonable

2   and non-discriminatory.

3       We know, and Mr. Taylor told you, that for -- let's see,

4   Mr. Taylor said that for the last twenty years -- I'm sorry,

5   Mr. Blasius said, "For the last twenty years the rate we've

6   used when we started negotiations on our technology is 2.25."

7   And Mr. Blasius, who was the patent licensing manager, said

8   that.  The rates have been negotiated for 20 years with

9   companies that have patents.  Sometimes it's less.  It's not

10  take-it-or-leave-it.  It's our starting rate.  They enter

11  into negotiations, they enter into cross-licenses and trade

12  value.  That's what we knew.

13      And largely, because the industry we knew was the

14  cell-phone industry.  And in the cell-phone industry you are

15  applying a rate to the end product.  That's what we knew.

16  That's what we had experience in.  And we didn't have six

17  months to prepare for this, we had to do this in a matter of

18  weeks.

19      And so you heard the testimony that we thought it was

20  reasonable to send out a letter, which is a beginning offer,

21  that puts in our standard rate -- which we've given to

22  others, so it's not discriminatory -- on the end product.

23  And say, okay, basically we're willing to talk.  And if you

24  look at that letter, that's what the letter says.  It is not

25  a demand, it is an offer.

1    It goes on to say that -- let's go to the next slide, next

2    paragraph.  You may not want to license all these.  We're

3    willing to enter into a license on RAND terms.  We're going

4    to leave the offer open for 20 days.  And you remember

5    initially Microsoft made a big deal as if there was something

6    sinister about the 20 days.  But then we showed you, I think

7    it was Exhibit 7252, which is a letter to Mr. Dailey from

8    Mr. Gutierrez where he has the exact same kind of language,

9    that Microsoft will leave the offer open for 20 days, please

10   confirm.  And that's because you want these negotiations to

11   get started.  It's what we've used for 20 years.  It's what

12   we could come up with right away.  It was not intended, at

13   any time, to be the end of discussions.

14       And the court has told you that that first offer does not

15   have to be RAND.  It would be kind of a crazy obligation to

16   put on someone that they have to come up with a RAND rate

17   right away.  What the court said that you've got to listen to

18   and look at -- and it's Instruction 16 -- is whether or not

19   this was, among other things, was this reasonable

20   commercially under the circumstances?  Reasonable means under

21   the circumstances.  You've got to ask yourself, what was the

22   subjective intent of Motorola?  Was Motorola trying to engage

23   in what was called a hold-up here?  Those are the questions

24   you have to ask.

25       And the criticisms, among the criticisms of that offer

1    are, well, we didn't consider patent pools.  And you heard

2    Mr. Dailey say, yeah, we didn't.  We put in our standard

3    offer.  And, by the way, for the WiFi technology, you've

4    heard about the MPEG patent pool.  Well, don't be confused,

5    that wasn't for WiFi, that was for the video compression.

6        You've heard testimony that Microsoft actually had

7    interest in a patent pool called Via.  Via, which would have

8    covered WiFi.  And the Via patent pool really has no effect

9    on the marketplace, very few people joined it.  And

10   Microsoft, though, did participate in those discussions, and

11   it dropped out.  Just as Motorola did with MPEG, and dropped

12   out.  So, you can't really infer anything from the fact that

13   you have discussions with a patent pool and you drop out.

14   Because Microsoft does the same thing.

15       So, they said you should have considered Via.  They say,

16   you should have considered the InteCap study.  The InteCap

17   study concerned, again, WiFi.  It was a study in 2003.  It's

18   a study that Mr. Dailey and Mr. Taylor said they did not know

19   existed, because they only had a short period of time here to

20   put this together.  And they didn't know this seven-year-old

21   study existed.  If you look at the study itself -- again,

22   this is 2003 -- you would notice that it doesn't contain a

23   lot of these WiFi patents that Motorola has, because -- I'm

24   putting up here now Exhibit 1 -- at the end of Exhibit 1,

25   that letter, we list the patents that are the WiFi patents.

1    And you look through them, and a great deal of them are after

2    2003.  They are patents that were acquired after the InteCap

3    study.

4        So, basically, given the context of what was happening

5    here, Motorola did the best it could to get an offer out

6    there where it expected to start negotiations.  Did it expect

7    an acceptance?  No.  That's not what you get in this

8    industry.  And you heard Mr. Gutierrez say that 99 out of a

9    hundred times he says no, we're going to negotiate.  And

10   that's what Motorola expected.  Motorola's goal, Mr. Dailey's

11   goal, was to start negotiations to arrive at a zero-zero, as

12   he said, zero-zero sort of place.

13       Before this lawsuit, Microsoft and Motorola had lived in

14   patent peace for years.  You heard Mr. Taylor say that, we

15   wanted kind of a zero-zero agreement where we're all using

16   each other's patents and no one pays anything.  That would

17   have been a great deal for Microsoft, because their Android

18   patents, we didn't infringe them.  That's what the ITC

19   determined.  We did not infringe those patents.  So why would

20   we pay them anything?  So, when you're negotiating all these

21   patents, zero-zero would have been a great result for

22   Microsoft, because Microsoft does infringe our patents, and

23   we're entitled to be paid whatever the reasonable amount of

24   the discriminatory rate is on that.

25       So, when you look at the October letter you've got to ask

1    yourself, was this something that was staged by Motorola to

2    get some advantage to try to get hold-up?  And what the

3    evidence shows is that it wasn't staged by Motorola to get

4    hold-up, that makes no sense whatsoever.  It's being staged

5    by Microsoft now, because they're trying to put that and

6    freeze that in a point in time and say, forget everything

7    else that happened that would tell you what was really going

8    on there.  Because when you ask yourself, really, just your

9    common sense, what advantage does Motorola get by sending out

10   an offer that Motorola thinks -- intentionally sending out an

11   offer it thinks is outrageous, that's outrageous.

12       Well, you can't get patent hold-up unless someone agrees

13   to do that.  Patent hold-up is getting a value above the

14   incremental value of your patent to the standard.  And the

15   court's not going to give you that.  The court is going to

16   rule that you get a reasonable and non-discriminatory rate,

17   period.  And so sending out that letter, how would that help

18   get an agreement for that high rate?

19       You heard Mr. Harrigan say it was ridiculous, it was

20   unreasonable.  It is not -- if you're a rational person, it's

21   not what you'd send out if you're trying to accomplish

22   hold-up.

23       And we know that it's not the sort of thing that would

24   affect Microsoft.  You heard Mr. Gutierrez actually say, in

25   May of 2013, after all this had taken place, you know, after

1    we had sent those letters, after we had lawsuits,

2    Mr. Gutierrez was asked, "You don't know of any context in

3    which Motorola has taken the position" -- I'm sorry, Ken, 7.

4    That's a good one, but I'll get back to it in just a second.

5    "It's true that, though, as of May 20, 2013, you could not

6    think of any circumstance in which Microsoft would make a

7    counteroffer that was higher than Microsoft thought the

8    patents were actually worth?"  He said, "That's correct.  We

9    wouldn't volunteer to overpay."  He says this in May of 2013,

10   after all of this had taken place.

11       Motorola would never expect Microsoft to say, oh, you're

12   asking for the sun, the moon, and the stars, and therefore

13   we're going to give you the moon.  That is not what one would

14   expect in this industry.  There would be no reason for

15   Motorola to intentionally send out an outrageous offer if it

16   thought -- if its goal was to get hold-up.

17       So then you look, okay, what's the other way it's going to

18   have an effect?  And you heard Mr. Harrigan say, well, this

19   was to clear the way so that Motorola could sue, so Motorola

20   could sue and get more than the reasonable and

21   non-discriminatory rate.  And the problem with that is a

22   court won't give you that.

23       And think to yourself:  Okay.  Rational person.  I'm

24   setting up a lawsuit so I can go in and say, Your Honor,

25   they're refusing to pay what I said was a reasonable and

1   non-discriminatory rate.  Here it is.  And what would their

2   response be?  It would be the response you've seen here,

3   where they do multiplication and show you wads of dollars and

4   say, look how ridiculous this is, and look how this compares

5   to the price of a computer, and look at the royalty stacking

6   and all of this.  That's what would happen.  It doesn't give

7   you any advantage to be unreasonable before going to court.

8        I mean, you're going to be asked was Mr. Dailey and Mr.

9   Taylor, were they doing what they could under the

10  circumstances, responding reasonably, under that context, in

11  good faith?  Or were they trying to set up a lawsuit so that

12  they would come in here and be ridiculed?  It is not behavior

13  that you would use if you're trying to get some advantage in

14  a lawsuit.

15       And, finally, Mr. Harrigan said that, well, it paves the

16  way for a lawsuit.  And the question is, how would it pave

17  the way?  It was suggested in some of the questioning that,

18  well, you know, Motorola had its own internal policy that it

19  would sit down and offer before suing.  And that's true.

20  Mr. Dailey testified to that, that was the standard practice

21  through the years.  "Now, your practice was that you would

22  not have filed a lawsuit on standards-essential patents

23  without first making an offer?"  He said, "Our practice is to

24  negotiate and not litigate unless we can find no good result

25  in the negotiation."  That's the standard practice.

1    We've been sued now.  And so Microsoft is saying the

2    reason we sent out the offer was so that we can check off our

3    internal checklist, so offer, then sue.  There's no evidence

4    of that.  You are expected to sue when you are sued.  That's

5    what Mr. Gutierrez said.

6        And did we ever -- here's really what, and this is where

7    I'm going to bring this back up, because I liked it, but Ken

8    brought it up too soon -- is that, did Motorola ever go into

9    these lawsuits and say, hey, lookie here, we made this offer

10   and therefore that entitles us to sue?  No.  And that's what

11   Ken brought up earlier.  I asked Mr. Gutierrez, "You don't

12   know of any context in which Motorola has taken the position

13   that because it sent out these October letters, that gave

14   them the right to sue Microsoft for an injunction or for

15   damages.  You know of no context in which that's the case?"

16   The answer is, "No."

17       So the evidence is compelling, if you do the hypotheses,

18   was Motorola trying to send out these offers to get hold-up?

19   The answer is no.  It would have been irrational to send out

20   those letters for that purpose.  What Motorola expected was

21   negotiation.  That's what, by the way, the standards-setting

22   organizations expect.

23       Exhibit 38, you saw the contracts with the

24   standards-setting organizations where it says, "Negotiations

25   are left to the parties concerned and are performed outside

1   the organizations."  A good illustration is what happened

2   with Marvell.  What happened with Marvell when Motorola sent

3   out its offer, its 2.25 percent?  Marvell came back and said,

4   you know, we have standards-essential patents, too.  We said,

5   that's great, let's talk about that.  And we said, let's look

6   at your claim charts.  They said, okay, we'll give you our

7   claim charts.  They didn't.  I mean, they dropped it, as I'll

8   discuss later, because they were only doing it because

9   Microsoft had a loaded gun to their heads, unlike one that

10  would just shoot out a flag that says "Boo."

11      But that's what we expected, what Marvell did, which is

12  you negotiate.  We learn about your business.  We learn about

13  what makes sense.  We learn about your products.  We learn

14  about how this technology affects you.

15      And what happened here -- and this is from

16  Mr. Gutierrez -- is undisputed.  When you look at the

17  instructions it's going to say, did this frustrate the

18  purpose of the contract?  That's one of the things you're

19  going to be asked.  It did not frustrate the purpose of the

20  contract, because as Mr. Gutierrez said, what happened when

21  these letters went out is we had bilateral negotiations that

22  encompassed these patents.  They weren't singled out.  It

23  wasn't like Motorola was saying, hey, look here, we're

24  insisting on this.  But bilateral negotiations went forward.

25      If we could play -- I think this was played during the

1  trial for you -- and so it's Slide 13.  This is

2  Mr. Gutierrez.

3      (Mr. Gutierrez's video deposition was played as follows:)

4          "Question:  Mr. Gutierrez, given your experience as

5  to how these negotiations typically proceed, you know, is it

6  your understanding that in instances where a potential

7  licensor says this offer is open for 'X' number of days, is

8  it your understanding that that somehow prevents Microsoft

9  from making an offer after that 20 days?

10      "Answer:  No, it doesn't prevent the other party from

11  making an offer.  But, in fact, we were having -- in parallel

12  with these discussions, with the receipt of these letters --

13  we were having licensing discussions of a broader scope that

14  would have encompassed the subject matter of these letters.

15      "And I think it's noteworthy that in the context of those

16  conversations these particular set of patents and

17  technologies were never raised by Motorola as the focus of

18  their dialogue with us.  Instead, in our multiple meetings,

19  at executive levels and others, they were really focused

20  elsewhere in terms of trying to resolve the disputes between

21  the two parties, generally.  And these topics were never a

22  priority for them in terms of trying to address them.

23      "And we were having licensing discussions, even on the

24  same day in which the first letter was received on October

25  22nd, there was a face-to-face meeting between the general

 1    counsels of both companies, and Mr. Kirk Dailey and myself,

 2    where we discussed these -- the overall patent dispute

 3    between the parties and the desire to move forward.

 4        "So, the letter has to be looked at in the context of the

 5    realities of the dynamic of the engagement between the two

 6    companies at that time.  And we received no signal from

 7    Motorola that this was really a matter that they wanted to

 8    handle as a separate-track negotiation, apart from the

 9    overall discussions that we were having."

10                (The videotape excerpt concluded.)

11            MR. PRICE:  The context of the reality of the

12    engagement is how you have to look at these orders.  There

13    was a track that encompassed all the patents.  Hopefully

14    getting to zero-zero, which as I said, would have been a good

15    deal, that did not frustrate the purposes of the RAND

16    obligation.  What happened is the parties did have

17    discussions.  It was after, however, the litigation staging,

18    which I'm going to talk to in a second.  Because what

19    happened immediately after sending that letter is on October

20    22nd there was a meeting between Mr. Gutierrez and Mr. Dailey

21    and the two general counsel.  And did Mr. Dailey or anyone

22    say, this is outrageous.  Or, hey, why would it be in our end

23    product?  Or, do you know how many people there are out there

24    who have patents on the standard?  Or anything they said to

25    you today?  No.  He said, he joked, "We got your missive."

1    They had a discussion, and that was it.

2        And Professor Murphy says, oh, it wouldn't have been

3    rational for them to say anything.  And, folks, it doesn't

4    cost anything when you're meeting with someone face-to-face

5    to simply say, we disagree; or simply say, this is

6    outrageous, we think; or simply say, we want more time to

7    respond; or simply say, guys, you guys are crazy.  We're

8    going to have to talk on a different level here if we're

9    going to talk at all.  It doesn't cost anything.  And from

10   the time those letters were sent until November 9th, in that

11   timeframe -- Ken, if we can put up the --

12       From October 22nd until November 9th, in that timeframe

13   there wasn't a peep from Microsoft about those letters.

14   There wasn't a call saying, that's outrageous.  There wasn't

15   a call saying, you violated the law.  They called us right

16   after suing October 1st, they said they had like three or

17   four calls, you know, at different levels.  They called us

18   after suing November 9th.  They didn't call at all between

19   October 22nd and November 9th, because they weren't

20   interested in actually talking at that point.  They were

21   interested in setting up the stage for their overall

22   litigation.  Because, remember, they anticipated, they knew

23   we were going to sue on those patents.  Mr. Gutierrez says

24   they knew from the beginning.  That's their six-month

25   analysis as to what's going to happen.  So they know we're

 1    going to sue.  It's a standard custom and practice.  They set

 2    this up so they could sue a day earlier.

 3         And, by the way, when they sue -- as I said, they sued

 4    here, and they didn't, again, say, we will pay any RAND

 5    royalty rate.  They didn't say that, you know.  So you've got

 6    to ask yourself, why did they sue here?  Well, it's the

 7    Western District of Washington.  It's Seattle.  Welcome to

 8    Seattle.  Where, of course, Microsoft is located.  Motorola

 9    sued in other districts, closer to where Motorola was

10    located, and also in the ITC.

11         So, there's litigation strategy going on here.  But the

12    November 9th lawsuit has nothing to do with saying:  We admit

13    we're using your patents; we admit we infringe; we admit

14    they're valid; we will pay you what the court says.  We never

15    got that.  We had to fight for that.  And fought for it we

16    did when we filed the November 10th lawsuit.

17         Now, two things:  Microsoft now pretends that this was

18    outrageous, the negotiations that took place after that, and

19    you heard testimony on them from Mr. Gutierrez.  Those were

20    bilateral negotiations trying to come to a resolution.  Those

21    negotiations are not a violation of RAND obligations.  We

22    know that because that's what Microsoft told the FTC in June

23    of 2011, after all this took place in November, after the

24    lawsuits, after the ITC lawsuit.  What happens after all of

25    that?  Well, Microsoft is making representations to the FTC

 1    as to what patent hold-up is.  And what sorts of things you

 2    should be concerned about in patent hold-up.

 3        And if we can put up, I think it's 2970, it's

 4    Exhibit 2970.  And, by the way, when you look at that back

 5    there, this is telling you what Microsoft thought the custom

 6    and practice was in the industry, what they thought it was,

 7    what they thought was reasonable in June of 2011.  And this

 8    is after all those lawsuits are filed, before the German

 9    lawsuit, which we'll get to, but after the lawsuits Motorola

10    filed in November.

11        And the first page of it is June 14, 2011, sent to the

12    commissioners of the FTC and the staff.  You're going to get

13    a version which is redacted.  The stuff we didn't read into

14    the evidence is blacked out, because we want you to focus on

15    what's relevant to this trial and not for other issues.  So,

16    when you look at it you're going to see lots of black or

17    white spaces, I'm not exactly sure exactly how it was done.

18    But among the things that Microsoft said, and this is -- if

19    we can get to page 49 here -- "Concerns about patent hold-up

20    should not extend to any bilateral business disagreement

21    between two companies regarding proposed licensing terms.

22    These discussions typically pertain to a broader set of

23    questions than just the proposed licensing terms for

24    essential patent claims reading on a standard."

25        And that's the situation that was taking place after those

1    lawsuits were filed.  We had business negotiations from

2    November until June and July, in which we were talking about

3    trying to come to a resolution that would encompass

4    everything.  And that is not patent hold-up.

5        The fact that we did that, the fact that Motorola did that

6    is proof that we weren't trying to engage in patent hold-up

7    when we sent out the October letters.  We were doing what is

8    customary, standard in the industry, and viewed as actually

9    the furthest thing from patent hold-up.

10       The second thing.  When we filed those lawsuits in

11   November, that was in response to Microsoft suing us and

12   saying, we know you're going to sue.  Put your patents on the

13   table.  You've heard evidence that Motorola, with respect to

14   these patents, the WiFi patents, the video compression, you

15   know, didn't actively go out and seek compensation just for

16   those patent portfolios.

17       I think yesterday Mr. Leonard was presented with a few

18   letters from 2003, before our patent portfolio got bigger

19   because we took over another company, in which there might

20   have been attempts to market these portfolios.  But basically

21   Motorola had never come to Microsoft, had not gone around and

22   tried to monetize, tried to use these portfolios.  What they

23   did was use them defensively in this case.  And Microsoft

24   will tell you, as they told the FTC in June of 2011, that

25   when you do that, when you're using your portfolio

 1    defensively, that is the farthest thing from patent hold-up.

 2              THE COURT:  Mr. Price, you've used 60 of 90.

 3              MR. PRICE:  Thanks.  Thank you.

 4         Here we go.  This is at page 7.  Again, this is June 2011.

 5    "Depending on the applicable business model, many companies

 6    largely use their patents vis-a-vis standards defensively.

 7    Far from seeking to 'hold up' implementers, these firms will

 8    not seek patent royalties at all in the ordinary course of

 9    business.  Rather, they will seek a patent license from an

10    implementer only when that implementer has first challenged

11    them on other patent infringement issues."  That is defensive

12    use of their patents.  And Microsoft recognizes that.  And

13    what did they tell you that was thought of in the industry at

14    the time, in June?  And that is, that that is far from

15    seeking a patent hold-up.

16         What happened in November wasn't seeking a patent hold-up.

17    What happened in November was we had to try to jump through

18    the hoops to get Microsoft to agree that they owed us

19    anything.  To go back to the timeline.  Those were the

20    lawsuits on November 10th we filed in the Western District of

21    Illinois.  And you see we filed in the ITC on November 22nd.

22    And that was to get an exclusion order.  If it was found that

23    Microsoft was infringing our patents, the patents were valid,

24    and Microsoft's defense was, we're entitled to a license

25    under a RAND rate, they can bring that defense up in those

1    lawsuits.

2        That's kind of the customary practice in these lawsuits.

3    Because if you're sued you can say, if I have to pay

4    anything, if you find out that I am infringing, then I can't

5    pay more than RAND.  And if I pay more than RAND, I can't get

6    an injunction.  Those are defenses permitted in those

7    lawsuits.  And, in fact, Microsoft was researching those

8    defenses in those lawsuits.  So they're not worried about, as

9    they were -- remember that graph with all those companies?

10   Anyone could come forward and say, we want to prevent you

11   from doing this, we want an outrageous royalty.  They're not

12   worried about that because the court wouldn't allow that to

13   happen.

14       But what we need to establish is that they are infringing

15   our patents and the patents are valid.  And Microsoft, in all

16   these lawsuits, far from saying, oh, we'll pay whatever RAND

17   rate is determined, said, you don't deserve a penny.  You

18   don't deserve a penny because your patents aren't any good

19   and because we don't infringe.

20       There was this gap -- not a gap -- but between November

21   and June/July there were discussions on trying to resolve

22   this.  These were the discussions Mr. Gutierrez talked about.

23   Again, this was anticipated by Microsoft.  And if we show the

24   timeline.  Remember, you heard testimony that there were term

25   sheets that were exchanged, that information was exchanged,

1    that we had high-level meetings, that we had discussions

2    about specific terms, multiple meetings at executive levels,

3    term sheets?  All of this took place in good faith, from

4    Motorola, from the time those lawsuits were filed.  And they

5    went on and on, until in June or July of 2011 it became clear

6    there was not going to be agreement between the companies.

7    Microsoft was insisting on being paid $5 a phone, $10 a

8    tablet, on those Android patents, the ones that it was found

9    that Motorola did not infringe.

10        Mr. Gutierrez testified that prior to the German action he

11   does not know of a single time when Microsoft offered

12   Motorola a RAND rate on Motorola's patents.  And so in that

13   context Motorola filed the lawsuit in Germany.  And is this

14   part of some plan to try to get excess value from Microsoft?

15   No.  Because if you look at the timeline, this is July of

16   2011.  This is eight months after the lawsuits were filed in

17   the U.S.  This was after there was discussion, after there

18   was negotiation.

19        And the reason that Motorola has to file in Germany, by

20   the way, is that it is a big economy, and no matter what this

21   court says a RAND royalty rate is, if Microsoft isn't

22   admitting that it's infringing the patents and that they're

23   valid, they don't have to pay it.  Motorola's only rights

24   against Microsoft are through its patents.  They're the only

25   rights they have.  And unless Microsoft says, yes, we're

 1    using that technology, we're infringing your patents, they

 2    don't have to pay us a cent.  And they were still

 3    maintaining, we aren't required to pay you a cent.  So even

 4    if a worldwide RAND royalty is set, we have to go to Germany

 5    to have them say, on these European patents they are valid,

 6    we infringed, and therefore we'll pay.  And they hadn't done

 7    that.  They hadn't come to the table with a RAND rate.  They

 8    hadn't come to the table saying that, we acknowledge that

 9    your patents are good and that we infringed them.

10        And Microsoft will tell you that suing and seeking an

11    injunction at that time was considered, this is a way to get

12    to that RAND rate and to get to that admission that there is,

13    in fact, infringement, and that you've got to pay something.

14        So, in fact, if we go to, again, the June 11, 2011 letter.

15    Again, this is after we sued in the ITC and after we sued

16    here, saying that, Microsoft, you infringed, you owe us

17    money.  We have this in front of you.  This is at page 13

18    where Microsoft says, "In addition, the existence of a RAND

19    commitment to offer patent licenses should not preclude a

20    patentholder from seeking preliminary injunctive relief or

21    commencing an action in the International Trade Commission,

22    just because the patentholder has made a licensing commitment

23    to offer RAND-based licenses in connection with a standard."

24    So they're saying that their understanding in 2011 is that

25    the existence of a RAND commitment doesn't prevent you from

1    seeking an injunction.

2        Now, whether you'll get the injunction depends upon the

3    law of the jurisdiction.  And they go on to say that,

4    "Whether such relief is available should be assessed under

5    the current legal framework in the applicable jurisdiction

6    which often is premised substantially on specific facts and

7    circumstances at issue."  And here is the key part, "Any

8    uniform declaration that such relief would not be available

9    if the patentholder has made a commitment to offer a RAND

10   license for its essential-patent claims in connection with a

11   standard, may reduce any incentives that implementers might

12   have to engage in good-faith negotiations with the

13   patentholder."

14       Microsoft acknowledges that you can use an injunction and

15   you may have to use an injunction to get someone like

16   Microsoft, the implementer, to come forward and say, yes, we

17   do infringe.  Yes, your patents are valid.  Yes, we will pay

18   RAND.  We will pay what the court determines.  And that

19   hadn't been accomplished as of the time that lawsuit was

20   filed in Germany.

21       And Germany, by the way, wasn't selected because of the

22   distribution center there.  You heard Professor Haedicke

23   explain to you that two-thirds of all patent lawsuits in

24   Europe are filed in Germany, because they have specialized

25   courts, because they are efficient.  And, yes, because they

```
 1    are cheaper.  And you've gotten the idea, because of the
 2    damages figures that are used here, that it can be expensive
 3    to litigate these cases.  So that's where two-thirds of all
 4    companies sue for European patents, is in Germany.  And
 5    that's why we went there.  And it's only because we went
 6    there that Microsoft finally came forward and said, to this
 7    court, okay, we'll be committed -- we will be bound by the
 8    RAND rate.
 9        Now, in Germany -- by the way, Microsoft did not, again,
10    admit that our patents were any good or that they used our
11    technology.  They didn't admit they were standards essential.
12    They fought that.  The court had to determine that they
13    infringed, after a trial.  That's what they put us through,
14    instead of saying, "We admit we infringe.  We admit the
15    patents are valid."
16        Here is the timeline of the lawsuit in Germany.  We filed
17    July of 2011, again, because Microsoft has not come to the
18    table, has never given a RAND offer, has never said, we'll
19    pay RAND.  Now, if you look at the timeline here, Microsoft
20    says they came into this court and finally said that they
21    were committed to pay RAND.  But it wasn't until April 12,
22    2012, April and May.  Now, at this point things are getting
23    pretty formalistic between the two companies.  We want them
24    to come here and say that they're going to pay RAND.
25        And you remember that May 2nd, 2012 order of the court?
```

1    It's in that timeframe that Microsoft came before this court

2    and the court said, I'm going to hold you to that promise.

3    I'm holding you, Microsoft, to that promise.  And in that

4    context, and only in that context, did this court say, okay,

5    we don't need the German injunction.  Because Microsoft was,

6    at that point, being held to a commitment to pay RAND.

7        Now, with respect to what, if anything, was caused by

8    this, whether or not there was any -- whether or not

9    Microsoft moved as a result of this, just look at the

10   timeline.  The lawsuit's filed July 6, 2011.  You've heard

11   Microsoft's counsel, Ms. McKinley, say, we know injunctions

12   are easily granted in Germany.  We know that that's a problem

13   for any company.

14       So, Microsoft waited six months, until January 2012,

15   before it says it considered moving out of Germany.  Now, you

16   might ask yourself, why would they wait?  And we asked

17   Mr. Roberts that.  And he said, I don't know.  I don't know

18   what's going on.  What we do know is that beginning in August

19   of 2011, right after this was filed, we know that Microsoft

20   was researching whether or not it would come into this court

21   and say, we're committing to RAND now, we're committing that

22   we will pay whatever you determine RAND to be.  We want you

23   to stop this.

24       And if you look -- I don't have the blow-up -- but if you

25   look at Exhibit 6577, it's a 230-page exhibit, and page 2318,

 1    there is an entry in August of 2011 where Microsoft is doing

 2    the research in August of 2011 about whether or not they can

 3    move.  And then they decide to move.  If you look at

 4    March 2012, they decide to move.  And then, and only then, do

 5    they come to this court and say, "Your Honor, you need to

 6    stop this because we've actually committed to paying RAND.

 7    We don't care what the rate is."  They wait eight months for

 8    that.  They decide to move and then they come here.

 9         Remember when I talked to you about staged litigation?

10    This is staged.  What happened is that Microsoft concluded

11    it's not a good idea to be in Germany.  The German courts

12    easily grant injunctions.  Two-thirds of patent suits are

13    filed here.  And you heard Ms. McKinley say, that's actually

14    what we told the business people.

15         And let's do Slide 61, Ken.

16    "Question:  In advising the client were you -- was it also

17    your responsibility to advise them as to the effect this move

18    would have on the distribution center, you know, in terms of

19    the future business, in terms of future activity?

20         "Answer:  So, we knew that injunctions are -- are frequent

21    in Germany.  And we -- I would have advised the business on

22    that.

23         "Question:  And why would that have had any application to

24    future business?

25         "Answer:  Having -- having your global logistics tied up

1   in Germany is -- foreseeably puts you in a situation in other

2   cases.

3       "Question:  Why would having your global logistics tied up

4   in Germany -- in Germany, put you at risk or have an effect

5   on future cases?

6       "Answer:  I think I've answered that.  That's -- again, I

7   -- my understanding is, Germans are -- injunctions are

8   frequent in patent-infringement cases in Germany."

9       So when you go back to this timeline, what you see

10  happening here is Microsoft realizes we shouldn't be here

11  because of the future, because these injunctions are easily

12  granted.  And that could affect us if we have a distribution

13  center here.

14      And so they research that in July.  They don't go and tell

15  the business unit anything about it for six months.  They

16  don't go to this court until after they've already decided to

17  move out of Germany, when they could have gone right away.

18  And that's because they thought, well, this is a good way to

19  get paid for our move.  That's a good idea for us to do,

20  anyway.  Because, otherwise, they would have gone in right

21  away.  And they didn't.

22      And that move to Germany, by the way, did bring benefits.

23  You know there were these calculations about damages?  And

24  you heard instructions that we have the duty to prove

25  mitigation.  That is, they should have done something

1    cheaper.  But what I want to talk to you about now is not

2    mitigation, it is what is the actual damage.  When you look

3    at damages, you have to look at benefits also.  You have to

4    weigh the pluses and the minuses.  So, on the one hand, they

5    moved because of a general threat, not this case, but because

6    their attorneys realized, we shouldn't have our center in

7    Germany.  But we can charge Motorola for it.

8        And also there are benefits.  You saw the letter from

9    Ms. Daly where she talks about the move as a vision for the

10   future.  And she has that graph which has the figures on the

11   German facility, and the new facility, and how it is bigger,

12   and how it is better for what Microsoft needs in the future.

13       And they brought in Mr. Davidson.  And you recall,

14   Mr. Davidson was a little bit less than honest about this

15   e-mail.  He said, you know, that the e-mail was not correct

16   in terms of the figures.  And he said also that he had never

17   discussed the e-mail with Ms. Daly.  And, of course, what

18   Ms. Daly told you, if we can play 30.

19       (Ms. Daly's video deposition was played as follows:)

20

21   "Question:  When Mr. Roberts reviewed the e-mail and

22   before you sent it, did he have any comments or edits to the

23   e-mail.

24   "Answer:  Owen Roberts reviewed it and Jeff Davidson, both

25   reviewed it.

1    "Question:  Okay.  Thank you.

2    "Answer:  Jeff Davidson supplied the facts and figures and

3    the photographs.

4    "Question:  I'm sorry?

5    "Answer:  Jeff Davidson supplied the facts and figures and

6    the photographs that are attached."

7         (The video deposition testimony concluded.)

8    Q   So there were benefits in moving from Germany.  And their

9    actions don't support that they moved because of this case.

10   They waited and waited so they could make the case, that's

11   why they moved.  But their attorney tells them for future

12   cases as well, you just don't want to be here.

13        Let's step back and look, then, at what Microsoft

14   really thought of all these actions by Motorola.  Remember

15   that June 2nd letter to the FTC where they say, this is how

16   we view the world in patent hold-up?  Well, there are two

17   paragraphs we read in for you.  This is Mr. Heiner.  Go to

18   50.  Remember there were these two paragraphs where they say,

19   "We suggest that a simplified and theoretical approach to

20   finding patent hold-up may not sufficiently map to complex

21   marketplace realities."  And they go on to say, "It may pull

22   in what are essentially routine business negotiations between

23   two parties."  It talks about how they consider broad

24   licensing terms, not just royalty elements.  That's what

25   happened here.

1        They go on to say that these types of negotiations

2   shouldn't be labeled as patent hold-up.  They go on to say

3   there's an important difference between intentional or

4   deceptive conduct in connection with patents that read on

5   standards, and routine bilateral disagreements over licensing

6   terms.

7        And then what do they say?  Now, this is after we've

8   sued in the ITC and after we've sued saying, you infringed

9   our patents, you should pay us.  They go on to say in the

10  very next paragraph:  In the former context -- and that's

11  intentional and deceptive conduct.  And Microsoft is accusing

12  Motorola of intentional conduct -- there seems to be a dearth

13  of examples of actual patent hold-up with regard to the

14  essential patent claims reading on a standard.  Microsoft has

15  never been accused of patent hold-up in this regard, nor has

16  it accused any other company of such behavior.  This is not

17  to say that Microsoft has never been a party to litigation

18  where the parties disagree whether proffered licensing terms

19  were consistent with the relevant patent licensing

20  commitment, such as RAND.  And when they have those

21  disagreements it may make sense for them to seek resolution

22  in the courts.

23        But their view as of that time, after we filed our

24  lawsuits in the ITC, and after the lawsuit here, was that's

25  not patent hold-up.  It ended up in a disagreement, and we

1    had bilateral negotiations.  And the explanation Mr. Heiner

2    gave you is simply, oh, I didn't mean for this to include

3    that.  "Intentional" only included hiding a patent.  And

4    there is nothing anywhere in this letter that defines patent

5    hold-up as hiding a patent.

6              THE COURT:  Mr. Price, you're a little under ten

7    minutes.

8              MR. PRICE:  Thank you.

9         That's how Microsoft saw the world.  And in connection

10   with staging.  Staging for you as opposed to staging

11   litigation as to what the real world is like, I want you to

12   consider two things.  One, the evidence about the FTC.  You

13   heard that there is an FTC "complaint."  Well, I think the

14   court instructed you that that doesn't mean the same thing as

15   a complaint like here in a lawsuit.  It is basically, we are

16   starting an investigation into an allegation.  It's an

17   allegation which the court told you you cannot accept for the

18   truth, because it is simply an investigation.  Microsoft

19   wants you to think that the allegations are, in fact, true.

20        Now, if you look at the timing of that FTC investigation,

21   what do we have?  And this is Slide 33.  What we have is it

22   was because Microsoft called -- I was going to say I'm

23   dyslexic, but that would still be 33 -- but what Mr. Heiner

24   testified to is that Microsoft called the FTC and said, "We

25   have a complaint that we want you to look into."  And what

1    was the timing of this?  Why was Microsoft doing that?  Is it

2    because of all this stuff that Motorola had been doing?  No.

3    It's because, if you look at the timing -- and I'll cross my

4    fingers, let's try 34 -- yes.  Okay?  Is it fair to say that

5    Microsoft was doing quite a bit of lobbying?  And they have a

6    government affairs office.  And those agencies include the

7    FTC.

8         And the second one, which I know must not be 34, the

9    second one was, the timing of this was, it was when Google,

10   Microsoft's, one of their big competitors, it's when Google's

11   acquisition of Motorola was about to close.  And this is in

12   May of 2012.  Where was Microsoft?  Why weren't they

13   complaining before that?  Why weren't they complaining

14   throughout this?  This is, again, staged.  It's a staged

15   presentation to try to get you to think there is something

16   wrong going on here.  They go to the FTC and complain.  The

17   FTC investigates.  And the reason they go is because, well,

18   Google is about to acquire Motorola.  And Google is their

19   chief competitor.

20        The second bit of wonderful staging is the Marvell

21   situation.  Now, if you remember the timeline -- if we can go

22   to timeline, 35 -- this is a timeline concerning Marvell.

23   And in November 2004 Microsoft started buying chips from

24   Marvell.  Motorola never requested that Marvell take a

25   license.  And then on November 24, 2010 -- this is

1   November 24th, this is after Microsoft has filed its

2   complaint, November 9th, and Motorola filed its complaint.

3   It's the same month.  They demand for the first time that

4   Marvell obtain a RAND license.  What they say to them in that

5   demand on November 24, 2010 is, you have to indemnify us if

6   we lose.  That is, all these horrors that Microsoft has

7   talked to you about that was visited upon them because of

8   Motorola's lawsuits, Microsoft goes to Marvell and says,

9   you're going to have to reimburse us for everything,

10  indemnify, unless you go out and get a license from Motorola.

11      And so with that gun to their head, Marvell finally asked

12  Motorola for a RAND license.  And the reason they asked, Ms.

13  Ochs testified, the only reason they asked was because

14  Microsoft said, if you don't do that, you're going to have to

15  indemnify us and pay us any damages that we have to pay to

16  Motorola because we're infringing their patents.

17      But what happened, what this inadvertently showed, was

18  what the industry expects and what Motorola expected from the

19  beginning, which is that there would be negotiations.  What

20  happened is Motorola said, we'll meet with you.  Marvell

21  responds June 26, 2012 saying, here's a counteroffer with a

22  zero-zero, basically, result.  And they said, we have

23  patents.  Marvell said, we have standards-essential patents,

24  so let's compare them.  And we say, okay, that's fine.  Send

25  us the claim charts.  Again, that's standard practice.  And

 1    Marvell says, we'll send you those.  We're working on them.

 2    We'll get it to you right away.  And that was June 26, 2012,

 3    and we haven't gotten them yet.  And the reason we haven't

 4    gotten them yet is just because this, again, is just

 5    stage-crafting.  This is just Microsoft trying to present, in

 6    this case here, a suggestion that there was something wrong

 7    here, by creating the situation with Marvell.

 8        And remember during the trial they also said, oh, and it

 9    was terrible that in our licensing negotiations we had this

10    defensive suspension provision which said, "Marvell, we'll

11    give you a license, but it won't apply to Apple and Gemalto

12    and Microsoft."  And Microsoft said, oh, there's something

13    wrong with that.  That's a violation of FRAND.

14        And Ms. Ochs, when she testified during deposition --

15    Mr. Palumbo did the examination here, playing himself --

16    said, this is 537, said, "Typically, in the context of

17    entering into a standards body with other competitors, or

18    even in agreements like this, there is a provision whereby if

19    the other party initiates an action against you, you may

20    suspend or somehow modify the RAND obligation."

21        She is talking about this defensive suspension issue that

22    if you're sued and then someone asks you for a license, you

23    know, that you could arguably say the person who sued you

24    doesn't have any obligation to you, you can say, well, it

25    won't apply to them.  When you look at that June 11, 2011

1    letter that Microsoft sent to the FTC, they discuss this

2    practice and say, this is part of standard business

3    negotiations.  And that's at page -- here we go, page 52,

4    Slide 52, page 6.  And Microsoft talks about oversimplifying

5    this analysis of standards-essential patents.

6         And if you look at the last bullet point down there,

7    actually, it's a sub-bullet point.  "Companies who are

8    willing to offer their essential patents free of charge,"

9    which is what we were doing with Marvell, "they include a

10   defensive suspension clause that causes that free license to

11   terminate if the licensee commences litigation against the

12   licensor without any grounds whatsoever."

13        And on the next page, the following page, you saw the

14   paragraph where Microsoft says, you know, the problem is that

15   this theoretical approach to patent hold-up -- and you've

16   heard the theoretical approach from Professor Murphy --

17   doesn't sufficiently map the complex marketplace realities

18   and pulls in what are essentially routine business

19   negotiations between the two parties.

20             THE COURT:  Hard stop at a minute and a half,

21   counsel.

22             MR. PRICE:  Thank you.  Ladies and gentlemen, in

23   response to Microsoft's lawsuit, Motorola did what was

24   standard and custom, the customary practice in the industry.

25   They responded.  They thought there would be further

1    negotiations.  And there was, by the way.  When you look at

2    damages, one of the instructions that you get, did anything

3    that Motorola did wrong cause harm?  It didn't.  Because

4    those negotiations continued.  The problem is that

5    Mr. Gutierrez testified Motorola never came up to a RAND,

6    even offer, until we finally had to go to Germany.  And then

7    Microsoft said, we don't infringe your patents.  And finally,

8    because the threat of injunction, they came here and said,

9    "We will commit to paying a RAND rate.  We will commit."

10   And, of course, that determination was made by the judge.

11       This lawsuit is simply trying to apply more pressure to

12   Motorola, now owned by Google, trying to get an advantage in

13   this bigger picture, in this bigger fight about what kind of

14   software is going to be on your phone.

15       So I request, obviously, that you -- and I'm glad that

16   you've actually listened to the evidence carefully.  I know

17   you're going to go back there and talk about the evidence and

18   talk about the dynamics of the negotiations --

19            THE COURT:  You're out of time.

20            MR. PRICE:  -- and do the right thing.

21            THE COURT:  Thank you.

22       Mr. Harrigan, you have 21 minutes, excuse me, 23 minutes.

23            MR. HARRIGAN:  Thank you, Your Honor.  Hopefully my

24   battery will last that long.

25       I will do this in no particular order.  I've been typing

1   as fast as I can.  One of the arguments that you just heard

2   is that Microsoft's complaint in this Microsoft lawsuit, in

3   this court, would not solve the problem.  Well, that's

4   incorrect.  It would have solved the problem if Motorola had

5   simply used the opportunity.  If it had not, instead, sought

6   injunctive relief that it didn't need in order to get a RAND

7   royalty.

8        Microsoft asked for an accounting in the complaint.  That

9   means it asked the court to tell both parties how much

10   Microsoft owed once the court decided what RAND was.  So for

11   that reason alone, Motorola could have gotten a RAND royalty

12   and Microsoft would have gotten a license, and none of these

13   other lawsuits would have been necessary.

14        However, it's been suggested that that wasn't enough, that

15   Microsoft needed to say, we will take a license on whatever

16   terms this court decides are RAND.  And Microsoft did that

17   very thing on September 30, 2011.  Now, counsel has been

18   using a much later document that refers back to that

19   statement by Microsoft.  But that document in 2013 is not

20   when Microsoft made this commitment.  Would you put up Slide

21   No. 1?

22        Okay.  So Mr. Killough testified that -- if you look at

23   the top.  "In its brief that Microsoft filed in this lawsuit

24   on September 30, 2011, did Microsoft tell the court anything

25   regarding a RAND license?"  And he quotes from it down below:

1    "Microsoft is seeking and remains ready and willing to take a

2    license to Motorola's H.264 and 802.11 declared essential

3    patents on RAND terms."  That statement was made to this

4    court.  And from that date forward no one could argue,

5    remotely argue, that Motorola couldn't get RAND and that

6    Microsoft couldn't get a RAND license right here in this

7    court.  All Motorola ever had to do after September 30, 2011,

8    is wait for this court to decide and submit its arguments

9    about what the rate should be.

10       Sixteen months later Motorola was still seeking injunctive

11   relief.  Injunctive relief that its own expert, Mr. Leonard,

12   says is unnecessary.  Money is all they're entitled to.  And

13   they could have gotten it all right here.  And that situation

14   existed during the 16 months that they were still trying to

15   get injunctions in the ITC and in Germany.

16       In fact, there's no reason to file an action in the ITC if

17   what you want is a reasonable royalty.  The ITC doesn't award

18   royalties.  The only thing the ITC can do is give injunctive

19   relief.  That's what Motorola was interested in, because it

20   wanted to hold its standards-essential patents hostage so it

21   could get leverage in the other negotiations that were going

22   on.  And that is bad faith and it is a breach of the RAND

23   commitment.

24       Now, you also might want to ask the question, why did

25   Motorola go to Germany?  And it's been suggested to you that

```
 1    Microsoft -- that Motorola couldn't have gotten an injunction
 2    unless some court determined that Microsoft wouldn't take a
 3    license on RAND terms.  That is absolutely incorrect.  You
 4    recall Mr. Haedicke, the German law expert, he was asked this
 5    question:
 6        "Do German courts recognize the concept of RAND?
 7        "Answer:  No, they don't."
 8        Germany -- basically the German courts basically say, do
 9    you have a license?  And if the answer is no, you get
10    enjoined.
11        And they do not determine whether Motorola had honored its
12    RAND commitment, as this court did -- I should say this court
13    determined what RAND really was.  That would have been the
14    basis for the license.  And there was no need for Motorola to
15    be going to a jurisdiction that doesn't recognize RAND in
16    order to get injunctive relief, which was unnecessary if it
17    simply wanted a RAND royalty.
18        And, of course, the other benefit of going to Germany was
19    the amount of leverage that it got.  Because the German
20    distribution center was sending products to a large portion
21    of the globe, and it gave Motorola a real hammer in getting
22    Microsoft to cave in on the negotiations with respect to the
23    rest of the patent portfolio.
24        The other thing that's important here is that starting --
25    that Motorola was still seeking injunctive relief in the ITC
```

1    until January of 2013.  And yet, beginning in May of 2012, it

2    knew that the FTC believed that its conduct amounted to

3    reneging on its RAND commitment.

4         MR. PRICE:  Your Honor, I object.  That's a misuse of

5    the FTC documents.

6         THE COURT:  I'll sustain that.  Ladies and gentlemen,

7    disregard the last portion of the argument.

8         MR. HARRIGAN:  What happened here is that the FTC

9    expressed grave concern about Motorola's conduct and a

10   consent decree was entered in January of 2013 between

11   Motorola and the FTC.  And in January 2013 Motorola dropped

12   its exclusion order claims in the ITC.  So those are the

13   facts in evidence.  And the point is that Motorola,

14   regardless of the concerns being expressed by the FTC over

15   the period from May of 2012 until January of 2013, did not

16   alter its course of action.  And with respect to the German

17   situation, it was still hoping that it could get an

18   injunction as late as the end of September of 2012, when the

19   Ninth Circuit finally ruled and upheld this court's ruling

20   that Motorola was barred from enforcing an injunction in

21   Germany.

22        There was some discussion about the Marvell situation.

23   And Motorola argued that something called defensive

24   suspension justified its excluding Microsoft from its Marvell

25   license offer.  But the fact is that defensive suspension

1    only applies where the lawsuit that's filed by the other side

2    is on the same standard.  And Microsoft never filed any such

3    lawsuit.  Defensive suspension has nothing to do with this.

4    What Motorola did, vis-a-vis Marvell, was to demand a royalty

5    that was more than the price of the chip.  And even at that,

6    it excluded Microsoft from the licensees, and that is

7    discriminatory.  And you'll recall that the last two letters

8    of RAND are non-discriminatory.  You cannot discriminate

9    without violating RAND.

10        Have you heard a sensible explanation of the grossly

11   excessive royalty demands in the October letters?  Well, one

12   of them is, that's our usual 2.25 percent.  But we know that

13   that royalty -- the precedent for that royalty is limited to

14   Motorola's cellular phone patents.  Motorola's cellular phone

15   patents are what makes cell phones, cell phones.  They are

16   central to the product.

17        There is no evidence that Motorola had ever gotten

18   anything like 2.25 percent for its H.264 or 802.11 patents.

19   In fact, it had never even tried to license them alone, which

20   is remarkable, since according to Motorola they're worth

21   $4 billion a year, which is the royalty that the demands

22   actually called for.

23        Motorola also knew that the MPEG LA rates were a tiny

24   fraction of what it was seeking for H.264.  That's the patent

25   pool.  Their rates were lower than $0.10 a unit.  And

1    Motorola's demands in its letters were $11.25 for H.264 in a

2    $500 laptop.  That information Motorola had when it wrote the

3    letters.  And it means that Motorola absolutely knew that

4    what it was demanding in those letters was outrageous.

5         In fact, Mr. Bawel, Motorola's representative at MPEG LA,

6    had complained about a royalty of $0.20 and argued that it

7    was, "Too high for mobile," as Mr. Glanz testified.  And yet,

8    $11.25, apparently, isn't.

9         The other thing that is significant here -- and I'd like

10   Slide No. 4 -- Motorola had never before applied a percentage

11   royalty to the customers of the licensee.  And here is the

12   testimony.

13        "Question:  And so is it fair to say that you were asking

14   Microsoft to do something that no other Motorola licensee was

15   doing.  Isn't that true?

16        "Answer:  That's right.  Because we expected to deal with

17   that in negotiations."

18        In other words, you heard the argument that Mr. Dailey

19   just dashed these letters off because he was short on time.

20   But, in fact, he had time to carefully design both of these

21   letters so that -- particularly the H.264 letter -- so the

22   2.25 percent, for the first time in Motorola's history,

23   applied not to the product of Microsoft, but to the product

24   of Microsoft's customer.

25        And the effect of that is enormous.  Because if it had

1   been 2.25 percent of whatever Microsoft gets for the

2   operating system, it would still be outrageous, but at least

3   it would be sensible, even though grossly too high.  But when

4   you apply it to Microsoft's customers' products, where the

5   operating system is exactly the same and does exactly the

6   same thing in every laptop, and the royalty goes from $11.25

7   for a $500 laptop and $22.50 for a $1,000 laptop, you can

8   tell that Motorola was setting out to demand something that

9   no company in its right mind would regard as anything other

10  than a joke.

11      It wanted to send a letter, say it had made an offer, have

12  the offer expire, go to court and seek injunctive relief.  It

13  had no interest in negotiating on these patents.  It had an

14  interest in negotiating on all the other patents and holding

15  these hostage so it could get an advantage in that

16  negotiation.  That is what was going on.  That is why those

17  letters -- the demands in those letters were outrageous.

18  They were designed to be totally unacceptable so you could go

19  to Germany and say, "They don't have a license."  Well,

20  obviously they don't have a license.  They have never gotten

21  a RAND offer.  And that is Motorola's obligation.  Its

22  obligation is to make its standards-essential patents

23  available to everyone on RAND terms.

24      So, you recall the discussion about how Mr. Gutierrez

25  said, well, yeah, we'd expect them to put all their patents

 1   on the table for whatever value they have.  And did that

 2   include standards-essential patents?  Well, sure.  But the

 3   point is, the standards-essential patents have nominal value.

 4   Remember the IEEE requirement for the royalty.  Nominal

 5   competitive costs.  The royalty for a standards-essential

 6   patent has to be reasonable.  And if all you're being -- so

 7   the only -- if you're not going to violate RAND, the only

 8   amount you can put on the table for a standards-essential

 9   patent is something that nobody will have a problem paying.

10   That's how the system is supposed to work.

11   Standards-essential patents are supposed to be no problem to

12   put in your products because you always know you'll be able

13   to use them and pay only a reasonable amount.

14       So, when Mr. Gutierrez has this conversation, of course

15   there's no problem putting standards-essential patents into

16   the mix, we're not going to have to pay much for them.  So

17   the patents that they really were negotiating about were

18   their regular patent portfolios.  And the reason Motorola

19   held the standards-essential patents back was because they're

20   such a good weapon.  And they're such a good weapon because

21   you can't practice the standard without using all of them,

22   even Motorola's sliver.

23       So it's taking the sliver.  It's violating RAND by

24   demanding far more than a reasonable royalty, going to court

25   and saying, no license, and threatening Microsoft with

 1    injunctive relief.  That was the goal.

 2              THE COURT:  Nine minutes, counsel.

 3              MR. HARRIGAN:  How many?

 4              THE COURT:  Nine.

 5              MR. HARRIGAN:  Thank you.

 6        Then there's this entire discussion about the Android

 7    phone patents.  Let's compare these two situations.

 8    Microsoft is asserting a garden-variety regular patent, not a

 9    standards-essential patent, because Motorola was, in fact,

10    infringing one of those patents, at least in its Android

11    phone products.  In fact, the ITC found that Motorola was

12    using one of those patents and that, therefore, it was --

13    Motorola was infringing Microsoft's patent.

14        But have you heard anything in this case that suggests

15    that what Microsoft was asking Motorola to pay for those

16    Android phone patents was unreasonable?  Not a word.  And, of

17    course, if there were any evidence that Microsoft was asking

18    for an unreasonable amount, you would have seen it.

19    Microsoft had no RAND obligation with respect to those

20    Android patents.  Motorola did with respect to its patents.

21        But the fact is that according to the evidence here,

22    Motorola could have solved that problem by simply recognizing

23    it was infringing and paying the reasonable amount that

24    Microsoft was asking for.  And what we know about what

25    Microsoft was asking for is that 80 percent of the companies

1    selling Android phones are in license agreements with

2    Microsoft and are paying royalties.  They're not being

3    overcharged.  In fact, Mr. Gutierrez said, essentially the

4    only outlier is Motorola.  It still has not taken a license.

5    But it could get one for an amount that a whole bunch of

6    other companies are seeing as totally reasonable.  By

7    contrast, Motorola's patents were available only on grossly

8    unreasonable terms.

9         And I'd like to remind you of one other thing, and that is

10   one of the things the court says that you should do or may do

11   in determining whether Motorola's demands, followed by

12   injunctive relief based on lack of a license, is to compare

13   Motorola's demands to the RAND royalty as determined by the

14   court.  That is in the instructions.  "In determining bad

15   faith, you may compare Motorola's demands for a RAND royalty

16   as determined by the court" -- excuse me -- "may compare

17   Motorola's demands to the RAND royalty as determined by the

18   court."

19        In fact, it is now undisputed -- take H.264.  The RAND

20   royalty as determined by the court was one half-a-cent.

21   Motorola's demands for a $500 laptop were $11.25.  So the

22   court is saying you can make that comparison in evaluating

23   whether Motorola was acting in good faith.  And that is

24   probably the single most unequivocal piece of evidence they

25   were not acting in good faith.  There was a lot of other

1    important evidence, like what they actually knew about what

2    their patents were worth.  But when you make that comparison,

3    it's hard to believe that a company as sophisticated as

4    Motorola could accidentally miss RAND by two thousand times.

5    That's what it would have you believe happened with those

6    letters.

7         So I want to mention something about the verdict form,

8    which you will have to fill out at some point, whenever

9    you're ready to do that.  The verdict form says this with

10   regard to -- it poses this question, before you award a

11   specific dollar amount for Microsoft's legal fees.  It says,

12   "Do you find that Motorola's conduct in seeking injunctive

13   relief, apart from Motorola's general course of conduct,

14   violated Motorola's duty of good faith and fair dealing with

15   respect to Motorola's contractual commitment?"

16        So I would just like to focus on the words "apart from

17   Motorola's general course of conduct," in that statement.

18   This question asks you to focus on Motorola's pursuit of

19   injunctive relief, because you can only award legal costs to

20   Microsoft for that part of Motorola's breach.  In other

21   words, what the court is saying is, exclude the general

22   course of conduct, but if Motorola's conduct in seeking

23   injunctive relief violated its duty of good faith, then you

24   should award the legal fees that Mr. Killough segregated out

25   that are related -- which is all of the legal fees that he

```
 1    segregated out, are related to the pursuit of injunctive

 2    relief.

 3              THE COURT:  Three minutes, counsel.

 4              MR. HARRIGAN:  Three.  Thank you.

 5        Mr. Pritikin just gave me a little guidance -- which he

 6    frequently does -- that the Android phone case is not

 7    remotely a defense to the claim that Microsoft is making

 8    against Motorola based upon the breach of the RAND

 9    commitment.  The fact that Motorola and Microsoft had some

10    other argument and that Motorola was upset about it, or

11    thought that Microsoft was doing something unfair, or was

12    launching a surprise attack, none of those things have any

13    effect on Motorola's RAND obligation.

14        The whole point of the RAND obligation is, no matter what

15    happens, you have to make your standards-essential patents

16    available to everyone -- everyone includes somebody you're

17    mad at -- on reasonable and non-discriminatory terms.  And

18    that is what Motorola did not do.  And the reason it did not

19    do it is it wanted to hold them hostage, so it could go to

20    Germany and say, Your Honor, they don't have a license -- or

21    whatever they call judges over there -- they don't have a

22    license, and therefore they should be enjoined.  And that put

23    enormous pressure on Microsoft, until this court stopped them

24    in their tracks in April of 2012, and until Microsoft, in its

25    other way of dealing with it, spent $23 million moving its
```

1   distribution facility into the Netherlands.

2       Thank you very much.

3           THE COURT:  Thank you, counsel.  Well, ladies and

4   gentlemen, at this point you have become the most important

5   people here -- not that you haven't been all the way along --

6   because the case now belongs to you.  I have been handed a

7   note by the clerk that says, "Would you please go through

8   your schedule for tomorrow?"  So I will start with today.

9   Your lunch is back there.  You can deliberate until around

10  4:20, and then I will bring you out and read you your

11  good-night message.  Or if you want to go until 5 o'clock,

12  I'll bring you out at 4:50 and then read the same thing.  But

13  that's today.

14      Tomorrow morning, we don't ask you to come out into the

15  courtroom before you start.  You just can't start

16  deliberating until everybody gets there.  So if you want to

17  come at 8:30, or if you want to come at 9 o'clock, work that

18  out among yourselves.  We, once again, will bring in your

19  lunch.  It's very important that we keep you well fed.

20      The court has no control, and wouldn't want any control,

21  over how long it takes you to deliberate on this case.

22  You're free to deliberate until 4:30 tomorrow, if it takes

23  you that long.  I'm not trying to suggest one way or the

24  other.

25      I'm going to leave at 1:30, because I need to go to

1    Sea-Tac and get on a 3 o'clock airplane.  My concerns are

2    that if you have questions, I consult with the lawyers before

3    I answer the question, and if I'm on an airplane, I can't

4    consult.  So there's going to be some delay in that.

5        And if you do reach a verdict, I could have the option of

6    asking another judge to take it.  But my preference would be

7    to have the opportunity to have you hand it to the clerk, the

8    clerk hands it to me, I read it and make sure it's internally

9    consistent, then we announce it to the parties.  I'm a little

10   concerned, given the complexity of this case, that if there

11   is an issue, that someone sitting up here and trying to be

12   the judge is going to go, "What was this case even about?"

13   So that's why I'm concerned about Friday.  We may reach it,

14   we may not.  That's entirely up to you.  So hopefully that is

15   some additional guidance.

16       I understand that people have commitments, and I'm going

17   to discuss that with the lawyers here in a moment.  But

18   that's the best guidance I can give you on that question.

19   Other than that, ladies and gentlemen, I'm sure you would all

20   like to stand up and stretch your legs.  So you can do that

21   by retiring to the jury room.  You'll get the exhibits, and

22   your lunch is already there.  And we will all be awaiting,

23   with interest, your result.

24       (The following occurred outside the presence of the jury.)

25           THE COURT:  Counsel, Juror No. 4 has airplane tickets

```
 1   on Friday.  She's indicated that she will change her flight.
 2   It seems to me there is nothing that we should do in that
 3   regard until sometime tomorrow.  If she announces that she
 4   doesn't want to change her flight and she wants to go, I'm
 5   going to need some guidance from the parties on whether I
 6   release the juror or not.  So you might start to think about
 7   that question.  You have a six-person jury, we have two
 8   additional, so we can lose one without any consequence.  But
 9   I want you to know it is Juror No. 4.  And that's what the
10   concern is.  This is not her grandmother dying, unless her
11   grandmother lives in Orlando.  That's what I know and now you
12   do, also.
13       Mr. Harrigan, anything further at this time?
14           MR. HARRIGAN:  Nothing, unless Mr. Pritikin thinks
15   there is.
16           MR. PRITIKIN:  No, sir.
17           THE COURT:  All right.  Mr. Price?
18           MR. PRICE:  No.
19           THE COURT:  Counsel, my rule is if I can deal with a
20   question by simply calling you, I will do so.  So you need to
21   leave your cell numbers and you need to make sure that you
22   have some space in your box, so if we have to leave you a
23   message, we can do that.  I know how those messages
24   accumulate while you're in trial.
25       If I don't think we can do it over the phone because it
```

1    requires a more in-depth discussion, I'm going to ask you to

2    come back.  I'd ask you to be accessible to the courthouse

3    within ten minutes or so, so we can handle those matters.

4    Counsel, thank you.

5        And if I don't hear anything from them, which is possible,

6    I will either bring them out at around 4:20 or 4:50,

7    depending on if they want to work a little bit longer, and

8    read them the standard, "Don't talk to anyone" instruction

9    and then send them home.

10        It's up to you whether you want to attend or not attend

11    that.  All I would ask is that if you do attend, don't all

12    line up in the hallway to watch them come in and out of the

13    elevator.  Other than that, we will be in recess.  Thank you,

14    counsel.

15            (The clerk brought out a note from a juror.)

16            THE COURT:  Don't go away.  The question is, "If we

17    decide Thursday afternoon, can one or two of us not be here

18    on Friday morning?"  I believe the answer to that is no, if

19    anyone wants to poll the jury.  Mr. Harrigan?  Mr. Pritikin.

20            MR. PRITIKIN:  Unfortunately, Your Honor, I think

21    they would all have to be here if the verdict is going to be

22    returned on Friday morning.

23            THE COURT:  Mr. Price, you agree?

24            MR. PRICE:  I agree.

25            THE COURT:  So do I.  And the other thing will be if

1  she wants to seek to be excluded from the jury, that's one

2  way out of that problem.  Thank you.

3              (The proceedings recessed.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2

3

4       We, Barry Fanning and Debbie Zurn, Official Court

5   Reporters for the United States District Court, Western

6   District of Washington, certify that the foregoing is a true

7   and correct transcript from the record of proceedings in the

8   above-entitled matter.

9

10

11   DATED this ^  day of August, 2013.

12

13

14   /s/ Barry Fanning              /s/ Debbie Zurn

15   Barry Fanning, Court Reporter    Debbie Zurn, Court Reporter

16

17

18

19

20

21

22

23

24

25